Nos. 22-15529, 22-15532, 22-15534, 22-15535, 22-15536, 22-15537, 22-15626, 22-15627, 22-15628

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

DEFENDERS OF WILDLIFE, et al.,

*Plaintiff-Appellees*;

v.

UNITED STATES FISH AND WILDLIFE SERVICE, et al.,

*Defendants-Appellants*;

and

STATE OF UTAH, et al.,

*Intervenor-Defendants-Appellants*.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF CALIFORNIA
NOS. 4:21-CV-344, 4:21-CV-349, AND 4:21-CV-561 (HON. JEFFREY S. WHITE)

## BRIEF OF IDAHO AS *AMICI CURIAE* IN SUPPORT OF DE-
## FENDANTS-APPELLANTS, INTERVENORS-DEFENDANTS-AP-
## PELLANTS, AND REVERSAL

RAÚL R. LABRADOR, ATTORNEY GENERAL
SCOTT L. CAMPBELL, Chief of Energy and Natural Resources Division
OWEN MORONEY, Deputy Attorney General
600 S. Walnut Street, P.O. Box 25, Boise, ID 83707
(208) 334-3715, owen.moroney@idfg.idaho.gov
*Counsel for Amicus State of Idaho*

# Table of Contents

SUMMARY OF THE ARGUMENT ................................................... 1

INTEREST OF Amici Curiae ................................................... 2

BACKGROUND ................................................................ 3

I. Statutory Background ................................................... 3

II. Biological Background ................................................. 5

III. Regulatory Background ................................................ 7

ARGUMENT .................................................................. 12

I. The District Court erred by failing to recognize a plain lack of Endangered Species Act jurisdiction ................................ 12

    A. The Endangered Species Act's Definition of Species. .... 14

    B. Endangered Species Act Terms Applied to Listed Wolves ....................................... Error! Bookmark not defined.

CONCLUSION ....................................... Error! Bookmark not defined.

CERTIFICATE OF SERVICE ................................................... 26

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ........................... 27

## Cases

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ........................................................................ 14, 18

*City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290 (2013) ........................... 12

*Crow Indian Tribe v. United States*, 965 F.3d 662 (9th Cir. 2020) ........ 23

*Defs. of Wildlife v. Dep't of Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005) ................................................................................................ 21

*Defs. of Wildlife v. Zinke*, 849 F.3d 1077 (D.C. Cir. 2017) ...................... 8

*Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, 584 F. Supp. 3d 812 (N.D. Cal. 2022) ................................................................................ 12, 22, 24

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) .......................................................................................... 12

*Food Mktg. Inst. v. Argus Leader Media*, 139 U.S. 2356 (2019) ....... 13, 23

*Hughes v. Oklahoma*, 441 U.S. 322 (1979) ............................................... 2

*Humane Soc'y v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017) .................... 23, 24

*Lacoste v. Dep't of Conservation of State of Louisiana*, 263 U.S. 545 (1924) ............................................................................................... 2

*Lamie v. U.S. Tr.*, 540 U.S. 526 (2004) .................................................. 13

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ............. 14

*McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020). ....................................... 13

*Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005). ........ 21

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) ..................................... 12

*Schroeder v. United States*, 793 F.3d 1080 (9th Cir. 2015 .............. 13, 22

*The Wilderness Soc. v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051 (9th Cir. 2003) ......................................................................... 13

*Trout Unlimited v. Lohn*, 559 F.3d 946 (9th Cir. 2009). ................. 14, 24

*United States v. LKAV*, 712 F.3d 436 (9th Cir. 2013) ........................... 13

## Statutes

5 U.S.C. § 706 ........................................................................................ 12

16 U.S.C. § 1531 .......................................................................... 2, 3, 14

16 U.S.C. § 1532 .......................................................................... 3, 4, 15

16 U.S.C. § 1533 ...................................................................................... 4

16 U.S.C. § 1536 .................................................................................... 14

16 U.S.C. § 1538 .................................................................................... 14

16 U.S.C. § 1539 .................................................................................... 14

Pub. L. 93-205, 87 Stat. 884, 886 (1973) ............................................... 4

