Nos. 22-15529, 22-15532, 22-15534, 22-15535, 22-15536,
22-15537, 22-15626, 22-15627, 22-15628

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

DEFENDERS OF WILDLIFE, et al.,
Plaintiffs-Appellees

v.

UNITED STATES FISH AND WILDLIFE SERVICE, et al.,
Defendants-Appellants

and

STATE OF UTAH, et al.,
Intervenor Defendants–Appellants

---

Appeal from the United States District Court
for the Northern District of California
Nos. 4:21-cv-00344-JSW, 4:21-cv-00349-JSW, and 4:21-cv-00561-JSW

---

**BRIEF OF AMICUS CURIAE
THE PROPERTY AND ENVIRONMENT RESEARCH CENTER
IN SUPPORT OF DEFENDANTS–APPELLANTS/REVERSAL**

---

JONATHAN WOOD
DYLAN P. SOARES
Property and Environment
Research Center (PERC)
2048 Analysis Drive, Suite A
Bozeman, Montana 59718-6829
Telephone: (406) 587-9591
Email: dsoares@perc.org

*Attorneys for Amicus Curiae*
*Property and Environment Research Center*

## Corporate Disclosure Statement

The Property and Environment Research Center is a nonprofit corporation organized under the laws of Montana, which has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

# Table of Contents

Corporate Disclosure Statement ...............................................................i

Table of Contents ...................................................................................ii

Table of Authorities............................................................................. iii

Statement of Interest of Amicus .............................................................1

Summary of the Argument .....................................................................4

Argument...............................................................................................8

    I.    *Humane Society* is specific to agencies recognizing a DPS of a
listed species to delist it ........................................................................8

    II.    The district court misinterpreted *Humane Society*.....................11

    III.    The district court's misinterpretation undermines incentives for
species recovery ..................................................................................15

Conclusion ..........................................................................................20

Certificate of Compliance with Type-Volume Limit, Typeface
Requirements, and Type-Style Requirements.......................................22

Certificate of Service ..........................................................................23

# Table of Authorities

**Cases**

*Crow Indian Tribe v. U.S.*, 965 F.3d 662 (9th Cir. 2020) ........... 10, 11, 13

*Def. of Wildlife v. Fish and Wildlife Serv.*, 584 F.Supp.3d 812 (N.D. Cal. 2022) ..................................................................... 7, 13, 14, 18

*Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017) 7, 9, 10, 13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ........................................................................... 15

*Protect Our Communities Foundation v. Jewell*, 825 F.3d 571 (9th Cir. 2016) ............................................................................. 14

*Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002) ................. 10

**Statutes**

16 U.S.C. § 1532(16) ................................................................. 10

16 U.S.C. § 1532(3) ................................................................... 8

16 U.S.C. § 1533(a) .................................................................. 10

**Other Authorities**

Betsy Carpenter, *The Best-Laid Plans*, 115 U.S. News & World Rep. 89 (1993) ............................................................................. 16

Brief for Pacific Legal Foundation and PERC, as Amici Curiae Supporting Defendants-Appellants, *Crow Indian Tribe v. U.S.*, 965 F.3d 662 (9th Cir. 2020) ...................................................... 3

Brief for PERC, as Amicus Curiae Supporting Defendants-Appellees, *N. Cascades Conservation Council v. Forest Serv.*, No. 24-1422 (9th Cir. filed Aug. 9, 2024) ................................................................. 3

Dept. of the Interior, *2017/2018 Annual Performance Plan & 2016 Report* 15 (2017) ...................................................................... 2

Dr. Katherine Wright & Shawn Regan, *Missing the Mark: How the Endangered Species Act Falls Short of Its Own Recovery Goals* (2023) 2

Establishment of a Nonessential Experimental Population of the Gray Wolf in Colorado, 88 Fed. Reg. 10,258 (Feb. 17, 2023 ......................... 19

Establishment of a Nonessential Experimental Population of the Gray Wolf in Colorado, 88 Fed. Reg. 77,014 (Nov. 8, 2023 .................... 19, 20

Fish & Wildlife Serv., *Environmental Conservation Online: Species Reports: Delisted Species* (last visited Sept. 16, 2024) .......................... 6

