Nos. 22-15529, 22-15532, 22-15534, 22-15535,
22-15536, 22-15537, 22-15626, 22-15627, 22-15628

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

DEFENDERS OF WILDLIFE, et al.,

*Plaintiff-Appellees*,

v.

UNITED STATES FISH AND WILDLIFE SERVICE, et al.,

*Defendant-Appellants,*

and

STATE OF UTAH, et al.,

*Intervenor Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California
Nos. 21-cv-00344, 21-cv-00349, 21-cv-00561 (Hon. J. White)

---

## THE U.S. SPORTSMEN'S ALLIANCE FOUNDATION'S AMICUS
## CURIAE BRIEF IN SUPPORT OF DEFENDANT-APPELLANTS

---

Michael T. Jean
U.S. Sportsmen's Alliance Foundation
801 Kingsmill Parkway
Columbus, Ohio 43229
Tel: (248) 508-9765
MJean@sportsmensalliance.org

*Attorney for Amicus Curiae U.S.*
*Sportsmen's Alliance Foundation*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, Amicus Curiae, the U.S. Sportsmen's Alliance Foundation submits the following corporate disclosure statement:

The Sportsmen's Alliance Foundation is a 501(c)(3) non-profit organization, incorporated in the state of Ohio, with its principal place of business in Columbus, Ohio. Sportsmen's Alliance Foundation is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

Date: September 20, 2024,     Respectfully submitted:


*/s/ Michael T. Jean*
Michael T. Jean

*Attorney for Amicus Curiae U.S.*
*Sportsmen's Alliance Foundation*

ii

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..................................................... ii

TABLE OF CONTENTS ......................................................................................... iii

TABLE OF AUTHORITIES ................................................................................ iv

INTEREST OF AMICUS ...................................................................................... 1

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 2

    **I.   THE GRAY WOLF IS A RESILIENT SPECIES THAT MADE A REMARKABLE COMEBACK.** ................................................................. 4

    **II.  THE ESA'S PURPOSE IS TO RECOVER AND DELIST SPECIES, NOT TO KEEP SPECIES LISTED IN PERPETUITY.** ................ 9

        *A.   The ESA does not give the benefit of the doubt to listing a species.* ...................................................................................... 10

        *B.   The ESA does not have a policy of institutionalized caution favoring listing a species.* ............................................... 15

        *C.   Congress did not intend for listed species to remain on the list forever* .................................................................................. 17

    **III. THE SERVICE CAN DELIST AN ENTITY THAT DOES NOT MEET THE STATUTORY DEFINITION OF A "SPECIES."** ................. 20

        *A.   The Service has to apply the ESA's statutory definitions.* .......... 20

        *B.   The listed entity is no longer a "species."* .................................. 22

    **IV. THE GRAY WOLF HAS RECOVERED TO THE POINT THAT IT NO LONGER REQUIRES PROTECTION IN THE LOWER-48 STATES.** ...................................................................................... 24

CONCLUSION ..................................................................................................... 27

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ....................... 28

CERTIFICATE OF SERVICE .......................................................................... 29

# TABLE OF AUTHORITIES

## Cases

*All. for the Wild Rockies v. Salazar*,
  800 F. Supp. 2d 1123 (D. Mont. 2011) .......................................................20

*Alsea Valley All. v. Evans*,
  161 F. Supp. 2d 1154 (D. Or. 2001).........................................................23

*Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*,
  273 F.3d 1229 (9th Cir. 2001) ............................................................ 14, 26

*Bennett v. Spear*,
  520 U.S. 154 (1997)..................................................................................11

*Biodiversity Legal Foundation v. Badgley*,
  309 F.3d 1166 (9th Cir. 2002) .................................................................13

*Bond v. United States*,
  572 U.S. 844 (2014)..................................................................................18

*Bostock v. Clayton Cnty., Georgia*,
  590 U.S. 644 (2020)..................................................................................16

*Buffalo Field Campaign v. Williams*,
  579 F. Supp. 3d 186 (D.D.C. 2022).........................................................15

*California Sea Urchin Comm'n v. Bean*,
  883 F.3d 1173 (9th Cir. 2018) .................................................................18

*Cawsey v. Brickey*,
  144 P. 938 (Wash. 1914). ...........................................................................9

*Coos Cnty. Bd. of Cnty. Comm'rs v. Kempthorne*,
  531 F.3d 792 (9th Cir. 2008) .............................................................. 10, 18

*Crow Indian Tribe v. United States*,
  343 F. Supp. 3d 999 (D. Mont. 2018) ......................................................15

*Ctr. for Biological Diversity v. Lubchenco*,
  758 F. Supp. 2d 945 (N.D. Cal. 2010).....................................................13

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
  450 F.3d 930 (9th Cir. 2006) .............................................................. 19, 24

*Ctr. for Biological Diversity v. United States Forest Serv.*,
  80 F.4th 943 (9th Cir. 2023) ......................................................................9

*Defenders of Wildlife v. Norton*,
  258 F.3d 1136 (9th Cir. 2001) .................................................................12

iv

*Defs. of Wildlife v. Babbitt*,
    958 F. Supp. 670 (D.D.C. 1997)......................................................11

*Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*,
    584 F. Supp. 3d 812 (N.D. Cal. 2022)........................................9, 24

*Defs. of Wildlife v. Zinke*,
    849 F.3d 1077 (D.C. Cir. 2017)....................................................12

*Food Mktg. Inst. v. Argus Leader Media*,
    588 U.S. 427 (2019)............................................................... 16, 17

*Geer v. State of Conn.*,
    161 U.S. 519 (1896)......................................................................9

*Gen. Land Off. v. United States Dep't of the Interior*,
    947 F.3d 309 (5th Cir. 2020) ................................................. 19, 22

*Hughes v. Oklahoma*,
    441 U.S. 322 (1979)......................................................................9

*Humane Soc'y of the United States v. Jewell*,
    76 F. Supp. 3d 69 (D.D.C. 2014)............................................4, 16

