Nos. 22-15529, 22-15532, 22-15534, 22-15535, 22-15536,
22-15537, 22-15626, 22-15627, 22-15628

———————————————————————

**United States Court of Appeals for the Ninth Circuit**

———————————————————————

Defenders of Wildlife, et al.,
*Plaintiffs/Appellees*,

v.

United States Fish and Wildlife Service, et al.,
*Defendants/Appellants*,

and

State of Utah, et al.,
*Intervenor Defendants/Appellants.*

———————————————————————

Appeals from the U.S. District Court for the N. District of California
Nos. 4:21-cv-344, 4:21-cv-349, and 4:21-cv-561 (Hon. Jeffrey S. White)

———————————————————————

**Opening Brief of the State of Utah**

———————————————————————

Kathy A.F. Davis
Jason L. DeForest
*Assistant Utah Attorneys General*
1594 W. North Temple, Ste. 300
Salt Lake City, Utah 84114
(801) 537-9801
kathydavis@agutah.gov
jdeforest@agutah.gov

*Counsel for the State of Utah*

# Table of Contents

Table of Authorities.................................................................................ii

Glossary ..................................................................................................iv

Introduction ............................................................................................ 1

Statement of Jurisdiction........................................................................4

Statement of the Issues ..........................................................................4

Pertinent Statutes and Regulations ........................................................5

Summary of Argument............................................................................6

Standard of Review ................................................................................7

Argument .................................................................................................8

    I.      The district court erred in holding that the Service failed to evaluate the full-listed gray wolf species and threats to that species.........................................................................................8

        A.    The district court erroneously applied Humane Society's readily distinguishable reasoning to conclude that the Service ignored wolves outside of the "metapopulations." ..... 9

        B.    The district court's evaluation of the Service's threats analysis ignores critical findings about threats throughout the range and existing regulatory mechanisms to address those threats............................................................................ 13

        C.    The district court's reasoning about the evaluation of federal public lands ignores the Service's findings and the jurisdictional authority of the State of Utah. ...................... 17

    II.    The district court erred in requiring evaluation of individual, disbursing wolves, rather than limiting the evaluation to the status of the species................................................................. 21

Conclusion.............................................................................................24

Statement of Related Cases .................................................................25

Form 8. Certificate of Compliance for Briefs .........................................26

i

# Table of Authorities

## Federal Cases

*Crow Indian Tribe v. United States*,
   965 F.3d 662 (9th Cir. 2020) ........................................................ 21, 22

*Defenders of Wildlife v. Norton*,
   258 F.3d 1136 (9th Cir. 2001) ............................................................ 21

*Defenders of Wildlife v. Zinke*,
   849 F.3d 1077 (D.C. Cir. 2017) ......................................................... 13

*Friends of Blackwater v. Salazar*,
   691 F.3d 428 (D.C. Cir. 2012) ...................................................... 13, 19

*Geer v. State of Connecticut*,
   161 U.S. 519 (1896) ........................................................................... 18

*Greater Yellowstone Coal., Inc. v. Servheen*,
   665 F.3d 1015 (9th Cir. 2011) .................................................... passim

*Humane Soc'y of the U.S. v. Zinke*,
   865 F.3d 585 (D.C. Cir. 2017) .................................................... passim

*Lacoste v. Dept. of Conservation*,
   263 U.S. 545 (1924) ........................................................................... 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1982) .............................................................................. 8

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ............................................................ 7, 8

*San Luis & Delta-Mendota Water Auth. v. Locke*,
   776 F.3d 971 (9th Cir. 2014) ............................................................... 8

## Federal Statutes

5 U.S.C. § 706(2)(A) .................................................................................. 7

16 U.S.C. § 1532(3) ................................................................................... 9

16 U.S.C. § 1532(3)(16)............................................................21

28 U.S.C. § 1291.......................................................................4

28 U.S.C. § 1331.......................................................................4

**Federal Regulations**

85 Fed. Reg. 69,778 (Nov. 3, 2020) (Final Rule).........................1

## Glossary

APA                   Administrative Procedures Act

CWA                   Clean Water Act

DPS                   Distinct Population Segment

ESA                   Endangered Species Act

ER                    Federal Appellants' Excerpts of Record

SPR                   Significant Portion of its Range

NRM DPS               Northern Rocky Mountains Distinct Population
                      Segment

