Nos. 22-15529, 22-15532, 22-15534, 22-15535, 22-15536,
22-15537, 22-15626, 22-15627, 22-15628

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

DEFENDERS OF WILDLIFE, *et al*.,
Plaintiffs-Appellees,

v.

UNITED STATES FISH AND WILDLIFE SERVICE, *et al*.,
Defendants-Appellants,

and

STATE OF UTAH, *et al.*,
Intervenors-Defendants-Appellants.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
Nos. 4:21-cv-344, 4:21-cv-349, 4:21-cv-561
Honorable Jeffrey S. White

---

**OPENING BRIEF OF INTERVENORS-DEFENDANTS-APPELLANTS
SAFARI CLUB INTERNATIONAL AND
NATIONAL RIFLE ASSOCIATION OF AMERICA**

---

Jeremy E. Clare
Regina Lennox
Safari Club International
501 2nd Street NE
Washington, DC 20002
(202) 543-8733
jclare@safariclub.org
rlennox@safariclub.org

Erin M. Erhardt
National Rifle Association of America
11250 Waples Mill Road
Fairfax, Virginia 22030
(703) 267-1161
eerhardt@nrahq.org

## CORPORATE DISCLOSURE STATEMENT OF
## SAFARI CLUB INTERNATIONAL

Under Fed. R. App. P. 26.1(a), Intervenor-Defendant-Appellant Safari Club

International ("SCI") submits the following Corporate Disclosure Statement.

SCI is a nonprofit corporation incorporated in the State of Arizona,

operating under § 501(c)(4) of the Internal Revenue Code.  SCI is not publicly

traded and has no parent corporation.  There is no stock issued, so there is no

publicly held corporation that owns 10 percent or more of its stock.

DATED this 20th day of September 2024.

*/s/* Jeremy E. Clare
Jeremy E. Clare
*Attorney for Intervenor-Defendant-*
*Appellant Safari Club International*

ii

## CORPORATE DISCLOSURE STATEMENT OF
## NATIONAL RIFLE ASSOCIATION OF AMERICA

Under Fed. R. App. P. 26.1(a), Intervenor-Defendant-Appellant National

Rifle Association of America ("NRA") submits the following Corporate Disclosure

Statement.

NRA is a nonprofit membership association incorporated in the state of New

York. NRA is not publicly traded and has no parent corporation. There is no

publicly held corporation that owns 10 percent or more of its stock.

DATED this 20th day of September 2024.

/s/ Erin M. Erhardt
Erin M. Erhardt
*Attorney for Intervenor-Defendant-*
*Appellant National Rifle Association of*
*America*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS .................................................. ii

TABLE OF AUTHORITIES .................................................................... vi

GLOSSARY ......................................................................................... x

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ............................................................. 2

STATEMENT OF ISSUES ...................................................................... 2

STATEMENT REGARDING ADDENDUM .................................................. 3

STATEMENT OF THE CASE .................................................................. 3

    A.   Statutory Background .................................................................. 3

    B.   Factual Background ..................................................................... 6

    C.   Proceedings Below ..................................................................... 10

SUMMARY OF THE ARGUMENT .......................................................... 11

STANDARD OF REVIEW ...................................................................... 14

ARGUMENT ....................................................................................... 16

    I.   The Service can rely on the ESA's definition of "species" as an independent ground for delisting. ............................................... 16

        A.   The Delisting Rule correctly applied the 1978 definition of "species" to the wolf entities. ...................................................... 19

        B.   *Humane Society* has no bearing on the Service's finding that the wolf entities are not "species." ..................................................... 25

        C.   The Service's "belt and suspenders" approach is appropriate. .......... 26

    II.   The Delisting Rule's threats assessment was reasonable and well-supported. ............................................................................... 29

        A.   The Delisting Rule fully analyzed the status of wolves in the lower 48 states. .............................................................................. 30

        B.   The Delisting Rule adequately considered the status of West Coast wolves. ................................................................................. 37

      i.    The district court's reliance on Henricks *et al.* (2019) is misplaced. ...................................................................37

     ii.    The Delisting Rule properly grouped West Coast wolves with Northern Rocky Mountains wolves based on their genetics. ...39

  C.    The Delisting Rule sufficiently discussed loss of historic range. ......42

      i.    The Service's analysis of human-caused mortality captured the effects of lost historical range as that factor was the primary cause of range loss. ...................................................................43

     ii.    The Delisting Rule describes how wolves are recolonizing historic range and demonstrates that current range is no longer contracting but expanding. ........................................................46

  D.    The Delisting Rule properly found that regulatory mechanisms on federal public lands are adequate. .......................................................49

CONCLUSION .................................................................................................52

FORM 8. CERTIFICATE OF COMPLIANCE ......................................................54

CERTIFICATE OF SERVICE .............................................................................55

STATEMENT REGARDING RELATED CASES–CIRCUIT RULE 28-2.6 .......56

ADDENDUM ...................................................................................................57

# TABLE OF AUTHORITIES

## <u>Cases</u>

All. for the Wild Rockies v. Salazar,
    672 F.3d 1170 (9th Cir. 2012) ....................................................... 9, 23

Am. Wildlands v. Kempthorne,
    530 F.3d 991 (D.C. Cir. 2008) ..................................................... 17, 38

Baltimore Gas & Elec. Co. v. NRDC,
    462 U.S. 87, 103 (1983) ....................................................................34

Burns v. United States,
    501 U.S. 129 (1991) ..........................................................................22

Colo. River Cutthroat Trout v. Salazar,
    898 F. Supp. 2d 191 (D.D.C. 2012) ..................................................43

Conservation Cong. v. Finley,
    774 F.3d 611 (9th Cir. 2014) ............................................................39

Crow Indian Tribe v. United States,
    965 F.3d 662 (9th Cir. 2020) ..................................................... 24, 25

Ctr. for Biological Diversity v. Bernhardt,
    946 F.3d 553 (9th Cir. 2019) ............................................................23

Ctr. for Biological Diversity v. Jewell,
    12-CV-2296, 2014 WL 5703029 (D. Ariz. Nov. 5, 2014) ................28

Ctr. for Biological Diversity v. Kempthorne,
    588 F.3d 701 (9th Cir. 2009) ............................................................16

Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,
    402 F. Supp. 2d 1198 (D. Or. 2005) .................................................50

Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,
    67 F.4th 1027 (9th Cir. 2023) ...........................................................24

Ctr. for Biological Diversity v. Zinke,
    868 F.3d 1054 (9th Cir. 2017) ..........................................................28

Defs. of Wildlife v. Norton,
    258 F.3d 1136 (9th Cir. 2001) ..........................................................48

Defs. of Wildlife v. Salazar,
   729 F. Supp. 2d 1207 (D. Mont. 2010)..............................................9

Defs. of Wildlife v. Sec'y, U.S. Dep't of the Interior,
   354 F. Supp. 2d 1156 (D. Or. 2005) .................................................8

Defs. of Wildlife v. Zinke,
   849 F.3d 1077 (D.C. Cir. 2017)........................................................9

FDA v. Brown & Williamson Tobacco Corp.,
   529 U.S. 120 (2000)........................................................................22

Fed. Commc'ns Comm'n v. Prometheus Radio Project,
   592 U.S. 414 (2021)........................................................................15

Friends of Santa Clara River v. U.S. Army Corps of Eng'rs,
   887 F.3d 906 (9th Cir. 2018) .................................................. 15, 18

Greater Yellowstone Coal., Inc. v. Servheen,
   665 F.3d 1015 (9th Cir. 2011) .......................................................51

Humane Soc'y of the U.S. v. Jewell,
   76 F. Supp. 3d 69 (D.D.C. 2014).....................................................9

Humane Soc'y of the U.S. v. Kempthorne,
   579 F. Supp. 2d 7 (D.D.C. 2008).....................................................8

Humane Soc'y of the U.S. v. Salazar,
   1:09-CV-1092 (D.D.C.) ....................................................................8

Humane Soc'y of the U.S. v. Zinke,
   865 F.3d 585 (D.C. Cir. 2017)................................................ passim

Kern Cnty. Farm Bureau v. Allen,
   450 F.3d 1072 (9th Cir. 2006) .......................................................38

Nat'l Wildlife Fed'n v. Norton,
   386 F. Supp. 2d 553 (D. Vt. 2005) ..................................................8

Nev. Land Action Ass'n v. U.S. Forest Serv.,
   8 F.3d 713 (9th Cir. 1993) .............................................................14

Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,
   475 F.3d 1136 (9th Cir. 2007) .......................................................14

Portland General Elec. Co. v. Bonneville Power Admin.,
   501 F.3d 1009 (9th Cir. 2007) .......................................................22

Rocky Mountain Wild v. Walsh,
    216 F. Supp. 3d 1234 (D. Colo. 2016) ........................................................50

San Luis & Delta-Mendota Water Auth. v. Jewell,
    747 F.3d 581 (9th Cir. 2014) ...................................................... 34, 38

San Luis & Delta-Mendota Water Auth. v. Locke,
    776 F.3d 971 (9th Cir. 2014) ........................................................14

Stone v. Immigr. & Natur. Serv.,
    514 U.S. 386 (1995)........................................................................21

Trout Unlimited v. Lohn,
    559 F.3d 946 (9th Cir. 2009) ...................................................... 16, 17

United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.,
    837 F.3d 1055 (9th Cir. 2016) .................................................... 21, 22

United States v. Booker,
    543 U.S. 220 (2005)........................................................................22

W. Watersheds Project v. Kraayenbrink,
    632 F.3d 472 (9th Cir. 2011) ........................................................15

Williams v. Taylor,
    529 U.S. 420 (2000)........................................................................20

## **Statutes**

5 U.S.C. §§ 701-706........................................................................2
16 U.S.C. § 1531(b) ........................................................................3
16 U.S.C. § 1532(3) ........................................................................4
16 U.S.C. § 1532(6) .................................................................... 4, 17
16 U.S.C. § 1532(16) ...................................... 4, 8, 17, 20, 21
16 U.S.C. § 1532(20) .................................................................. 4, 17
16 U.S.C. § 1533(a)(1) ......................................................... 4, 5, 34
16 U.S.C. § 1533(b)(1)(A)..............................................................5
16 U.S.C. § 1533(c)(2)(A)............................................................21
16 U.S.C. § 1533(c)(2)(B)..............................................................5
16 U.S.C. §§ 1531-1544 ................................................................2
28 U.S.C. § 1291 ............................................................................2
28 U.S.C. § 1331 ............................................................................2

Pub. L. No. 112-10, 125 Stat. 38 (2011)................................................23

Pub. L. No. 93–205, § 3(11), 87 Stat. 884, 886 (1973) ..........................20

## Rules and Regulations

50 C.F.R. § 424.11(a)................................................................................4

50 C.F.R. § 424.11(c)................................................................................5

50 C.F.R. § 424.11(e)(2) (2019) ..............................................................5

50 C.F.R. § 424.11(e)(3) (2019) ..............................................................5


39 Fed. Reg. 1171 (Jan. 4, 1974) ............................................................6

43 Fed. Reg. 9607 (Mar. 9, 1978)...................................................... 6, 20

61 Fed. Reg. 4722 (Feb. 7, 1996) ...................................................... 8, 17

68 Fed. Reg. 15804 (Apr. 1, 2003) ........................................................23

72 Fed. Reg. 37346 (July 9, 2007)..........................................................23

72 Fed. Reg. 6052 (Feb. 8, 2007) ............................................................8

74 Fed. Reg. 15070 (Apr. 2, 2009) ..........................................................8

74 Fed. Reg. 15123 (Apr. 2, 2009) .................................................... 9, 22

76 Fed. Reg. 81666 (Dec. 28, 2011).........................................................9

77 Fed. Reg. 25792 (May 1, 2012)..........................................................27

77 Fed. Reg. 55530 (Sept. 10, 2012) ........................................................9

79 Fed. Reg. 37575 (July 1, 2014)..........................................................43

84 Fed. Reg. 9648 (Mar. 15, 2019)..........................................................10

85 Fed. Reg. 69778 (Nov. 3, 2020) ("Delisting Rule") .................. passim

88 Fed. Reg. 57388 (Aug. 23, 2023) ......................................................41


Fed. R. App. P. 26.1(a) ...................................................................... ii, iii

Fed. R. App. P. 4(a)(1)(B) ........................................................................2

# GLOSSARY

| APA | Administrative Procedure Act |
|---|---|
| Delisting Rule | Endangered and Threatened Wildlife and Plants; Removing the Gray Wolf (Canis lupus) from the List of Endangered and Threatened Wildlife, 85 Fed. Reg. 69778 (Nov. 3, 2020) |
| DPS | Distinct Population Segment |
| DPS Policy | Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 Fed. Reg. 4722 (Feb. 7, 1996) |
| ER | Federal Appellants' Excerpts of Record |
| ESA | Endangered Species Act |
| Int.ER | Intervenors-Defendants-Appellants' Excerpts of Record |
| NRA | National Rifle Association of America |
| SCI | Safari Club International |
| SPR Policy | Final Policy on Interpretation of the Phrase "Significant Portion of its Range" in the Endangered Species Act's Definitions of "Endangered Species" and "Threatened Species," 79 Fed. Reg. 37575 (July 1, 2014) |
| Service | U.S. Fish and Wildlife Service |
| 1978 Listing Rule | Reclassification of the Gray Wolf in the United States and Mexico, 43 Fed. Reg. 9607 (Mar. 9, 1978) |

## INTRODUCTION

Gray wolves in the United States have been recovered for years. The U.S. Fish and Wildlife Service ("Service") has repeatedly come to the same conclusion—wolf populations are increasing, their range is expanding, and the primary threats that previously caused their endangerment have been mitigated. The delisting rule at issue came to the same conclusion. The district court does not vacate this factual determination. For this reason alone, this Court should reverse the district court's decision. It should affirm the delisting, celebrate the success of the gray wolf's recovery, and let the Service get on to recovering other species that truly need it.

