Nos. 22-15529, 22-15532, 22-15534, 22-15535, 22-15536,
22-15537, 22-15626, 22-15627, 22-15628

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

DEFENDERS OF WILDLIFE, ET AL.,
*Plaintiffs-Appellees*,

vs.

UNITED STATES FISH & WILDLIFE SERVICE, ET AL.,
*Defendants-Appellants,*

STATE OF UTAH, ET AL.,
*Intervenor-Appellants*.

On Appeal from the United States District Court, Northern District of
California, Oakland Division, Nos. 4:21-cv-344, 4:21-cv-349, 4:21-cv-561
(Hon. Jeffrey S. White)

---

## OPENING BRIEF OF INTERVENOR-APPELLANTS
## AMERICAN FARM BUREAU FEDERATION, NATIONAL
## CATTLEMEN'S BEEF ASSOCIATION, PUBLIC LANDS COUNCIL,
## AND AMERICAN SHEEP INDUSTRY ASSOCIATION

---

Lawson E. Fite
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503-222-9981
Facsimile: 503-796-2900

*Attorneys for Intervenor-Appellants American Farm Bureau Federation,
National Cattlemen's Beef Association, Public Lands Council, and
American Sheep Industry Association*

# Table of Contents

**Page**

I.      INTRODUCTION ........................................................................ 1

II.     STATEMENT OF JURISDICTION ........................................ 1

IV.     LEGAL FRAMEWORK ........................................................... 4

V.      STATEMENT OF FACTS ....................................................... 8

      A.      Wolves were listed under the Act prior to 1978 and NRM wolves were de-listed starting in 2011. ..................................... 8

      B.      After an exhaustive review, the Service de-listed lower-48 wolves in 2020. ......................................................... 10

      C.      This Court reversed the district court's denial of intervention to the Agricultural Groups.............................................. 14

      D.      The district court rejected the Service's De-Listing Rule........... 17

VI.     STANDARD OF REVIEW ..................................................... 19

VII.    SUMMARY OF ARGUMENT .............................................. 20

VIII.   ARGUMENT ............................................................................ 22

      A.      The Service adequately evaluated the status of wolves outside core population areas................................................ 22

      B.      The Service properly evaluated the wolf's status in significant portions of the range................................................ 25

      C.      The Service's interpretation of genetic evidence was entitled to deference. .............................................................. 27

      D.      The agency's evaluation of federal regulatory mechanisms was not arbitrary. ............................................................. 28

IX.     CONCLUSION ........................................................................ 30

142193\283260\46416965.v1

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Salazar*,
    672 F.3d 1170 (9th Cir. 2012) ........................................................9

*Arakaki v. Cayetano*,
    324 F.3d 1078 (9th Cir. 2003) ......................................................17

*Bennett v. Spear*,
    520 U.S. 154 (1997) ......................................................................20

*Center for Biological Diversity v. Haaland*,
    58 F.4th 412 (9th Cir. 2023) ...........................................................7

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ................................................................18, 26

*Churchill Cnty. v. Norton*,
    276 F.3d 1060 (9th Cir. 2001), *opinion amended on denial of
    reh'g*, 282 F.3d 1055 (9th Cir. 2002) ..........................................24

*Crow Indian Tribe v. United States*,
    965 F.3d 662 (9th Cir. 2020) ........................................................20

*Ctr. for Biological Diversity v. Zinke*,
    900 F.3d 1053 (9th Cir. 2018) ................................................20, 25

*Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, No. 21-CV-00344-
    JSW, 2021 WL 3744105 (N.D. Cal. June 21, 2021) ...............15, 16

*Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*,
    584 F.Supp. 3d 812 (N.D. Cal. 2022) ....................................*passim*

*Defs. of Wildlife v. United States Fish & Wildlife Serv.*,
    Nos. 21-16382, 21-16383, 21-16384, 2022 WL 3656444 (9th
    Cir. Aug. 24, 2022) .................................................................2, 16

*Defs. of Wildlife v. Zinke*,
    849 F.3d 1077 (D.C. Cir. 2017) .....................................................9

*Desert Survivors v. U.S. Dep't of Interior*,
336 F. Supp. 3d 1101 (N.D. Cal. 2018)......................................................26

*Food Mktg. Inst. v. Argus Leader Media*,
588 U.S. 427 (2019)..................................................................................2, 3

*Friends of Blackwater v. Salazar*,
691 F.3d 428 (D.C. Cir. 2012)........................................................................7

*Greater Yellowstone Coal., Inc. v. Servheen*,
665 F.3d 1015 (9th Cir. 2011) ................................................................20, 29

*Humane Society of the United States v. Zinke*,
865 F.3d 585 (D.C. Cir. 2017)......................................................................24

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) ....................................................................3, 21

*The Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) (en banc) ........................................................28

*Little Sisters of the Poor Saints Peter & Paul Home v.
Pennsylvania*,
591 U.S. 657 (2020)........................................................................................2

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024)..................................................................18, 19, 26

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989)......................................................................................20

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010)........................................................................................2

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)........................................................................................20

*Nat'l Ass'n of Home Builders v. Norton*,
340 F.3d 835 (9th Cir. 2003) ........................................................................20

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
524 F.3d 917 (9th Cir. 2008) ..........................................................................6

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
475 F.3d 1136 (9th Cir. 2007) ......................................................................27

iii

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
795 F.3d 956 (9th Cir. 2015) ............................................................3

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
426 F.3d 1082 (9th Cir. 2005) .................................................19, 20

*Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*,
898 F.2d 1410 (9th Cir. 1990) ....................................................6, 19

*Salmon Spawning & Recovery All. v. Gutierrez*,
545 F.3d 1220 (9th Cir. 2008) ..........................................................3

*San Luis & Delta-Mendota Water Auth. v. Haugrud*,
848 F.3d 1216 (9th Cir. 2017) ........................................................19

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)........................................................................26

*Sw. Ctr. for Biological Diversity v. Berg*,
268 F.3d 810 (9th Cir. 2001) ............................................................2