## Other Authorities

Merriam-Webster, Definition of "Distinct," *available at* https://www.merriam-webster.com/dictionary/distinct#:~:text=distinct%2C%20separate%2C%20discrete%20mean%20not,two%20distinct%20versions (accessed Sept. 5, 2024) ....................................................................................... 19

Senate Report No. 96-151 (May 15, 1979) ....................................... 15, 16

## Rules

Federal Rule of Appellate Procedure 29 ................................................... 1

# Regulations

50 C.F.R. 17 .................................................................... 8424.11

50 C.F.R. §§ 17.11 ......................................................................3

50 C.F.R. §§ 17.12 ......................................................................3

50 C.F.R. § 424.11 .....................................................................4

61 Fed. Reg. 4,722 (February 7, 1996) ................................. 15, 16, 17, 19

74 Fed. Reg. 15,123 (Apr. 2, 2009) .............................................8

77 Fed. Reg. 55,530 (Sept. 10, 2012) .........................................8

82 Fed. Reg. 20,284 (May 1, 2017) ............................................8

85 Fed. Reg. 69,778 (Nov. 3, 2020) ...........................................11

Final Rule, 43 Fed. Reg. 9,607 (March 9, 1978) .......................7

Rule Pub. L. 112–10, 125 Stat. 38 (2011) (Section 1713) ........8

The State of Idaho respectfully submits this brief as amicus curiae pursuant to Federal Rule of Appellate Procedure 29(a).

## Summary of the Argument

The State of Idaho addresses a single issue—statutory jurisdiction. Endangered Species Act (hereinafter "ESA" or "Act") statutory jurisdiction, which the District Court did not address, is limited to entities that are "species." The "lower 48" gray wolf listed entity clearly is not one of the three entities qualifying as "species" for purposes of ESA jurisdiction. The listed entity is not a: (1) biological species, (2) biological subspecies, or (3) distinct population segment that interbreeds when mature.

Instead, the "lower-48" listing is a non-biological hodgepodge. Biolgoically indistinct wolves are carved out from wolves in Alaska and Canada (where wolves are not ESA-listed) and the delisted Northern Rocky Mountain DPS (Idaho, Montana, Wyoming and portions of Oregon and Washington). The lower-48 listing also includes multiple states outside of historic range entirely. *See* maps shown in Figures, *infra* at 9.

The ESA precludes the Service from recognizing something other than a "species" as threatened or endangered. The exceedance of statutory jurisdiction for this gray wolf non-species is not a trifling legal

matter. Continuing ESA protections when they are unnecessary for the viability of gray wolves diverts federal resources away from biological resources at risk of extinction—away from the ESA's actual statutory purpose. This diversion of resources affects conservation not only in Idaho, but the rest of our nation and globe. The ESA was never intended to be a general biodiversity statute, or to provide perpetual protection solely addressing social—not biological—concerns.

## Interest of Amici Curiae

The State of Idaho has a significant interest in the correct interpretation of the ESA, 16 U.S.C. § 1531 et. seq.[1] Since passage of the ESA, Idaho has worked to recover listed populations, such as grizzly bears and wolves, under the terms of the ESA. Idaho's resources are not unlimited, and the State should be able to target its resources towards species with actual conservation issues. Court precedent, combined with a non-

_____

[1] The Supreme Court has long recognized state's sovereign trustee power over wildlife management. *Lacoste v. Dep't of Conservation of State of Louisiana*, 263 U.S. 545, 549 (1924) ("The wild animals within its borders are, so far as capable of ownership, owned by the state in its sovereign capacity for the common benefit of all of its people."); *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979) ("[P]rotection of the wildlife of a state is peculiarly within the police power of the state, and the state has great latitude in determining what means are appropriate for its protection.").

adherence to a key-stone defined term in the ESA, "species," has resulted in expansive listings, diverting limited conservation resources. Furthermore, delisting decisions are important to Idaho, because the ESA listing preempts state and tribal sovereign authorities over resident wildlife species within their respective jurisdictions. In this case the United States Fish and Wildlife Service (Service) interpreted the ESA correctly and its well-reasoned rule should be upheld.