Fish & Wildlife Serv., *ESA Basics: 50 Years of Conserving Endangered Species* (2023) ................................................................. 8, 16

Fish & Wildlife Serv., *Federal and State Endangered and Threated Species Expenditures: Fiscal Year 2019* 113 (2019) ............................ 17

Fish & Wildlife Serv., *Federal and State Endangered and Threatened Species Expenditures: Fiscal Year 2018* 14 (2018) ............................ 17

Hank Fischer, *Who Pays for Wolves?: How Markets Helped Reduce Conflict Between Ranchers and Wolves*, PERC Reports (2001) ............. 5

*Hearing on the ESA at 50 Before the H. Nat. Res. Comm., Subcomm. on Water, Wildlife, and Fisheries*, 118th Cong. (2023) .............................. 3

J. Michael Scott, et al., *Conservation-reliant species and the future of conservation*, 3 Conservation Letters 91 (2010) ................................... 15

Jonathan Wood & Tate Watkins, *Critical Habitat's "Private Land Problem": Lessons from the Dusky Gopher Frog*, 51 Envtl. L. Rep. 10,565 (2021); ............................................................................. 2

Jonathan Wood, *The Road to Recovery: How Restoring the Endangered Species Act's Two-Step Process Can Prevent Extinction and Promote Recovery*, PERC Pol'y Rep. (2018) .......................................................... 3

Leah R. Gerber, et al., *Endangered species recovery: A resource allocation problem*, 362 Science 284 (2018). .................................... 6, 17

*Legis. Hearing on the Recovering Am.'s Wildlife Act, Before the S. Comm. On Env't & Pub. Works*, 117th Cong. (2021) ............................ 3

Megan Evansen & Andrew Carter, *Funding Needs for the US Fish and Wildlife Service's Endangered Species Programs*, Defenders of Wildlife (2024) ..................................................................................... 18

iv

PERC, *A Field Guide for Wildlife Recovery: The Endangered Species Act's Elusive Search to Recover Species—and what to do About it* (2023) .............................................................................................. 2, 6

PERC, *Grizzly Conflict Reduction Grazing Agreement*, (last visited Sept. 19, 2024) .................................................................................................. 4

Removal of the Interior Least Tern for the Federal List of Endangered and Threatened Wildlife, 86 Fed. Reg. 2,564 (Jan. 13, 2021) ............. 12

Removing the Gray Wolf (Canis Lupis) From the List of Endangered and Threatened Wildlife, 85 Fed. Reg. 69,778 (Nov. 3, 2020) 4, 5, 6, 11, 12

Removing the Kirtland's Warbler From the Federal List of Endangered and Threatened Wildlife, 84 Fed. Reg. 54,436 (Oct. 9, 2019 ............... 12

The Property and Environment Research Center (PERC) respectfully submits this amicus brief supporting Defendants-Appellees United States Fish and Wildlife Service et al., Intervenor-Defendants the state of Utah, et al., and reversal of the district court's summary judgment ruling.[1]

## Statement of Interest of Amicus

PERC is the national leader in market solutions for conservation, with over 40 years of research and a network of respected scholars and practitioners. Through research, law and policy, and innovative field conservation programs, PERC explores how aligning incentives for environmental stewardship produces sustainable outcomes for land, water, and wildlife. Founded in 1980, PERC is nonprofit, nonpartisan, and proudly based in Bozeman, Montana.

---

[1] Pursuant to FRAP 29(a)(2), all parties have consented to the filing of this amicus brief, with Appellees asking that the brief state that they take no position on its filing. No counsel for a party authored this brief in whole or in part, and no party or counsel for a party contributed money intended to fund the preparation or submission of this brief. No person other than PERC, its members, or its counsel contributed money intended to fund the preparation or submission of this brief.

PERC's work on the Endangered Species Act has focused on how to make the law work better to promote species recovery.[2] In the 50 years since the statute was enacted, only 3% of listed species have recovered and a similarly small percentage have been improving.[3] According to PERC's research, only 13 species have recovered of the 300 the Fish and Wildlife Service predicted to do so by 2023.[4] To address this persistent lack of recovery progress, PERC and its researchers have produced extensive scholarship on how to improve incentives to restore habitat and recover species.[5] This includes research addressing how conflict over

---

[2] *See, e.g.,* PERC, *A Field Guide for Wildlife Recovery: The Endangered Species Act's Elusive Search to Recover Species—and what to do About it* (2023), https://perc.org/2023/09/20/a-field-guide-for-wildlife-recovery/.