*Humane Soc'y of United States v. Zinke*,
    865 F.3d 585 (D.C. Cir. 2017)................................................ passim

*In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*,
    794 F. Supp. 2d 65 (D.D.C. 2011),..............................................13

*Kern Cnty. Farm Bureau v. Allen*,
    450 F.3d 1072 (9th Cir. 2006) ....................................................14

*Modesto Irr. Dist. v. Gutierrez*,
    619 F.3d 1024 (9th Cir. 2010) ....................................................23

*Nat. Res. Def. Council v. Haaland*,
    102 F.4th 1045 (9th Cir. 2024) ............................................. 11, 12

*Nat'l Ass'n of Home Builders v. Norton*,
    340 F.3d 835 (9th Cir. 2003) ................................................ 22, 23

*Nat'l Fam. Farm Coal. v. U.S. Env't Prot. Agency*,
    966 F.3d 893 (9th Cir. 2020) ......................................................11

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
    595 U.S. 109 (2022)....................................................................21

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)....................................................................10

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    886 F.3d 803 (9th Cir. 2018) ......................................................17

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*,
    898 F.2d 1410 (9th Cir. 1990) ...................................................19

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ....................................................11

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ....................................................11

*Stenberg v. Carhart*,
    530 U.S. 914 (2000) ..................................................................21

*Tennessee Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ............................................................ 16, 17

*Trout Unlimited v. Lohn*,
    645 F. Supp. 2d 929 (D. Or. 2007) ....................................... 12, 13

*Tucson Herpetological Soc. v. Salazar*,
    566 F.3d 870 (9th Cir. 2009) ....................................................23

*Utah Native Plant Soc'y v. United States Forest Serv.*,
    923 F.3d 860 (10th Cir. 2019) ....................................................9

*Williams Alaska Petroleum, Inc. v. State*,
    529 P.3d 1160 (Alaska 2023) ......................................................9

**Statutes**

5 § U.S.C. 706(2). .............................................................................24

16 U.S.C. § 1531(b) ........................................................ 10, 11, 12, 17

16 U.S.C. § 1532 ............................................................... 18, 21, 22

16 U.S.C. § 1533(a) ............................................................... 12, 24

16 U.S.C. § 1533(b) ........................................................... 13, 14, 15

16 U.S.C. § 1533(c) ................................................................... 18, 19

16 U.S.C. § 1536(a) ........................................................................17

Pub. L. 93–205, 87 Stat 884 (1973) ................................................22

Pub. L. 95–632, 92 Stat 3751 (1978) ..............................................22

Pub. L. 112–10, 125 Stat. 38 (2011) ...............................................22

**Other Authorities**

43 Fed. Reg. 9607 (Mar. 9, 1978) ...................................................22

61 Fed. Reg. 4,722 (Feb. 7, 1996) ...................................................23

74 Fed. Reg. 15123 (April 2, 2009) ...............................................6, 26

76 Fed. Reg. 26086 (May 5, 2011) ................................................6, 7

84 Fed. Reg. 45020 (Aug. 27, 2019)........................................................21

85 Fed. Reg. 69778 (Nov. 3, 2020)................................................. passim

89 Fed. Reg. 72739 (Sept. 6, 2024) ........................................................3

H.R. Conf. Rep. No. 97–835 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2860 ........13

H.R. Rep. No. 93–412 (1973) ...............................................................16

J. Michael Scott et al., *Recovery of Imperiled Species Under the Endangered Species Act: The Need for a New Approach*, 3 FRONTIERS ECOLOGY & ENV'T 383 (2005)...........................................................................3

Martha Williams, *Lessons from the Wolf Wars: Recovery v. Delisting Under the Endangered Species Act*, 27 Fordham Envtl. L. Rev. 106 (2015). .. 10, 19, 20

Max Chaffetz, *Clarifying the Endangered Species Act's "Distinct Population Segment" Policy Through the Lens of Grizzly Bears*, 4/5/2019 Geo. Envtl. L. Rev. Online 1 (2019). ...................................................................4

**Regulations**

50 C.F.R. § 424.11(c).......................................................................25

50 C.F.R. § 424.11(e)................................................................. 12, 21

50 C.F.R. § 424.14(a).......................................................................13

## INTEREST OF AMICUS[1]

Sportsmen's Alliance Foundation is an Ohio-based non-profit organization, incorporated under § 501(c)(3) of the Internal Revenue Code. It is dedicated to promoting and educating the public about our hunting, fishing, and trapping heritage, and science-based wildlife management. Sportsmen's Alliance Foundation achieves its mission through public education and issue research conducted both on its own and through partnerships with local sportsmen and conservation organizations. It also engages in litigation when necessary to protect the beneficial pursuits of hunting, trapping, fishing, and scientific wildlife management practices. Sportsmen's Alliance Foundation has organizational members, including its parallel entity, the U.S. Sportsmen's Alliance, a § 501(c)(4) non-profit whose membership consists of individuals across the country. Their hunting and conservation interests are affected by the gray wolf's status and the outcome of these cases.

## INTRODUCTION

The gray wolf is a resilient species that has made a remarkable recovery. Outside of the population in Minnesota, it was largely eradicated from the lower-48

---

[1] All parties consented to the filing of this brief. No counsel for a party authored this brief in any way. No party or party's counsel made contributions to fund the preparation or submission of this brief. No person, other than the Sportsmen's Alliance Foundation, its members, or its counsel, made contributions to fund the preparation or submission of this brief.

states by the 1930s. A century later, it is thriving. But despite its success and many attempts to delist the gray wolf under the Endangered Species Act ("ESA"), it remains listed in the lower-48 states, outside of the northern rocky mountain distinct population segment, which was delisted through an act of Congress. Indeed, in the last 16 years courts have reversed about a quarter of the Fish and Wildlife Service's ("Service") delisting decisions, many of which involved the gray wolf. In doing so, courts have strayed from the ESA's text and structure and applied a heightened standard for delisting a species. That is not what Congress intended. When the factors threatening the species with extinction were ameliorated, Congress intended the species to be delisted.