## Introduction

This appeal arises from several challenges to a final rule, enacted in 2020 by the United States Fish and Wildlife Service (Service), that removed gray wolves from listing under the Endangered Species Act (ESA) throughout the lower 48 United States. 85 Fed. Reg. 69,778 (Nov. 3, 2020) (Final Rule). The Service carefully considered existing gray wolf populations in the relevant geographic areas, 3-ER-310-11, and the history of cooperation and assistance provided by the states to ensure wolf conservation into the foreseeable future, 3-ER-319, in determining that gray wolves in the lower 48 United States no longer met the definition of an endangered or threatened species under the ESA. *See* 3-ER-304. The district court disagreed, vacated the Final Rule, and remanded the matter to the Service. 1-ER-29. This effectively relisted gray wolves under the ESA in the existing Minnesota and 44-state entities. *Id*. The State of Utah, along with the other Defendants in this litigation, appeals the district court's decision to overturn the Final Rule.

State management of gray wolves is critically important for the State of Utah. To that end, the State has expended significant resources over several decades to prepare for and conserve wolves disbursing

1

and/or establishing within the State. More specifically, Utah has developed a plan to manage, study, and conserve wolves moving into Utah while avoiding conflicts with the wildlife management objectives of the Ute Indian Tribe, preventing livestock depredation, and protecting the investment made in wildlife in Utah. *See* 3-ER-364.

While Utah does not yet have any established packs of gray wolves, two neighboring states, Idaho and Wyoming, have large, thriving wolf populations. 3-ER-314-15. Additionally, another neighboring state, Colorado, had a group of at least six wolves residing in the northwest portion of the state at the time the Final Rule went into effect. 3-ER-347-48. The Service therefore evaluated Utah's and Colorado's wolf management plans/regulations to ensure disbursing wolves were accounted for in the Final Rule. *Id.* Those evaluations show that the plans/regulations in both Utah and Colorado will ensure wolf conservation post-delisting. *See* 3-ER-363-64.

Similarly, the Final Rule included a robust discussion of post-delisting management plans for states outside of the Central Rockies, including Wisconsin, Minnesota, Michigan, Washington, Oregon, and California. *See* 3-ER-351-63. The Service concluded these state plans also

2

consistently provide for the maintenance of gray wolves above recovery levels post delisting. *See, e.g.*, 3-ER-368-69.

The district court correctly found the Service was entitled to rely upon those state plans/regulations when making its delisting decision based on threats to the species. 1-ER-23-25. But despite these findings with respect to Utah, and functionally identical findings with respect to the states outside of the NRM DPS and the Great Lakes States, the district court found that the Service failed to account for the status of wolves outside of those two "metapopulations." *See* 1-ER-14 (identifying the "flaw" in the Final Rule as the Service's "failure to address the status of wolves outside core populations under statutory listing criteria"). The inconsistency in this finding cannot be squared and it pervades the district court's opinion. The Service is tasked with evaluating *existing* regulatory mechanisms and how those mechanisms address identified threats. It therefore evaluated state-specific management plans outside of the "metapopulations" and, according to the district court's opinion, reasonably relied on those plans/regulations. Despite these findings, the district court made a blanket finding that disbursing wolves were disregarded entirely. This is inconsistent with the ESA and ignores the

detailed analyses of the Final Rule, particularly as it relates to state-specific management plans. The decision must be overturned.

## Statement of Jurisdiction

The district court had jurisdiction under 28 U.S.C. § 1331 (federal question). The court's order granting in part Plaintiffs' summary judgment motions is final and appealable because it resolved all claims as to all parties. The court vacated the Final Rule and remanded to the Service for further consideration. 1-ER-29.

The district court entered judgment on February 10, 2022. Utah timely filed a notice of appeal on April 11, 2022. Fed. R. App. P. 4(a)(1)(B).

This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## Statement of the Issues

Utah states two issues in addition to, and/or to further elaborate on, those stated by the Federal and other Intervenor Appellants:

1. Whether the district court erred by holding that the Service failed to evaluate the full-listed gray wolf species and the threats to that species?