The district court repeatedly second-guessed the Service, instead of affording appropriate deference to the agency's technical findings. It construed the Endangered Species Act ("ESA") in a manner that keeps gray wolves in the lower 48 states on the ESA's lists of threatened and endangered species, despite the wolves' recovery. But the ESA was not meant to be "Hotel California." It should be interpreted and applied reasonably. This Court should correct the district court's errors for all the reasons explained below.

## JURISDICTIONAL STATEMENT

1. The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because the plaintiffs' claims arose under the ESA, 16 U.S.C. §§ 1531-1544, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA").

2. The district court's judgment was final as it granted the plaintiffs' motions for summary judgment and vacated the rule under review. 1-ER-2–3.[1] The district court entered judgment on February 10, 2022. *Id*. This Court has jurisdiction under 28 U.S.C. § 1291.

3. SCI and NRA filed a notice of appeal on April 11, 2022. Int.ER-1. The appeal is timely under Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF ISSUES

In this brief, SCI and NRA present the following issues:

1. Whether the district court erred in holding that the Service cannot rely on the ESA's current definition of "species" as an independent basis for removing listed gray wolf entities from the lists of endangered and threatened species.

2. Whether the district court erred in holding that the Service failed to fully assess the status of populations of gray wolves that are peripheral but connected to Great Lakes and Northern Rocky Mountains populations.

---

[1] Citations to "ER" refer to the Excerpts of Record filed with Federal Appellants' opening brief. Dkt. 33 in Case 22-15529. Citations to "Int.ER" refer to the Intervenors-Defendants-Appellants' Excerpts of Record filed with this brief.

3. Whether the district court erred in holding that the Service did not sufficiently analyze the genetic status of West Coast wolves, despite significant discussion of this issue in the delisting rule at issue and related biological report.

4. Whether the district court erred in holding that the Service's discussion of loss of historic range in relation to the control of unregulated human-caused mortality of gray wolves did not adequately address the causes and effects of historic range loss.

5. Whether the district court erred in imposing new requirements for the Service's threats assessment, including that the Service explain how regulatory mechanisms on federal lands will "ensure" a sustainable wolf population post-delisting.

## STATEMENT REGARDING ADDENDUM

An addendum reproducing relevant statutes and regulations is at the end of this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

The purpose of the ESA is to "conserve" species and the ecosystems upon which they depend.  16 U.S.C. § 1531(b).  To "conserve" means "use of all methods and procedures which are necessary to bring any endangered species or

threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3). Therefore, the goal of the ESA is to recover a "species" so that protections are no longer needed and the species can be delisted.

The first step in implementing the ESA is to identify a "species." This is a technical finding left to the discretion of the Secretary of the Interior (and by designation, the Service). 16 U.S.C. § 1533(a)(1) ("The Secretary shall by regulation promulgated in accordance with subsection (b) determine whether any species is an endangered species or a threatened species …"). The ESA defines "species" as "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16). When making a "species" determination, the Service "shall rely on standard taxonomic distinctions and the biological expertise of the [Service] and the scientific community concerning the relevant taxonomic group." 50 C.F.R. § 424.11(a).

The next step in a listing or delisting is to determine if the species is threatened or endangered[2] based on five factors:

---

[2] An "endangered" species is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened" species "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

4

    (A) the present or threatened destruction, modification, or curtailment
       of its habitat or range;
    (B) overutilization for commercial, recreational, scientific, or
       educational purposes;
    (C) disease or predation;
    (D) the inadequacy of existing regulatory mechanisms; or
    (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). Again, this is a technical finding by the Service. The

Service makes this decision "solely on the basis of the best scientific and

commercial data available," and after "taking into account" efforts being made by

state and foreign powers to protect the species. 16 U.S.C. § 1533(b)(1)(A).

    The ESA also requires the Service to review all listings of endangered and

threatened species periodically and to determine whether any species should be

reclassified or removed from the lists. *See* 16 U.S.C. § 1533(c)(2)(B). The Service

"shall delist a species if [it] finds that … [t]he species does not meet the definition

of an endangered species or a threatened species." 50 C.F.R. § 424.11(e)(2)

(2019).[3] When making such delisting determinations, the Service considers the

same five factors identified by the statute. 16 U.S.C. § 1533(a)(1). The Service

also shall delist a species if it finds that "[t]he listed entity does not meet the

statutory definition of a species." 50 C.F.R. § 424.11(e)(3) (2019).

---

[3] The Service revised 50 C.F.R. § 424.11 in 2019 and again in 2024. The quoted
2019 version was in effect when the Service published the Delisting Rule.

### B.     Factual Background

The gray wolf (*Canis lupus*) in the United States is an ESA success story.[4]
Gray wolves were nearly eradicated during the nineteenth and first half of the
twentieth centuries due to human persecution, which included government-funded
wolf-extermination efforts.  3-ER-320.  Only about 1,040 gray wolves remained
south of the Canadian border in Minnesota and Isle Royale, Michigan, when gray
wolf subspecies were first listed under the ESA.  39 Fed. Reg. 1171 (Jan. 4, 1974);
3-ER-314.  In 1978, the Service reclassified gray wolves in the lower 48 United
States as endangered, except in Minnesota, where gray wolves were listed as
threatened. 43 Fed. Reg. 9607 (Mar. 9, 1978) ("1978 Listing Rule"); 3-ER-314.
Prior to the 1978 Listing Rule, four subspecies and location combinations of gray
wolves were listed under the ESA: the Mexican wolf, the Northern Rocky
Mountains wolf, the eastern timber wolf, and the Texas gray wolf.  43 Fed. Reg. at
9607.  Despite acknowledging the existence of subspecies, the Service chose to list
gray wolves as a single species (*Canis lupus*) across the lower 48 states because it
believed "this matter [could] be handled most conveniently by listing only the
species name."  *See id.*

---

[4] U.S. Fish and Wildlife Service, Press Release (Oct. 29, 2020),
https://www.fws.gov/news/ShowNews.cfm?ref=trump-administration-returns-management-and-protection-of-gray-wolves-to-&_ID=36801.

The Service and its state, tribal, and local partners invested heavily in recovery of gray wolf populations in the Great Lakes States of Michigan, Minnesota, and Wisconsin. *See, e.g.*, 3-ER-386 (noting that the Service has "been strongly committed to gray wolf recovery since the 1970s" and commitment from partners has resulted in success). Similarly, the Service and its state, tribal, and local partners implemented a recovery plan in the Northern Rocky Mountains States of Idaho, Montana, and Wyoming[5]—including the release and reintroduction of gray wolves into portions of this area. *See, e.g.*, 3-ER-306 (noting reintroduction of wolves in Northern Rocky Mountains). These efforts paid off. By the late 1990s, the Great Lakes wolf populations had far exceeded recovery plan criteria. 3-ER-317. The Northern Rocky Mountains wolf populations were not far behind and exceeded recovery goals by 2002. 3-ER-318.[6]

Based on these successes, the Service has sought to reduce or remove ESA protections for these wolves for over 20 years. The Service first reclassified populations of wolves from endangered to threatened in a 2003 rule, which was subsequently vacated by two district courts. 3-ER-307, Table 1 (citing rule). In these cases, much of the courts' respective decisions turned on the Service's

---

[5] The Northern Rocky Mountains also includes the eastern one-third of each of Washington and Oregon and a small part of north-central Utah.

[6] The third region, the Southwestern United States, is populated by the Mexican wolf subspecies, 3-ER-313, and remains listed, 3-ER-419.

7

attempt to create and downlist various "distinct population segments" ("DPS").[7]
*See Defs. of Wildlife v. Sec'y, U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156,
1170–72 (D. Or. 2005); *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 564–
65 (D. Vt. 2005).

In 2007, 2009, and 2011, the Service tried to delist Great Lakes wolves
again. The 2007 rule, 72 Fed. Reg. 6052 (Feb. 8, 2007), was challenged by a
number of groups. The "central issue" before the court was the Service's use of
the DPS Policy to designate and delist a segment of gray wolves at the same time,
which the court found impermissible. *Humane Soc'y of the U.S. v. Kempthorne*,
579 F. Supp. 2d 7, 11–12 (D.D.C. 2008). The Service sought to incorporate the
court's reasoning into a 2009 rule. 74 Fed. Reg. 15070 (Apr. 2, 2009). But that
rule was vacated by settlement due to the Service's failure to provide public notice
and comment. *Humane Soc'y of the U.S. v. Salazar*, 1:09-CV-1092-PLF (D.D.C.
2009).

In 2011, the Service finalized another rule to remove the Great Lakes wolves
from the ESA lists of endangered and threatened species. 76 Fed. Reg. 81666

---

[7] Under the ESA, the term "species" includes "any subspecies of fish or
wildlife or plants, and any distinct population segment of any species of
vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).
The Service considers three elements regarding the status of a possible DPS:
(1) "discreteness of the population segment"; (2) the "significance of the
population segment"; and (3) the "population segment's conservation status." 61
Fed. Reg. 4722, 4725 (Feb. 7, 1996) ("DPS Policy").

(Dec. 28, 2011). That rule was also vacated, largely based on the court's ruling that the ESA prevents the Service from simultaneously designating and delisting a DPS. *Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69, 113 (D.D.C. 2014). On appeal, however, the D.C. Circuit reversed and held that the ESA allows the Service to designate and delist a DPS. *Humane Soc'y of the U.S. v. Zinke*, 865 F.3d 585, 597 (D.C. Cir. 2017). But the D.C. Circuit ultimately affirmed vacatur of the 2011 rule on the grounds the Service failed to review the status of the listed species as a whole and failed to consider the implications of delisting the DPS on wolves outside of the Great Lakes area. *Id.* at 601–03.

On a separate track, in 2009 the Service removed wolf populations in Idaho, Montana, and portions of Oregon, Washington, and Utah (the Northern Rocky Mountains States) from the ESA list of endangered species. 74 Fed. Reg. at 15123. Although a district court held that the Service could not delist a subset of the gray wolf species, *see Defs. of Wildlife v. Salazar,* 729 F. Supp. 2d 1207 (D. Mont. 2010); Congress legislatively reinstated the delisting. Pub. L. No. 112-10, 125 Stat. 30 (2011). This Court upheld that Congressional act. *All. for the Wild Rockies v. Salazar*, 672 F.3d 1170 (9th Cir. 2012). In 2012, the Service delisted the wolf population in Wyoming. 77 Fed. Reg. 55530 (Sept. 10, 2012). The D.C. Circuit upheld that rule in 2017. *Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1093 (D.C. Cir. 2017).

Relevant here, by 2019 two gray wolf entities remained protected under the ESA: threatened-listed wolves in Minnesota, and endangered-listed wolves in all or portions of 44 U.S. states. 3-ER-307. On March 15, 2019, the Service proposed to remove ESA protections for all remaining gray wolves (except Mexican wolves). 84 Fed. Reg. 9648 (Mar. 15, 2019); 3-ER-494. Unlike the prior rules, the proposed rule did not create a DPS. Instead, it analyzed the legal and conservation status of the two gray wolf entities as listed under the ESA. 3-ER-499–532. On November 3, 2020, the Service published the final rule removing the gray wolf, except Mexican wolves, from the ESA lists of threatened and endangered species. 85 Fed. Reg. 69778 (Nov. 3, 2020) ("Delisting Rule"); 3-ER-304. The Delisting Rule went into effect on January 4, 2021. 3-ER-304.

## C. Proceedings Below

Two coalitions of organizations and a separate single organization sued the Service and other federal defendants in three lawsuits after the Delisting Rule went into effect asserting violations of the APA and the ESA. 1-ER-5.

Resolving cross-motions for summary judgment, the district court held that the Service violated the ESA in several respects. It granted summary judgment in favor of the plaintiffs, vacated the Delisting Rule, and entered judgment. 1-ER-5; 1-ER-3. SCI, NRA, and the other defendants timely appealed the district court's adverse findings. *E.g.*, Int.ER-1 (SCI and NRA notice of appeal). Although the

court also found in favor of defendants on several issues, none of the plaintiffs

appealed any aspect of the district court's order and judgment.  4-ER-633; 4-ER-

663; 4-ER-692.

## SUMMARY OF THE ARGUMENT

The district court's order and judgment in favor of the plaintiffs should be

reversed.

***Definition of "species."***  The district court erred in rejecting the Delisting

Rule's conclusion that the listed gray wolf entities in the lower 48 states are not a

"species" that the ESA can protect.  The plaintiffs did not dispute the substance of

the Service's conclusion that neither of the two listed wolf entities meet the ESA's

definition of a "species."  The district court did not address this underlying

biological determination.  Rather, the court incorrectly interpreted the ESA to

contain an exception for species listed before 1978.  That exception conflicts with

the statute's text, Congressional intent, and the Service's practice in evaluating the

status of other animals listed before 1978.  Moreover, the Delisting Rule does not

conflict with the D.C. Circuit's decision in *Humane Society of the United States v.*

*Zinke*.  The Service did not extract a smaller segment from a larger one, but

considered the listed gray wolf entities and determined based on new information

that these entities are not "species."  Finally, the court erred by faulting the Service

for taking a "conservative approach" in the Delisting Rule and analyzing the gray

11

wolf entities under the ESA listing factors as an alternative avenue for delisting. Nothing in the ESA prohibits the Service from conducting a threats assessment to reinforce its initial decision to delist gray wolves for not being a "species."