*Tennessee Valley Auth. v. Hill*,
437 U.S. 153 (1978)..........................................................................4

*Tucson Herpetological Soc. v. Salazar*,
566 F.3d 870 (9th Cir. 2009) ..........................................................20

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
435 U.S. 519 (1978)........................................................................24

**Statutes and Court Rules**

5 U.S.C. § 704.....................................................................................1

5 U.S.C. § 706(2)(A) .........................................................................19

16 U.S.C. § 1531(a)(2).......................................................................23

16 U.S.C. § 1531(a)(3).......................................................................23

16 U.S.C. § 1531(b) .............................................................................6

16 U.S.C. § 1531(c) ...........................................................................23

iv

16 U.S.C. § 1531(c)(1) ..................................................................................6

16 U.S.C. § 1532(3) .......................................................................................7

16 U.S.C. § 1532(6) ...............................................................................6, 26

16 U.S.C. § 1532(16) .....................................................................................6

16 U.S.C. § 1532(20) .....................................................................................6

16 U.S.C. § 1533 ...........................................................................4, 24, 25

16 U.S.C. § 1533(a) .......................................................................................5

16 U.S.C. § 1533(a)(1) ..................................................................................5

16 U.S.C. § 1533(b) .......................................................................................5

16 U.S.C. § 1533(b)(1)(A) ............................................................................5

16 U.S.C. § 1533(b)(1)(B) ............................................................................6

16 U.S.C. § 1533(c)(1) ..................................................................................4

16 U.S.C. § 1533(c)(2) ...............................................................................4, 5

16 U.S.C. § 1533(d) .......................................................................................6

16 U.S.C. § 1533(f) .............................................................6, 7, 22, 26

16 U.S.C. § 1533(f) .......................................................................................6

16 U.S.C. § 1533(g) ...............................................................................7, 25

16 U.S.C. § 1536(a)(1) ..................................................................................6

16 U.S.C. § 1536(a)(2) ...........................................................................6, 25

16 U.S.C. § 1538(a)(1) ..................................................................................6

16 U.S.C. § 1604(i) .....................................................................................29

28 U.S.C. § 1291 ...........................................................................................2

28 U.S.C. § 1331 .......................................................................................1, 2

Fed. R. Civ. P. 24(b) ...........................................................................16, 17

v

**Session Laws**

Endangered Species Act Amendments of 1978, Pub. L. No. 95-
632, 92 Stat. 3751 (Nov. 1978) ...................................................8, 9

Endangered Species Preservation Act of 1966, Pub. L. No. 89-669,
80 Stat. 926 (Oct. 15, 1966) ........................................................6, 8

Endangered Species Act of 1973, Pub. L. No. 93-205, 87 Stat. 884
(Dec. 28, 1973) .................................................................................4

**Federal Regulations and Notices**

36 C.F.R. § 219.9(b) ................................................................................29

36 C.F.R. § 219.9(c) ................................................................................29

32 Fed. Reg. 4001 (Mar. 11, 1967) ..........................................................8

43 Fed. Reg. 9607 (Mar. 9, 1978) .............................................................8

76 Fed. Reg. 25,590 (May 5, 2011) .........................................................10

77 Fed. Reg. 55,530 (Sept. 10, 2012) .......................................................9

78 Fed. Reg. 35,664 (June 13, 2013) ..............................10, 11, 12, 27

84 Fed. Reg. 9648 (Mar. 15, 2019) .........................................................10

85 Fed. Reg. 69,778 (Nov. 3, 2020) .................................................*passim*

142193\283260\46416965.v1

## I. INTRODUCTION

The American Farm Bureau Federation, American Sheep Industry Association, National Cattlemen's Beef Association, and Public Lands Council (collectively, the "Agricultural Coalition" or "Agricultural Groups") represent America's farmers, ranchers, and livestock producers with significant interests in returning gray wolves to state management. Their members have contributed significantly to wolf recovery over the last several decades and have borne the brunt of increasing wolf/livestock interactions as wolf populations have continued to grow and expand.

This case is about whether a government agency will be permitted to follow science and the law. The 2020 decision to remove wolves from the Endangered Species List was made by career officials in one Administration and supported by career officials in another. The Endangered Species Act mandates this kind of objective decision-making, "solely" on the basis of the best data available. Yet the district court applied exacting scrutiny to the agency's findings, moving the goalposts beyond what the statute requires and beyond the practice of this Court. This Court should reverse and thereby reinstate the de-listing of gray wolves.

## II. STATEMENT OF JURISDICTION

The district court exercised federal question jurisdiction over this case under the Administrative Procedure Act ("APA"), 5 U.S.C. § 704. *See* 28

1

U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291. The Court had jurisdiction over the Agricultural Groups' timely appeal of the denial of their motion to intervene as of right, *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 814 (9th Cir. 2001), and a panel of this Court granted the Agricultural Groups the ability to participate in these appeals. *Defs. of Wildlife v. United States Fish & Wildlife Serv.*, Nos. 21-16382, 21-16383, 21-16384, 2022 WL 3656444 at *1 (9th Cir. Aug. 24, 2022).

Since the Government has appealed, and the Agricultural Groups seek the same relief as the Government, it is not necessary to demonstrate the Groups' standing to appeal. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020). Should such a showing become necessary, the Agricultural Groups have made it. To have standing to appeal, a party must demonstrate "that it has suffered an actual or imminent injury that is 'fairly traceable' to the judgment below and that could be 'redress[ed] by a favorable ruling.'" *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 432–33 (2019) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149–150 (2010)).