## Background

### I.    Statutory Background

Congress enacted the ESA in 1973 to "provide a program for the conservation of [] endangered species and threatened species." 16 U.S.C. § 1531(b). The term "species," contained in the very name of the Act, is a central cornerstone to agency authority and jurisdiction under the Act. Such species are "listed" on the Lists of Endangered and Threatened Wildlife and Plants, 50 C.F.R. §§ 17.11, 17.12. Under the Act, the goal of conserving a "species" is "to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532. The ESA requires the Service to review the list of endangered and threatened species and

determine whether any species should be delisted. 16 U.S.C. § 1533(c)(2); 50 C.F.R. § 424.11(e). For listing and delisting decisions to occur, the Service must identify a "species" at issue and then consider five statutory factors as applied to the "species," to determine whether it meets the definition of an "endangered species" or a "threatened species." 16 U.S.C. § 1533(a)(1)(A)-(E).

The term "species" has a specific meaning: it is a creature of the Act, encompassing three things. Congress defined "species" as a (1) species, (2) subspecies, or (3) "distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

When the Act was originally adopted in 1973, Congress defined the term "species" to include species, subspecies or "any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature." Pub. L. 93-205, 87 Stat. 884, 886 (1973). In November 1978, Congress amended the Act to restrict the definition to distinct population segments (DPS). 16 U.S.C. 1532(16).

When a "species" recovers and the Service removes ESA protections, it must monitor the species for at least five years. 16 U.S.C. §

1533(g). If the monitoring reveals a "significant risk" to the species, the ESA permits the Service to relist the species using the ESA's emergency listing procedures. *Id.*

## II.    Biological Background

Gray wolves are truly one of the most adaptable mammals on earth, with an ability to have large annual litters, allowing wolf populations to rapidly increase in size. ER 428, 451. Further, the ability to disperse long distances allows wolf populations to quickly expand and recolonize vacant habitats. ER 429. Indeed, the species' astounding reproductive and dispersal capability have been found to compensate for annual mortality rates as high as 48 percent of a given population. ER 323.

Gray wolves historically occupied a good portion of the lower 48 United States but were reportedly absent from coastal and interior portions of California, the arid deserts and mountaintops of the western United States, and parts of the eastern and southeastern United States. ER 431-32. Gray wolf range and numbers in the lower 48 United States declined significantly during the 1800s and early 1900s through poisoning, unregulated trapping and shooting, and government-funded wolf-extermination efforts. ER 314. Gray wolves were largely eliminated from

the western United States by the early 1900s and persisted only in remote northeastern Minnesota through the 1960s. ER 432-34.

Following this period, the Service, in partnership with States and Tribes, began efforts to recover wolf populations in the lower 48 States and, in accord with the species remarkable reproductive and dispersal abilities, experienced great success. In the western United States, the Service reintroduced gray wolves into central Idaho and Yellowstone National Park in the mid-1990s, ER 437, and the populations skyrocketed, soon achieving recovery plan objectives, ER 318. In only seven years, the Northern Rocky Mountain population grew from 101 wolves in 1995, to a conservative minimum population estimate of 663 wolves distributed throughout Idaho, Montana, and Wyoming by the end of 2002. ER 437. By the end of 2015, the final year of a combined population estimate that was part of the post-delisting monitoring for Idaho and Montana, the population reached a minimum estimated size of 1,704 wolves. ER 437. In 2019, Idaho, Montana, and Wyoming estimated well over 2,000 wolves. ER 438. This increase occurred in concert with expansion of hunting and trapping in the three states. Today, gray wolves exist within the lower 48 states in the Northern Rocky Mountains and Great Lake regions, as well

as a separate Mexican wolf subspecies listed in the southwest. ER 449; ER 311 (identifying separate listing of the Mexican wolf subspecies). In reality, these two wolf populations connect in Canada and Alaska, where wolves have never been listed under the ESA. ER 449-50. Today, this large block of gray wolves numbers in the tens of thousands, and constitutes a robust, healthy and broadly distributed population of wolves in North America. Gray wolves also occur in Europe and Asia.