[3] *See id.* at 5. *See also* Dept. of the Interior, *2017/2018 Annual Performance Plan & 2016 Report* 15 (2017), https://www.osmre.gov/sites/default/files/pdfs/DOI_PerformancePlan_2017-2018.pdf (reporting that only 4% of listed species were improving and that this rate had been consistent over the previous 5 years).

[4] Dr. Katherine Wright & Shawn Regan, *Missing the Mark: How the Endangered Species Act Falls Short of Its Own Recovery Goals* (2023), https://www.perc.org/2023/07/26/missing-the-mark/.

[5] *See A Field Guide for Wildlife Recovery, supra* n.2; Jonathan Wood & Tate Watkins, *Critical Habitat's "Private Land Problem": Lessons from the Dusky Gopher Frog*, 51 Envtl. L. Rep. 10,565 (2021); Jonathan Wood, *The Road to Recovery: How Restoring the Endangered Species Act's Two-Step Process Can Prevent Extinction and Promote Recovery*, PERC Pol'y

delisting species denies federal and state agencies, private landowners, and conservation groups their reward for recovering species and depletes resources that could be used to recover other species.[6] PERC's experts have also regularly appeared as witnesses in congressional hearings to share their expertise on how to recover more species under the ESA.[7] PERC has participated in cases concerning incentives to restore habitat and recover species.[8] And PERC has partnered with other conservation

---

Rep. (2018), https://www.perc.org/wp-content/uploads/2018/04/endangered-species-road-to-recovery.pdf.

[6] *See A Field Guide for Wildlife Recovery*, *supra* n.2, at 14–17.

[7] *See, e.g., Hearing on the ESA at 50 Before the H. Nat. Res. Comm., Subcomm. on Water, Wildlife, and Fisheries*, 118th Cong. (2023) (statement of Jonathan Wood), https://www.perc.org/wp-content/uploads/2023/07/HNR-Testimony-ESA-at-50-Jonathan-Wood.pdf; *Legis. Hearing on the Recovering Am.'s Wildlife Act, Before the S. Comm. On Env't & Pub. Works*, 117th Cong. (2021) (statement of Jonathan Wood), https://www.perc.org/wp-content/uploads/2021/12/Jonathan-Wood-Written-Testimony-EPW-Hearing.pdf.

[8] *See, e.g.,* Brief for PERC, as Amicus Curiae Supporting Defendants-Appellees, *N. Cascades Conservation Council v. Forest Serv.*, No. 24-1422 (9th Cir. filed Aug. 9, 2024); Brief for Pacific Legal Foundation and PERC, as Amici Curiae Supporting Defendants-Appellants, *Crow Indian Tribe v. U.S.*, 965 F.3d 662 (9th Cir. 2020).

organizations to recover listed species by reducing conflict with landowners.[9]

## Summary of the Argument

The gray wolf is one of the ESA's signature success stories. In 1978, there were only an estimated 1,235 wolves in the lower 48, almost all of them in Minnesota. Removing the Gray Wolf (Canis Lupis) From the List of Endangered and Threatened Wildlife, 85 Fed. Reg. 69,778, 69,788 (Nov. 3, 2020) (to be codified at 50 C.F.R. pt. 17). Today, there are likely more than 6,000 wolves around the Great Lakes, the Northern Rockies, and the West Coast, which are biologically connected to nearly 30,000 wolves in Canada. *Id.* The two largest populations in Minnesota and the Northern Rockies have recovered so much that wolves have dispersed into more than a dozen neighboring states and established resident populations in several of them. *Id.* at 69,789.

---

[9] *See* PERC, *Grizzly Conflict Reduction Grazing Agreement*, (last visited Sept. 19, 2024), https://www.perc.org/innovation-lab/grizzly-conflict-reduction-grazing-agreement/.