Here, the Service correctly determined that the threats to the gray wolf, the greatest one traditionally being human caused mortality, were gone. And the Service did what it was supposed to do—it delisted the wolves and returned their management to the states, which is where it belongs. The district court, nevertheless, held the Service to a higher standard than Congress did, vacated the delisting for being arbitrary and capricious, and set the delisting aside. It further erred when it held that the wolf could not be delisted because it is no longer a "species" under the ESA. This Court should reverse.

## ARGUMENT

Recovering and delisting an endangered or threatened species is an arduous

task. As of 2023, only 55 of the 2,375 species that have been listed under the ESA have been delisted due to recovery.[2] There are two primary reasons for this. The first is that it takes a lot of work to recover a species. This is illustrated by the Service's most recent rule delisting the Apache trout. 89 Fed. Reg. 72739 (Sept. 6, 2024). It took 50 years of (1) restoring and connecting fragmented habitats to promote genetic diversity and connectivity, (2) removing non-native trout from the ecosystem that were interbreeding with the Apache trout and competing with it for resources, and (3) reintroducing Apache trout that were raised in hatcheries.[3] To call that a herculean task is an understatement. With limited resources, those efforts are simply not available for all the listed species, and recovery may not be in the cards for them. J. Michael Scott et al., *Recovery of Imperiled Species Under the Endangered Species Act: The Need for a New Approach*, 3 FRONTIERS ECOLOGY & ENV'T 383, 384 (2005).

Even if that herculean task can be achieved, there is another problem when it comes to delisting a species: legal challenges. Between 2008 and 2019, "federal courts have vacated twelve attempts by the [Service] to delist various animal species." Max Chaffetz, *Clarifying the Endangered Species Act's "Distinct Population*

---

[2] https://www.fws.gov/sites/default/files/documents/endangered-species-act-basics-february-2023.pdf (last visited September 19, 2024).

[3] *See* https://www.fws.gov/press-release/2023-08/proposed-delisting-apache-trout (last visited September 6, 2026).

*Segment" Policy Through the Lens of Grizzly Bears*, 4/5/2019 Geo. Envtl. L. Rev. Online 1 (2019). The decision below marks number 13. Thus, nearly 25% of the Service's delisting attempts have been vacated over the last 16 years. This compounds the first problem by forcing already scarce conservation resources to continue to be spent on species that the Service believes are recovered—in addition to the resources that are being spent on litigating delisting efforts.

While the Court is not able to do anything about the first problem, it can rectify the second. Courts have deviated from the ESA's text and structure when reviewing delisting decisions and placed their proverbial thumbs on the scale in favor of listing the species. Instead, the Court should apply the ESA evenhandedly to listing and delisting decisions as Congress intended.

## I. THE GRAY WOLF IS A RESILIENT SPECIES THAT MADE A REMARKABLE COMEBACK.

Due to limited resources, recovery is unfortunately not in the cards for all threatened and endangered species. But that is not the case for the gray wolf. It "is one of [the ESA's] success stories." *Humane Soc'y of the United States v. Jewell*, 76 F. Supp. 3d 69, 81 (D.D.C. 2014), *aff'd sub nom. Humane Soc'y of United States v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017). "By the 1930s, wolves were nearly erased from the lower 48 states as a result of one of the most effective eradication campaigns in modern history." *Id*. (citation and quotations omitted). In 2022, however, there were 2,797 wolves in the Northern Rocky Mountain region. *See* U.S. Fish and

Wildlife Service *2023 Species Status Assessment for the Gray Wolf (Canis lupus) in the Western United States* ("2023 Status Assessment"), *131.[4] And the current low-end estimated wolf population in the Western Great Lakes region is 4,688 wolves (762 in Michigan,[5] 1007 in Wisconsin,[6] and 2,919 in Minnesota[7]). This puts the total population of wolves in the lower-48 states at 7,485. But these wolves are not isolated. The Northern Rocky Mountain wolves are "connected to a large and expansive population of about 15,000 wolves in western Canada." 85 Fed. Reg. 69778, 69788 (Nov. 3, 2020). And the Western Great Lakes wolves are connected "to a population of about 12,000-14,000 wolves in eastern Canada." *Id*. at 69886.

---

[4] Available at https://www.regulations.gov/document/FWS-HQ-ES-2021-0106-55883 (Last visited September 19, 2024)

[5] https://www.michigan.gov/dnr/about/newsroom/releases/2024/06/13/latest-dnr-survey-shows-stable-wolf-population-in-michigan (last visited August 28, 2024). This is an underestimate of the true wolf population. According to a Michigan Department of Natural Resources Carnivore Specialist, the estimate is low because it was taken during the winter, a time where wolf numbers tend to drop because of the natural conditions, and it is before the pups are born in the spring. *See* https://www.wxpr.org/energy-environment/2024-07-05/u-p-wolf-population-at-carrying-capacity-michigan-dnr-advocates-for-delisting-species (last visited September 19, 2024).

[6] https://widnr.widen.net/s/tlkjlrrhr7/wisconsin_gray_wolf_report_2023 (last visited August 28, 2024). This is a winter population estimate and is also likely to be low. The number is likely closer to 1,200 as of January 2024. https://www.usnews.com/news/best-states/wisconsin/articles/2024-01-25/wisconsin-assembly-approves-a-bill-mandating-a-limit-on-the-wolf-population-sends-proposal-to-evers (last visited September 19, 2024).

[7] https://files.dnr.state.mn.us/wildlife/wolves/2023/survey-wolf.pdf (last visited September 19, 2024). This was also a low-end, mid-winter estimate.

This recovery is due to the gray wolf's resiliency and adaptability. "Gray wolves have a circumpolar range including North America, Europe, and Asia." 2023 Status Assessment at *viii; 85 Fed. Reg. at 69786. They "are habitat generalists," meaning that they "can successfully occupy a wide range of habitats." 2023 Status Assessment at *13; 85 Fed. Reg. at 69813. They "have long legs that are well adapted to running, allowing them to move fast and travel far in search of food, and large skulls and jaws that are well suited to catching and feeding on large mammals." 2023 Status Assessment at *10. "Wolves also have keen senses of smell, hearing, and vision, which they use to detect prey and one another" and "to avoid detection by potential prey in ambush attempts." *Id*. Overall, "they are efficient at utilizing available food resources." *Id*.