   *Preservation*: Federal Appellants raised this issue in their motion for summary judgment. *See* 1-ER-13-14.

4

*Standard of review*: This Court reviews the district court's grant of summary judgment *de novo. Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011).

2. Whether the district court erred by requiring the Service to analyze individual, disbursing wolves rather than the status of the species as a whole?

*Preservation*: Federal Appellants raised this issue in their motion for summary judgment. *See* 1-ER-10-17, 21-26.

*Standard of review*: This Court reviews the district court's grant of summary judgment *de novo. Greater Yellowstone Coal.*, 665 F.3d at 1023.

## Pertinent Statutes and Regulations

All pertinent statutes and regulations are set forth in the addendum following Federal Appellants' opening brief.

## Statement of the Case

Utah adopts and incorporates Federal Appellants' Statement of the Case.

## Summary of Argument

The Final Rule removing the gray wolf entities from the list of endangered and threatened species should be upheld.

Utah adopts and incorporates the arguments made by the Federal Appellants and other Intervenor Appellants, which include similar arguments related to state-specific regulatory mechanisms. Utah provides additional argument relevant to state-specific regulatory mechanisms to demonstrate why several of the district court's rulings are erroneous and warrant reversal.

1.     The district court erred in holding that the Service failed to evaluate the full-listed gray wolf species and specific threats to that species. First, the Service evaluated several configurations of gray wolf entities to ensure full consideration of the effect of delisting. The Service also properly vetted regulatory mechanisms throughout the lower 48 states to ensure wolves are protected post delisting. When considered in this context, the *Humane Society* case relied upon by the district court supports delisting and demonstrates that the Final Rule fully satisfies the Service's obligations under the ESA. *Humane Soc'y of the U.S. v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017).

6

2.     The district court erred by requiring the Service to analyze disbursing wolves rather than the status of the species. The ESA does not require a review of wolves disbursing into states with minimal or no population, especially when those wolves are accounted for by existing regulatory mechanisms. Instead, the Service must conduct a "comprehensive review of the *entire listed species and its continuing status*." *Humane Soc'y*, 865 F.3d at 601 (emphasis added). This determination is limited to "whether the species is endangered or threatened, *not whether the species could reach still higher population levels if given more protection*." *Humane Soc'y*, 865 F.3d at 612 (emphasis added). The Service conducted that review by evaluating multiple potential gray wolf entities across the lower 48 United States and vetting the effect of regulatory mechanisms on wolf populations post delisting. The district court's conclusion that the Service ignored wolves outside of two "metapopulations" is therefore wrong and must be reversed.

### Standard of Review

The Administrative Procedure Act, 5 U.S.C. § 706(2)(A), governs judicial review of whether agency action complies with the Endangered Species Act ("ESA"). *San Luis & Delta-Mendota Water Auth. v. Jewell*,

747 F.3d 581, 601 (9th Cir. 2014). Under a "highly deferential" standard, *id.*, a reviewing court may not substitute its judgment for that of the agency and must uphold an agency's decision as long as the agency has considered the relevant data, articulated a satisfactory explanation for its action, and made no clear error of judgment. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1982). A reviewing court "must generally be at its most deferential" when reviewing scientific determinations within the agency's area of expertise. *Jewell*, 747 F.3d at 602 (citations omitted).

This Court reviews the district court's grant of summary judgment *de novo*. *Greater Yellowstone Coal.*, 665 F.3d at 1023 (9th Cir. 2011). Under the APA, this Court conducts its "own review of the administrative record," without deference to the district court. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 991 (9th Cir. 2014).

## Argument

I. **The district court erred in holding that the Service failed to evaluate the full-listed gray wolf species and threats to that species.**

The district court's decision is based primarily on a contradictory theme—the Service failed to analyze wolves outside of two

"metapopulations." This theme is most prominent in the lower court's analysis of the "full-listed gray wolf species," but the argument, and its clear contradictions, pervades the decision. Stated simply, the district court erroneously relies upon the *Humane Society* case to argue that the Service failed to fully evaluate threats to wolves outside of the NRM DPS and the Great Lake States, which rendered the remaining wolves "orphans" to the law. The district court's decision is inconsistent with *Humane Society* and belied by the court's further analyses about state-specific management plans. Where this Court can reverse error and do so consistent with the ESA's purpose of promoting cooperative recovery of a species to a point where the Act's measures are "no longer necessary," it should do so. *See Greater Yellowstone Coal.*, 665 F.3d at 1032 (citing 16 U.S.C. § 1532(3)).