*Analysis of listed wolves.* The Service properly assessed the status of wolves across the lower 48 states, including the entirety of the two listed entities. For each configuration, the Service relied on the best available scientific information to evaluate potential threats and found that neither of the listed entities nor any of the analyzed configurations meet the definition of an endangered or threatened species. The Delisting Rule also fully explained why wolves in West Coast States and Colorado and "lone dispersers" are not necessary to preserving the resiliency, redundancy, and representation of gray wolves in the listed entities. This fulfilled the Service's obligations under the ESA and under *Humane Society*. The Service did not and could not commit the same flaw as in that case, because it left no "orphan to the law," or any remnant wolves whatsoever. Accordingly, the district court's ruling that the Service failed to evaluate the status of listed gray wolves should be reversed.

*West Coast wolves.* The district court erred in finding the Service did not rely on the best available science or fully analyze the genetics of West Coast wolves and improperly grouped them with Northern Rocky Mountains wolves. The study cited by the court is not the best available science, but rather contains

12

policy recommendations that the Service has no obligation to implement. Further, the Delisting Rule directly addressed the potential genetic impact of delisting wolves. It also specifically discussed the genetic status of West Coast wolves, noting that all wolves in Oregon and California genetically descended from Northern Rocky Mountains wolves, and only one wolf in the listed portion of Washington reflected an "admixture" of genes including a coastal ecotype. Given uncertainty as to where the admixing occurred, it was reasonable for the Service to conclude that West Coast wolves are not genetically distinct from non-listed Northern Rocky Mountains wolves.

*Loss of historic range.* Next, the district court overlooked the Delisting Rule's substantial discussion of the causes, effects, and mitigation of loss of historic range. The Service explained that human-caused mortality was the primary reason for substantial range contraction. However, the Delisting Rule determined that human-caused mortality has been sufficiently controlled across the lower 48 states and that for each listing configuration, gray wolf range is no longer contracting but expanding. In discussing the threat of habitat loss, the Delisting Rule further describes how wolves are recolonizing historic range. Taken as a whole, the rule fulfilled the Service's legal obligations.

*Inadequacy of regulatory mechanisms on federal lands.* Finally, the district court erred in overturning the Delisting Rule's finding on the adequacy of

13

federal lands regulatory mechanisms. The court conflated a lack of express protective language with a threat to the future viability of wolves. Those are two different things. Regulatory mechanisms need not ensure future protection of a species as long as they do not pose a threat. And the district court glossed over the Delisting Rule's analysis of federal lands protections, which include conservation measures and deference to state laws that mitigate the risk of human-caused mortality.

Accordingly, the district court's judgment should be reversed with respect to the issues presented in this appeal. The Court should reinstate the Delisting Rule as a reasonable application of the Service's authority under the ESA and analysis of the best scientific and commercial information available.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007). The Court "view[s] the case from the same position as the district court," *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993); which means the Court owes no deference to the district court's findings or conclusions. *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 991 (9th Cir. 2014).

Courts review ESA claims under the APA's "arbitrary and capricious" standard. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011). The standard "requires that agency action be reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A reviewing court "may not substitute its own policy judgment for that of the agency." *Id.* Rather, the court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* The agency's decision will not be vacated "unless the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 921 (9th Cir. 2018) (quotation marks and citations omitted).

Because this case deals with scientific and technical matters within the Service's mandate, judicial review must be "highly deferential to the agency and presume the agency action to be valid. Such deference is especially warranted when reviewing the agency's technical analysis and judgments, based on an evaluation of complex scientific data within the agency's technical expertise." *Ctr.*

*for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009) (cleaned up, citations omitted).

## ARGUMENT

In the Delisting Rule, the Service made two separate determinations. First, the Service determined that neither the Minnesota wolves nor the lower 44 states wolves meet the ESA's definition of a "species." The Service thus determined it could delist both listed entities on that basis. 3-ER-309–10. Second, the Service took a "conservative approach" and analyzed the listed wolf entities and other configurations of wolves under the ESA listing factors "to eliminate the possibility of removing protections for any gray wolves that might meet the [ESA's] definition of a 'species' and might be endangered or threatened." 3-ER-310. This Court can uphold the Delisting Rule if it finds that either determination complies with the ESA. And it should uphold the Delisting Rule on both grounds.

## I.     The Service can rely on the ESA's definition of "species" as an independent ground for delisting.

The Delisting Rule properly concluded that the listed gray wolf entities in the lower 48 states are not "species" the ESA can protect. When the Service evaluates the status of a listed or unlisted entity, the ESA mandates that the Service "first … decide whether [the] population of fish or wildlife constitutes a 'species' or a 'distinct population segment' within the meaning of the ESA." *Trout Unlimited v. Lohn*, 559 F.3d 946, 949 (9th Cir. 2009). This decision is

"analytically distinct" from and "not influenced by" the subsequent decision regarding the conservation status of the entity. *Id.* at 955. And this decision is fundamental, because only a "species" may be designated as threatened or endangered under the ESA. 16 U.S.C. § 1532(6), (20); *see also Am. Wildlands v. Kempthorne*, 530 F.3d 991, 994 (D.C. Cir. 2008) ("In determining whether to list a species as threatened or endangered, the Service must first define the species so the agency can estimate its population.").

In the Delisting Rule, the Service reviewed whether the currently listed gray wolf entities constitute "species." As the Service explained, the entities are not entire species or subspecies—which is obvious because "*Canis lupus*" exist in many other places. 3-ER-309; *see also* 3-ER-428 (Service Biological Report, noting that "[g]ray wolves have a circumpolar range including North America, Europe, and Asia").

Therefore, to meet the definition of "species," each listed entity would need to be as a "distinct population segment." 16 U.S.C. § 1532(16). The Service applied its DPS Policy, which requires that populations be "discrete" and "significant" to qualify as a DPS. 61 Fed. Reg. at 4725. The Service determined that neither listed entity is a DPS because they are not "discrete," i.e., markedly separated from other populations of wolves. 3-ER-309–10. Wolves listed as threatened in Minnesota are not discrete from wolves in Wisconsin and Michigan.

17

3-ER-309.  Endangered-listed wolves, including those in parts of West Coast States, are likewise not discrete from Minnesota's wolves or the delisted wolves in the Northern Rocky Mountains.  3-ER-309–10.  Thus, the Service concluded that the listed entities are not DPSs and are not otherwise "species" as defined under the ESA.  Based on this finding, "the currently listed gray wolf entities could be removed from the [ESA] List because they do not meet the statutory definition of a 'species.'" 3-ER-310.  The Service identified this determination as an "independent basis for delisting, which is based on the plain language of the [ESA]." *Id.*

The Service's determination is a scientific judgment within the agency's area of expertise.  This Court should defer to the Service's reasoned judgment regarding whether the listed entities meet the ESA's definition of "species" and uphold the Delisting Rule on this basis alone.  *Friends of Santa Clara River*, 887 F.3d at 921 (review of agency decision-making under the APA "requires [courts] to defer to an agency's determination in an area involving a high level of technical expertise").

The Court should also affirm the Service's determination because it is uncontested.  In the district court, Appellees did not dispute the substance of the Service's conclusion that neither of the two listed wolf entities meet the ESA's definition of a "species."  The district court likewise did not address or find fault

with the Service's underlying biological analysis regarding whether the listed

entities meet the definition of species. 1-ER-10–13. Nevertheless, the district

court declined to uphold the Delisting Rule because it: (1) disagreed that the

Service could delist the wolves based on the 1978 definition of "species" since

wolves were listed pursuant to a previous definition of the term; (2) found that

such a delisting runs afoul of the D.C. Circuit's holding in *Humane Society of the

United States. v. Zinke*, 865 F.3d at 602; and (3) faulted the Service for analyzing

the status of the various configurations of wolves, even though the Service argued

it could delist solely based on its determination that the listed entities are not

species. 1-ER-11–13. For the reasons explained below, the district court erred in

holding that the Service could not delist the wolves based on its conclusion that the

listed entities are not species, and this Court should reverse.

### A. The Delisting Rule correctly applied the 1978 definition of "species" to the wolf entities.

The district court erred in reversing the Service's delisting of wolves due to

the timing of the wolves' listing in 1978. In doing so, the district court

contradicted basic canons of statutory construction in interpreting Congress'

subsequent amendment to the ESA and disagreed with decades of judicial holdings

and regulatory rulemakings.

When enacted, the ESA's definition of "species" included full taxonomic

species, subspecies (i.e., a taxonomic subdivision of a species), and "any other

group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature." Pub. L. No. 93–205, § 3(11), 87 Stat. 884, 886 (1973). This definition applied in 1978, when the Service reclassified and listed wolves under the ESA as they currently are—threatened in Minnesota and endangered throughout the remainder of the lower 48 states. 43 Fed. Reg. at 9607. But later in 1978, Congress amended the definition of "species" by replacing the "smaller taxa in common spatial arrangement" language with the current language: "any distinct population segment of any species of vertebrate fish or wildlife" that interbreeds when mature. 16 U.S.C. § 1532(16). Congress amended the definition to "exclude taxonomic categories below subspecies from the definition as well as distinct populations of invertebrates." H.R. Rep. 95-1804, at 25 (1978) (Conf. Rep.), *reprinted in* 1978 U.S.C.C.A.N. 9484, 9485. Although Congress did not provide an exception for application of the 1978 definition to already-listed entities, the district court erroneously created such an implied exception. 1-ER-11. The district court's holding is unsupported for many reasons.

First, the district court's conclusion contradicts basic canons of statutory construction. The Court's review starts "as always, with the language of the statute." *Williams v. Taylor*, 529 U.S. 420, 431 (2000). Courts "ordinarily resist reading words or elements into a statute that do not appear on its face." *United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*, 837 F.3d 1055, 1062 (9th

Cir. 2016). "When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995). Here, the ESA on its face does not include an exception for application of the pre-1978 definition of "species" to gray wolves or any other species listed before the definition amendment. 16 U.S.C. § 1532(16). To have real and substantial effect, the 1978 amendment would apply to any future determinations of the status of wolves. A straightforward reading of the statute does not support application of an exception, despite the district court's conclusion, because the text simply does not include such language.

Second, in addition to the typical application of amended statutory text, the ESA's structure makes clear that the amended definition should be applied prospectively. The ESA requires the Service to review listed entities every five years to confirm they are appropriately listed. 16 U.S.C. § 1533(c)(2)(A). Despite this requirement to review the listings, the district court's holding suggests the Service should ignore applicable statutory requirements for species put on the ESA lists before the 1978 amendment, such as wolves, presumably into perpetuity. That holding makes no sense given that the ESA requires the Service to continually ensure that its lists accurately reflect species' status pursuant to the standards set forth in the ESA. An agency "may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law,'

because 'an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress.'" *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1026 (9th Cir. 2007) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125, 161 (2000) (internal citation omitted)).

Third, the district court's conclusion relied on there being "nothing in the statute that suggests that Congress intended the 1978 amendments to the ESA to remove protections for already-listed entities." 1-ER-11. A lack of legislative history is not grounds for creating an exception to statutory requirements. *Burns v. United States*, 501 U.S. 129, 136 (1991) ("An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent."), *abrogated on other grounds by United States v. Booker*, 543 U.S. 220 (2005); *United Cook Inlet Drift Ass'n*, 837 F.3d at 1064. The district court erred by offering no justification for reading an exception into the statute that otherwise plainly applies to wolves.

Fourth, even if the district court was correct with respect to the lack of contemporaneous legislative intent (which it is not), Congress has since clarified that the 1978 definition of "species" applies to gray wolves. In 2009, the Service determined that Northern Rocky Mountains wolves constituted a DPS pursuant to the 1978 definition of "species." 74 Fed. Reg. at 15123. The rule was vacated, but

Congress instructed the Service to republish the rule and delist those wolves. Pub. L. No. 112-10, 125 Stat. 38, 150 (2011). In so doing, Congress amended the ESA. *All. for the Wild Rockies*, 672 F.3d at 1174–75; *see also Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 562 (9th Cir. 2019) (explaining that Congress "effectively amended the [ESA] . . . [and] changed the substantive law" when it reinstated the 2009 delisting rule). As the 2009 delisting was based on the 1978 definition of "species," Congress agreed with the Service's application of that definition to wolves. The district court mistakenly ignored this expression of congressional intent.

Fifth, the Service has consistently applied the 1978 definition of "species" to species listed prior to amendment of the definition.[8] Reviewing courts have likewise applied the 1978 definition to pre-amendment listed species. None of these courts have suggested that the pre-1978 definition of "species" should apply instead.

---

[8] *See*, *e.g.*, 68 Fed. Reg. 15804, 15807 (Apr. 1, 2003) (applying 1978 definition in rule applicable to gray wolves throughout the lower 48 states); 72 Fed. Reg. 37346, 37358 (July 9, 2007) (applying 1978 definition in delisting rule for bald eagles, which were listed under the ESA's predecessor in 1966 and under the ESA in 1978 before the amendment to "species."). Although the district court faulted the Service for failing to delist wolves "solely on th[is] theory until now," 1-ER-11, n.4, the Service has consistently applied the 1978 definition of "species." Further, the district court did not consider that wolf populations have significantly increased in population and expanded in range since 1978 such that they do not qualify as DPSs—but they may have qualified as "distinct" populations prior to 2020. *E.g.*, 3-ER-309–10.

23

For example, in *Humane Society*, the D.C. Circuit applied the 1978 definition to wolves, finding that the Service can recognize and delist a DPS of wolves even if the Service did not do it properly in that case.[9]  865 F.3d at 595. The D.C. Circuit could not have reached this conclusion if the pre-1978 definition applied because it did not provide for designation of DPSs.  Likewise, the D.C. Circuit would not have been concerned about the "remnant" population of wolves becoming an "orphan to the law" if the Service could have simply kept the remnant wolves listed as a separate entity under the pre-1978 definition of "species."  *Id.* at 602–03.