The record shows that Coalition members have incurred economic losses, including loss of livestock and damage to private property, from gray wolves, and wolf depredation has increased as wolf numbers have increased. Int.ER-26, 33, 39, 44, 49, 55. The Delisting Rule, if restored, would return more decisions

regarding wolf management to State and Tribal agencies, and to private landowners. In that way, restoring the Delisting Rule will benefit Coalition members and remove restrictions on Coalition members' ability to protect their livestock from wolves, seek compensation for lost livestock, and avoid any potential restrictions on members' routine agricultural activity. A reversal here would redress the Groups' injury and provide the requested relief, which is enough to satisfy Article III. *Food Marketing*, 588 U.S. at 433; *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015) (in APA case, holding that potential timber receipts affected by Roadless Rule gave Alaska standing to appeal); *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008) (appellant asserting APA procedural rights need only show a favorable decision could affect interests). In sum, appealing intervenors "can allege a threat of injury stemming from the order they seek to reverse, an injury which would be redressed if they win on appeal." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1399 (9th Cir. 1995).

## III.   ISSUES ON APPEAL

1.   Whether the U.S. Fish & Wildlife Service ("Service") sufficiently analyzed threats to wolves that have spread outside core population areas as the species recovered;

2.   Whether the district court improperly substituted its judgment when rejecting the Service's finding that gray wolves on the West

3

Coast are not a discrete population;

3.  Whether the Service appropriately analyzed whether gray wolves are threatened or endangered in a significant portion of their range;

4.  Whether the Service appropriately evaluated loss of historic range and the sufficiency of federal land management regulations.

## IV.  LEGAL FRAMEWORK

This case concerns the Service's application of section 4 of the Endangered Species Act of 1973 ("ESA"), as amended, 16 U.S.C. § 1533. Pub. L. No. 93-205, 87 Stat. 884 (Dec. 28, 1973). The enactment of the ESA "represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).

Section 4 prescribes the process by which species are added or removed to and from the List of Endangered and Threatened Wildlife. Section 4(c)(1) requires that the Service "shall from time to time revise each list published under the authority of this subsection to reflect recent determinations, designations, and revisions. . . ." 16 U.S.C. § 1533(c)(1). Every five years, the Service must conduct a review of all species on the List and determine on the basis of the review whether any such species should be removed from the List or changed in status between endangered and threatened. 16 U.S.C. § 1533(c)(2). De-listing or reclassification decision are subject to the same

4

standards as initial listing, set forth in ESA sections 4(a) and 4(b). 16 U.S.C.
§ 1533(c)(2).

      Section 4(a)(1) establishes five factors to be considered in a listing
decision:

> (A) the present or threatened destruction,
> modification, or curtailment of its habitat or range;
>
> (B) overutilization for commercial, recreational,
> scientific, or educational purposes;
>
> (C) disease or predation;
>
> (D) the inadequacy of existing regulatory
> mechanisms; or
>
> (E) other natural or manmade factors affecting [the
> species'] continued existence.

16 U.S.C. § 1533(a)(1). And section 4(b) limits the Service's discretion; it
"shall make determinations required by subsection (a)(1) solely on the basis of
the best scientific and commercial data available … after conducting a review
of the status of the species and after taking into account those efforts, if any,
being made by any State or foreign nation, or any political subdivision of a
State or foreign nation, to protect such species, whether by predator control,
protection of habitat and food supply, or other conservation practices, within
any area under its jurisdiction; or on the high seas." 16 U.S.C. § 1533(b)(1)(A).
The Service must also consider species "identified as in danger of extinction, or
likely to become so within the foreseeable future, by any State agency or by any
agency of a foreign nation that is responsible for the conservation of fish or

5

wildlife or plants." 16 U.S.C. § 1533(b)(1)(B).

An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range...." 16 U.S.C. § 1532(6). A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). Species eligible for listing include subspecies and "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

A species listed under the ESA is subject to a number of protections, including the prohibition on "take" of any endangered species within the United States as well as prohibitions on commerce of such species. 16 U.S.C. § 1538(a)(1). Section 4(d) authorizes the Service to extend the section 9 prohibitions to threatened species. 16 U.S.C. § 1533(d). Federal agencies must consult with the Service to ensure that Federal actions do not jeopardize the continued existence of listed species or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2). Agencies also are obliged by section 7(a)(1) to develop programs for conservation of listed species. 16 U.S.C. § 1536(a)(1); *see Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*, 898 F.2d 1410, 1417–18 (9th Cir. 1990) (describing agencies' section 7(a)(1) duties).

The ultimate goal of the ESA is conservation of listed species. 16 U.S.C. §§ 1531(b), 1531(c)(1), 1533(f); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries*

*Serv.*, 524 F.3d 917, 931 (9th Cir. 2008) (invalidating agency plan that did not adequately provide for recovery). Conservation is "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3). To that end, the statute provides for a recovery planning process for each listed species. 16 U.S.C. § 1533(f). It anticipates that successful recovery will lead to de-listing and return of management obligations to the States. Section 4(g) requires the Service to work cooperatively with States to systematically monitor de-listed species for at least five years after de-listing. 16 U.S.C. § 1533(g). This requirement applies to "all species which have recovered to the point at which the measures provided pursuant to this chapter are no longer necessary and which, in accordance with the provisions of this section, have been removed" from the List. *Id.* Recovery Plans are non-binding guidelines, though they provide criteria by which a species' progress toward recovery is measured. *Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 (D.C. Cir. 2012); *Center for Biological Diversity v. Haaland*, 58 F.4th 412, 417–18 (9th Cir. 2023) (holding that recovery plans are not final agency actions because they do not have legal consequences). Rather, the key question is the same when listing *or* de-listing a species: do the five factors in section 4(a)(1) show that the species is threatened or endangered?

## V.    STATEMENT OF FACTS

### A.    Wolves were listed under the Act prior to 1978 and NRM wolves were de-listed starting in 2011.

Wolves (then known as "Timber Wolves") were first listed as "threatened with extinction" under a previous species protection statute in 1967. 32 Fed. Reg. 4001 (Mar. 11, 1967). The prior statute, the Endangered Species Preservation Act of 1966, had teeth only within the National Wildlife Refuge System. Pub. L. No. 89-669, § 4(d), 80 Stat. 928, 928 (Oct. 15, 1966). At that time, to be listed as "threatened with extinction" meant the Service found, "after consultation with affected States," that a species' "existence is endangered because its habitat is threatened with destruction, drastic modification, or severe curtailment, or because of overexploitation, disease, predation, or because of other factors, and that its survival requires assistance." *Id.* § 1(c), 80 Stat. 926. Those same principles carry through to the modern ESA; the goal is to get a species to the point where the statute's many conservation tools are not required.