### III.   Regulatory Background

Beginning in the late 1960s, the Service began protecting gray wolves under the predecessor statute to the ESA, and then under the ESA following its passage in 1973. ER 306-07. In 1978, the Service reclassified the gray wolf listing from multiple subspecies entities to two entities: threatened in Minnesota and endangered throughout the remaining 48 coterminous United States and Mexico. *See* Final Rule, 43 Fed. Reg. 9,607 (March 9, 1978). This listing included large areas where wolves were extirpated and areas outside the species' historical range. ER 308, 432.

Following listing, and in accord with the species astounding reproductive and dispersal capability, gray wolf populations rapidly expanded

in the lower 48 States. As described above, wolves were released in central Idaho and Yellowstone National Park in the mid-1990s and populations increase exponentially. *Supra* at 6.

Following a period of protracted litigation, Congress mandated that the Service reissue a 2009 rule designating a distinct population of gray wolves in the northern Rocky Mountains ("Northern Rocky Mountain Distinct Population Segment" or "NRM DPS"), removing ESA protection for all except those in Wyoming. ER 307; Rule Pub. L. 112–10, 125 Stat. 38 (2011) (Section 1713); 50 C.F.R. 17, 74 Fed. Reg. 15,123 (Apr. 2, 2009). In 2012, the Service removed ESA protections for wolves in Wyoming and essentially added them to the NRM DPS. 77 Fed. Reg. 55,530 (Sept. 10, 2012). A lower court vacated that delisting rule, but the D.C. Circuit reversed. *Defs. of Wildlife v. Zinke*, 849 F.3d 1077 (D.C. Cir. 2017); 82 Fed. Reg. 20,284 (May 1, 2017). This resulted in a listed gray wolf entity as reflected on the next page:



**Figure 1:** Current legal status of *C. lupus* under the Act. Northern Rocky Mountains DPS and Mexican Wolf Non-Essential Experimental Population are not part of the currently listed entities.

ER 308. However, as acknowledged by the Service, portions of this listed area never contained gray wolves:



**Figure 1.** Historical range and current range of the gray wolf (*Canis lupus*) in the lower 48 United States.

ER 432. Thus, Florida, Alabama, Mississippi, Louisiana, and Arkansas never appear to have contained wolves. *Id.* Additionally, large swaths of states like California, Texas, Missouri, Tennessee, Georgia, South Carolina, and North Carolina also appear to have never contained grey wolves. *Id.*

Currently, the "lower 48 listing" contained in the Service's 1978 Rule is a hodgepodge, tracing its origins to regulatory, judicial, and Congressional actions, rather than biology or adherence to ESA terms. First, Congressional action directed the reissuance of the 2009 rule identifying the NRM DPS and delisting the DPS except for the portion in Wyoming. *Supra* at 8. Second, a 2012 Rule, upheld in litigation, delisted wolves in Wyoming, joining the rest of the delisted NRM DPS. *Supra* at 8. Third, the Service designated an endangered Mexican wolf subspecies in 2015 and now manages this subspecies separately from other gray wolves in the lower 48 States. ER 435. Thus, as of 2019, gray wolves are listed as threatened in Minnesota and endangered in the 44-State entity (exempting the NRM DPS and the range of what is deemed the Mexican wolf subspecies). ER 306, 308.