This recovery did not occur by happenstance. Federal and state officials worked diligently to expand our understanding of the species and to address significant threats. *Id.* at 69,790–92 (discussing the implementation of recovery plans for gray wolf populations). Working with conservation organizations and landowners, they reintroduced wolves into areas of their historic range where wolves had long been absent, and they worked to address the inevitable conflicts that arose from the return of a predator to these ecosystems. *See id.* at 69,797–69,809. Conservation groups (including one of the plaintiffs) compensated landowners adversely affected by wolves to reduce conflict, a role later assumed by states. *See* Hank Fischer, *Who Pays for Wolves?: How Markets Helped Reduce Conflict Between Ranchers and Wolves*, PERC Reports (2001).[10] And, through a combination of legislative and agency action, wolves were delisted in the Northern Rockies more than a decade ago, demonstrating that state management is consistent with secure wolf populations and continued expansion into surrounding states through

---

[10] https://www.perc.org/2001/12/01/who-pays-for-wolves/.

5

dispersal. Removing the Gray Wolf, 85 Fed. Reg. at 69,788–89. In fact, likely because recoveries are so hard-won, no recovered and delisted species has backslid under state management and been relisted. *See A Field Guide for Wildlife Recovery*, *supra* n.2, at 15; *see also* Fish & Wildlife Serv., *Environmental Conservation Online: Species Reports: Delisted Species*, (last visited Sept. 16, 2024).[11]

Erecting obstacles to delisting recovered species can breed ill-will that can persist even after a long-delayed delisting, discouraging further conservation efforts for the species. *See A Field Guide for Wildlife Recovery*, *supra* n.2, at 13. It can also harm other, more vulnerable species by signaling that investments in species' recovery may not be rewarded with a prompt delisting *See id.* And it can result in limited resources being expended on a recovered species that could otherwise contribute to the recovery of a struggling species. *See id.*; *see also* Leah R. Gerber, et al., *Endangered species recovery: A resource allocation problem*, 362 Science 284 (2018).

---

[11] https://ecos.fws.gov/ecp/report/species-delisted.

The district court created such an obstacle to delisting by turning the D.C. Circuit's decision in *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017), on its head. That case addressed the risk that recognizing a recovered distinct population segment (DPS) within a larger species listing would work an end-run around recovering the species. *Id.* The district court misconstrued this to mean that the Service cannot recognize the recovery of a listed species if any subpopulation or even a single member of that species remains vulnerable. *Def. of Wildlife v. Fish and Wildlife Serv.*, 584 F.Supp.3d 812, 823–24 (N.D. Cal. 2022).

It is bad enough that this proposition finds no support in the statute's text or this Court's precedent. But it also punishes recovery. Blocking the delisting of a recovered species because some populations or individual members still face threats effectively treats a species' population growth to the point that members disperse and establish fledgling populations as a strike against delisting. Indeed, the delisting decision would have been lawful, under the district court's interpretation of *Humane Society*, if the large populations in the Great Lakes and Northern Rockies were the only wolves in the lower 48. *See id.* This novel

"recovered too much" theory for overturning a delisting penalizes the Service, states, conservation groups, and private landowners for their recovery efforts and obstructs the ESA's "ultimate goal" of recovering species "so they no longer need protection" under the Act. Fish & Wildlife Serv., *ESA Basics: 50 Years of Conserving Endangered Species* (2023);[12] *see* 16 U.S.C. § 1532(3) (defining the ESA's "conservation" mandate as recovery to the point a species is no longer endangered or threatened).

## Argument

### I. *Humane Society* is specific to agencies recognizing a DPS of a listed species to delist it

To understand the district court's error, it is essential to begin with the narrow context of *Humane Society*. In that case, the D.C. Circuit reviewed the Fish and Wildlife Service's decision to "divide and delist" gray wolves by carving out a DPS from the broader species listing and immediately delisting that DPS as recovered. *Humane Society*, 865 F.3d

---

[12] https://www.fws.gov/sites/default/files/documents/endangered-species-act-basics-february-2023.pdf.

at 593. At the time, this was a novel use of the Service's DPS authority and it remains uncommon.