They also reproduce well. "Females and males typically begin breeding as 2-year olds and may annually produce young until they are over 10 years old." 74 Fed. Reg. 15123, 15123 (April 2, 2009). "Litters are born from early April into May; they range from 1 to 11 pups, but generally include 4 to 6 pups." 76 Fed. Reg. 26086, 26095 (May 5, 2011). "Normally a pack has a single litter annually, but the production of 2 or 3 litters in one year has been routinely documented in Yellowstone National Park." *Id*. Likewise, there is normally only one breeding pair per pack—"the top-ranking male and female." 2023 Status Assessment at *10. But research from the Northern Rocky Mountain region shows that "multiple breeders are observed in

6

approximately 25 percent of packs." *Id*. This is a sign that the habitat is saturated. *Id*.

"Yearling wolves frequently disperse from their natal packs" in search of "suitable unoccupied habitat and a member of the opposite sex." 76 Fed. Reg. at 26095. "These dispersal movements allow a wolf population to quickly expand and colonize areas of suitable habitat that are nearby or even those that are isolated by a broad area of unsuitable habitat." *Id*.

The wolves have recovered to the point that they have hit their carrying capacity in a number of regions.[8] This is the case in Michigan's Upper Peninsula. *See* n. 5 *supra*. It is the case in Minnesota.[9] It was the case in Wisconsin in 2020, and it is probably the case again today.[10] And the fact that there are multiple breeding pairs in 25% of the packs in the Northern Rocky Mountain region suggests that the habitat

---

[8] Carrying capacity "is the number of individuals of a particular population that the environment can support." Manuel C. Molles Jr. *Ecology: Concepts & Applications* 259 (4th ed. 2008); *see also* 2023 Status Assessment at *29 nn. 7-8 (defining biological and cultural carrying capacity).

[9] https://wtip.org/minnesota-dnr-finalizes-wolf-management-plan/ (last visited September 19, 2024).

[10] Wisconsin's carrying capacity is between 1,200-1,300 wolves. https://www.jsonline.com/story/sports/outdoors/2023/08/01/dnr-updated-plan-likely-to-result-in-800-to-1200-wolves-in-wisconsin/70501395007/ (last visited September 19, 2024). The wolf population was estimated to be 1,195 in 2020. *See* n. 6 *supra,* Wisconsin 2023 Gray Wolf Report at *22. The population dropped when a wolf hunt was held while the wolves were delisted under the 2020 Final Rule. But the population has since grown and is now estimated to be 1,200.

there is saturated.

Where they have not reached their carrying capacity, their numbers are growing strongly. Thirty new wolf pups were born in California this spring, "the biggest increase in California wolves in a century."[11] The Washington state wolf population increased by 20% in 2023, "the 15th year in a row that the number of" gray wolves increased.[12] Oregon's wolf population plateaued last year for the first time since 2011, but had it not given 10 wolves to Colorado for reintroduction, the population would have grown by 5.6%, from 178 to 188 wolves.[13]

Reaching their carrying capacity is a significant milestone in the recovery process. "[A]s populations grow, expand, and approach carrying capacity, their ability to compensate for human-caused mortality increases." 2023 Status Assessment at *36. Research conducted on different wolf populations in Idaho, Wisconsin, and Minnesota over the last 12 years has confirmed this. *Id*. Indeed, when the wolf population reaches carrying capacity, reproduction is unaffected by the loss of a breeding wolf. *Id*. at * 39; 85 Fed. Reg. at 69811.

---

[11]  https://www.sfgate.com/bayarea/article/california-gray-wolf-population-more-than-doubled-19742499.phpb (last visited September 19, 2024).

[12]  *See*  https://washingtonstatestandard.com/2024/04/22/latest-count-finds-washingtons-wolf-population-is-increasing/ (last visited September 19, 2024).

[13]  https://www.opb.org/article/2024/04/16/oregon-wolf-population-plateaus-for-the-first-time-in-more-than-a-decade/ (last visited September 19, 2024); https://www.dfw.state.or.us/Wolves/annual_reports.asp (last visited September 19, 2024).

All told, the wolves are thriving. But despite being an ESA success story, they remain listed throughout much of the lower-48 states.

## II.   THE ESA'S PURPOSE IS TO RECOVER AND DELIST SPECIES, NOT TO KEEP SPECIES LISTED IN PERPETUITY.

Upon earning their sovereignty, the states took ownership of their wildlife in their sovereign capacity in "a trust for the benefit of the people." *Geer v. State of Conn.,* 161 U.S. 519, 529 (1896), *overruled on other grounds by Hughes v. Oklahoma*, 441 U.S. 322 (1979); *Cawsey v. Brickey*, 144 P. 938, 939 (Wash. 1914). This is commonly referred to as the "public trust doctrine." *Williams Alaska Petroleum, Inc. v. State*, 529 P.3d 1160, 1187 (Alaska 2023) (citations omitted).[14] Congress, however, enacted the ESA "to provide a program for the conservation of … endangered species and threatened species" and "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be con-

_____

[14] The states also take the primary role in wildlife management over species on federal lands: "The federal government works cooperatively with states in the management of wildlife on federal lands, with states bearing most of the responsibility for the management of hunting and fishing." *Ctr. for Biological Diversity v. United States Forest Serv.*, 80 F.4th 943, 947 (9th Cir. 2023) (citation omitted). The Tenth Circuit has held that Congress has not "enact[ed] legislation respecting national forests … to preempt Utah's traditional trustee and police powers as a sovereign to manage wildlife within its borders." *Utah Native Plant Soc'y v. United States Forest Serv.*, 923 F.3d 860, 867 (10th Cir. 2019). Thus, the district court erred in finding that there were inadequate protections for wolves on federal public lands because those management plans "'do not contain standards and guidelines specific to wolf management.'" *Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, 584 F. Supp. 3d 812, 832 (N.D. Cal. 2022).

served." 16 U.S.C. § 1531(b). But Congress did not intend to usurp the states of their traditional role in wildlife management by placing its thumb on the scale in favor of listing and then keeping a species listed in perpetuity. This is plainly reflected in the ESA's text, which is "the best evidence of Congress's intent," *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012), and its structure, which also reflects Congress's intent, *Coos Cnty. Bd. of Cnty. Comm'rs v. Kempthorne*, 531 F.3d 792, 807 (9th Cir. 2008).