### A. The district court erroneously applied Humane Society's readily distinguishable reasoning to conclude that the Service ignored wolves outside of the "metapopulations."

In *Humane Society*, the Service had created legal ambiguity by designating the Western Great Lake wolf distinct population segment, which spanned two previously listed entities (wolves in Minnesota listed as threatened, and other lower-48 wolves listed as endangered), and then

9

announcing the remaining population was no longer a protectable species. *Humane Soc'y*, 865 F.3d at 602. The *Humane Society* court found that the Service had legal authority to identify a DPS within a listed entity, and assign "a different conservation status to that segment if the statutory criteria for uplisting, downlisting, or delisting are met." *Id.* at 600. But *Humane Society* found that the Service did not exercise this authority properly in designating and delisting the Western Great Lakes wolf DPS. *Id.* According to the D.C. Circuit, the Service had circumvented ESA delisting standards by "fail[ing] to address the impact that extraction of the segment would have on the legal status of the remaining wolves in the already-listed species." *Id.* at 600. Stated differently, the ESA "requires a comprehensive review of the entire listed species and its continuing status." *Id.* at 601.

Several central points from the district court's decision demonstrate why *Humane Society* does not render the Final Rule inadequate. As an initial matter, and as admitted by the district court, *Humane Society* is distinguishable because it "dealt with the effect that delisting a DPS had on the remaining wolf population." 1-ER-14. This case does not involve the creation of a narrowly defined DPS for the purpose of delisting a

remnant. Instead, the Service considered the status of wolves throughout the Lower 48 United States, using several different configurations to ensure evaluation of all relevant populations. 3-ER-310-11.

The district court nevertheless found the reasoning of *Humane Society* persuasive, claiming that the Service made the same mistake— "the failure to address the status of wolves outside core populations under statutory listing criteria." 1-ER-14. In doing so, the district court improperly transitioned from the "species" analysis required by the ESA to an analysis of individual, disbursing wolves, as discussed below. Plus, the district court's subsequent reasoning demonstrates the extent to which the Service reviewed the status of regulatory mechanisms and protections for wolves throughout the Lower 48 United States.

Specifically, based on the reasoning of *Humane Society*, the district court concluded that "the Service failed to adequately consider the threats to wolves outside of the core populations in the Great Lakes and Northern Rocky Mountains." 1-ER-14. This conclusion is at odds with the rest of the district court's decision. First, and of most relevance to Utah, the district court found that the Service assessed the adequacy of regulatory mechanisms in both Colorado and Utah and "the Service's

11

determination that the existing regulatory mechanisms in Colorado and Utah provide adequate protection for the gray wolf was not arbitrary and capricious." 1-ER-25. The district court made nearly identical findings about wolf management plans in Washington, Oregon, and California, finding the Service "articulated a reasonable basis for the conclusion that sufficient protections existed to guide management of wolves in these states following delisting." 1-ER-25. Finally, the district court concluded the Final Rule provided "adequate support for the Service's determination that the Great Lakes' state management plans would provide adequate protection for gray wolves after delisting." 1-ER-23.

Thus, unlike *Humane Society*, the Service evaluated and justifiably found that the regulatory mechanisms in the Lower 48 United States, including those outside of the two "metapopulations," were adequate to protect wolves post-delisting. Indeed, the district court denied Plaintiffs' Motion for Summary Judgment as it related to the adequacy of state-specific management plans. 1-ER-22-25. The district court made no effort to address this inconsistency, repeatedly referring to its conclusion that wolves were somehow ignored by the Service entirely. 1-ER-21. However, a robust evaluation of state-specific management plans, and their related

effect on wolves post-delisting, is a far cry from ignorance. The district court's reliance on *Humane Society* was therefore misplaced and its conclusion about "ignorance" inaccurate.