This Court similarly applied the 1978 definition of "species" to grizzly bears, which were listed under the ESA in 1975.  *Crow Indian Tribe v. United States*, 965 F.3d 662, 671 (9th Cir. 2020).  This Court also applied the 1978 definition to jaguars, which were first federally protected in 1972 and then again under the ESA.  *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 67 F.4th 1027, 1030–31 n.1 (9th Cir. 2023).  Thus, the Service's consistent application of the 1978 definition, and the courts' analysis of the Service's actions,

---

[9] If the district court intended to limit its holding only to actions that "remove protections for already-listed entities," Congress reinstating the 2009 delisting rule and the courts' holdings in *Humane Society* and *Crow Indian Tribe* fully contradict that limitation.  *See* 1-ER-11.  These authorities confirm that the Service can delist gray wolf DPSs pursuant to the 1978 amendment to the definition of "species." *Humane Soc'y*, 865 F.3d at 595; *Crow Indian Tribe v. United States,* 965 F.3d 662, 671 (9th Cir. 2020).

do not support the district court's exception to application of the 1978 definition of species. For all these reasons, the district court's erroneous decision should be reversed.

### B. *Humane Society* has no bearing on the Service's finding that the wolf entities are not "species."

The district court's holding that the Delisting Rule conflicts with *Humane Society* should be reversed. The ESA's definition of a "species" was not even at issue in *Humane Society*. In *Humane Society*, the D.C. Circuit overturned the Service's designation and delisting of a Western Great Lakes DPS. The Court did so in part because the Service subsequently proposed to delist "remnant" wolves that were not included in the DPS delisting because those wolves no longer meet the definition of a "species." 865 F.3d at 602–03. The Court found "[t]he Service cannot circumvent the [ESA's] explicit delisting standards by riving an existing listing into a recovered sub-group and a leftover group that becomes an orphan to the law." *Id.* at 603.[10] The Delisting Rule at issue is fundamentally different than the Service's 2011 rule at issue in *Humane Society*.

---

[10] The Ninth Circuit agreed with the D.C. Circuit's holding, concluding that if "the [Service] determines that delisting the DPS would render the remnant population no longer viable, no partial delisting can take place. This is necessary in order to avoid the '*de facto* delisting' the court in *Humane Society* was concerned about." *Crow Indian Tribe*, 965 F.3d at 678.

25

Here, the Service did not extract a segment from an already-listed species. It did not delist "by balkanization." *Id.* at 603. And it did not "review a single segment with blinders on, ignoring the continuing status of the species' remnant." *Id.* at 601. Instead, the Service reviewed the entirety of the listed entities, determined that they did not constitute species under the ESA, and delisted the entire listed entities without any remnants. The Delisting Rule is not "statutory dodge" or a "backdoor route to the *de facto* delisting of already-listed species." *Id.* at 602–03. Rather, in a transparent and straightforward analysis, the Service applied the required statutory definition to all listed gray wolves (except Mexican wolves) and determined that the listed entities are not species. 3-ER-309–10.

Because of these notable and material differences between the Service's action at issue in *Humane Society* and the determination in the Delisting Rule, the district court's application of the *Humane Society* holding to the Delisting Rule is flawed. This Court should reverse the district court and hold that the Delisting Rule is a permissible exercise of the Service's authority under the ESA.

### C. The Service's "belt and suspenders" approach is appropriate.

The district court also found that the Delisting Rule "contradict[ed]" the assertion that the court should uphold the rule based on the determination that the listed entities are not species. 1-ER-12. The court noted that, "[a]lthough the Service states that it believes it can delist gray wolves based solely on the statutory

definition of 'species,' it chose not to do so in the [Delisting] Rule." *Id.* The district court faulted the Service for this approach and declined to uphold the Delisting Rule because the Service also reviewed the relevant ESA listing factors. But it makes no sense for a court to vacate an agency action for taking a "conservative approach," as the Service did in the Delisting Rule—concluding that delisting is appropriate based on a determination regarding the entities' status as "species," yet also analyzing the gray wolf entities under the ESA listing factors as an alternative. 3-ER-310. Nothing in the ESA or Service policy prohibits the Service from also conducting a threats assessment to reinforce and further explain its ultimate determination.

The Service's dual analysis in the Delisting Rule is not a novel approach. The Service also utilized dual determinations when considering whether to list the Sonoran Desert Area population of bald eagle under the ESA. 77 Fed. Reg. 25792 (May 1, 2012). The Service explained:

> [W]e have determined that the Sonoran Desert Area population of bald eagle does not qualify as a DPS and, therefore, is not a listable entity because it is not significant to the taxon as a whole. However, we provide below a threats assessment of the Sonoran Desert Area population of bald eagle and a determination of its conservation status. The DPS Policy neither requires nor prohibits completion of a threats assessment once we have determined that a population does not qualify as a DPS. Nevertheless, in this instance, we concluded that completing a threats assessment—and detailing the nature, scope, and likely effect of the threats to the population and the species— would provide us and the public with valuable information for understanding the status of the population.

27

*Id.* at 25810.  Based on the threats assessment, the Service determined that listing the eagle population was not warranted.  *Id.* at 25828.

This example is instructive because this Court reviewed and upheld that finding.  Center for Biological Diversity—an appellee here—challenged the Service's findings that the eagle population did not constitute a DPS and that the eagle is not endangered or threatened.  *Ctr. for Biological Diversity v. Jewell*, 12-CV-2296, 2014 WL 5703029 (D. Ariz. Nov. 5, 2014).  The Arizona district court appears to have taken no issue with the Service's dual determination and upheld the finding based on the Service's conclusion that the bald eagle population at issue did not qualify as a species.  The court concluded:

> A population must qualify as a DPS before becoming eligible for a
> threatened or endangered listing.  Because the Court upholds [the
> Service's] conclusion that the significance element of the DPS Policy
> is not satisfied, and that the desert eagle therefore does not qualify as a
> DPS, the Court need not reach the question of whether [the Service]
> acted arbitrarily and capriciously in finding the desert eagle not
> threatened or endangered.

*Id.* at *13 (citing the Service's DPS Policy).  On appeal, this Court affirmed and found that the Service reasonably concluded that the eagle population was not a DPS.  *Ctr. for Biological Diversity v. Zinke*, 868 F.3d 1054 (9th Cir. 2017).  Here, the Court likewise should uphold the Delisting Rule's finding that the gray wolf entities are not species, which can end the Court's review.

For the reasons explained above, the Court should reverse the district court's decision and reinstate the Delisting Rule based on the Service's uncontested determination that the listed gray wolf entities do not meet the ESA's definition of species.

## II. The Delisting Rule's threats assessment was reasonable and well-supported.

This Court should reverse the district court and reinstate the Delisting Rule for a second reason: the Service's threats assessment was robust and satisfied the Service's ESA obligations. In fact, the district court upheld the Service's application of Section 4(a) of the ESA to most of the analysis of existing regulatory mechanisms. But the court erred by finding: (1) the Service did not comply with *Humane Society* because it did not fully analyze threats to gray wolves in peripheral populations or areas; (2) the Delisting Rule did not sufficiently explain the genetic status of West Coast wolves; (3) the Service did not evaluate the causes and effects of loss of historic range; and (4) the Delisting Rule did not describe how regulatory mechanisms on federal lands will ensure a sustainable wolf population post-delisting.

This Court should reverse the district court. The Service thoroughly analyzed threats to the gray wolf entities. The district court's nit-picking and selective reading would keep species on the ESA lists forever. But that is not the

29

ESA's goal.  And it is not the court's role to substitute its judgment for the Service's.

### A. The Delisting Rule fully analyzed the status of wolves in the lower 48 states.

This Court should reverse the district court's finding that the Service failed to fully analyze the status of gray wolves outside "core populations."  Contrary to the court's ruling, the Service thoughtfully assessed these wolves using the best available scientific information and its expertise.  The Service determined, after considering peripheral populations, that no listed entities, nor any of the analyzed configurations, meet the definition of an endangered or threatened species.  As a result, the Service fulfilled its obligations under *Humane Society*.  *E.g.*, 3-ER-387 (explaining how the rule complies).  Yet, the district court simply disagreed with the Service and supplanted the Service's carefully considered decision with its own.  The district court overstepped its bounds.

The district court's decision is unfounded because the Service assessed the status of wolves across the lower 48 states, including the entirety of the two listed entities.  *Id.*  The Delisting Rule analyzed the status of gray wolves in multiple configurations including in Minnesota and the 44 states outside of Minnesota and the Northern Rocky Mountains, and all gray wolves (listed and delisted) across the lower 48 states.  *E.g.*, 3-ER-310–11; 3-ER-405–19.  For each configuration, the Service relied on the best available scientific information to evaluate potential

threats from human-caused mortality, habitat loss, disease, and inadequate regulatory mechanisms. *E.g.*, 3-ER-320–69; 3-ER-406–19. After careful consideration of these potential threats, the Service found that neither of the listed entities, nor any of the analyzed configurations, meet the definition of an endangered or threatened species. 3-ER-408; 3-ER-411; 3-ER-415; 3-ER-419. This fulfilled the Service's obligations under the ESA, including as held in *Humane Society*.

But it was not enough for the district court. The court found "the Service did not adequately consider threats to wolves outside of [the Great Lakes and Northern Rocky Mountains] core populations. Instead, the Service avoids analyzing these wolves by concluding, with little explanation or analysis, that wolves outside of the core populations are not necessary to the recovery of the species." 1-ER-14. The district court relied on a statement in the Delisting Rule that "the relatively few wolves that occur within the 44-state entity outside of Wisconsin and Michigan, including those in the West Coast States and central Rocky Mountains, as well as lone dispersers in other States, are not necessary for the recovered status of the 44-state entity." 3-ER-409.

The district court did not fairly read the Delisting Rule. The Service did focus on the core populations of wolves for both of the listed entities. And it

concluded that the relatively few wolves outside these populations[11] are not

necessary to preserving the resiliency, redundancy, and representation of the listed

entities.  3-ER-409; 3-ER-412.[12]  But it did ***not*** reach this result "with little

explanation or analysis."

For example, when reviewing the 44-state entity, the Service logically

focused on Wisconsin and Michigan's "large, stable to growing, population" of

wolves as the primary population within the entity.  3-ER-408.  But the Service

also recognized "there are also a small number of colonizing wolves in the West

Coast States and central Rocky Mountains that represent the expanding edge of a

large population outside the 44-State entity (in the northern Rocky Mountains and

western Canada)."  3-ER-408.  Even though the listed wolves in the West are not

"necessary" for the recovered status of the 44-state entity, they are also not an

isolated population of wolves that the Service simply ignored.  Rather, those

wolves are the "expanding edge" of wolf populations that are already delisted and

not included in the 44-state listed entity.  Further, the Service "expects[s] wolves in

the [Northern Rocky Mountains] and western Canada to continue to expand into

unoccupied suitable habitats in the Western United States, as envisioned in State

---

[11] *See* 3-ER-314 (as of 2020, 54 wolves outside the Northern Rocky Mountains
DPS in the western states and 6 wolves in Colorado).

[12] The Service also determined that these wolves are not biologically significant to
the larger metapopulations of wolves as part of its analysis under the SPR Policy.
*E.g.*, 3-ER-410–11.

wolf conservation and management plans."[13]  3-ER-409.  Thus, although the relatively few listed West Coast States wolves have minimal impact on the overall health of the 44-state entity, they are biologically—even if not legally—part of a much larger, secure, and expanding wolf metapopulation.  Thus, the Service fully explained why those wolves are not critical to the recovery of wolves in the 44-state entity.

The rule also explains how "the viability" of the listed entities are "further enhanced by" peripheral wolves, which "enhance[ ]" resiliency, redundancy, and representation.  3-ER-409; 3-ER-412.  The Service spent pages assessing the status of and threats to both listed entities, including peripheral wolves for each entity.  *E.g.*, 3-ER-320; 3-ER-322; 3-ER-343–45; 3-ER-363–64; 3-ER-368–69; 3-ER-371; 3-ER-374; 3-ER-409; 3-ER-413.  And the Service explained why these wolves are not "necessary" to the overall health of gray wolves: because they initially came from the core populations themselves, and because wolf biology and secure habitat, by themselves, are adequate to "enable the maintenance of populations capable of withstanding all other foreseeable threats."  3-ER-408–10; 3-ER-412–14.

---

[13] The Service also notes that Washington, Oregon, and California have state management plans, and the Service expects those states will continue "to manage wolves through appropriate laws and regulations."  3-ER-409.

Despite what it wrote, the district court appears to have vacated the Delisting Rule because it simply disagreed with the Service's conclusions. But that is not the court's role. The district court was "limited in [its] review of matters within the expertise of an agency." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 592 (9th Cir. 2014). "'When examining this kind of scientific determination ... a reviewing court must generally be at its most deferential.'" *Id.* at 592–93 (quoting *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983)). The role of small populations or dispersed wolves in the overall the species' status is a biological determination, within the Service's mandate and special expertise. *See* 16 U.S.C. § 1533(a)(1). The district court erred in overstepping its bounds.

Further, the district court buttressed its conclusion with reference to *Humane Society*, but the court misapplied the case. In *Humane Society*, the issue was the Service's simultaneous identification and delisting of a distinct population segment of gray wolves in the Great Lakes. As explained above (pages 25-26), the D.C. Circuit held that the Service erred by failing to address whether the remnant wolves—those wolves outside the delisted DPS—warranted continued listing or would otherwise be an "orphan to the law." 865 F.3d at 600–03.