The Government consolidated various listings to list gray wolves (*Canis lupus*) as endangered in 47 of the lower 48 states and threatened in Minnesota in 1978. *See* 43 Fed. Reg. 9607 (Mar. 9, 1978); *see also* 85 Fed. Reg. 69,778, 69,779–82 (Nov. 3, 2020) [3-ER-305–08] (summarizing regulatory history). At that time, the 1978 amendments to the ESA were not yet in force. Endangered Species Act Amendments of 1978, Pub. L. No. 95-632, 92 Stat. 3751 (Nov.

8

1978). Those amendments added "distinct population segment ["DPS"] of any species of vertebrate fish or wildlife which interbreeds when mature" to the definition of species eligible for listing. *Id.* § 2(5), 92 Stat. 3752. Thus, while the 1978 listing had separate status for wolves in Minnesota and elsewhere in the lower 48, it did not designate Minnesota wolves as a DPS. 85 Fed. Reg. at 69,782 [3-ER-308]. As the Service has described, the listed species outside Minnesota "erroneously including areas outside the species' historical range and was misread" by some to indicate a "more expansive" recovery effort than the Service intended. *Id.*

In 2011, after several failed regulatory de-listing efforts, Congress legislatively de-listed gray wolves in Idaho, Montana, and portions of neighboring states in the "Northern Rocky Mountains" DPS. *See All. for the Wild Rockies v. Salazar*, 672 F.3d 1170 (9th Cir. 2012) (upholding statute against separation-of-powers challenge). That rule included Wyoming wolves in the DPS, but Wyoming wolves were not delisted until 2012. 77 Fed. Reg. 55,530 (Sept. 10, 2012); *Defs. of Wildlife v. Zinke*, 849 F.3d 1077 (D.C. Cir. 2017).

The Northern Rocky Mountain DPS, once fully delisted (and judicially approved) in 2017, includes all of Idaho, Montana, and Wyoming. It also includes slivers of Washington, Oregon, and Utah. Specifically, wolves are delisted in Washington in "that portion of WA east of the centerline of Highway

9

97 and Highway 17 north of Mesa and that portion of WA east of the centerline of Highway 395 south of Mesa." 76 Fed. Reg. 25,590, 25,591 (May 5, 2011). In Oregon, they are delisted in the "portion of OR east of the centerline of Highway 395 and Highway 78 north of Burns Junction and that portion of OR east of the centerline of Highway 95 south of Burns Junction." *Id.* The eastern Washington and Oregon wolves were considered part of the Northern Rockies population because of their "connectivity to core habitats in central Idaho." 78 Fed. Reg. 35664, 35,709 (June 13, 2013). And in Utah, wolves are delisted only in "that portion of UT east of the centerline of Highway 84 and north of Highway 80." *Id.* This structure has led to oddities as wolf populations continue to grow and expand. Wolves can range widely, with pack territories sized from 12.7 to over 1,000 square miles, the latter being equivalent to the land area of Rhode Island. ER 377–78. A single animal could range throughout the day and its ESA status would change just by crossing a road.

## B. After an exhaustive review, the Service de-listed lower-48 wolves in 2020.

The U.S. Fish & Wildlife Service ("FWS") proposed to delist gray wolves in the lower 48 states (the "Delisting Rule") based on the continued success of gray wolf recovery. 84 Fed. Reg. 9648 (Mar. 15, 2019) [3-ER-494]. The Agricultural Groups and their members submitted comments on the proposed Delisting Rule and have extensively engaged on gray wolf management issues for decades, including through prior rulemakings and in

10

litigation challenging prior rules regarding the gray wolf. Int.ER-25–26, 31, 39, 45, 49–50.

On November 3, 2020, FWS issued its final Delisting Rule. 85 Fed. Reg. 69,778 [3-ER-305]. In that final rule, FWS determined that the gray wolf has recovered and removed the species from the list of endangered and threatened species. Id. FWS based its determination on the best scientific and commercial data available, a thorough analysis of threats to the species and how they have been alleviated, and the commitment and proven track record of States and Tribes to manage healthy wolf populations. The Delisting Rule represents the culmination of managed recovery efforts by federal and state governments along with private land managers such as the members of the Agricultural Groups.

Over a decade ago, the Service identified a national strategy for wolf recovery which would focus on conservation of populations of gray wolves in the Northern Rockies and in the Great Lakes. 85 Fed. Reg. at 69,783 [3-ER-309] (citing 78 Fed. Reg. at 35,707). Even then, the Service expected continued dispersal of wolves from the Northern Rockies and British Columbia into the Pacific Northwest. 78 Fed. Reg. at 35,711. When it first analyzed whether Pacific Northwest wolves would constitute a DPS, the Service concluded that there was not physical separation from Northern Rockies wolves, as "any gaps in suitable (breeding) habitat are not so wide as to preclude dispersing

11

individuals. Wolves are well known to move long distances across a variety of habitat types including open grasslands and agricultural areas … and rivers are not effective barriers to movement ….” 78 Fed. Reg. at 35,712. Genetic data was “equivocal” such that the Service could not conclude that wolves on either side of the NRM boundary “have marked genetic differences.” *Id.* at 35,713. Since the Northwest wolves were not physically or genetically discrete, they could not be a DPS. *Id.*

In the Delisting Rule, the Service reported that wolf populations have recovered beyond all recovery goals. 85 Fed. Reg. at 69,789–90 [3-ER-315–316]. As of 1974, right after enactment of the ESA, wolves in the lower 48 were confined to a small population of 1,000 animals in northern Minnesota and an isolated group of 40 animals on Isle Royale, Michigan. 85 Fed. Reg. at 69,788 [3-ER-314]. Wolves in the lower 48 now consist primarily of “two large, stable or growing metapopulations” in the Western U.S. and in the Great Lakes. *Id.* Current estimates are nearly 2,000 wolves in the Western States and over 4,200 in the Great Lakes. 85 Fed. Reg. at 69,788, 69,790 [3-ER-314, 316]. Both these populations are connected to robust populations in Canada which provide demographic depth and defense against stochastic events like megafires. 85 Fed. Reg. at 69,788 [3-ER-314].