This lawsuit concerns the Service's efforts to remedy the remaining orderless patchwork listing of grey wolves through a final rule issued in 2020 (2020 Rule). Endangered and Threatened Wildlife and Plants; Removing the Gray Wolf (Canis lupus) From the List of Endangered and Threatened Wildlife," 85 Fed. Reg. 69,778 (Nov. 3, 2020). Following a great deal of public comment and peer review, the Service issued the 2020 Rule removing regulatory protections for the two prior listed entities—the Minnesota entity and the 44-State entity. ER 304. In the Rule, the Service first concluded that neither entity constitutes a "species" as Congress defined the term and that the Service could not protect these entities as a separate "species." ER 309-10. The Service also decided to review the "status of gray wolves in several configurations . . . to eliminate the possibility of removing protections for any gray wolves that might meet the Act's definition of a 'species' and might be endangered or threatened." ER 310.

The 2020 Rule was challenged in the present case, and among other holdings, the District Court vacated and remanded the 2020 Rule holding that the Service could not rely on the definition of "species" as an independent basis for delisting wolves. *Defs. of Wildlife v. U.S. Fish & Wildlife*

*Serv.*, 584 F. Supp. 3d 812, 821-23 (N.D. Cal. 2022) (ER 29). The District Court's decision does not reconcile its reasoning with the terms of the ESA on this point. The Service along with various Intervenor Defendants now appeals the District Courts ruling. The State of Idaho submits this amicus brief solely with respect to the jurisdictional interpretation of the term "species."

## Argument

### I. The District Court erred by failing to recognize a plain lack of Endangered Species Act jurisdiction.

"[A]n administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). Agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires." *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 291 (2013). Indeed, the applicable scope of review under the Administrative Procedure Act (APA) places agency authority/ jurisdiction front and center. *See* 5 U.S.C. § 706(2)(C). That standard of review requires courts to determine

whether the Service's final action is "in *excess of statutory jurisdiction, authority*, or limitation, or *short of statutory right*." *Id.*

Statutory interpretation begins with "a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 139 U.S. 2356, 2364 (2019). When the statute's meaning is plain, "the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." *Schroeder v. United States*, 793 F.3d 1080, 1083 (9th Cir. 2015) (citing *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004)). Understanding a statute's plain meaning requires an analysis of "the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). Thus, courts rely on "established rules of statutory construction" to understand a statute's meaning. *United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013); *see also The Wilderness Soc. v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir. 2003) ("Canons of statutory construction help give meaning to a statute's words."). Only if the language is ambiguous may the court look to extratextual sources to construe the meaning of the act. *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2469 (2020).

The Supreme Court recently overruled what has been known as the *Chevron* doctrine. *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) (overruling *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). Courts must now "exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enterprises*, 144 S. Ct. at 2273. "[C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.*

## A. The Endangered Species Act's Definition of Species.

As the name implies, the ESA has as singular focus on conserving "species" to the point that listing is not necessary. In the Act, Congress defined "species;" provided the Service with authority to list a "species" as threatened or endangered; and structured the remaining portions of the ESA to serve the goal of recovering "species." 16 U.S.C. §§ 1532(16), 1533(a)(1), 1531(b), 1533(f)(1), 1536(a), 1538, 1539. Thus, this Court has recognized that the "first" inquiry applicable to listing is determining whether a population of fish or wildlife constitutes a "species" within the meaning of the ESA. *Trout Unlimited v. Lohn*, 559 F.3d 946, 949 (9th Cir. 2009). The task of defining a "species" should be "neutral." *Id.* at 955.

"Species" is a defined term. It includes taxonomic species and sub-species, as well as "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). Congress did not define the term "distinct population segment", and so the Service and the National Marine Fisheries Service (NMFS) promulgated a joint DPS Policy in 1996. 61 Fed. Reg. 4,722 (February 7, 1996).