The agency's decision in that case consisted of two distinct steps. First, the Service changed the boundaries of the existing listing of the Minnesota population of wolves to include populations in "Minnesota, Wisconsin, and Michigan, as well as portions of North Dakota, South Dakota, Iowa, Illinois, Indiana, and Ohio." *Id.* It did so by finding that this population qualified as a DPS because it was (1) "discrete," in that it was at least 400 miles from the next closest wolf pack, and (2) "significant," because it contained 70% of the wolves south of Canada, and a loss of this population would "constitute a significant gap in the range of the gray wolves in the United States." *Id.* (internal quotations omitted). Next, the Service analyzed whether this DPS was endangered or threatened, and concluded that after analyzing the five statutory factors, that this DPS of wolves was recovered and should be delisted. *Id.*

The D.C. Circuit held that the ESA allows the Service to recognize a DPS of a listed species for the purpose of delisting that DPS. *Id.* at 595–600. However, the court restrained this power by requiring the Service

9

"to address the impact that extraction of the [DPS] would have on the legal status of the remaining wolves." *Id.* at 600. The ESA allows the listing only of species, subspecies, and DPSs of species. 16 U.S.C. §§ 1532(16), 1533(a). The court was concerned that carving out the DPS could result in the listing of a remnant population that no longer qualified as any of these entities, which could "circumvent the [ESA's] explicit delisting standards by" creating "a leftover [population] that [was] an orphan to the law." *Humane Society*, 865 F.3d at 603. Such a "statutory dodge" would "contravene[] Congress' will and subvert[] the careful balance of the statute." *Id.* (cleaned up) (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 91–92 (2002)). Indeed, the Court noted that the Service had proposed to delist the remnant population because it was "no longer a protectable 'species'[.]" *Humane Society*, 865 F.3d at 602.

As this Circuit has observed, this holding had less to do with the Service's analysis and more with the practical concern of a "backdoor route to the *de facto* delisting" of the entire species. *Crow Indian Tribe v. U.S.*, 965 F.3d 662, 677 (9th Cir. 2020) (cleaned up). This Court has

10

interpreted *Humane Society* to require the Service, when recognizing a recovered DPS within a larger species listing, to determine whether "there is a sufficiently distinct and protectable remnant population, so that the delisting of the DPS will not further threaten the existence of the remnant." *Id. Crow Indian Tribe* makes clear what narrow cases *Humane Society* applies to: when the Service creates and delists a DPS, leaving a remnant population whose qualification for protection under the ESA is uncertain.

## II.    The district court misinterpreted *Humane Society*

Instead of the relatively novel approach of creating a DPS for the sole purpose of delisting the DPS, the Service here followed the normal course of reviewing the status of the currently listed species and found it to have recovered. It considered three different configurations of the existing gray wolf listings, concluding that the species had recovered under every configuration. Removing the Gray Wolf, 85 Fed. Reg. at 69,784–85. Key to this determination was the health of two meta-populations of wolves in the Great Lakes Region and the Western United States, whose security is sufficient to render wolves no longer endangered

11

or threatened in the lower-48. *Id.* at 69,786. The Service recognized that wolves outside of these two metapopulations may be less secure. But it concluded that, while these lone dispersers "play[] an important role in recolonization of suitable habitat," the threats to them do not pose a threat of extinction to the species. *Id.* at 69,786.

Delisting a species based on the strength of core populations is nothing new. Species recovery is rarely uniform. Consequently, the Service often delists species based on the health of one or more metapopulations, despite threats to individual members of the species outside those populations. *See, e.g.*, Removal of the Interior Least Tern for the Federal List of Endangered and Threatened Wildlife, 86 Fed. Reg. 2,564, 2,567–68 (Jan. 13, 2021) (to be codified at 50 C.F.R. pt. 17) (delisting a species based on the health of four metapopulations that account for "more than 95 percent of all adult birds and nesting sites," despite lacking a "complete or organized rangewide count [of the species] since 2005"); Removing the Kirtland's Warbler From the Federal List of Endangered and Threatened Wildlife, 84 Fed. Reg. 54,436, 54,437 (Oct. 9, 2019) (to be codified at 50 C.F.R. pt. 17) (delisting a species based on

protection of "[t]he core of the Kirtland's warbler's breeding range" despite not knowing the number of birds that "ultimately exist outside of the core breeding range").