### A. The ESA does not give the benefit of the doubt to listing a species.

Many courts have made the process of delisting a species harder than it was intended to be under the ESA. Indeed, current Fish and Wildlife Service Director Martha Willimas has noted that "courts hold that even robust species are not ready for delisting." Martha Williams, *Lessons from the Wolf Wars: Recovery v. Delisting Under the Endangered Species Act*, 27 Fordham Envtl. L. Rev. 106, 110 (2015). Yet, "at the time that Congress passed the ESA [it believed] that potential extinction and recovery of species was a linear process, and that once threats were identified and ameliorated, all would be fine." *Id*. at 124. Congress's intentions, however, are not reflected in the delisting jurisprudence.

This can be seen when courts have strayed from the ESA's text and structure and have mistakenly held that the ESA requires giving the decision to list a species "the benefit of the doubt." *Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670, 680 (D.D.C.

10

1997). This is wrong. There is no benefit-of-the-doubt standard in the ESA. *Humane Soc'y of United States*, 865 F.3d at 597 ("Nothing in the statutory text compels the Service to put a thumb on the scale in favor of listing, nor does the text require the Service to temporize when the best evidence indicates that a revision is warranted.").

Instead, Congress required the decision to be made "solely on the basis of the best scientific and commercial data available … after conducting a review of the status of the species and after taking into account" any conservation efforts. 16 U.S.C. § 1533(b)(1)(A). "The obvious purpose of the requirement that each agency 'use the best scientific and commercial data available' is to ensure that the ESA not be implemented haphazardly, ***on the basis of speculation or surmise***." *Bennett v. Spear*, 520 U.S. 154, 176 (1997) (emphasis added). This does not require "'perfection'" "'where the information is not readily available.'" *Nat'l Fam. Farm Coal. v. U.S. Env't Prot. Agency*, 966 F.3d 893, 925 (9th Cir. 2020) (quoting *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014)). It means that the agency cannot ignore better evidence that is available at the time the decision was made. *Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1067 (9th Cir. 2024) (citing *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014)). "[I]f the only available data is weak, and thus not dispositive, an agency's reliance on such data does not render the agency's determination arbitrary and capricious." *Locke*, 776 F.3d at 995 (citation and quotations omitted). The Court, there-

11

fore, cannot "order the agency to explain every possible scientific uncertainty." *Nat. Res. Def. Council*, 102 F.4th at 1067 (cleaned up). Listing a species based on the benefit of the doubt is the opposite of the best-available-data standard.

Moreover, the standard for delisting a species is the same as the standard for listing a species in the first place. 50 C.F.R. § 424.11(e)(2); *Humane Soc'y of United States*, 865 F.3d at 597. But giving the decision to list the benefit of the doubt creates a double standard. Giving the benefit of the doubt to list would also require an assumption that any potential threats would require listing. But the Court does not make that assumption. *See Defenders of Wildlife v. Norton,* 258 F.3d 1136, 1143 (9th Cir. 2001) (It "does not make sense to assume that the loss of a predetermined percentage of habitat or range would necessarily qualify a species for listing."); *Humane Soc'y of United States*, 865 F.3d at 597. Instead, the listing determination "is a quintessential judgment call that Congress left to the Secretary, and by delegation to the Service, which has years of experience in evaluating" threats to species under §§ 1533(a)-(b). *Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1083 (D.C. Cir. 2017).

The ESA's structure further demonstrates that listing is not favored. "Under Section 4, the default position for all species is that they are not protected under the ESA." *Trout Unlimited v. Lohn*, 645 F. Supp. 2d 929, 947 (D. Or. 2007). A species receives the ESA's protection "only … after an affirmative determination" that list-

ing the species is warranted based on the best available scientific and commercial information. *Id*. Indeed, giving the benefit of the doubt to listing the species "would require listing a species as threatened if there is any possibility of it becoming endangered in the foreseeable future." *Id*.; *Ctr. for Biological Diversity v. Lubchenco*, 758 F. Supp. 2d 945, 955 (N.D. Cal. 2010) (same); *In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*, 794 F. Supp. 2d 65, 110 n. 53 (D.D.C. 2011), *aff'd sub nom. In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.--MDL No. 1993*, 709 F.3d 1 (D.C. Cir. 2013) (same).

This is further reflected in the citizen-petition process in § 4 of the ESA. Under that process, any interested person can initiate a listing change by filing a petition with the Service. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(a). Congress imposed firm deadlines on the Service to "force action on listing and delisting proposals." H.R. Conf. Rep. No. 97–835, at 21 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2860, 2862. First, the Service must make a 90-day and a 12-month finding on the petition. 16 U.S.C. § 1533(b)(3)(A), (B); *Biodiversity Legal Foundation v. Badgley*, 309 F.3d 1166, 1175–76 (9th Cir. 2002). If the Service finds that the proposed listing action is warranted in the 12-month finding, it must publish that finding in the Federal Register with the "text of a proposed regulation to implement [the] action." 16 U.S.C. § 1533(b)(3)(B)(ii). And within one year of publishing the proposed regulation, the Service must publish a final rule implementing its decision. 16 U.S.C. §

1533(b)(6)(A).