**B.    The district court's evaluation of the Service's threats analysis ignores critical findings about threats throughout the range and existing regulatory mechanisms to address those threats.**

Based on its conclusion that the "Service failed to analyze wolves outside of the two core metapopulations," the district court also summarily concluded that "the Service [therefore] failed to adequately conduct a threats assessment for these wolves." 1-ER-21. But this conclusion cannot be squared with the Final Rule or the district court's opinion. The Service provided a robust evaluation of threats to the species throughout the Lower 48 United States (*see* 3-ER-322-47), which is necessarily related to the regulatory mechanisms designed to address those threats. *See Friends of Blackwater v. Salazar*, 691 F.3d 428, 436 (D.C. Cir. 2012) (finding it reasonable for the Service to evaluate the adequacy of regulatory mechanisms in the light of identified threats to the species). Stated differently, the Service is entitled to rely upon state-specific management plans to address threats to a species post delisting. *See, e.g.*, *Defenders of Wildlife v. Zinke*, 849 F.3d 1077, 1083 (D.C. Cir.

13

2017) (upholding reliance on Wyoming's management plan and finding the evaluation of state-specific management plans is a "quintessential judgment call [for the Service], which has years of experience in evaluating what is reasonably likely to be implemented and effective").

The Service identified several potential threats to gray wolves, including human-caused mortality, disease and parasites, habitat suitability and availability, genetic diversity, effects of climate change, and cumulative effects. *See* 3-ER-322-47. Regarding "human-caused mortality," which the Service identified as the most significant factor affecting the long-term conservation of wolves, the Service went well beyond its evaluation of the NRM DPS and the Minnesota entity. For the Central Rocky Mountain States, the Service found that human-caused mortality would not have a significant effect on those populations because the states "have existing laws and regulations to conserve wolves" and Utah in particular "has a management plan that will be implemented post-delisting to guide wolf management in the State." 3-ER-338. This is after the Service conducted a robust evaluation of human-caused mortality in the NRM DPS, the Minnesota entity, and the states of Washington, Oregon, and California. 3-ER-322-39.

14

Similarly, the Service evaluated habitat and prey availability throughout the Lower 48 United States, including an analysis of the Central Rocky Mountain States (3-ER-343-44), the West Coast States (3-ER-342-43), the NRM DPS (3-ER-342), and the Great Lakes Area (3-ER-340-41). The Service noted similar protections in the Central Rocky Mountain States for the effects of disease and/or parasites, noting specific measures used to assess the health, disease and parasite loads. 3-ER-344-45. Indeed, the Service analyzed each identified threat for the configurations identified in the Final Rule. *Id.*; *see also*, 3-ER-346-47. (evaluating genetic diversity and inbreeding, effects of climate change, and cumulative effects).

The district court was therefore wrong to conclude that the Service ignored threats to wolves outside of the "metapopulations," especially in states like Utah where wolves have not yet established. *See Humane Society*, 865 F.3d at 612 (finding it reasonable, even in the absence of state-specific plans, to conclude that the deaths of individual wolves entering adjacent states would pose no threat to the larger segment's survival).

Moreover, the Service continued its analysis by extensively evaluating the regulatory mechanisms in all states, including those outside of the "metapopulations," to determine what effect, if any, those mechanisms would have on wolves post delisting. 3-ER-347-68. Those are the same regulatory mechanisms deemed adequate by the district court. 1-ER-23-25. The district court's "threats" conclusion is therefore internally inconsistent. The regulatory mechanisms approved by the district court are the same plans relied upon by the Service to ensure wolves are protected from identified threats post delisting. It therefore cannot also be true that the Service failed to analyze threats to wolves outside of the "metapopulations."

Considering the above, the district court's finding about threats was wrong. The Service conducted a full evaluation of the threats posed to wolves in all the Lower 48 United States. And the Service concluded that any such threats were ameliorated by state-specific regulatory mechanisms and, according to the district court's opinion, reliance on those mechanisms was not arbitrary and capricious. The threats analysis in the Final Rule therefore satisfied the requirements of the ESA.

16

**C.    The district court's reasoning about the evaluation of federal public lands ignores the Service's findings and the jurisdictional authority of the State of Utah.**

After recognizing the adequacy of state-specific management plans, the district court changed course and found that the Service failed to properly evaluate the adequacy of federal public land management regimes. 1-ER-26. This finding was based primarily on the court's determination that the Service could not exclude wolf populations in the western United States. *Id.* The district court ignored several key elements of the ESA in making this determination.