The Service did not and could not commit the same flaw here. It properly conducted a threats assessment for ***all*** wolves within listed entities as well as delisted wolves. 3-ER-310–11. And the Delisting Rule clearly stated that it did

34

not leave behind a remnant.  Rather, the Service grouped dispersing wolves and small populations on the West Coast and in Colorado with the metapopulations from which they originated—and provided reasons to support this decision.  *E.g.*, 3-ER-312 3-ER-314–15.  According to *Humane Society*, "the Service cannot find that a population segment is distinct—in the Service's words, that it is severable because it is '*discrete*' and 'significant'—without determining whether the remnant itself remains a species so that its own status under the [ESA] will continue as needed." 865 F.3d at 600–01 (emphasis added).  The Delisting Rule concluded that Great Lakes wolf populations connect to each other, to adjacent states like North Dakota, and to a large wolf population in Eastern Canada.  3-ER-314–15.  Similarly, the Service found that wolf populations in the Northern Rocky Mountains States connect to one another, to the West Coast States, and to western Canada.  *Id.*  Thus, the Service avoided the same flaw by recognizing that gray wolf populations or dispersers are not discrete but connected to larger wolf populations.[14]

---

[14] Throughout the Delisting Rule, the Service determined that "lone dispersers" are not "biologically meaningful" to the listed entities.  *E.g.*, 3-ER-410.  While the district court faulted the Service for this determination, the D.C. Circuit found a similar conclusion to be "reasonabl[e]."  *Humane Soc'y*, 653 F.3d at 612 ("the Service reasonably concluded that the deaths" of lone dispersers outside of core range "would be so minimal as to pose no threat to the segment's survival").

*Humane Society* did not suggest that the existence of a few wolves outside core populations would require either ESA listing of those wolves or continued listing of wolves everywhere. *See* 865 F.3d at 602; *see also id.* at 611–12 (acknowledging the small number of wolves outside the Great Lakes States when finding regulatory mechanisms to be adequate). Nor did *Humane Society* suggest that the Service must recover wolves across the lower 48 states. The Court held the exact opposite: "the [ESA] tasks the Service with determining whether the species is endangered or threatened, not whether the species could reach still higher population levels if given more protection." *Id.* at 612. *Humane Society* held only that the Service must address the ***listing status*** of wolves that exist outside the delisted DPS. In the Delisting Rule, the Service considered the listing status of wolves across the lower 48 states and simply found that the wolves outside the core populations are not necessary for recovery.[15] For all these reasons, the district court's ruling should be reversed.

---

[15] Focusing on two core populations is also consistent with the 1978 Listing Rule and development of recovery plans specific to wolves in the Great Lakes and Northern Rocky Mountains—the best habitat and most appropriate places to conserve wolves. *See* 43 Fed. Reg. at 9607 (acknowledging gray wolf populations in the Great Lakes area and wolves still potentially resident in the Northern Rocky Mountains); Int.ER-130 (recovery plan for Great Lakes wolves); Int.ER-115 (recovery plan for Northern Rocky Mountains wolves).

**B.    The Delisting Rule adequately considered the status of West Coast wolves.**

This Court should reverse the district court's finding that the Service failed to address the "best available science" regarding the genetics of West Coast wolves.  1-ER-15–17.  The study cited by the district court is not the "best available science."  1-ER-16 (citing Hendricks *et al.* (2019), 3-ER-534).  Even if it was, the district court elevates conservation policy recommendations by the study's authors to a level far above what the ESA requires.  And putting aside the study, the court's opinion overlooks or mischaracterizes significant discussion of this issue in the Delisting Rule and administrative record.  When read in its entirety, the Delisting Rule fully and reasonably considered the status of West Coast wolves.

**i.    The district court's reliance on Henricks *et al.* (2019) is misplaced.**

The study on which the district court based its holding, Hendricks *et al.* (2019), contains limited science and considerable opinion.  The authors do not hide their view that "current conservation schemes do not provide adequate protection for diverse ecotypes, nor do they provide for full restoration of ecotypes to their historical range."  3-ER-535.  The paper "discuss[es] how current conservation policy for and management of admixed and hybrid populations … is insufficient."  3-ER-535–36.  With respect to wolves in Washington, this paper cites another, Hendricks *et al.* (2018), which summarizes the actual genetic analysis of wolves.

37

3-ER-542–43.[16]  Hendricks *et al.* (2019), the follow-up, takes the first paper and uses it as a springboard for the authors' preferred conservation policy.  As such, Henricks *et al.* (2019) is not "science" in the first place.  *E.g.*, *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080–81 (9th Cir. 2006) (characterizing "best available science" as "best available data," "scientific evidence," and "biological information"); *Am. Wildlands*, 530 F.3d at 1000 (noting papers were not best available science when they contained "speculation" or recommended further research).[17]

As an example, the district court faults the Service for failing to follow the recommendations of Hendricks *et al.* (2019) that "wolves with coastal ancestry 'should be considered a priority for conservation given their unique evolutionary heritage and adaptations.'"  1-ER-16 (citing 3-ER-543 (Hendricks *et al.* (2019)));  *see also* 3-ER-560 (Hendricks *et al.* (2018)).  But the district court takes this sentence out of context.  The paper does not point to an established wolf or wolf pack.  The statement reflects a recommendation of something that wildlife managers should prioritize in the authors' view.  Even if this paper is "best available science" (which it is not), the ESA does not require the Service to accept

---

[16] Hendricks *et al.* (2018) also includes a section on "Implications for conservation," which is cited by the district court.

[17] Moreover, the district court owed deference to the Service's decision about what constitutes the best available science for a particular issue.  *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 602.

management recommendations from scientific papers. And even if the Service fails to adopt certain recommendations, it does not mean the Service failed to consider the best available science. *Conservation Cong. v. Finley*, 774 F.3d 611, 620 (9th Cir. 2014) ("[d]eclining to adopt particular recommendations in a recovery plan or a study—neither of which is binding on an agency—does not constitute failing to consider them…").

### ii. The Delisting Rule properly grouped West Coast wolves with Northern Rocky Mountains wolves based on their genetics.

The district court erred in finding the Service did not fully analyze the genetics of West Coast wolves and improperly grouped them with Northern Rocky Mountains wolves. As an initial matter, the Delisting Rule addressed head-on the potential genetic impact of delisting wolves. *E.g.*, 3-ER-347 (finding that "changes in genetic diversity or population structuring" due to reduced genetic transfer "are not likely to be of such a magnitude that they pose a significant threat to the species," and relying on studies showing "evidence of inbreeding avoidance … and the demonstrated benefits of even relatively low numbers of effective dispersers"). The Service acknowledged the very risk to West Coast wolves that the district court purported to identify—but reached a different conclusion than the court. The district court erred by substituting its judgment for the Service's in an area of the Service's expertise. *Conservation Cong.*, 774 F.3d at 620 ("Under our deferential

39

standard of review, we are not permitted to substitute our judgment for the agency's in determining which scientific data to credit, so long as the conclusion is supported by adequate and reliable data.").

The district court also ignored significant discussion in the Delisting Rule and Gray Wolf Biological Report which reflects how the Service grappled with the genetic status of West Coast wolves. The court held that, "although the Service acknowledged the existence of West Coast wolves of mixed ancestry, it did not adequately address the science indicating that these wolves have distinct genetic traits that could distinguish them from [Northern Rocky Mountains] wolves or provide a rational explanation for its conclusion." 1-ER-17. That is not true. The Delisting Rule explained, in detail, that there are no "wolves" with a distinct genotype but *one wolf* in the non-delisted portion of Washington State that reflects *admixed* genetics—meaning its genetic analysis shows both Northern Rocky Mountains and a western coastal influence.

Specifically, the Service found that wolves in the West Coast States are, unsurprisingly, not genetically distinct from Northern Rocky Mountains wolves given that parts of Oregon and Washington are in both the DPS and the endangered-listed entity. 3-ER-310. Genetic analysis indicated that "[a]ll wolves recolonizing Oregon and California appear to be descended from inland wolves dispersing from the northern Rocky Mountains." 3-ER-313. Two wolves in

Washington reflected an "admixture" of genes from the Northern Rocky Mountains DPS as well as coastal Alaska or Canada.[18]  *See id.*  The Delisting Rule noted a lack of clarity as to where the admixing occurred—in the delisted DPS or the listed portion of Washington State.  *Id.*; *see also* 3-ER-426–27.  Given this uncertainty and the clear genetic link to the Northern Rocky Mountains wolves, it was rational for the Service to conclude that West Coast wolves are not genetically distinct from non-listed Northern Rocky Mountains wolves.  3-ER-310.

The Service also addressed the "coastal ecotype" of wolves in response to a peer review comment.  3-ER-381.  It explained that the coastal ecotype of wolves has not colonized the Pacific Northwest; rather, "wolves that recolonized Washington and Oregon originate primarily from the interior forest ecotype."  *Id.*; *see also* 3-ER-426–27.  Then the Service ran through the numbers:

> Of the 54 wolves from Washington and Oregon that Hendricks et al. (2018) sampled, 2 possessed mitochondrial DNA haplotypes only known from wolf populations in coastal British Columbia.  ***Only one of the two wolves with the coastal haplotype resided in the west coast portion of the entity currently listed as endangered*** (44-State entity) and, consequently, the combined listed entity, in an area considered highly suitable for coastal wolves.  ***The other resided within the boundary of the [Northern Rocky Mountains] DPS in the interior of***

---

[18] Wolf populations in Canada and Alaska are not listed as threatened or endangered.  As the Service explained, it previously denied petitions to list wolves "inhabiting Pacific coastal rainforest ecosystems in [its] 2016 assessment of the status of the Alexander Archipelago wolf and found that these wolves are not in danger of extinction or likely to become so in the foreseeable future."  3-ER-381.  The Service again denied a petition to list Alexander Archipelago wolves in 2023.  88 Fed. Reg. 57388 (Aug. 23, 2023).

*northeast Washington.* Furthermore, based on an assessment of single nucleotide polymorphisms (SNPs), three of the five wolves from Washington were intermediate between [Northern Rocky Mountains] wolves and coastal wolves, indicating that Washington was an admixture zone for coastal and inland wolf ecotypes (Hendricks et al. 2018, p. 8). Thus, rather than dispersal and recolonization of wolves from a specific ecotype to that same ecotype, these results demonstrate the ability of wolves to disperse to, inhabit, and survive in a variety of habitats that may be very different from where they or their parents originated.

3-ER-381.

Given the extremely limited prevalence of coastal wolf genetics, the Service rationally concluded that wolves in the West Coast States are not genetically distinct from the Northern Rocky Mountains, and the Service based its conclusion on its analysis of the best available science. 3-ER-426–27. The district court's ruling that the combination of Northern Rocky Mountains and West Coast wolves was arbitrary and capricious should be reversed.

### C. The Delisting Rule sufficiently discussed loss of historic range.

This Court should reverse the district court's conclusion that the Delisting Rule did not fully discuss loss of historic range. The district court found the Service did not "adequately grapple with the causes and effects of historical range loss." 1-ER-22. But the district court ignored substantial discussion in the Delisting Rule and evidence in the administrative record showing the Service considered the loss of historic range as part of its assessment of current threats to gray wolves. In so doing, the Service met its burden under the Service's

Significant Portion of its Range policy.  79 Fed. Reg. 37575 (July 1, 2014) ("SPR Policy").

The district court properly conceded that the ESA does not identify "loss of historic range" as one of the threats that must be analyzed for the Service to find that a species is threatened or endangered.  1-ER-21–22.  Rather, loss of historic range is considered in the context of other factors affecting a species.  3-ER-318; SPR Policy, 79 Fed. Reg. at 37584.  The Service was under no obligation to create a single header to evaluate loss of historic range.  *See Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 206 (D.D.C. 2012) (holding that although the Service's "analysis of how the listing factors interact" was "somewhat haphazard" to the extent it was scattered throughout its findings rather than set forth in a separate section, it had adequately considered threats because its reasoning could be "reasonably discerned").  Instead, the Service chose to evaluate loss of historic range throughout the Delisting Rule and especially in the sections regarding human-caused mortality and habitat, and its reasoning can be reasonably discerned.

### i. The Service's analysis of human-caused mortality captured the effects of lost historical range as that factor was the primary cause of range loss.

The Delisting Rule acknowledged that gray wolves had faced "substantial contraction" of historic range.  *E.g.*, 3-ER-415.  But the Service found that gray wolf range then "expanded significantly" since wolves were listed in 1978.  *Id.*

More importantly, the Service directly addressed the "causes and effects" of historical range loss:

> [T]he impacts of lost historical range are no longer manifesting in a way that threatens the viability of the species. The causes of the previous contraction (for example, targeted extermination efforts), and the effects of that contraction (for example, reduced numbers of individuals and populations, and restricted gene flow), in addition to the effects of all other threats, have been ameliorated or reduced such that the combined listed entity does not meet the [ESA's] definitions of "threatened species" or "endangered species."

*Id.* The Service supported this summary finding with additional discussion of the causes and effects.

For example, the Delisting Rule explained that "human-caused mortality" was "the main factor responsible for the decline in gray wolves." 3-ER-320. The Delisting Rule noted that the wolf's range declined significantly during the 19th and 20th centuries because of "poisoning, unregulated trapping and shooting, and government-funded wolf-extermination efforts." *See* 3-ER-314; 3-ER-504 ("range of the gray wolf entity began receding after the arrival of Europeans as a result of deliberate killing of wolves by humans and government funded bounty programs aimed at eradication"); *see also* Int.ER-103 ("following the arrival of Europeans, however, distribution and abundance of large carnivores decreased dramatically"). Unregulated human-caused mortality resulted in substantial negative effects, including range contraction. 3-ER-432 (Figure 1 showing range contraction).