The recovery criteria for wolves in the Great Lakes are (1) a secure wolf population in Minnesota and (2) another population outside Minnesota or Isle

Royale of at least 100 wolves for five successive years. *Id.* at 69,791 [3-ER-317]. The Service found that wolves "greatly exceed" these criteria because there have been more than 2,000 wolves in Minnesota for more than 20 years and there have been over 100 wolves in Wisconsin since 1994. *Id.* For the Rocky Mountain population, the recovery goal was 30 or more breeding pairs and at least 300 wolves equitably distributed among Montana, Idaho, and Wyoming for three consecutive years. *Id.* at 69,792 [3-ER-318]. Wolves in the northern Rockies "far exceeded" recovery goals in 2009. *Id.* Specifically there were at least 45 breeding pairs and 450 wolves—numbers which have only increased in the fifteen years since. *Id.* Modeling indicates that "wolves will likely continue to recolonize areas of the Pacific Northwest … and California … and could become established in the central and southern Rocky Mountains … and the Northeast." *Id.* at 69,813 [3-ER-339]. The Service also concluded that "essentially all suitable habitat in Minnesota is now occupied" but that significant new habitat was available in the West Coast States. *Id.* at 69,816 [3-ER-342].

The Service exhaustively considered the main threats to each population of wolf, including human-caused mortality, 85 Fed. Reg. at 69,794–813 [3-ER-320–339]; habitat and prey availability, *id.* at 69,813–18 [3-ER-339–344]; disease and parasites, *id.* at 69,818–20 [3-ER-344–346]; genetic diversity and inbreeding, *id* at 69,820–21 [3-ER-346–347]; and climate change and

13

cumulative effects. *Id.* at 69,821 [3-ER-347]. It reviewed state, federal and Tribal wolf management efforts throughout the country, including close looks at management in the West Coast States. *Id.* at 69,821–43 [3-ER-347–369]. Thus, the Service concluded that the "combined listed entity" across 45 states was not in danger of extinction or likely to become endangered within the foreseeable future. *Id.* at 69,888–89 [3-ER-414–415]. Finally, the Service analyzed the status of all wolves in the lower 48 states and concluded that those wolves did not warrant listing. *Id.* at 69,889–93 [3-ER-415–419].

### C. This Court reversed the district court's denial of intervention to the Agricultural Groups.

The Delisting Rule took effect January 4, 2021. 3-ER-304. Environmental groups filed three lawsuits in the U.S. District Court for the Northern District of California to challenge the Delisting Rule. The cases were all deemed related and assigned to the same judge. 4-ER-621, 4-ER-650–651, 4-ER-679.

The Agricultural Coalition moved to intervene. The Coalition's motion was accompanied by evidence of each organization's interest in wolves. Ranchers in northeast Oregon and northwest Minnesota described the challenges they faced in protecting their livestock from depredation and in obtaining compensation for livestock killed or injured by wolves. Int.ER-42–45, 52–57. The Coalition further described its efforts to work with states to "best ensure[] the continued sustainable population of the gray wolf" and develop

14

"tools to manage interactions between wolves, the public and domestic livestock." Int.ER-50.

The Coalition also described the efforts of farmers and ranchers to collaborate with states in developing plans to manage wolves. This included the Michigan Department of Natural Resources' Wolf Management Plan, which "will help ensure the continued viability of Michigan's wolf population, while seeking to reduce human-wolf conflicts and allowing farmers and ranchers to successfully maintain and protect their land and livestock." Int.-ER 26–27.

The district court denied the Groups' intervention on June 21, 2021. *Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, No. 21-CV-00344-JSW, 2021 WL 3744105 (N.D. Cal. June 21, 2021). The court concluded that the Coalition's motion was timely, that it had demonstrated an interest in the subject of the action, and that interest could be impaired by the litigation. *Id.* at *2. The court also indicated that the Coalition's arguments about inadequacy of the Government's representation were well-taken. *Id* at *3.

"However," the district court stated, "the Agricultural Coalition does little to address the issue of adequate representation by the [prior] Intervenor Defendants," sporting groups. *Id.* In the court's view, "the Intervenor Defendants' interest is in ensuring that the primary management of the regulation of gray wolf populations remains with the states, which they feel are better suited to create policies and regulations that benefit their members. The

15

Agricultural Coalition also argues that state agencies are better positioned to understand the needs of its members to protect their property and livestock from wolves. Accordingly, the two groups share the same interest." *Id.* It continued, "[a]lthough the two groups have different motivations for favoring state management of gray wolf populations, there is nothing to suggest that the Intervenor Defendants would be incapable of or unwilling to make arguments supporting state agency management of gray wolf populations rather than federal control." *Id.* Thus, the court concluded the Coalition "has not made the required compelling showing that the existing parties are inadequate representatives for its interests." *Id.* The district court also denied permissive intervention, expressing concern about practical considerations" that "adding another party to this action may nevertheless delay the proceedings" and that "intervention would potentially complicate what is already a somewhat unwieldly situation involving three related cases." *Id.* at *4.