The 1996 DPS Policy recognized Congress's instruction to exercise the authority to designate DPSs "sparingly and only when the biological evidence indicates that such action is warranted." 61 Fed. Reg. 4722 (citing Senate Report 151, 96th Congress, 1st Session). The policy clearly indicates the purpose of the DPS Policy is to "better judge and concentrate their efforts toward the conservation of biological resources at risk of extinction," and refers to "the ability to address local issues (without the need to list, recover, and consult rangewide)" resulting in a more effective conservation program. *Id.* at 4,725. While recent courts have quoted this language in regard to assessing identification of a DPS from within a historic listed entity, *infra* at 23, it applies to examination of whether a listed entity is a species in the first place.

The 1996 DPS Policy discusses Senate Report No. 96-151 (May 15, 1979), in which the Senate Committee rejected calls to remove authority to designate DPSs because that authority could lead to the listing of "squirrels in a specific city park" even though an abundance of squirrels lived in "other parks in the same city, or elsewhere." Report at 6-7. The Committee equated protecting squirrels in a city park with an abuse of the DPS concept, not a proper application of it. Report at 7. Congress did not intend for USFWS to protect haphazard groupings of animals as threatened or endangered. *Id.* As summed up in the DPS Policy:

> The Services consider the Act to be directed at maintenance of species and populations as elements of natural diversity. Consequently, the principal significance to be considered in a potential DPS will be the significance *to the taxon* to which it belongs ... the Act is not intended to establish a comprehensive biodiversity conservation program, and it would be improper for the Services to recognize a potential DPS as significant and afford it the Act's substantive protections solely or primarily on these grounds.

61 Fed. Reg. 4,724 (emphasis added).

Under the 1996 DPS Policy, USFWS considers three elements to determine whether the population segment is a valid DPS:

> 1. Discreteness of the population segment in relation to the remainder of the species to which it belongs;
>
> 2. The significance of the population segment to the species to which it belongs; and

3. The population segment's conservation status in relation to the Act's standards for listing (i.e., is the population segment, when treated as if it were a species, endangered or threatened?).

61 Fed. Reg. 4722, 4725. The Service may consider a population segment of a vertebrate species "discrete" if it satisfies either one of the following conditions:

1. It is markedly separated from other populations *of the same taxon* as a consequence of physical, physiological, ecological, or behavioral factors. Quantitative measures of genetic or morphological discontinuity may provide evidence of this separation.

2. It is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(l)(D) of the Act.

*Id.* at 4.724-25 (emphasis added).

For the significance element,

[i]f a population segment is considered discrete under one or more of the above considerations, its biological and ecological significance will then be considered in light of Congressional guidance (see Senate Report 151, 96th Congress, 1st Session) that the authority to list DPSs be used "sparingly" while encouraging the conservation of genetic diversity. In carrying out this examination, the Service will consider available scientific evidence of *the discrete population segment's importance to the taxon to which it belongs*. This consideration may include, but is not limited to, the following:

1. Persistence of the discrete population segment in an ecological setting unusual or unique for the taxon.

2. Evidence that loss of the discrete population segment would result in a significant gap in the range of a taxon.

3. Evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range, or

4. Evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics.

*Id.* at 4,725 (emphasis added).

It is notable that under *Loper Bright Enterprises*, to the extent not already litigated, this Court no longer owes any *Chevron* deference to the Service's interpretation of terms, to the extent they are ambiguous, under the DPS Policy. This brief, however, still uses the policy as a guidepost to interpret the undefined DPS term.

## B. Endangered Species Act Terms Applied to Listed Wolves.

The listed wolf entity plainly is not a "species" as it fails to qualify as a taxonomic species, subspecies, or distinct population segment. The two currently listed gray wolf entities at dispute are in (1) Minnesota (listed as threatened) and (2) portions of 44 U.S. States and Mexico (listed as endangered). ER 309. Neither of the entities encompasses an entire

species, or a subspecies, of gray wolf. *Id.* Gray wolves have a circumpolar range including North America, Europe, and Asia and there is no dispute that the species is secure. ER 428. Thus, the currently listed entities would only constitute listable entities, meeting the statutory definition of "species," if they qualified as DPSs. ER 309.