Despite the Service following this common delisting analysis, the district court held that the Service violated *Humane Society*. *Def. of Wildlife*, 584 F. Supp. 3d at 824. But these are two distinctly different scenarios. In *Humane Society*, the Service created a DPS and found that population recovered, opening the possibility that the remnant population would no longer qualify for protection under the ESA. *See Humane Society*, 865 F.3d at 602–03. Here, the Service analyzed the species as listed under the ESA and found that it was recovered, an approach that has no potential to "circumvent" the ESA. *See Crow Indian Tribe*, 965 F.3d at 677.

This Court's interpretation of the proper remedy for a *Humane Society* violation reinforces the point. *See Crow Indian Tribe*, 965 F.3d at 678 (directing the Service to "determine on remand whether there is a sufficiently distinct and protectable remnant population, so that the delisting of the DPS will not further threaten the existence of the

13

remnant"). This analysis cannot be done here because there is no remnant population for the Service to analyze for distinctness and protectability. Nor is there any risk that the Service's decision will result in a listed entity that does not qualify as a species, subspecies, or DPS of a species, triggering a backdoor delisting.

Instead of the problem identified in *Humane Society*, the district court's decision should be understood as the court substituting its judgment for the Service's. The court dismisses the Service's finding that "remnant wolves outside of core populations as lone dispersers . . . are not necessary to the viability of the species[.]" *Def. of Wildlife*, 584 F. Supp. 3d at 823–24. Other than the fairly obvious reasons why "lone dispersers" are not necessary to the viability of two metapopulations that span nine states and contain over 6,000 individuals, the Service analyzed threats to, and the status of, all wolves throughout the Continental U.S. Removing the Gray Wolf, 85 Fed. Reg. at 69,793–69,821. Its analysis of how threats to lone dispersers affect the species overall is entitled to respect. *See Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 583 (9th Cir. 2016) ("When the agency's determination is founded on reasonable

14

inferences from scientific data, a reviewing court will not 'substitute its judgment for that of the agency.'" (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The district court didn't do that and, instead, created a false equivalence with *Humane Society*.

## III. The district court's misinterpretation undermines incentives for species recovery

The decision below is not only bad law but, if allowed to stand, would undermine species recovery and the very purpose of the ESA. Species generally only recover thanks to the effort of federal and state agencies, conservation organizations, and private landowners to reduce threats and restore habitat. J. Michael Scott, et al., *Conservation-reliant species and the future of conservation*, 3 Conservation Letters 91 (2010) (finding that 84% of listed species depend on proactive conservation efforts).[13]

---

[13] https://conbio.onlinelibrary.wiley.com/doi/epdf/10.1111/j.1755-263X.2010.00096.x.

Investments in recovery require an incentive, especially for the private landowners that provide habitat for the vast majority of endangered and threatened species. ESA Basics, *supra* (reporting that two-thirds of listed species depend on private land for habitat). Generally, the presence of a species or its habitat on private land is penalized with regulation that limits the use of that land and reduces its value. *See A Field Guide to Wildlife Recovery*, *supra* n.2, at 5. As a former director of the Fish and Wildlife Service observed, "[t]he incentives are wrong here. If I have a rare metal on my property, its value goes up. But if a rare bird occupies the land, its value disappears." Betsy Carpenter, *The Best-Laid Plans*, 115 U.S. News & World Rep. 89 (1993). Therefore, the chief incentive for recovery efforts is the prospect that the species will recover to the point that it can be delisted and no longer regulated under the statute. *A Field Guide for Wildlife Conservation*, *supra* n.2, at 15. When the delisting of a recovered species is delayed, it can discourage efforts to recover species. *See id.* States, landowners, and others considering recovery efforts will be less likely to do so if they cannot count on their efforts being rewarded due to litigation risks. *See id.*

16

Keeping recovered species on the list can also consume resources needed to recover other, more vulnerable species. *See* Gerber, et al., *supra*. This is especially true for gray wolves, which consistently received a disproportionate share of federal and state recovery funding prior to their delisting. *See* Fish & Wildlife Serv., *Federal and State Endangered and Threated Species Expenditures: Fiscal Year 2019* 113 (2019)[14] (reporting nearly $3 million in spending on gray wolves, the 36th most among listed species); Fish & Wildlife Serv., *Federal and State Endangered and Threatened Species Expenditures: Fiscal Year 2018* 14 (2018)[15] (reporting $6 million in spending on gray wolves, again putting the species in the top-50). Petitioners themselves have noted how the lack of funds available for many other species has set back the recovery of those species. *See, e.g.,* Megan Evansen & Andrew Carter, *Funding Needs for the US Fish and Wildlife Service's Endangered Species Programs*,

---

[14] https://www.fws.gov/sites/default/files/documents/endangered-threatened-species-expenditures-report-to-congress-fiscal-year-2019.pdf.