Congress intended for the Service to thoroughly review the data during this process: "FWS must include in any proposed or final listing decision 'a summary of the data on which such regulation is based and must show the relationship of such data to such regulation.'" *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1075 (9th Cir. 2006) (quoting 16 U.S.C. § 1533(b)(8)) (alterations omitted).

Furthermore, § 1533(b)(6)(B)(ii) states that if a proposed listing is not finalized within a year because "there is not sufficient evidence to justify" it, then the listing must be withdrawn and cannot be proposed again unless "sufficient new information" justifies it. "Sufficient evidence" and the mandatory language of the provision imply—if not mandate—that there is no benefit of the doubt in favor of listing. Giving the species the benefit of the doubt necessarily means that the decision to list was based on insufficient information. For if there were sufficient information, then there would be no doubt. *Cf. Westerfeld v. Indep. Processing, LLC*, 621 F.3d 819, 823 (8th Cir. 2010) ("[T]he party bearing the burden of proof is not entitled to the benefit of the doubt."); *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1233 (9th Cir. 2001) (Service's Incidental Take Statements were arbitrary and capricious "where there either was no evidence that the endangered species existed on the land or no evidence that a take would occur if the permit were issued.").

14

Congress further "recognize[d] that even after a year of study and notice-and-comment rulemaking over the course of another year, a 'substantial disagreement' may still remain 'regarding the sufficiency or accuracy of the available dat[a] relevant to the determination' and, accordingly, the statute permits the Service to extend the 12-month period by an additional 'six months for purposes of soliciting additional data.'" *Buffalo Field Campaign v. Williams*, 579 F. Supp. 3d 186, 199 (D.D.C. 2022) (quoting 16 U.S.C. § 1533(b)(6)(B)(i)). If Congress intended resolve doubts in favor of listing, then it would not have allowed the Service (1) to extend its deadlines—which were designed to promote quick decisions and begin the recovery process sooner—to solicit additional data to ensure that the decision was based on sufficient information or (2) to withdraw the decision if it was not supported.

Despite the ESA's text, structure, and precedent, courts have, both explicitly and implicitly, set the bar too high to delist a recovered species. That is one of the reasons why of the 2,375 species that have been listed under the ESA, only 55 species have been delisted due to recovery. *See* n. 2 *supra*.

### B. The ESA does not have a policy of institutionalized caution favoring listing a species.

Similar to giving the listing decision the benefit of the doubt, some courts have reviewed delisting decisions through the lens of the ESA's policy of "'institutionalized caution.'" *Crow Indian Tribe v. United States*, 343 F. Supp. 3d 999, 1013 (D. Mont. 2018), *aff'd in part, remanded in part*, 965 F.3d 662 (9th Cir. 2020) (citation

15

omitted); *Humane Soc'y of the United States*, 76 F. Supp. 3d at 120 n.27. This is the same mistake by another name. It fails for the same reasons that the benefit-of-the-doubt standard fails. It also fails on its own as a matter of statutory construction.

The "institutionalized caution" policy comes from legislative history, not the ESA's text. *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 178 (1978) (quoting H.R. Rep. No. 93–412, pp. 4–5 (1973)). "The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 674 (2020) (citations omitted). Even if turning to legislative history is appropriate, it can only be done to resolve ambiguities: "'Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it.'" *Id*. (citation omitted); *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019) (It is inappropriate to "resort to legislative history before consulting the statute's text and structure.") That Committee Report cannot override the ESA's best-available-science standard, the structure of the ESA, or the Administrative Procedure Act's arbitrary-and-capricious standard.

This is especially true here, where that legislative history is from a House Committee Report on H.R. 37—a bill that never became law because S. 1983 was

passed and became the ESA instead.[15] *See*, *e.g.*, *Food Mktg. Inst.*, 588 U.S. at 437 (Lower court erred by "rel[ying] heavily on statements from witnesses in congressional hearings years earlier on a different bill that was never enacted into law.").

Moreover, the institutionalized-caution standard applies to protecting listed species, i.e., halting their extinction by conserving them. *Tennessee Valley Auth.*, 437 U.S. at 194. It is a policy under § 7 of the ESA, *id*. at 182 (Legislative history of H.R. 37 was consulted to interpret section 7 of the ESA.), which is designed to "[e]nsure" that federal agency actions are "not likely to jeopardize the continued existence of any" listed species or adversely modify any listed species' habitat, 16 U.S.C. § 1536(a)(2). It does not apply to listing and delisting decisions.

### C. Congress did not intend for listed species to remain on the list forever.

Not only did Congress not intend to favor listing a species, but it also did not intend for listing decisions to be set for eternity. Start with the purpose of the statute and its definitions. The purpose of the ESA is to ***conserve*** the species. 16 U.S.C. § 1531(b); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) ("[T]he ESA's underlying purpose is the conservation of species."). Congress defined "conserve" (and "conservation") as "the use of all methods and procedures which are necessary to bring any endangered species or threatened spe-

---

[15] https://www.congress.gov/bill/93rd-congress/house-bill/37 (last visited September 19, 2024).

cies to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3). Thus, the ESA's end goal is to recover and delist the species, and it must be interpreted consistently with that goal. *California Sea Urchin Comm'n v. Bean*, 883 F.3d 1173, 1184 (9th Cir. 2018), *as amended* (Apr. 18, 2018) (Ambiguities in statute should be interpreted in a way that can be "squared with the statute's stated purpose.").[16]

Other statutory commands reflect this as well. The ESA ***"requires*** FWS only to revise the list 'from time to time,' to reflect 'recent determinations.'" *Coos Cnty. Bd. of Cnty. Comm'rs*, 531 F.3d at 810 n.13 (emphasis added) (quoting 16 U.S.C. § 1533(c)(1)); *Humane Soc'y of United States*, 865 F.3d at 591; *see also id*. at 597 ("[S]ubsection (c)(1) itself expressly contemplates that new 'designations' and 'determinations' could intervene that would require 'revising' an extant listing."). And "'[e]very five years, the Service ***must*** "review and determine whether any such species should (i) be removed from such list; (ii) be changed in status from an endangered species to a threatened species; or (iii) be changed in status from a threatened species to an endangered species.'" *Humane Soc'y of United States*, 865 F.3d at 591

---

[16] Similarly, "it is appropriate to refer to basic principles of federalism embodied in the Constitution to resolve ambiguity in a federal statute." *Bond v. United States*, 572 U.S. 844, 859 (2014). The ESA should be interpreted in a way that favors returning the control of wildlife to the states to manage under the public trust doctrine.