As an initial matter, the Court failed to identify which of these "western United States" wolves were ignored by the Service in the Final Rule. *Id.* Utah assumes the Court is referring to all wolves outside of the listed NRM DPS entity. But, as discussed above, the Service evaluated the effectiveness of all state-specific plans outside of the NRM DPS and determined they were adequate to protect wolves post-delisting. The wolves therefore were not "ignored," particularly when considering the states' jurisdictional authority over delisted wolves. *See Lacoste v. Dept. of Conservation*, 263 U.S. 545, 549 (1924) ("The wild animals within its borders are, so far as capable of ownership, owned by the state in its

17

sovereign capacity for the common benefit of all of its people. Because of such ownership, and in the exercise of its police power the state may regulate and control the taking, subsequent use and property rights that may be acquired therein"); *Geer v. State of Connecticut*, 161 U.S. 519, 529 (1896) ("We take it to be correct doctrine in this country that the ownership of wild animals, so far as they are capable of ownership, is in the state, not as a proprietor, but in its sovereign capacity, as the representative and for the benefit of all its people in common.").

The Service also spent several pages in the Final Rule evaluating the regulatory mechanisms outlined in the federal public land management regime, which included consideration of the protections offered by state-specific management plans. 3-ER-366-69. The district court took issue with this evaluation, finding that the Service's review was arbitrary and capricious because it did not explain how the cited mechanisms would "ensure a sustainable wolf population post-delisting." 1-ER-26. This is inconsistent with the requirements of the ESA and ignores the protections offered by state-specific management.

Regulatory mechanisms do not need to provide the same level of protection as the ESA to support delisting. *See, e.g., Greater Yellowstone*

*Coal.*, 665 F.3d at 1032 (recognizing "that delisting cannot require the imposition of legal protections commensurate with those provided by the ESA itself"); *see also Humane Soc'y*, 865 F.3d at 611 (upholding the Service's reliance on the state management plan, in part because the Service remained obligated to conduct a 5-year analysis of the species and retained emergency powers to address declines). Indeed, the very purpose of the ESA is to recover a species to a point where the mechanisms of the ESA are no longer required. *Greater Yellowstone Coal.*, 665 F.3d at 1032.

The Service therefore need only assess existing regulatory mechanisms in light of its assessment of other threats to the species. *See Friends of Blackwater*, 691 F.3d at 436. The Service did just that, evaluating sensitive species listings by the BLM and U.S. Forest Service and the likelihood of wolf mortality from lethal removal for predation. 3-ER-368. Recognizing the resiliency of wolves in the northern Rocky Mountains and considering the summation of state-specific plans protecting wolves throughout the western United States, the Service found wolves are adequately protected post delisting. *Id.* These findings more than suffice to support a delisting decision. *See Humane Soc'y*, 865

19

F.3d at 611-12 (upholding the Service's reliance on state-specific management).

* * *

In summary, when the Final Rule is considered in context there can be no dispute that the Service fully evaluated the status of wolves outside of the NRM DPS and the Great Lakes states. First, contrary to the decision in *Humane Society*, the Final Rule analyzed several gray wolf entities to ensure wolves throughout the Lower 48 United States were considered in the Final Rule. Second, the Service evaluated state-specific regulatory mechanisms, through the lens of specifically identified threats, to determine gray wolves would be adequately protected post delisting. Finally, the Service evaluated the regulatory mechanisms outlined in the federal public land management regime, which necessarily included consideration of the protections offered by state-specific management plans. 3-ER-366-69. The district court therefore erred in finding that the Service failed to evaluate the full-listed gray wolf species and threats to that species.

## II. The district court erred in requiring evaluation of individual, disbursing wolves, rather than limiting the evaluation to the status of the species.