44

Importantly, the Delisting Rule then determined that human-caused mortality has been sufficiently controlled to no longer pose a significant threat to wolves. Minnesota, Michigan, and Wisconsin are committed "to continue to regulate human-caused mortality so that it does not reduce the wolf population below recovery levels." 3-ER-322. The regulatory framework for each of the Northern Rocky Mountains States ensures that wolf populations will be maintained "well above Federal recovery targets." 3-ER-323. Washington, Oregon, California, Colorado, and Utah are "also committed to conserving wolves as demonstrated by the development of management plans and/or codification of laws and regulations that protect wolves."[19] 3-ER-322. The Service's findings are supported by Smith *et al.* (2010), Int.ER-85 (finding that to increase wolf populations, a state must reduce illegal killing and conflicts with livestock); O'Neil *et al.* (2017), Int.ER-72 (wolves expand range and increase density when human-wolf conflict is limited); and Stenglein *et al.* (2018), Int.ER-58 (illegal human-caused mortality has the largest impact on wolves in Wisconsin; however, expansion and increased numbers result from low levels of illegal harvest).

---

[19] The district court held that "state management plans in the Great Lakes States would adequately protect gray wolves after delisting." 1-ER-24. The district court further held that "the existing regulatory mechanisms in Colorado and Utah provide adequate protection for the gray wolf." 1-ER-25. No party challenges these decisions.

Ultimately, the Service concluded for each listing configuration that gray wolf range is no longer contracting but expanding, because the primary cause of the former contraction no longer impacts the viability of gray wolves. *See, e.g.*, 3-ER-413 (finding the recovery of the combined Minnesota and the 44-state entities is "attributable primarily to successful interagency cooperation in the management of human-caused mortality," which resulted in "significant expansion of the occupied range of and number of wolves in the combined listed entity over the past decades"); 3-ER-416 ("with ongoing State management in the [Northern Rocky Mountains] States, expansion of the western U.S. metapopulation into unoccupied suitable habitat in the West is likely to continue"); 3-ER-418 (finding recovery efforts "resulted in significant expansion of the occupied range of and number of wolves in the lower 48 United States over the past decades, in conjunction with regulatory mechanisms developed and implemented by State, Tribal, and Federal managers").

> ### ii. The Delisting Rule describes how wolves are recolonizing historic range and demonstrates that current range is no longer contracting but expanding.

In discussing the threat of habitat loss, the Delisting Rule concludes that range contraction has reduced significantly, if not stopped completely. 3-ER-415 (the effects of range contraction have "been ameliorated or reduced"). Wolves have recolonized additional suitable habitat throughout the Great Lakes, Northern

Rocky Mountains, West Coast States, and Central Rocky Mountains. Specifically, Minnesota wolf populations have doubled and expanded their range by 300%. 3-ER-443. Minnesota wolves have expanded into suitable habitat in the entire Upper Peninsula of Michigan, and northern and central Wisconsin. 3-ER-416. Northern Rocky Mountains wolves have experienced exponential range expansion as "viable populations occupy large portions of Idaho, Montana, Wyoming, eastern Washington, and eastern Oregon" and continue to expand from the Northern Rocky Mountains States "into the West Coast States (western Washington, western Oregon, northern California), and Colorado." *Id.* As suitable habitat in eastern Washington and eastern Oregon continues to become saturated, wolves have "continued to expand their distribution and abundance" into additional suitable habitat in West Coast States. *Id.* The Delisting Rule summarizes these findings in Figure 2, which shows that following the federal listing of gray wolves and the regulation of human-caused mortality, the wolves' current range has expanded significantly. 3-ER-315.

Simply put, the Delisting Rule discusses the "possible enduring consequences" of lost historic range and reaches an optimistic conclusion: range loss is not a continuing threat to gray wolves because they are secure in core range and continuously expanding into new range. That conclusion satisfies the ESA. It is consistent with this Court's precedent acknowledging that range loss for a wide-

47

ranging species is not necessarily a current or continuing threat. *See Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1143 (9th Cir. 2001) (holding that a "species with an exceptionally large historic range may continue to enjoy healthy population levels despite the loss of a substantial amount of suitable habitat").

The district court erred in holding the Service's review inadequate. The Service fulfilled its obligations. As the Service explained in response to a comment, the ESA does not require restoration to full historic range:

> [The ESA] does not describe recovery in terms of the proportion of historical range or potential habitat that must be occupied by a species, nor does it include restoration throughout the entire historical range as a conservation purpose. Thus, the [ESA] does not require [the Service] to restore the gray wolf (or any other species) to all of its historical range or any specific percentage of currently suitable habitat.

3-ER-389; 3-ER-382 ("Neither [the ESA] nor our regulations require that a listed species be restored to any threshold amount of its historic range before it may be delisted").

Nor does *Humane Society* mandate a different conclusion. There, the D.C. Circuit found the Service "brush[ed] off a substantial loss of historical range as irrelevant" because the Service omitted all consideration of lost historical range. 865 F.3d at 605. Here, on the other hand, the Delisting Rule fully engaged with the analysis. It found that the gray wolf's range has expanded to far more acreage than when the species was listed in 1978 and that the range will continue to expand

48

in the future.  Because the gray wolf's range considerably expanded and will continue to expand, the species is no longer threatened by an ongoing loss of historic range.  3-ER-315.

In analyzing the ESA factors of habitat loss and human-caused mortality, the Service considered the gray wolf's historic range.  The district court erred in determining otherwise and its ruling should be reversed.

### D. The Delisting Rule properly found that regulatory mechanisms on federal public lands are adequate.

The district court's ruling on the adequacy of regulatory mechanisms on federal public lands should be reversed.  The district court based its ruling on a statement that U.S. Forest Service land management plans "'do not contain standards and guidelines specific to wolf management.'"  1-ER-26 (quoting 3-ER-368).  From there, the court held that the rule "does not explain how these mechanisms will ensure a sustainable wolf population post-delisting."  *Id.*  But the court misconstrued both the ESA and the record.

First, the district court mistakenly conflated a lack of express protective language into a threat that requires listing.  The ESA directs the Service to "determine whether any species is an endangered species or a threatened species because of any of the following factors: … (D) the inadequacy of existing regulatory mechanisms."  16 U.S.C. § 1533(a)(1)(D).  Thus, the question is "whether the existing regulatory mechanisms are so inadequate that they represent

49

a threat to the [species] and, … lead [the Service] to a conclusion that the species is threatened or endangered." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 402 F. Supp. 2d 1198, 1209 (D. Or. 2005), *aff'd in part, rev'd in part on other grounds*, 274 F. App'x 542 (9th Cir. 2008). Because the inquiry focuses on the threat, the Service "may find that no existing regulatory mechanism ***protects a particular species*** and yet it is nonetheless not 'likely to become an endangered species'" or a threatened species. *Rocky Mountain Wild v. Walsh*, 216 F. Supp. 3d 1234, 1247 (D. Colo. 2016) (emphasis added). Thus, even if the Service found that federal land management plans do not protect gray wolves (which it did not), the district court erred in automatically equating the absence of express protections with an ESA requirement for continued listing.

Second, the Delisting Rule does far more than the district court suggests. The district court acknowledged that the rule "refers to certain existing mechanisms, such as the sensitive species listings for both [federal] agencies."[20] 1-ER-26. But the Delisting Rule explains that wolves will be listed as "sensitive species" in one U.S. Forest Service Region and may be listed as such in others, meaning "conservation objectives for the gray wolf and its habitat would continue

---

[20] The district court faulted the Service for "not explain[ing] how these mechanisms will ensure a sustainable wolf population post-delisting." 1-ER-26. But regulatory mechanisms need not "ensure" future viability. *See Humane Soc'y,* 865 F.3d at 610–12.

50

to be addressed during planning and implementation of projects." 3-ER-368. On Bureau of Land Management lands, wolves would remain as "sensitive species" for at least five years following delisting and would be "managed consistent with species and habitat management objectives … to promote their conservation and minimize the likelihood and need for listing under the [ESA]." *Id.* While these protections may not be as great as the ESA's, they do not need to be. *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1032 (9th Cir. 2011) (finding it "reasonable to conceive of 'adequate' regulatory mechanisms as offering a recovered species something less than the stalwart protections of the ESA").

Third, the district court also failed to recognize that states regulate wildlife offtake on many federal lands. The Delisting Rule acknowledges this legal reality. 3-ER-351. State wildlife management agencies regulate hunting and other forms of offtake on federal lands, if any offtake is allowed at all.[21] Thus, to the extent that state regulatory mechanisms are sufficient to mitigate the risk of human-caused mortality—which both the district court and *Humane Society* court have found—then regulation of such mortality should also be adequate on federal lands within those states. *See* 1-ER-22–25; *Humane Soc'y*, 865 F.3d at 610–12.

---

[21] On some federal lands, such as National Parks, offtake of wildlife is prohibited. 3-ER-351.

In sum, the district court misconstrued the Delisting Rule's discussion, asked for too much from the Service—more than the ESA requires—and ignored the analysis contained in the rule. For these reasons, the district court's decision should be reversed.

## CONCLUSION

SCI and NRA request that the Court reverse the district court's ruling and remand with instructions to reinstate the Delisting Rule.

DATED this 20th day of September 2024.

Respectfully submitted,

/s/ Jeremy E. Clare
Jeremy E. Clare
Regina Lennox
Safari Club International
501 2nd Street N.E.
Washington, D.C. 20002
202-543-8733
jclare@safariclub.org
rlennox@safariclub.org
*Attorneys for Intervenor-Defendant-Appellant Safari Club International*

/s/ Erin M. Erhardt
Erin M. Erhardt
National Rifle Association of America
11250 Waples Mill Road
Fairfax, Virginia 22030
703-267-1161
eerhardt@nrahq.org

*Attorney for Intervenor-Defendant-Appellant National Rifle Association of America*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):**   22-15529, 22-15532, 22-15534, 22-15535, 22-15536, 22-15537, 22-15626, 22-15627, 22-15628

I am the attorney or self-represented party.

**This brief contains** [ 12,248 ] **words,** including [ 0 ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [            ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** [ s/ *Jeremy Clare* ]   **Date** [ September 20, 2024 ]
*(use "s/[typed name]" to sign electronically-filed documents)*

**Form 8**                                                                 *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court

for the United States Court of Appeals for the Ninth Circuit by using the appellate

CM/ECF system on September 20, 2024.

Respectfully submitted,

/s/ Jeremy E. Clare
Jeremy E. Clare
*Attorney for Intervenor-Defendant-*
*Appellant Safari Club International*

## STATEMENT REGARDING RELATED CASES –
## CIRCUIT RULE 28-2.6

Counsel for Intervenors-Defendants-Appellants SCI and NRA are unaware

of any related cases pending before this Court.

Dated this 20th day of September 2024.

Respectfully submitted,

/s/ Jeremy E. Clare
Jeremy E. Clare
*Attorney for Intervenor-Defendant-*
*Appellant Safari Club International*

# ADDENDUM

16 U.S.C. § 1531 ................................................................................ ADD-1

16 U.S.C. § 1532 ................................................................................ ADD-3

16 U.S.C. § 1533 ................................................................................ ADD-7

50 C.F.R. § 424.11 (2019) ............................................................. ADD-18

50 C.F.R. § 424.11 (2024) ............................................................. ADD-21

United States Code Annotated
    Title 16. Conservation
        Chapter 35. Endangered Species (Refs & Annos)

**16 U.S.C.A. § 1531**

§ 1531. Congressional findings and declaration of purposes and policy

**(a) Findings**

The Congress finds and declares that--

**(1)** various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation;

**(2)** other species of fish, wildlife, and plants have been so depleted in numbers that they are in danger of or threatened with extinction;

**(3)** these species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people;

**(4)** the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction, pursuant to--

    **(A)** migratory bird treaties with Canada and Mexico;

    **(B)** the Migratory and Endangered Bird Treaty with Japan;

    **(C)** the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere;

    **(D)** the International Convention for the Northwest Atlantic Fisheries;

    **(E)** the International Convention for the High Seas Fisheries of the North Pacific Ocean;

    **(F)** the Convention on International Trade in Endangered Species of Wild Fauna and Flora; and

    **(G)** other international agreements; and

**ADD-1**

**(5)** encouraging the States and other interested parties, through Federal financial assistance and a system of incentives, to develop and maintain conservation programs which meet national and international standards is a key to meeting the Nation's international commitments and to better safeguarding, for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants.

## (b) Purposes

The purposes of this chapter are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

## (c) Policy

**(1)** It is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter.

**(2)** It is further declared to be the policy of Congress that Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species.

### CREDIT(S)

(Pub.L. 93-205, § 2, Dec. 28, 1973, 87 Stat. 884; Pub.L. 96-159, § 1, Dec. 28, 1979, 93 Stat. 1225; Pub.L. 97-304, § 9(a), Oct. 13, 1982, 96 Stat. 1426; Pub.L. 100-478, Title I, § 1013(a), Oct. 7, 1988, 102 Stat. 2315.)

16 U.S.C.A. § 1531, 16 USCA § 1531
Current through P.L. 118-80. Some statute sections may be more current, see credits for details.

United States Code Annotated
    Title 16. Conservation
        Chapter 35. Endangered Species (Refs & Annos)

## 16 U.S.C.A. § 1532

### § 1532. Definitions

For the purposes of this chapter--

**(1)** The term "alternative courses of action" means all alternatives and thus is not limited to original project objectives and agency jurisdiction.

**(2)** The term "commercial activity" means all activities of industry and trade, including, but not limited to, the buying or selling of commodities and activities conducted for the purpose of facilitating such buying and selling: *Provided, however*, That it does not include exhibition of commodities by museums or similar cultural or historical organizations.

**(3)** The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

**(4)** The term "Convention" means the Convention on International Trade in Endangered Species of Wild Fauna and Flora, signed on March 3, 1973, and the appendices thereto.