This Court reversed. *Defs. of Wildlife v. United States Fish & Wildlife Serv.*, Nos. 21-16382, 21-16383, 21-16384, 2022 WL 3656444 (9th Cir. Aug. 24, 2022). The panel held that the district court had abused its discretion in denying permissive intervention under Federal Civil Rule 24(b). Specifically, the panel noted that the Service "was required, when promulgating its Delisting rule, to consider the adequacy of existing state schemes that, in this case, include provisions that distinctly address hunting and agriculture." Thus, "the

16

Coalition's specific interest in the litigation—ensuring the protection of livestock or compensating for its loss—differs significantly from the interests of the other parties, such as an interest in recreational hunting." *Id.* "Additionally," the panel held, "specialized knowledge is relevant to assessing the effect of state-specific hunting or agricultural regulatory schemes. In these circumstances," the panel concluded "that the current parties would not 'undoubtedly make all of a proposed intervenor's arguments,' nor would they be 'capable and willing to make such arguments.'" *Id.* (quoting *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003)). Since the case below had already proceeded to final judgment, the panel ordered that the "Coalition shall participate as intervenors in the currently pending related appeals." *Id.*

### D. The district court rejected the Service's De-Listing Rule.

In the meantime, the district court proceeded on summary judgment. Its decision overturning the Delisting Rule was issued in February 2022. *Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, 584 F. Supp. 3d 812 (N.D. Cal. 2022) [1-ER-4]. The court recited the appropriate review standards and relevant statutory provisions. *Id.* at 821 [1-ER-9–10]. It then rejected the Rule on multiple grounds. First, it rejected the argument that the currently listed entities—the Minnesota population and the 44-state population of wolves—did not meet the definition of "species" under the ESA. *Id.* at 822 [1-ER-10–13]. Next it concluded that the Service failed to evaluate the "entire" species when relying

17

on the Great Lakes and Northern Rockies populations to determine that the species had recovered. Specifically, this means that the court thought that threats to wolves outside those areas were not adequately considered. *Id.* at 824 [1-ER-13–14]. In the same vein, the court found that the Service had not adequately reviewed the science on genetic separation between West Coast and Rocky Mountain wolves. *Id.* at 825 [1-ER-15–17]. In particular, the court cited to two studies which it said indicated coastal wolves had unique heritage or contributions to wolf populations. *Id.* [1-ER-16]. The court rejected the Service's finding on the ground that it was not a "thoughtful and comprehensive evaluation of the best available science about the genetic relationships between the wolf populations." *Id.* at 826 [1-ER-17].

The district court also found that the Service had not applied a reasonable definition of "significant portion of the range" to which the court could defer under the former *Chevron* doctrine. *Id.* at 827–28 [1-ER-17–20] (citing *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984), *overruled by Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024)). It concluded by striking down the Service's threats assessment on two grounds, the failure to analyze the impact of lost historical range, 584 F. Supp. 3d at 829 [1-ER-21], and purportedly inadequate analysis of regulatory mechanisms. *Id.* at 832 [1-ER-22]. The court upheld the Service's findings that state management of wolves in the Great Lakes states, West Coast, Colorado,

18

and Utah would ensure adequate management of the wolf populations in those states. *Id.* at 830–32 [1-ER-23]. The court vacated the Delisting Rule. *Id.* at 834 [1-ER-28].

This appeal followed; in the interim, the Court resolved the Agricultural Groups' separate appeal on intervention.

## VI.    STANDARD OF REVIEW

Judicial review of administrative decisions under the ESA is subject to section 706 of the Administrative Procedure Act, 5 U.S.C. § 706. *Pyramid Lake*, 898 F.2d at 1414. This court's review of the district court's decision is de novo. *Id.* The APA authorizes a reviewing court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Section 706's "arbitrary and capricious" provision mandates "that judicial review of agency policymaking and factfinding be deferential." *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2261 (2024). Under the deferential standard, this Court does not substitute its judgment for that of the agency. Rather, the Court evaluates whether "the agency has articulated a rational connection between the facts found and the conclusions made." *San Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216, 1227 (9th Cir. 2017), *as corrected* (Mar. 23, 2017) (citations and quotation marks omitted).

Courts "defer to the evaluations of agencies when the evidence presents

19

conflicting views because 'an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.'" *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). Thus, an action will be deemed arbitrary and capricious in limited circumstances such as "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Pac. Coast Fed'n*, 426 F.3d at 1090 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## VII.   SUMMARY OF ARGUMENT

The purpose of the ESA is to conserve and recover species. Its purpose is not to impose potentially costly regulation for the regulation's sake. Recovery and de-listing are just as important to the statute's goals as listing and conservation. That is why the ESA contains "best available data" requirements, to avoid implementing the statute on the basis of "speculation or surmise." *Bennett v. Spear*, 520 U.S. 154, 176 (1997). Remarkably, though this Court has

20

rejected numerous de-listing decisions[1] and upheld many listing decisions, while occasionally rejecting listing determinations,[2] it has rarely if ever upheld a de-listing.

Here, the Service appropriately exercised its limited discretion to determine that gray wolves in the lower 48 States have recovered and listing under the ESA is no longer warranted. The Service based its conclusion on decades of experience, substantial scientific studies, and a lengthy review of available data. Throughout, the Service emphasized the stunning success of wolf recovery, with the species exceeding recovery planning expectations and continuing to expand its range.

The district court took a different view. Instead of accepting or celebrating the indicators of recovery, it used them as cudgels, castigating the Service for perceived analysis gaps. The grounds on which the district court rejected the Delisting Rule ignored the Service's duty to conserve species and

---

[1] *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011) (rejecting grizzly bear de-listing); *Crow Indian Tribe v. United States*, 965 F.3d 662 (9th Cir. 2020) (same); *see also Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053 (9th Cir. 2018) (overturning decision not to list Arctic grayling). *Tucson Herpetological Soc. v. Salazar*, 566 F.3d 870, 879 (9th Cir. 2009), rejected the Service's withdrawal of a proposed listing rule for flat-tailed horned lizard.

[2] *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835 (9th Cir. 2003) (rejecting designation of a DPS of the cactus ferruginous pygmy owl); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) (remanding listing determination without vacatur).