As described above, a population must be both discrete and significant to the remainder of its taxon to qualify as a DPS. *Supra* at 16-17. Here, the complete failure of the listed entities to meet any condition of discreteness should be dispositive. Under the DPS policy, to be discrete a population segment must be markedly separate from other members of the species because of "physical, physiological, ecological, or behavioral factors." 61 Fed. Reg. at 4,725. The "discrete" term relates to the DPS term "distinct," which is defined as "distinguishable to the eye or mind as being discrete or *not the same*."[2] Yet, here we have listed gray wolf populations that are *every bit the same* as surrounding populations—in other words not discrete. Minnesota wolves are physically, ecologically,

---

[2] Merriam-Webster, Definition of "Distinct," *available at* https://www.merriam-webster.com/dictionary/distinct#:~:text=distinct%2C%20separate%2C%20discrete%20mean%20not,two%20distinct%20versions (accessed Sept. 5, 2024) (emphasis added).

behaviorally, and genetically connected to wolves in Wisconsin, Michigan, other surrounding States, and Canada and are thus not distinct from the 44-State entity. ER 309. Likewise, the 44-State entity is not a DPS. Within the listed entity, wolves in the Great Lakes Region do not interact with wolves in the Northern Rocky Mountains. However, North America's gray wolves are connected from Alaska through Canada, with one arm extending into the Great Lakes Region and the other extension into the Rocky Mountains. ER 309-10. There is no argument that the listed wolf entities are not "discrete" or "distinct" from surrounding populations of gray wolves. Thus, the Service was correct in determining that no valid DPS existed.

The listed wolf entities are also overbroad, containing areas lacking historical grey wolf populations. This overbreadth results in a listed entity that fails to meet the statutory definition of "species," as listing wolf populations that never existed cannot be listing a "population." As the Service has acknowledged, "[i]n the lower 48 United States, gray wolves were reportedly absent from coastal and interior portions of California, the arid deserts and mountaintops of the western United States, and parts of the eastern and southeastern United States. ER 431; *supra* at 9.

The fact that the 44-State entity includes large swaths of the country where wolves were never present is another reason that the listing fails to meet the statutory definition of "species."

Two district court cases highlight the fact that a "species" designation should be based upon biology, not other factors such as geography. Those cases address a 2003 Rule that reclassified the 1978 wolf listing into three DPSs—Eastern, a Western, and a Southwestern DPSs. *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005); *Defs. of Wildlife v. Dep't of Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005)). The courts rejected those DPS classifications because the Service lumped large swaths of historical habitat into the range of extant populations, thus designating DPSs "based upon geography, not biology." *See Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 564. The Service's decision in the 2020 Rule is in accord with these cases, remedying the issues that those courts recognized. The listed Minnesota and 44-State entities include areas of unoccupied and never occupied habitat. *Supra* at 9-10. They simply represent geographic areas, not biologically delineated "species" and as such are outside the jurisdiction of the Act.

The District Court unaccountably ignored the jurisdictional issue. *See Defs. of Wildlife*, 584 F. Supp. 3d at 821-23 (ER 10-13). The jurisdictional failure of the gray wolf entities to meet the statutory definition of "species" was plainly addressed in the delisting rule, ER 309, and the U.S.'s summary judgment briefing, Dkt. 107 at 18.