[15] https://www.fws.gov/sites/default/files/documents/endangered-and-threatened-species-expenditures-fiscal-year-2018.pdf.

Defenders of Wildlife (2024)[16] (bemoaning that "hundreds of species receive less than $1000 a year for their recovery, and many species receive no recovery funding at all").

While these concerns apply generally to delayed delistings of recovered species, the district court's reading of *Humane Society* creates uniquely perverse incentives. It effectively punishes the Service, states, landowners, and conservation groups for recovering wildlife populations to the point that the species can disperse to new areas and create fledgling populations. *Defenders of Wildlife*, 584 F.Supp.3d at 823–24. Such populations and the dispersers that create them will always be more vulnerable than core, established populations and, thus, would count against delisting under the district court's rationale. As the Service notes in its brief, this would make it effectively impossible to delist species like the wolf, for whom dispersal and population shuffling is a natural process. Fed. App. Opening Br. at 39–40.

---

[16] https://defenders-cci.org/files/ESA_funding_request_FY2024.pdf.

18

Indeed, concern that range expansion and the establishment of additional populations will be penalized has already been borne out. On the same day that the Service delisted wolves, Colorado voters approved a plan to reintroduce wolves to the state. *See* Establishment of a Nonessential Experimental Population of the Gray Wolf in Colorado, 88 Fed. Reg. 10,258 (Feb. 17, 2023) (to be codified at 50 C.F.R. pt. 17). The district court's decision threw a wrench into that plan. Any wolves naturally dispersing into Colorado or intentionally introduced would automatically be regulated as endangered, even though the wolves themselves were from the recovered and delisted Northern Rocky Mountain population. *Id.* To allay concerns that Colorado's planned contribution to wolf recovery would effectively be punished by federal regulation, the Fish and Wildlife Service established an experimental population in the state and gave the state greater authority to manage wolves. Establishment of a Nonessential Experimental Population of the Gray Wolf in Colorado, 88 Fed. Reg. 77,014 (Nov. 8, 2023) (to be codified at 50 C.F.R. pt. 17). But this drew concerns from neighboring states and tribes that they would eventually face regulatory penalties when wolves

19

began spreading into their boundaries. *Id.* at 77,015. This concern was addressed by a provision to prevent further expansion of the wolf's range by capturing wolves that leave the state and returning them to Colorado. *Id.* Such provisions are understandable responses to regulatory disincentives, but far better would be to address the disincentives created by the district court's decision directly.

## Conclusion

The Service properly concluded that wolves meet the standard for delisting. The court below impermissibly expanded an inapplicable D.C. Circuit case to require the Service to analyze threats to every member of the wolf population that expanded its range outside the two metapopulations. This decision should be reversed to ensure that the ESA is applied as the statute requires, and to avoid disincentivizes against species recovery.

20

Dated: September 20, 2024     Respectfully submitted,

<u>/s/ Dylan P. Soares</u>
JONATHAN WOOD
DYLAN P. SOARES
Property and Environment
Research Center (PERC)
2048 Analysis Drive, Suite A
Bozeman, Montana 59718-6829
Telephone: (406) 587-9591
Email: <u>dsoares@perc.org</u>
Attorneys for Amicus Curiae
Property and Environment
Research Center

## Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and 9th Cir. R. 32-1, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

   [X] this document contains 3,639 words, **or**

   [ ] this brief uses a monospaced typeface and contains _____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   [X] this document has been prepared in a proportionally spaced typeface using Word X in Century Schoolbook, 14 Point font, **or**

   [ ] this document has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type*].

DATED: September 20, 2024

s/ Dylan Soares

Dylan Soares

22

**Certificate of Service**

I hereby certify that on September 20, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

<u>s/ Jonathan Wood</u>

Jonathan Wood