(quoting 16. U.S.C. § 1533(c)(2)(A), (B) (emphasis added) (alterations omitted); *see also id*. at 596 ("'Such species' would seem to require review of the species' status as listed."); *Gen. Land Off. v. United States Dep't of the Interior*, 947 F.3d 309, 314 (5th Cir. 2020) ("Following [the five-year] review, the ESA requires a determination of whether any species should be removed from the lists or moved from one list to the other."). Congress clearly envisioned listed species to be reviewed at least every five years and for the species to be delisted if it no longer needed the ESA's protection. And it left the Service with no discretion to remove a species that no longer needs the ESA's protection. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 935 (9th Cir. 2006) (The word "shall" in § 1533 of the ESA imposes mandatory requirements on the Service.).

Lastly, federal "agencies have affirmative obligations to conserve [the listed species] under section 7(a)(1)" of the ESA. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1417 (9th Cir. 1990) (citation omitted). Agencies cannot conserve a species to the point where the ESA's protections are no longer necessary if the species can never be removed from the list. It also frustrates the Act's direction to the Service to "devote needed resources to the protection of endangered and threatened species, while abating the Act's comprehensive protections when a species … is recovered." *Humane Soc'y of United States*, 865 F.3d at 598; *see also* Williams, 27 Fordham Envtl. L. Rev. at 127 ("'[R]ecovering species is com-

19

plex and challenging work, often requiring substantial time, and resources to help increase the population, decrease threats, and adapt to additional factors like invasive species and climate change.'").

Despite the ESA's text and structure, courts have interpreted it in a way that keeps listed species listed. That is especially true with the gray wolf. In years of litigation concerning the wolf's status, "similar if not the very same issues have repeatedly come before the courts, with similar results"; "though, no solutions emerged from the opinions." Williams, 27 Fordham Envtl. L. Rev. at 146–47. It should not take an act of Congress to delist a species. *See*, *e.g.*, *All. for the Wild Rockies v. Salazar*, 800 F. Supp. 2d 1123 (D. Mont. 2011), *aff'd*, 672 F.3d 1170 (9th Cir. 2012) (affirming an Act of Congress delisting wolves in the Northern Rocky Mountain states). The only way to break from this tradition is to apply the ESA as Congress intended—without favoring listing. The Court should do that here.

## III. THE SERVICE CAN DELIST AN ENTITY THAT DOES NOT MEET THE STATUTORY DEFINITION OF A "SPECIES."

### A. The Service has to apply the ESA's statutory definitions.

The first way that the Court can apply the ESA as Congress intended is to recognize that a species can be delisted when it no longer meets the statutory definition of a species.[17] "Administrative agencies are creatures of statute. They accord-

---

[17] Although the Federal Defendants did not appeal this issue, the Intervenor-

ingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022). Thus, the only way the gray wolf can be listed in the lower-48 states is if it is an endangered or threatened "species," which Congress defined as "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16); *Humane Soc'y of United States*, 865 F.3d at 590, n.1 ("The 'species' that the Endangered Species Act protects are" the species subject to the ESA's definition of a species, not the scientific definition of a species.); *Stenberg v. Carhart,* 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning.").

The regulations bear this out as well. The Service must delist a species when (1) it is extinct, (2) it has recovered to the point where it no longer meets the definition of threatened or endangered under those five factors, (3) new information shows that the listed species is not endangered or threatened, or (4) new information shows that the listed species is not a "species" under the ESA. 50 C.F.R. § 424.11(e); 84 Fed. Reg. 45020, 45052 (Aug. 27, 2019) (The version of § 424.11(e)(3) in effect at the time of the lower-48 delisting allowed for delisting when the "entity does not

---

Defendants did, and it is appropriately before the court.

meet the statutory definition of a species."). With those regulations in place at the relevant times, it would have been arbitrary for the Service to keep an entity listed that does not meet the statutory definition of a species. *Gen. Land Off.*, 947 F.3d at 320 (collecting authorities); *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003) ("[F]ederal agencies must follow their own rules.") (citation omitted).

### B. The listed entity is no longer a "species."

The listed entity—the threatened wolves in Minnesota, and the endangered wolves in the lower 44 states, excluding the Northern Rocky Mountain population—does not meet the definition of a species. *See* 43 Fed. Reg. 9607, 9608 (Mar. 9, 1978) (listing Minnesota's population as threatened and the rest of the wolves in the lower 48 as endangered); Pub. L. 112–10, 125 Stat. 38 (2011) (Act of Congress delisting wolves in the Northern Rocky Mountain states).

In 1973, Congress defined species to include "any subspecies of fish or wildlife or plants and *any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature*." Pub. L. 93–205, 87 Stat 884 (1973) (emphasis added). That changed in November of 1978 when Congress amended the definition of species by replacing the "smaller taxa" portion of the definition with the distinct population segment. Pub. L. 95–632, 92 Stat 3751 (1978); 16 U.S.C. § 1532(16). "Congress added the term 'distinct population seg-

ment' ('DPS') to the definition of species in 1978 so that agencies could 'provide different levels of protection to different populations of the same species.'" *Modesto Irr. Dist. v. Gutierrez*, 619 F.3d 1024, 1028 (9th Cir. 2010) (quoting *Nat'l Ass'n of Home Builders,* 340 F.3d at 842).