The ESA expressly ties recovery to the "species," not geography, by defining "species" and considering recovery in terms of the status of and threats to the species. 16 U.S.C. § 1532(3)(16); *see also Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1143 (9th Cir. 2001) (finding that "[a] species with an exceptionally large historical range may continue to enjoy healthy population levels despite the loss of a substantial amount of suitable habitat"). The Service therefore must conduct "a comprehensive review of the *entire* listed species and its continuing status." *Humane Soc'y*, 865 F.3d at 601 (emphasis added). This determination is limited to "whether the species is endangered or threatened, *not whether the species could reach still higher population levels if given more protection*." *Id.* at 612 (emphasis added). The ESA therefore does not require an evaluation of *individual* animals moving outside of listed entities, especially if those animals are legally protected through existing regulatory mechanisms. *See Crow Indian Tribe v. United States*, 965 F.3d 662, 678 (9th Cir. 2020) (citing *Humane Society* and finding the inquiry as to a "remnant" population is a practical matter and considers whether the "remnant"

21

population has sufficient legal protection to ensure its continued existence).

Instead, based on the reasoning of *Humane Society*, the inquiry must be whether the Service properly considered the legal status and/or protection of wolves outside of entities subject to delisting. *Humane Soc'y*, 865 F.3d at 612; *Crow Indian*, 965 F.3d at 678. Although it found the Service's evaluation of "remnant" populations inadequate, the *Humane Society* court approved of the Service's evaluation of wolves *within* a newly created DPS, based on the number of wolves disbursing into states within that entity and/or the protections provided by those states. *Humane Soc'y*, 865 F.3d at 610. Several of those states had legal protections in place, including protection from indiscriminate hunting. *Id.* at 612. However, even with respect to those states with no protection for wolves, the Court found it was not "arbitrary or capricious to overlook a State's failure to protect an animal that does not exist within its borders." *Id.* Moreover, according to the Court, "the Service reasonably concluded that the deaths of any wolves that might enter those states would be so minimal as to pose no threat to the segment's survival." *Id.*

Here, the Service is similarly justified in determining that wolves outside of a "metapopulation" do not threaten the survival of the species.

The district court ignored that reasoning entirely, overturning the Final Rule and claiming the Service concluded "with little explanation or analysis, that wolves outside of the core populations are not necessary to the recovery of the species." 1-ER-14. As discussed, the Service fully considered wolves outside of the core populations by evaluating the regulatory mechanisms designed to protect those wolves post delisting. *See* 3-ER-347-68. (evaluating wolf management throughout the Lower 48 United States and the associated regulatory mechanisms designed to address threats to the species). After reviewing those mechanisms, the Service unequivocally found that the Central Rocky Mountain States, the West Coast States, the states within the Minnesota entity, and the states within the NRM DPS were adequately prepared to protect wolves post delisting. 3-ER-368-69. This is consistent with the requirements of the ESA, particularly as it relates to states without existing wolf populations and demonstrates the adequacy of the Service's evaluation.

Even setting aside those evaluations, however, it was proper for the Service to conclude that wolves in states like Utah are not necessary to

the recovery of the species. As detailed by *Humane Society*, delisting is appropriate if the loss of individual wolves within a delisted entity does not pose a threat to the survival of the species. *Humane Soc'y*, 865 F.3d at 612. The Service conducted a proper review of the gray wolf species throughout the Lower 48 United States, including those states without established populations, and found gray wolves no longer qualify as an endangered species. Based on the mandates of the ESA and a proper reading of the cited case law, this Court should reinstate the Final Rule.

## Conclusion

For the foregoing reasons, this Court should reverse the district court's judgment, and the Final Rule delisting gray wolves throughout the lower 48 States should be reinstated.

Respectfully submitted,

*/s/ Jason L. Deforest*
Kathy A.F. Davis
Jason L. DeForest
*Assistant Utah Attorneys General*
1594 West North Temple, Ste. 300
Salt Lake City, Utah 84114
(801) 537-9801
*Counsel for the State of Utah*

## Statement of Related Cases

The undersigned is not aware of any other related cases beyond those already consolidated in this matter.


*/s/ Jason L. Deforest*

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s):** Nos. 22-15529, 22-15532, 22-15534, 22-15535, 22-15536, 22-15537, 22-15626, 22-15627, 22-15628.

I am the attorney or self-represented party.

**This brief contains 4,452 words,** including <u>0</u> words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

26

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** */s/ Jason DeForest*        **Date** September 20, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

27