**(5)(A)** The term "critical habitat" for a threatened or endangered species means--

**(i)** the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

**(ii)** specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

**ADD-3**

**(B)** Critical habitat may be established for those species now listed as threatened or endangered species for which no critical habitat has heretofore been established as set forth in subparagraph (A) of this paragraph.

**(C)** Except in those circumstances determined by the Secretary, critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species.

**(6)** The term "endangered species" means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man.

**(7)** The term "Federal agency" means any department, agency, or instrumentality of the United States.

**(8)** The term "fish or wildlife" means any member of the animal kingdom, including without limitation any mammal, fish, bird (including any migratory, nonmigratory, or endangered bird for which protection is also afforded by treaty or other international agreement), amphibian, reptile, mollusk, crustacean, arthropod or other invertebrate, and includes any part, product, egg, or offspring thereof, or the dead body or parts thereof.

**(9)** The term "foreign commerce" includes, among other things, any transaction--

  **(A)** between persons within one foreign country;

  **(B)** between persons in two or more foreign countries;

  **(C)** between a person within the United States and a person in a foreign country; or

  **(D)** between persons within the United States, where the fish and wildlife in question are moving in any country or countries outside the United States.

**(10)** The term "import" means to land on, bring into, or introduce into, or attempt to land on, bring into, or introduce into, any place subject to the jurisdiction of the United States, whether or not such landing, bringing, or introduction constitutes an importation within the meaning of the customs laws of the United States.

**(11)** Repealed. Pub.L. 97-304, § 4(b), Oct. 13, 1982, 96 Stat. 1420.

**(12)** The term "permit or license applicant" means, when used with respect to an action of a Federal agency for which exemption is sought under section 1536 of this title, any person whose application to

**ADD-4**

such agency for a permit or license has been denied primarily because of the application of section 1536(a) of this title to such agency action.

**(13)** The term "person" means an individual, corporation, partnership, trust, association, or any other private entity; or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State, or of any foreign government; any State, municipality, or political subdivision of a State; or any other entity subject to the jurisdiction of the United States.

**(14)** The term "plant" means any member of the plant kingdom, including seeds, roots and other parts thereof.

**(15)** The term "Secretary" means, except as otherwise herein provided, the Secretary of the Interior or the Secretary of Commerce as program responsibilities are vested pursuant to the provisions of Reorganization Plan Numbered 4 of 1970; except that with respect to the enforcement of the provisions of this chapter and the Convention which pertain to the importation or exportation of terrestrial plants, the term also means the Secretary of Agriculture.

**(16)** The term "species" includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature.

**(17)** The term "State" means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, American Samoa, the Virgin Islands, Guam, and the Trust Territory of the Pacific Islands.

**(18)** The term "State agency" means any State agency, department, board, commission, or other governmental entity which is responsible for the management and conservation of fish, plant, or wildlife resources within a State.

**(19)** The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

**(20)** The term "threatened species" means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.

**(21)** The term "United States", when used in a geographical context, includes all States.

## CREDIT(S)

(Pub.L. 93-205, § 3, Dec. 28, 1973, 87 Stat. 885; Pub.L. 94-359, § 5, July 12, 1976, 90 Stat. 913; Pub.L. 95-632, § 2, Nov. 10, 1978, 92 Stat. 3751; Pub.L. 96-159, § 2, Dec. 28, 1979, 93 Stat. 1225;

Pub.L. 97-304, § 4(b), Oct. 13, 1982, 96 Stat. 1420; Pub.L. 100-478, Title I, § 1001, Oct. 7, 1988, 102 Stat. 2306.)

16 U.S.C.A. § 1532, 16 USCA § 1532
Current through P.L. 118-80. Some statute sections may be more current, see credits for details.

United States Code Annotated
Title 16. Conservation
Chapter 35. Endangered Species (Refs & Annos)

**16 U.S.C.A. § 1533**

§ 1533. Determination of endangered species and threatened species

Effective: December 27, 2022

**(a) Generally**

**(1)** The Secretary shall by regulation promulgated in accordance with subsection (b) determine whether any species is an endangered species or a threatened species because of any of the following factors:

**(A)** the present or threatened destruction, modification, or curtailment of its habitat or range;

**(B)** overutilization for commercial, recreational, scientific, or educational purposes;

**(C)** disease or predation;

**(D)** the inadequacy of existing regulatory mechanisms; or

**(E)** other natural or manmade factors affecting its continued existence.

**(2)** With respect to any species over which program responsibilities have been vested in the Secretary of Commerce pursuant to Reorganization Plan Numbered 4 of 1970--

**(A)** in any case in which the Secretary of Commerce determines that such species should--

**(i)** be listed as an endangered species or a threatened species, or

**(ii)** be changed in status from a threatened species to an endangered species,

he shall so inform the Secretary of the Interior, who shall list such species in accordance with this section;

**(B)** in any case in which the Secretary of Commerce determines that such species should--

**ADD-7**

**(i)** be removed from any list published pursuant to subsection (c) of this section, or

**(ii)** be changed in status from an endangered species to a threatened species,

he shall recommend such action to the Secretary of the Interior, and the Secretary of the Interior, if he concurs in the recommendation, shall implement such action; and

**(C)** the Secretary of the Interior may not list or remove from any list any such species, and may not change the status of any such species which are listed, without a prior favorable determination made pursuant to this section by the Secretary of Commerce.

**(3)(A)** The Secretary, by regulation promulgated in accordance with subsection (b) and to the maximum extent prudent and determinable--

**(i)** shall, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and

**(ii)** may, from time-to-time thereafter as appropriate, revise such designation.

**(B)(i)** The Secretary shall not designate as critical habitat any lands or other geographical areas owned or controlled by the Department of Defense, or designated for its use, that are subject to an integrated natural resources management plan prepared under section 670a of this title, if the Secretary determines in writing that such plan provides a benefit to the species for which critical habitat is proposed for designation.

**(ii)** Nothing in this paragraph affects the requirement to consult under section 1536(a)(2) of this title with respect to an agency action (as that term is defined in that section).

**(iii)** Nothing in this paragraph affects the obligation of the Department of Defense to comply with section 1538 of this title, including the prohibition preventing extinction and taking of endangered species and threatened species.

**(b) Basis for determinations**

**(1)(A)** The Secretary shall make determinations required by subsection (a)(1) solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator

**ADD-8**

control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

**(B)** In carrying out this section, the Secretary shall give consideration to species which have been--

**(i)** designated as requiring protection from unrestricted commerce by any foreign nation, or pursuant to any international agreement; or

**(ii)** identified as in danger of extinction, or likely to become so within the foreseeable future, by any State agency or by any agency of a foreign nation that is responsible for the conservation of fish or wildlife or plants.

**(2)** The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) on the basis of the best scientific data available and after taking into consideration the economic impact, impact on national security, and any other relevant impact, of specifying any particular area as critical habitat. The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

**(3)(A)** To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of Title 5, to add a species to, or to remove a species from, either of the lists published under subsection (c), the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted. If such a petition is found to present such information, the Secretary shall promptly commence a review of the status of the species concerned. The Secretary shall promptly publish each finding made under this subparagraph in the Federal Register.

**(B)** Within 12 months after receiving a petition that is found under subparagraph (A) to present substantial information indicating that the petitioned action may be warranted, the Secretary shall make one of the following findings:

**(i)** The petitioned action is not warranted, in which case the Secretary shall promptly publish such finding in the Federal Register.

**(ii)** The petitioned action is warranted, in which case the Secretary shall promptly publish in the Federal Register a general notice and the complete text of a proposed regulation to implement such action in accordance with paragraph (5).

**(iii)** The petitioned action is warranted, but that--

**(I)** the immediate proposal and timely promulgation of a final regulation implementing the petitioned action in accordance with paragraphs (5) and (6) is precluded by pending proposals to determine whether any species is an endangered species or a threatened species, and

**(II)** expeditious progress is being made to add qualified species to either of the lists published under subsection (c) and to remove from such lists species for which the protections of this chapter are no longer necessary,

in which case the Secretary shall promptly publish such finding in the Federal Register, together with a description and evaluation of the reasons and data on which the finding is based.

**(C)(i)** A petition with respect to which a finding is made under subparagraph (B)(iii) shall be treated as a petition that is resubmitted to the Secretary under subparagraph (A) on the date of such finding and that presents substantial scientific or commercial information that the petitioned action may be warranted.

**(ii)** Any negative finding described in subparagraph (A) and any finding described in subparagraph (B)(i) or (iii) shall be subject to judicial review.

**(iii)** The Secretary shall implement a system to monitor effectively the status of all species with respect to which a finding is made under subparagraph (B)(iii) and shall make prompt use of the authority under paragraph 7[1] to prevent a significant risk to the well being of any such species.

**(D)(i)** To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of Title 5, to revise a critical habitat designation, the Secretary shall make a finding as to whether the petition presents substantial scientific information indicating that the revision may be warranted. The Secretary shall promptly publish such finding in the Federal Register.

**(ii)** Within 12 months after receiving a petition that is found under clause (i) to present substantial information indicating that the requested revision may be warranted, the Secretary shall determine how he intends to proceed with the requested revision, and shall promptly publish notice of such intention in the Federal Register.

**(4)** Except as provided in paragraphs (5) and (6) of this subsection, the provisions of section 553 of Title 5 (relating to rulemaking procedures), shall apply to any regulation promulgated to carry out the purposes of this chapter.

**(5)** With respect to any regulation proposed by the Secretary to implement a determination, designation, or revision referred to in subsection (a)(1) or (3), the Secretary shall--

**(A)** not less than 90 days before the effective date of the regulation--

**ADD-10**

**(i)** publish a general notice and the complete text of the proposed regulation in the Federal Register, and

**(ii)** give actual notice of the proposed regulation (including the complete text of the regulation) to the State agency in each State in which the species is believed to occur, and to each county or equivalent jurisdiction in which the species is believed to occur, and invite the comment of such agency, and each such jurisdiction, thereon;

**(B)** insofar as practical, and in cooperation with the Secretary of State, give notice of the proposed regulation to each foreign nation in which the species is believed to occur or whose citizens harvest the species on the high seas, and invite the comment of such nation thereon;

**(C)** give notice of the proposed regulation to such professional scientific organizations as he deems appropriate;

**(D)** publish a summary of the proposed regulation in a newspaper of general circulation in each area of the United States in which the species is believed to occur; and

**(E)** promptly hold one public hearing on the proposed regulation if any person files a request for such a hearing within 45 days after the date of publication of general notice.

**(6)(A)** Within the one-year period beginning on the date on which general notice is published in accordance with paragraph (5)(A)(i) regarding a proposed regulation, the Secretary shall publish in the Federal Register--

**(i)** if a determination as to whether a species is an endangered species or a threatened species, or a revision of critical habitat, is involved, either--

**(I)** a final regulation to implement such determination,

**(II)** a final regulation to implement such revision or a finding that such revision should not be made,

**(III)** notice that such one-year period is being extended under subparagraph (B)(i), or

**(IV)** notice that the proposed regulation is being withdrawn under subparagraph (B)(ii), together with the finding on which such withdrawal is based; or

**(ii)** subject to subparagraph (C), if a designation of critical habitat is involved, either--

**(I)** a final regulation to implement such designation, or

**(II)** notice that such one-year period is being extended under such subparagraph.

**(B)(i)** If the Secretary finds with respect to a proposed regulation referred to in subparagraph (A)(i) that there is substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned, the Secretary may extend the one-year period specified in subparagraph (A) for not more than six months for purposes of soliciting additional data.

**(ii)** If a proposed regulation referred to in subparagraph (A)(i) is not promulgated as a final regulation within such one-year period (or longer period if extension under clause (i) applies) because the Secretary finds that there is not sufficient evidence to justify the action proposed by the regulation, the Secretary shall immediately withdraw the regulation. The finding on which a withdrawal is based shall be subject to judicial review. The Secretary may not propose a regulation that has previously been withdrawn under this clause unless he determines that sufficient new information is available to warrant such proposal.

**(iii)** If the one-year period specified in subparagraph (A) is extended under clause (i) with respect to a proposed regulation, then before the close of such extended period the Secretary shall publish in the Federal Register either a final regulation to implement the determination or revision concerned, a finding that the revision should not be made, or a notice of withdrawal of the regulation under clause (ii), together with the finding on which the withdrawal is based.

**(C)** A final regulation designating critical habitat of an endangered species or a threatened species shall be published concurrently with the final regulation implementing the determination that such species is endangered or threatened, unless the Secretary deems that--

**(i)** it is essential to the conservation of such species that the regulation implementing such determination be promptly published; or

**(ii)** critical habitat of such species is not then determinable, in which case the Secretary, with respect to the proposed regulation to designate such habitat, may extend the one-year period specified in subparagraph (A) by not more than one additional year, but not later than the close of such additional year the Secretary must publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat.

**(7)** Neither paragraph (4), (5), or (6) of this subsection nor section 553 of Title 5 shall apply to any regulation issued by the Secretary in regard to any emergency posing a significant risk to the well-being of any species of fish or wildlife or plants, but only if--

**ADD-12**

**(A)** at the time of publication of the regulation in the Federal Register the Secretary publishes therein detailed reasons why such regulation is necessary; and

**(B)** in the case such regulation applies to resident species of fish or wildlife, or plants, the Secretary gives actual notice of such regulation to the State agency in each State in which such species is believed to occur.

Such regulation shall, at the discretion of the Secretary, take effect immediately upon the publication of the regulation in the Federal Register. Any regulation promulgated under the authority of this paragraph shall cease to have force and effect at the close of the 240-day period following the date of publication unless, during such 240-day period, the rulemaking procedures which would apply to such regulation without regard to this paragraph are complied with. If at any time after issuing an emergency regulation the Secretary determines, on the basis of the best appropriate data available to him, that substantial evidence does not exist to warrant such regulation, he shall withdraw it.