21

ecosystems, instead conjuring hypothetical situations that fell short of an imagined ideal. This was error. The court should have applied the appropriately deferential standard of review, and if it had, would have upheld the Delisting Rule. This Court should reverse.

## VIII. ARGUMENT

### A. The Service adequately evaluated the status of wolves outside core population areas.

The district court's chief complaint with the Service's analysis was the failure to evaluate "threats to wolves outside the core populations." 584 F. Supp. 3d at 824 [1-ER-14]. As an initial matter, it is important to understand where the court did not find fault, which is the Service's conclusion that the Northern Rocky and Great Lakes populations are robust and recovered. The district court did not acknowledge that the Service expressly reviewed the status of all wolves in the lower 48 states. *See* 85 Fed. Reg. at 69,893 [3-ER-419]. The court made no mention of the Service's findings that wolves in the core populations have greatly exceeded all recovery goals. While this Court and the D.C. Circuit have emphasized the non-binding nature of recovery plans, it is highly relevant to a recovery determination that the species has grown past the "objective, measurable criteria which, when met, *would result* in a determination, in accordance with the provisions of this section, that the species be removed from the [Endangered Species L]ist." 16 U.S.C. § 1533(f) (emphasis added).

22

Next, the court mischaracterized the analysis undertaken by the Service. It concluded that the Service "avoids analyzing" wolves outside the Northern Rockies and Great Lakes "by concluding … that wolves outside of the core populations are not necessary to the recovery of the species." 584 F. Supp. 3d at 824 [1-ER-14]. The district court conflated two separate analyses. The Service extensively evaluated the status of wolves outside core populations, including detailed examination of human-caused wolf mortality in Oregon, 85 Fed. Reg. at 69,807 [3-ER-333], and Washington, *id.* at 69,808 [3-ER-334], and the ultimate conclusion that "[w]e also do not expect to see significant increases in human-caused mortality in the West Coast States primarily because those States have regulatory mechanisms in place that balance wolf management and wolf conservation." *Id.* at 69,812 [3-ER-338]. The Service reached the same conclusion regarding the southern Rocky Mountains. *Id.* The district court, as noted above, upheld the Service's evaluation of those regulatory mechanisms, but it then rejected the next logical conclusion that wolves in those states could be de-listed. This was error.

The court faulted the Service's analysis of lone dispersing wolves in various other states. 584 F. Supp. 3d at 824 [1-ER-14]. But in doing so, it failed to recognize that the ESA is designed for management of species, not individual animals. The Act finds that certain "species of fish, wildlife, and plants have been so depleted in numbers that they are in danger of or threatened with

extinction" and that "these species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. §§ 1531(a)(2), 1531(a)(3). To that end, the ESA establishes "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and provides "a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(c). The lone dispersers at issue are not a species, nor are they a genetic or biological reserve of one. The district court erroneously imposed additional requirements on the Service beyond the clear mandate of ESA section 4. This Court has declared that it is "not free to 'impose upon the agency [our] own notion of which procedures are "best" or most likely to further some vague, undefined public good.'" *Churchill Cnty. v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001), *opinion amended on denial of reh'g*, 282 F.3d 1055 (9th Cir. 2002) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978)). The district court erroneously overreached.

The district court's reliance on *Humane Society of the United States v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017), is similarly misplaced. In *Humane Society*, the Service de-listed a Great Lakes DPS of wolves but did not retain remnant wolves as listed. That is not the situation here; the Service analyzed all wolf populations and determined they should all be de-listed. The presence of

24

lone dispersers, even though it is not a substantial contributor to recovery, is a
signal that wolves are recovering and continuing to expand their range. To
instead preclude delisting on the basis of dispersers badly misreads the statute.
It views the animals as merely means to impose regulatory restrictions, rather
than evidence of conservation success.

To the extent that the district court read *Humane Society* to support the
proposition that a listing determination must "assess the impact of delisting" on
individual animals within the species, *see* 584 F. Supp. 3d at 824 [1-ER-14],
*Humane Society* must be rejected. The analysis of regulatory mechanisms and
post-delisting monitoring (which, again, the district court upheld) is all that is
required by ESA section 4(g). A listing determination is not an impact analysis
like an ESA section 7 consultation, *see* 16 U.S.C. § 1536(a)(2), nor is it akin to
an environmental impact statement which much address all effects of a major
federal action. Rather, it is a cabined evaluation based "solely" on the best
available data and the five listing factors. There is no justification for adding
more.

## B. The Service properly evaluated the wolf's status in significant portions of the range.

The Service evaluated both listed entities and wolves as a whole to see if
they were endangered or threatened in a significant portion of the range,
pursuant to the definitions of threatened and endangered species. It concluded
they were not. 85 Fed. Reg. at 69,881–93 [3-ER-407–08, 3-ER-410–411, 3-ER-

414–415, 3-ER-418–419.] The Service defined "significant" for purposes of the Rule to be "whether any portions of the range may be biologically meaningful in terms of the resiliency, redundancy, or representation of the entity being evaluated." *Id.* at 69,878 [3-ER-404.]

The Service defined "range" to mean "the general geographical area occupied by the species at the time [the Service] makes a status determination under section 4 of the Act," that is, the current range of the species. *Id.* at 69,853 [3-ER-379]. No party disputed this definition and this Court has previously upheld it in *Center for Biological Diversity v. Zinke*, 900 F.3d 1053, 1066–67 (9th Cir. 2018). Moreover, the use of current range is a sensible statutory interpretation. The ESA definition refers to a species that "*is* in danger of extinction throughout all or a significant portion of its range," using present tense. 16 U.S.C. § 1532(6) (emphasis added). A species cannot be endangered in its unoccupied historic range—it is extirpated or extinct there. Thus the Service's reading is persuasive and should be adopted.