While the District Court did not address the text of the ESA, it indirectly addressed the text in two erroneous ways. First, the District Court seemed to imply the ESA grandfathered historical listings occurring prior to 1978. The ESA does no such thing. The District Court implied such grandfathering when it stated, "there is nothing in the statute that suggests that Congress intended the 1978 amendments to the ESA [changing the definition of "species"] to remove protections for already-listed entities." *Defs. of Wildlife*, 584 F. Supp. 3d at 822 (ER 11). This is an erroneous misapplication of the law as the plain text of the ESA should control. *Schroeder*, 793 F.3d at 1083 (When the statute's meaning is plain, "the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms."). Without express grandfather language, it is erroneous to rely on historical versions of the ESA—without such language occurring in

current law. Statutory interpretation begins with "a careful examination of the ordinary meaning and structure of the law itself," not language read into the law. *See Food Mktg. Inst.*, 139 U.S. at 2364.

Second, the District Court erred in analogizing the present case to *Humane Soc'y v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017) and *Crow Indian Tribe v. United States*, 965 F.3d 662 (9th Cir. 2020). In those cases, the Courts essentially held that the Service cannot designate and delist a DPS without analyzing the effects on the species' remnant population(s). *Humane* Soc'y, 865 F.3d at 603 (remanding a Service rule carving out a Western Great Lakes DPS of wolves and delisting it because the rule failed to analyze remaining wolf populations); *Crow Indian Tribe*, 965 F.3d at 678 (remanding a Service rule designating and delisting a Greater Yellowstone DPS of grizzly bears because the rule did not sufficiently analyze the effect on remnant populations). In contrast, in the present case no such designation of a smaller DPS occurred so the District Court's analogy was misplaced. *See Defs. of Wildlife*, 584 F.Supp.3d at 822-23.

The Service's 2020 Rule is actually in accord with the reasoning of *Humane Society* as it addresses the whole of the listed grey wolf entity.

*See Humane Soc'y*, 865 F.3d at 601 ("The Endangered Species Act's text requires the Service, when reviewing and redetermining the status of a species, to look at the whole picture of the listed species, not just a segment of it."). Addressing the whole of the listed entity and its failure to fit within the terms of the ESA is essential. In other words, if the Service follows the reasoning of *Humane Society* and the essential statutory structure of the ESA, it *must* analyze whether the whole of the listed entity is a "species." *Humane Soc'y of United States*, 865 F.3d at 601 ( ("The statute requires a comprehensive review of the entire listed species and its continuing status."); *Trout Unlimited*, 559 F.3d at 949 (describing the "first" inquiry as "decid[ing] whether a population of fish or wildlife constitutes a 'species' or a 'distinct population segment' within the meaning of the ESA").

Since it is obvious that the listed entity cannot meet this statutorily defined term, the Service's authority ends there. In contrast to the District Court's reasoning, following the plain text of the ESA is not a "backdoor route to *de facto* delisting" and is the opposite of a "statutory dodge." *See Defs. of Wildlife*, 584 F. Supp. 3d at 822-23 (ER 11-12). Delisting an entity that is not a species ends an unlawful listing. Extending statutory

jurisdiction beyond agency authority granted by that Congress is ultra vires. *See* Supra at 12.

The statutory terms and structure of the ESA plainly require the Service and a reviewing court to first identify whether any listed entity meets the statutory definition of "species." As the patchwork listed entities in this case clearly cannot meet this term, the inquiry should end there.

## Conclusion

For these reasons, the District Court's judgment should be reversed, and the Service's 2020 Rule should be upheld.

Respectfully submitted this 19th day of September, 2024.

*/s/ Owen Moroney*
OWEN MORONEY
Deputy Attorney General
600 S. Walnut Street
P.O. Box 25
Boise, ID 83707
*Counsel for Amicus State of Idaho*

## Certificate of Service

I hereby certify that on the date listed below, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: <u>September 19, 2024.</u>

<u>/s/ Owen Moroney</u>
OWEN MORONEY

**Form 8.** CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Numbers** 22-15529, 22-15532, 22-15534, 22-15535, 22-15536, 22-15537, 22-15626, 22-15627, 22-15628

I am the attorney or self-represented party.

This brief contains 5,123 words, including words manually counted in visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

**Signature:** /s/ *Owen Moroney*    **Date:** September 19, 2024