"Congress did not define the term 'distinct population segment' ('DPS') and the ESA does not set forth any restrictive criteria for defining a DPS." *Alsea Valley All. v. Evans*, 161 F. Supp. 2d 1154, 1157 (D. Or. 2001) (citation omitted). "Listing distinctions below that of subspecies or a DPS of a species are not allowed under the ESA." *Id*. at 1162 (citation omitted).[18]

The currently listed entity is not a "species," because it is not a subspecies or a DPS. The Minnesota population may have been a DPS at one time, but that is no longer the case as the population has expanded into Wisconsin and Michigan: it is no longer "markedly separated from other populations" in Michigan and Wisconsin. 61 Fed. Reg. 4,722, 4,725 (Feb. 7, 1996); 85 Fed. Reg. at 69781 (Service recognized that Minnesota wolves expanded in the 2011 Rule). Nor are wolves in the other lower-44 states outside of Minnesota and the congressionally delisted Northern Rocky Mountain population a DPS.

---

[18] "Whether a species is threatened with extinction in a 'significant portion of its range' and whether a 'distinct population segment' of a species is threatened with extinction are independent legal questions." *Tucson Herpetological Soc. v. Salazar*, 566 F.3d 870, 873 n. 2 (9th Cir. 2009) (citation omitted).

23

The district court, however, ruled that "there is nothing in the statute that suggests that Congress intended the 1978 amendments to the ESA to remove protections for already-listed entities." *Defs. of Wildlife*, 584 F. Supp. 3d at 822. This Court has held otherwise when it comes to ESA amendments and their future effects on previously listed species: "Pursuant to the 1982 Amendments, critical habitat designations for the stickleback—listed as an endangered species in 1970—are governed by the procedures for critical habitat revisions." *Ctr. for Biological Diversity*, 450 F.3d at 935. The Service was therefore required to apply the 1978 definition of species to all five-year status reviews of the individual species' status as listed. *Humane Soc'y of United States*, 865 F.3d at 591.

Because the currently listed entity is not a "species" under the ESA, it cannot be listed as such. The Service's decision to apply the statutory definition, its own regulations, and delist the species was not arbitrary and capricious, an abuse of discretion, and was in accordance with the law. 5 § U.S.C. 706(2)(A).

## IV. THE GRAY WOLF HAS RECOVERED TO THE POINT THAT IT NO LONGER REQUIRES PROTECTION IN THE LOWER-48 STATES.

Even if the currently listed entity is a species, the court should nevertheless reverse the district court's ruling and uphold the delisting rule because the wolves have recovered. The wolves are not threatened under the five factors in § 4. 16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(c). Although listing is not warranted under

any of the factors, Sportsmen's Alliance will focus on hunting and trapping. The Service's conclusion that hunting and trapping do not pose a threat to wolves is supported by the administrative record and past experiences. *See* 85 Fed. Reg. at 69794–69813.

Human-caused mortality was traditionally the greatest threat to wolves, but regulated harvests currently are not, especially in areas where they have reached their carrying capacity due to their high reproductivity levels. *See e.g.*, Gray Wolf Biological Report: Information on the Species in the Lower 48 States (October 13, 2020), 3-ER-429–30. Indeed, "where productivity is average or high, higher mortality rates can be sustained, especially if the harvested or controlled population is near a source population that is producing dispersers." 3-ER-430. Wolves in the lower-48 states are reproducing at a high rate. *See* *6–8 *supra*. Hunting does not affect reproductivity rates in the northern rocky mountain or western great lakes region. Moreover, "breeding members can be quickly replaced from either within or outside the pack, and pups can be reared by another pack member should their parents die." 3-ER-429. Thus, as long as mortality rates are sustainable, wolf populations will expand and recolonize in vacant habitats. *Id*. And even if the mortality rate is not sustainable, the population will recover once the rate is reduced. *Id*.

The northern rocky mountain wolf population is a prime example of this. It has grown despite years of regulated hunting and trapping. In 2009, the Service es-

timated that there were 1,639 wolves in Idaho, Montana, and Wyoming. 74 Fed. Reg. at 15123. After more than a decade of post-delisting regulated harvesting, the 2022 year-end minimum estimate for wolves in these states was 2,383 (958 in Idaho, 1,087 in Montana, and 338 in Wyoming). 2023 Status Assessment at *107 (Table 3). These wolves also dispersed into neighboring states where their populations continued to grow.

The same is true for the Western Great Lakes wolf population. Wisconsin's population has rebounded after the 2021 harvest. *See* n.10 supra; *see also* 85 Fed. Reg. at 69876 (discussing adaptive management and lowering wolf-harvest quotas based on population monitoring to keep the harvest sustainable). Wolves from this population regularly disperse into Indiana, Illinois, Iowa, Missouri, North Dakota, and South Dakota. 85 Fed. Reg. at 69789. And earlier this year, a wolf from the Western Great Lakes region was found in Colorado.[19] There is no doubt that these wolves have grown and expanded to the point that a regulated, sustainable harvest, does not pose a threat to them. And the adaptive management quotas will ensure that the harvest remains sustainable. The Service's conclusion is not arbitrary and capricious. It "articulated a rational connection between the facts found and the choice made." *Arizona Cattle Growers' Ass'n*, 273 F.3d at 1236.

---

[19] https://www.idahostatesman.com/news/nation-world/national/article287979945.html (last visited September 19, 2024).

## CONCLUSION

For the forgoing reasons, the decision below should be reversed.

Date: September 20, 2024,          Respectfully submitted:


*/s/ Michael T. Jean_____*
Michael T. Jean, MI Bar No. p76010
U.S. Sportsmen's Alliance Foundation
801 Kingsmill Parkway
Columbus, Ohio 43229
Tel: (248) 508-9765
MJean@sportsmensalliance.org

*Attorney for Amicus Curiae U.S.*
*Sportsmen's Alliance Foundation*

27

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-15529, 22-15532, 22-15534, 22-15535,  22-15536, 2

I am the attorney or self-represented party.

**This brief contains** | 6,583 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Michael T. Jean | **Date** | 9/20/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**          *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: September 20, 2024          */s/ Michael T. Jean*
                                  Michael T. Jean

                                  *Attorney for Amicus Curiae U.S.*
                                  *Sportsmen's Alliance Foundation*