**(8)** The publication in the Federal Register of any proposed or final regulation which is necessary or appropriate to carry out the purposes of this chapter shall include a summary by the Secretary of the data on which such regulation is based and shall show the relationship of such data to such regulation; and if such regulation designates or revises critical habitat, such summary shall, to the maximum extent practicable, also include a brief description and evaluation of those activities (whether public or private) which, in the opinion of the Secretary, if undertaken may adversely modify such habitat, or may be affected by such designation.

**(c) Lists**

**(1)** The Secretary of the Interior shall publish in the Federal Register a list of all species determined by him or the Secretary of Commerce to be endangered species and a list of all species determined by him or the Secretary of Commerce to be threatened species. Each list shall refer to the species contained therein by scientific and common name or names, if any, specify with respect to each such species over what portion of its range it is endangered or threatened, and specify any critical habitat within such range. The Secretary shall from time to time revise each list published under the authority of this subsection to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b).

**(2)** The Secretary shall--

**(A)** conduct, at least once every five years, a review of all species included in a list which is published pursuant to paragraph (1) and which is in effect at the time of such review; and

**(B)** determine on the basis of such review whether any such species should--

  **(i)** be removed from such list;

**ADD-13**

**(ii)** be changed in status from an endangered species to a threatened species; or

**(iii)** be changed in status from a threatened species to an endangered species.

Each determination under subparagraph (B) shall be made in accordance with the provisions of subsections (a) and (b).

## (d) Protective regulations

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife, or section 1538(a)(2) of this title, in the case of plants, with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to section 1535(c) of this title only to the extent that such regulations have also been adopted by such State.

## (e) Similarity of appearance cases

The Secretary may, by regulation of commerce or taking, and to the extent he deems advisable, treat any species as an endangered species or threatened species even though it is not listed pursuant to this section if he finds that--

**(A)** such species so closely resembles in appearance, at the point in question, a species which has been listed pursuant to such section that enforcement personnel would have substantial difficulty in attempting to differentiate between the listed and unlisted species;

**(B)** the effect of this substantial difficulty is an additional threat to an endangered or threatened species; and

**(C)** such treatment of an unlisted species will substantially facilitate the enforcement and further the policy of this chapter.

## (f) Recovery plans

**(1)** The Secretary shall develop and implement plans (hereinafter in this subsection referred to as "recovery plans") for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species. The Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable--

**(A)** give priority to those endangered species or threatened species, without regard to taxonomic classification, that are most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity;

**(B)** incorporate in each plan--

**(i)** a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

**(ii)** objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

**(iii)** estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

**(2)** The Secretary, in developing and implementing recovery plans, may procure the services of appropriate public and private agencies and institutions, and other qualified persons. Recovery teams appointed pursuant to this subsection shall not be subject to chapter 10 of Title 5.

**(3)** The Secretary shall report every two years to the Committee on Environment and Public Works of the Senate and the Committee on Merchant Marine and Fisheries of the House of Representatives on the status of efforts to develop and implement recovery plans for all species listed pursuant to this section and on the status of all species for which such plans have been developed.

**(4)** The Secretary shall, prior to final approval of a new or revised recovery plan, provide public notice and an opportunity for public review and comment on such plan. The Secretary shall consider all information presented during the public comment period prior to approval of the plan.

**(5)** Each Federal agency shall, prior to implementation of a new or revised recovery plan, consider all information presented during the public comment period under paragraph (4).

**(g) Monitoring**

**(1)** The Secretary shall implement a system in cooperation with the States to monitor effectively for not less than five years the status of all species which have recovered to the point at which the measures provided pursuant to this chapter are no longer necessary and which, in accordance with the provisions of this section, have been removed from either of the lists published under subsection (c).

**ADD-15**

**(2)** The Secretary shall make prompt use of the authority under paragraph 7[1] of subsection (b) of this section to prevent a significant risk to the well being of any such recovered species.

**(h) Agency guidelines; publication in Federal Register; scope; proposals and amendments: notice and opportunity for comments**

The Secretary shall establish, and publish in the Federal Register, agency guidelines to insure that the purposes of this section are achieved efficiently and effectively. Such guidelines shall include, but are not limited to--

    **(1)** procedures for recording the receipt and the disposition of petitions submitted under subsection (b)(3) of this section;

    **(2)** criteria for making the findings required under such subsection with respect to petitions;

    **(3)** a ranking system to assist in the identification of species that should receive priority review under subsection (a)(1) of this section; and

    **(4)** a system for developing and implementing, on a priority basis, recovery plans under subsection (f) of this section.

The Secretary shall provide to the public notice of, and opportunity to submit written comments on, any guideline (including any amendment thereto) proposed to be established under this subsection.

**(i) Submission to State agency of justification for regulations inconsistent with State agency's comments or petition**

If, in the case of any regulation proposed by the Secretary under the authority of this section, a State agency to which notice thereof was given in accordance with subsection (b)(5)(A)(ii) files comments disagreeing with all or part of the proposed regulation, and the Secretary issues a final regulation which is in conflict with such comments, or if the Secretary fails to adopt a regulation pursuant to an action petitioned by a State agency under subsection (b)(3), the Secretary shall submit to the State agency a written justification for his failure to adopt regulations consistent with the agency's comments or petition.

**CREDIT(S)**

    (Pub.L. 93-205, § 4, Dec. 28, 1973, 87 Stat. 886; Pub.L. 94-359, § 1, July 12, 1976, 90 Stat. 911; Pub.L. 95-632, §§ 11, 13, Nov. 10, 1978, 92 Stat. 3764, 3766; Pub.L. 96-159, § 3, Dec. 28, 1979, 93 Stat. 1225; Pub.L. 97-304, § 2(a), Oct. 13, 1982, 96 Stat. 1411; Pub.L. 100-478, Title I, §§ 1002 to 1004, Oct. 7, 1988, 102 Stat. 2306; Pub.L. 108-136, Div. A, Title III, § 318, Nov. 24, 2003, 117 Stat. 1433; Pub.L. 117-286, § 4(a)(113), Dec. 27, 2022, 136 Stat. 4318.)

**ADD-16**

**Footnotes**

[1]     So in original. Probably should be "paragraph (7)".

16 U.S.C.A. § 1533, 16 USCA § 1533

Current through P.L. 118-80. Some statute sections may be more current, see credits for details.

Code of Federal Regulations
> Title 50. Wildlife and Fisheries
>> Chapter IV. Joint Regulations (United States Fish and Wildlife Service, Department of the Interior and National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Department of Commerce); Endangered Species Committee Regulations
>>> Subchapter A
>>>> Part 424. Listing Endangered and Threatened Species and Designating Critical Habitat (Refs & Annos)
>>>> Subpart B. Revision of the Lists

**50 C.F.R. § 424.11**

§ 424.11 Factors for listing, delisting, or reclassifying species.

Effective: September 26, 2019 to May 5, 2024

(a) Any species or taxonomic group of species (e.g., genus, subgenus) as defined in § 424.02(k) is eligible for listing under the Act. A taxon of higher rank than species may be listed only if all included species are individually found to be endangered or threatened. In determining whether a particular taxon or population is a species for the purposes of the Act, the Secretary shall rely on standard taxonomic distinctions and the biological expertise of the Department and the scientific community concerning the relevant taxonomic group.

(b) The Secretary shall make any determination required by paragraphs (c), (d), and (e) of this section solely on the basis of the best available scientific and commercial information regarding a species' status.

(c) A species shall be listed or reclassified if the Secretary determines, on the basis of the best scientific and commercial data available after conducting a review of the species' status, that the species meets the definition of an endangered species or a threatened species because of any one or a combination of the following factors:

(1) The present or threatened destruction, modification, or curtailment of its habitat or range;

(2) Overutilization for commercial, recreational, scientific, or educational purposes;

(3) Disease or predation;

(4) The inadequacy of existing regulatory mechanisms; or

(5) Other natural or manmade factors affecting its continued existence.

**ADD-18**

(d) In determining whether a species is a threatened species, the Services must analyze whether the species is likely to become an endangered species within the foreseeable future. The term foreseeable future extends only so far into the future as the Services can reasonably determine that both the future threats and the species' responses to those threats are likely. The Services will describe the foreseeable future on a case-by-case basis, using the best available data and taking into account considerations such as the species' life-history characteristics, threat-projection timeframes, and environmental variability. The Services need not identify the foreseeable future in terms of a specific period of time.

(e) The Secretary shall delist a species if the Secretary finds that, after conducting a status review based on the best scientific and commercial data available:

(1) The species is extinct;

(2) The species does not meet the definition of an endangered species or a threatened species. In making such a determination, the Secretary shall consider the same factors and apply the same standards set forth in paragraph (c) of this section regarding listing and reclassification; or

(3) The listed entity does not meet the statutory definition of a species.

(f) The fact that a species of fish, wildlife, or plant is protected by the Convention on International Trade in Endangered Species of Wild Fauna and Flora (see part 23 of this title) or a similar international agreement on such species, or has been identified as requiring protection from unrestricted commerce by any foreign nation, or to be in danger of extinction or likely to become so within the foreseeable future by any State agency or by any agency of a foreign nation that is responsible for the conservation of fish, wildlife, or plants, may constitute evidence that the species is endangered or threatened. The weight given such evidence will vary depending on the international agreement in question, the criteria pursuant to which the species is eligible for protection under such authorities, and the degree of protection afforded the species. The Secretary shall give consideration to any species protected under such an international agreement, or by any State or foreign nation, to determine whether the species is endangered or threatened.

(g) The Secretary shall take into account, in making determinations under paragraph (c) or (e) of this section, those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

**Credits**
[84 FR 45052, Aug. 27, 2019]

SOURCE: 45 FR 13022, Feb. 27, 1980; 49 FR 38908, Oct. 1, 1984; 78 FR 53076, Aug. 28, 2013, unless otherwise noted.

AUTHORITY: 16 U.S.C. 1531 et seq.

Code of Federal Regulations
   Title 50. Wildlife and Fisheries
      Chapter IV. Joint Regulations (United States Fish and Wildlife Service, Department of the Interior and National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Department of Commerce); Endangered Species Committee Regulations
         Subchapter A
            Part 424. Listing Endangered and Threatened Species and Designating Critical Habitat (Refs & Annos)
            Subpart B. Revision of the Lists

**50 C.F.R. § 424.11**

§ 424.11 Factors for listing, delisting, or reclassifying species.

Effective: May 6, 2024

(a) Any species or taxonomic group of species (e.g., genus, subgenus) as defined in § 424.02 is eligible for listing under the Act. A taxon of higher rank than species may be listed only if all included species are individually found to be endangered or threatened. In determining whether a particular taxon or population is a species for the purposes of the Act, the Secretary shall rely on standard taxonomic distinctions and the biological expertise of the Department and the scientific community concerning the relevant taxonomic group.

(b) The Secretary shall make any determination required by paragraphs (c), (d), and (e) of this section solely on the basis of the best available scientific and commercial information regarding a species' status without reference to possible economic or other impacts of such determination.

(c) A species shall be listed or reclassified if the Secretary determines, on the basis of the best scientific and commercial data available after conducting a review of the species' status, that the species meets the definition of an endangered species or a threatened species because of any one or a combination of the following factors:

(1) The present or threatened destruction, modification, or curtailment of its habitat or range;

(2) Overutilization for commercial, recreational, scientific, or educational purposes;

(3) Disease or predation;

(4) The inadequacy of existing regulatory mechanisms; or

(5) Other natural or manmade factors affecting its continued existence.

**ADD-21**

(d) In determining whether a species is a threatened species, the Services must analyze whether the species is likely to become an endangered species within the foreseeable future. The foreseeable future extends as far into the future as the Services can make reasonably reliable predictions about the threats to the species and the species' responses to those threats. The Services will describe the foreseeable future on a case-by-case basis, using the best available data and taking into account considerations such as the species' life-history characteristics, threat-projection timeframes, and environmental variability. The Services need not identify the foreseeable future in terms of a specific period of time.

(e) Species will be delisted if the Secretary determines, based on consideration of the factors and standards set forth in paragraph (c) of this section, that the best scientific and commercial data available substantiate that:

(1) The species is extinct;

(2) The species has recovered to the point at which it no longer meets the definition of an endangered species or a threatened species;

(3) New information that has become available since the original listing decision shows the listed entity does not meet the definition of an endangered species or a threatened species; or

(4) New information that has become available since the original listing decision shows the listed entity does not meet the definition of a species.

(f) The fact that a species of fish, wildlife, or plant is protected by the Convention on International Trade in Endangered Species of Wild Fauna and Flora (see part 23 of this title) or a similar international agreement on such species, or has been identified as requiring protection from unrestricted commerce by any foreign nation, or to be in danger of extinction or likely to become so within the foreseeable future by any State agency or by any agency of a foreign nation that is responsible for the conservation of fish, wildlife, or plants, may constitute evidence that the species is endangered or threatened. The weight given such evidence will vary depending on the international agreement in question, the criteria pursuant to which the species is eligible for protection under such authorities, and the degree of protection afforded the species. The Secretary shall give consideration to any species protected under such an international agreement, or by any State or foreign nation, to determine whether the species is endangered or threatened.

(g) The Secretary shall take into account, in making determinations under paragraph (c) or (e) of this section, those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

**Credits**
[84 FR 45052, Aug. 27, 2019; 89 FR 24335, April 5, 2024]

**ADD-22**

SOURCE: 45 FR 13022, Feb. 27, 1980; 49 FR 38908, Oct. 1, 1984; 78 FR 53076, Aug. 28, 2013, unless otherwise noted.

AUTHORITY: 16 U.S.C. 1531 et seq.