With regard to "significant," the district court applied the *Chevron* framework but found the Service's definition unreasonable because it lacked an objective standard. 584 F. Supp. 3d at 828 [1-ER-20.] There is nothing in the ESA that requires, or likely allows, an objective threshold. Where the ESA requires objective thresholds, it says so explicitly, as in the recovery plan requirements for "objective measurable criteria". 16 U.S.C. § 1533(f). Post-

*Loper Bright*, while the *Chevron* framework does not apply, the Service's application is persuasive under *Skidmore* and its progeny, all the more so since it comes from an agency with experience and expertise in conservation biology. *Loper Bright*, 144 S. Ct. at 2262 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

The district court also erroneously applied the SPR Policy to require the Service to make further consideration of historic range. 584 F. Supp. 3d at 829 [1-ER-21]. As it noted in the opinion, the SPR Policy has been enjoined. *Desert Survivors v. U.S. Dep't of Interior*, 336 F. Supp. 3d 1101, 1131 (N.D. Cal. 2018). There is no reason to constrain the Service with a Policy that courts have invalidated. And a requirement to study historic range, though it has at time been engrafted onto the ESA, makes little sense in determining the present status of a species. Certainly, the history of a species may contribute to its current status, but historic range is not relevant to whether a species is threatened or endangered. Nor does recovery entail regaining a species' whole historic range. Rather recovery occurs when the mechanisms of the Act are no longer needed to conserve the relevant species.

**C.    The Service's interpretation of genetic evidence was entitled to deference.**

The Service evaluated whether West Coast Wolves constitute a DPS, applying its judicially-approved DPS Policy. *See Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136 (9th Cir. 2007). Under the policy, a

population must be both "discrete" and "significant" to be a DPS. The court accepted the Service's determination that West Coast wolves are not physically discrete from Northern Rockies wolves. 584 F. Supp. 3d at 825 [1-ER-16]. But it quibbled with the Service's conclusion that there is not genetic discreteness. *Id.* The Service addressed these issues in 2013, determining then that evidence of genetic separation was "equivocal" and did not support a finding of "marked genetic differences." 78 Fed. Reg. at 35,713. More recent data shows that wolves in Washington primarily share Northern Rocky ancestry, with the exception of two individual wolves. 85 Fed. Reg. at 69,787 [3-ER-313]. All wolves in Oregon and California have Northern Rocky ancestry. *Id.*

This was not enough for the district court in light of the "unique" genetic characteristics of coastal wolves. 584 F. Supp. 3d at 825 [1-ER-16]. The Service concluded, however, that this unique genetic material is largely not present in West Coast Wolves. It is not the court's role to sit as a panel of scientists, deciding which evidence is more scientifically important than other material. *The Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008) (en banc).

### D. The agency's evaluation of federal regulatory mechanisms was not arbitrary.

The court glibly dismissed the Service's analysis of wolf management on federal lands with the comment that Forest Plans in the West Coast States "do not contain standards and guidelines specific to wolf management" and found

28

the Service did not explain how existing mechanisms such as sensitive species listing will ensure a sustainable wolf population. 584 F. Supp. 3d at 832 [1-ER-26] (quoting 85 Fed. Reg. at 69,842 [3-ER-368]). These statements are inaccurate. The district court first failed to acknowledge the extent to which wolves on public lands inhabit National Parks, National Wildlife Refuges, and Wilderness Areas, all lands on which hunting is prohibited. 85 Fed. Reg. at 69,825, 69,842 [3-ER-351, -368].

In the quoted section of the Rule, the Service explained that "conservation objectives for the gray wolf and its habitat would continue to be addressed during planning and implementation of projects." *Id.* at 69,842 [3-ER-368]. This is consistent with the updated Forest Service planning rule, which requires measures in each Forest Plan to maintain viability of species of conservation concern.[3] 36 C.F.R. § 219.9(b). All actions in a National Forest must comply with the Forest Plan. 16 U.S.C. § 1604(i); *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1031 (9th Cir. 2011). The Service also noted that "BLM requires the designation of federally delisted species as sensitive species for 5 years following delisting" and that "BLM sensitive species are managed consistent with species and habitat management objectives in land use and implementation plans to promote their conservation and

---

[3] Species of conservation concern are equivalent to "sensitive species" under the prior planning rule. 36 C.F.R. § 219.9(c).

29

minimize the likelihood and need for listing under the Act." 85 Fed. Reg. at 69,842 [3-ER-368]. Based on measures like these, the Service concluded that the "Forest Service and Bureau of Land Management have a demonstrated capacity and a proven history of providing sufficient habitat for wildlife…." *Id.* at 69,825 [3-ER-351]. The district court's conclusion otherwise was erroneous.

## IX. CONCLUSION

The judgment of the district court should be reversed.

DATED this 20th day of September, 2024.

Respectfully submitted,

SCHWABE, WILLIAMSON & WYATT, P.C.

By:    *s/ Lawson E. Fite*
Lawson E. Fite
Email: lfite@schwabe.com

*Attorneys for Intervenor-Appellants American Farm Bureau Federation, National Cattlemen's Beef Association, Public Lands Council, and American Sheep Industry Association*

Of counsel:
Ellen Steen
Travis Cushman
AMERICAN FARM BUREAU
FEDERATION
Ste. 1000W
600 Maryland Ave. S.W.
Washington, D.C. 20024

Mary-Thomas Hart
NATIONAL CATTLEMEN'S BEEF
ASSOCIATION
1275 Pennsylvania Ave. N.W.
Suite 801
Washington, D.C. 20004

142193\283260\46416965.v1

## CERTIFICATE OF COMPLIANCE

Ninth Cir. Case Number(s):  Nos. 22-15529, 22-15532, 22-15534, 22-15535, 22-15536, 22-15537, 22-15626, 22-15627, 22-156289.

This brief contains **6,861** words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f).  The brief's type size and typeface comply with FRAP 32(a)(5) and (6). I certify that this brief complies with the word limit of Cir. R. 32-1.

DATED this 20th day of September, 2024.

_s/ Lawson E. Fite_

Lawson E. Fite

142193\283260\46416965.v1