Nos. 22-15529, 22-15532, 22-15534, 22-15535, 22-15536,
22-15537, 22-15626, 22-15627, 22-15628

───────────────

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

───────────────

DEFENDERS OF WILDLIFE, *et al.*,
*Plaintiffs/Appellees*,

v.

UNITED STATES FISH AND WILDLIFE SERVICE, *et al.*,
*Defendants/Appellants*

and

STATE OF UTAH, *et al.,*
*Intervenor Defendants/Appellants*.

───────────────

Appeal from the United States District Court for the Northern District of California
Nos. 4:21-cv-344, 4:21-cv-349, and 4:21-cv-561 (Hon. Jeffrey S. White)

───────────────

**APPELLEES' JOINT ANSWERING BRIEF**

───────────────

Kristen L. Boyles
Michael B. Mayer
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-7340
kboyles@earthjustice.org
mmayer@earthjustice.org

Timothy J. Preso
Earthjustice
1716 W. Babcock St.
P.O. Box 4743
Bozeman, MT 59772-4743
(406) 586-9699
tpreso@earthjustice.org

Jared E. Knicley
Natural Resources Defense
Council
1152 15th St. NW, Suite 300
Washington, DC 20005
(202) 513-6242
jknicley@nrdc.org

Sarah K. McMillan
Western Environmental Law
Center
103 Reeder's Alley,
Helena, MT 59601
(406) 708-3062
mcmillan@westernlaw.org

Kelly E. Nokes
Western Environmental Law
Center
P.O. Box 218
Buena Vista, CO 81211
(575) 613-8051
nokes@westernlaw.org

*Attorneys for Appellees Defenders of Wildlife, et al., NRDC, and WildEarth Guardians, et al.*

## TABLE OF CONTENTS

STATEMENT OF THE CASE...................................................................3

    I.      LEGAL BACKGROUND......................................................3

    II.     GRAY WOLVES IN THE UNITED STATES ...................................5

    III.    FWS'S PRIOR, UNLAWFUL DELISTING EFFORTS.....................7

    IV.    2020 DELISTING RULE.........................................................8

    V.     DELISTING RESPONSE ................................................10

    VI.    DISTRICT COURT DECISION.........................................11

SUMMARY OF ARGUMENT ................................................................13

STANDARD OF REVIEW ...................................................................13

ARGUMENT ......................................................................................14

    I.      FWS'S THREATS' ASSESSMENT VIOLATED THE ESA. ..........14

          A.     FWS Failed To Look at Nationwide Wolf Impacts.................15

          B.     FWS Failed To Consider the Effects of Lost Historical Range........................................................................21

    II.     FWS'S "SIGNIFICANT PORTION OF ITS RANGE" ANALYSIS WAS ARBITRARY. .......................................................25

          A.     Courts Have Repeatedly Rejected FWS's Attempts To Read the ESA's "Significant Portion" Language Out of the Statute...................................................................26

          B.     FWS's Standardless "Significant Portion" Analysis in the Delisting Rule Was Arbitrary and Capricious. .........................28

          C.     FWS Irrationally Applied Its Arbitrary "Significant Portion" Approach. ...............................................34

1.    FWS's approach to wolf abundance and genetic contributions was inconsistent.......................................35

2.    FWS failed to adequately consider important factors .. 38

III.    FWS UNLAWFULLY IGNORED THE CONSERVATION STATUS OF WEST COAST WOLVES............................................43

A.    FWS Changed Its Position without Explanation. .....................44

B.    FWS's Reliance on Lack of Physical Separation Was Invalid. ....................................................................................46

C.    FWS Ignored Recent Genetic Science......................................49

IV.    FWS FAILED TO ENSURE THE ADEQUACY OF REGULATORY PROTECTIONS ON FEDERAL LANDS. ............51

A.    The District Court Correctly Held No Federal Regulatory Mechanisms Exist. ...................................................................51

B.    FWS's New Theory that State Mechanisms Can Replace Federal Mechanisms Is Incorrect and Cannot Save the Flawed Rule. ...............................................................................54

C.    Potential "Sensitive Species" Status Designations Are Insufficient. ............................................................................57

V.    THE DISTRICT COURT CORRECTLY HELD THAT FWS DID NOT (AND COULD NOT) SOLELY RELY ON THE DEFINITION OF "SPECIES" TO JUSTIFY DELISTING. ..............59

A.    FWS Did Not Delist Wolves Solely on the Statutory Definition of Species....................................................................59

B.    Congress Did Not Wipe Out Protections for Wolves When It Amended the ESA in 1978. .......................................60

CONCLUSION ..........................................................................................66

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*All. for the Wild Rockies v. Salazar,*
672 F.3d 1170 (9th Cir. 2012) ..............................................................65

*Biodiversity Legal Found. v. Babbitt,*
943 F. Supp. 23 (D.D.C. 1996) ......................................................52, 55

*Coos Cnty. Bd. of Comm'rs v. Kempthorne,*
531 F.3d 792 (9th Cir. 2008) ...............................................................66

*Crow Indian Tribe v. United States,*
965 F.3d 662 (9th Cir. 2020) .......................................15, 16, 51, 64

*Ctr. for Biological Diversity v. Haaland,*
998 F.3d 1061 (9th Cir. 2021) ......................................................45, 46

*Ctr. for Biological Diversity v. Jewell,*
248 F. Supp. 3d 946 (D. Ariz. 2017) ............................................28, 43

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
33 F.4th 1202 (9th Cir. 2022) ...............................................................59

*Ctr. for Biological Diversity v. Zinke,*
900 F.3d 1053 (9th Cir. 2018) ...............................22, 24, 25, 42, 50

*Defs. of Wildlife v. Hall,*
565 F. Supp. 2d 1160 (D. Mont. 2008) .................................................8

*Defs. of Wildlife v. Norton,*
258 F.3d 1136 (9th Cir. 2001) ......................................................24, 27, 32

*Defs. of Wildlife v. Norton,*
354 F. Supp. 2d 1156 (D. Or. 2005) ......................................7, 18, 19

*Defs. of Wildlife v. Salazar,*
729 F. Supp. 2d 1207 (D. Mont. 2010) ......................................8, 64

*Defs. of Wildlife v. Zinke*,
  849 F.3d 1077 (D.C. Cir. 2017) ....................................................... 8, 33

*Desert Survivors v. U.S. Dep't of the Interior*,
  321 F. Supp. 3d 1011 (N.D. Cal. 2018) ........................................ 28, 52

*Friends of the Blackwater v. Salazar*,
  691 F.3d 428 (D.C. Cir. 2012) ....................................................... 56, 58

*Friends of Animals v. Haaland*,
  997 F.3d 1010 (9th Cir. 2021) .............................................................. 13

*Getty v. Federal Sav. & Loan Ins. Corp.*,
  805 F.2d 1050 (D.C. Cir. 1986) ........................................................... 25

*Greater Yellowstone Coal. v. Servheen*,
  665 F.3d 1015 (9th Cir. 2011) .......................................... 20, 52, 53, 54

*Helena Hunters and Anglers Ass'n v. Moore*,
  2023 WL 6626158 (D. Mont. Oct. 11, 2023) ....................................... 53

*Humane Soc'y of the U.S. v. Jewell*,
  76 F. Supp. 3d 69 (D.D.C. 2014) ....................................... 3, 8, 60, 62

*Humane Soc'y of the U.S. v. Kempthorne*,
  579 F. Supp. 2d 7 (D.D.C. 2008) ........................................................... 8

*Humane Soc'y of the U.S. v. Pritzker*,
  548 Fed. Appx. 355 (9th Cir. 2013) ..................................................... 32

*Humane Soc'y of the U.S. v. Salazar*,
  No. 09-1092 (D.D.C. July 2, 2009) ........................................................ 8

*Humane Soc'y of the U.S. v. Zinke*,
  865 F.3d 585 (D.C. Cir. 2017) ....................... 4, 8, 17, 22, 25, 33, 46, 60, 64, 65

*Japanese Village, LLC v. Fed. Transit Admin.*,
  843 F. 3d 445 (9th Cir. 2016) ......................................................... 54, 55

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) ............................................... 14, 24, 31, 32

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ...................................................................14, 30, 35

*Nat'l Ass'n of Home Builders v. Norton*,
340 F.3d 835 (9th Cir. 2003) ...............................................................47

*Nat'l Parks Conservation Ass'n v. EPA*,
788 F.3d 1134 (2015)..........................................................................38

*Nat'l Wildlife Fed'n v. Norton*,
386 F. Supp. 2d 553 (D. Vt. 2005) ...........................................7, 19, 42

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
475 F.3d 1136 (9th Cir. 2007) .............................................................62

*Ohio v. EPA*,
144 S. Ct. 2040 (2024).........................................................................51

*Or. Nat. Res. Council v. Daley*,
6 F. Supp. 2d 1139 (D. Or. 1998) ...................................................52, 57

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
795 F.3d 956 (9th Cir. 2015) ...............................................................45

*Pearson v. Shalala*,
164 F.3d 650 (D.C. Cir. 1999).........................................30, 31, 34, 36

*Rocky Mountain Wild v. Walsh*,
216 F. Supp. 3d 1234 (D. Colo. 2016)..................................................56

*Salix v. U.S. Forest Serv.*,
944 F. Supp. 2d 984 (D. Mont. 2013)...................................................54

*Secs. and Exch. Comm'n v. Chenery Corp.*,
318 U.S. 80 (1943)...............................................................................33

*Sierra Club v. Mainella*,
459 F. Supp. 2d 76 (D.D.C. 2006)........................................................31

*Sw. Ctr. for Biological Diversity v. Babbitt*,
939 F. Supp. 49 (D.D.C. 1996).............................................................52

vi

*Swan View Coalition v. Barbouletos*,
2008 WL 5682092 (D. Mont. Mar. 31, 2008) ....................................53

*Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms,*
*& Explosives*,
437 F.3d 75 (D.C. Cir. 2006) ........................................................30, 31

*Trout Unlimited v. Lohn*,
559 F.3d 946 (9th Cir. 2009) ...............................................................51

*WildEarth Guardians v. Jeffries*,
370 F. Supp. 3d 1208 (D. Or. 2019) ....................................................55

**Federal Statutes**

Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

5 U.S.C. § 706(2) ....................................................................13, 14, 32

Endangered Species Act, 16 U.S.C. § 1531 *et seq.*

16 U.S.C. § 1531(b) .................................................................................3

16 U.S.C. § 1531(c) .................................................................................4

16 U.S.C. § 1532(6) .................................................................12, 26, 43

16 U.S.C. § 1532(16) ..........................................................................4, 61

16 U.S.C. § 1532(19) ...............................................................................4

16 U.S.C. § 1532(20) ...............................................................12, 26, 43

16 U.S.C. § 1533 ..........................................................................3, 4, 15

16 U.S.C. § 1533(a)(1)(D) ...............................................................52, 57

16 U.S.C. § 1533(b)(1)(A) .......................................................................4

16 U.S.C. § 1533(c)(2)(A) ......................................................................65

16 U.S.C. § 1533(c)(2)(B) ......................................................................65

16 U.S.C. § 1538(a)(1)(B) .......................................................................4

Pub. L. 93–205, § 3(11), 87 Stat. 884, 886 (1973) ....................................61

**State Statutes**

Wisc. Stat. § 29.185(6)(a)(2) ....................................10

**Regulations**

32 Fed. Reg. 4001 (Mar. 11, 1967) ....................................6

38 Fed. Reg. 14678 (June 4, 1973) ....................................6

39 Fed. Reg. 1171 (Jan. 4, 1974) ....................................6

41 Fed. Reg. 17736 (Apr. 28, 1976) ....................................6

41 Fed. Reg. 24064 (June 14, 1976) ....................................6

43 Fed. Reg. 9607 (Mar. 9, 1978) ....................................7, 61

61 Fed. Reg. 4722 (Feb. 7, 1996) ....................................41, 47, 49, 61, 62

68 Fed. Reg. 15804 (Apr. 1, 2003) ....................................6

72 Fed. Reg. 37346 (July 9, 2007) ....................................63

73 Fed. Reg. 10514 (Feb. 27, 2008) ....................................45, 47

74 Fed. Reg. 15123 (Apr. 2, 2009) ....................................45

75 Fed. Reg. 60516 (Sept. 30, 2010) ....................................39

76 Fed. Reg. 23650 (Apr. 27, 2011) ....................................39

76 Fed. Reg. 81666 (Dec. 28, 2011) ....................................16

78 Fed. Reg. 35664 (June 13, 2013) ....................................17

79 Fed. Reg. 37578 (July 1, 2014) ....................................28, 42

82 Fed. Reg. 30502 (June 30, 2017) ....................................40

84 Fed. Reg. 9648 (Mar. 15, 2019) ....................................8, 9

84 Fed. Reg. 52598 (Oct. 2, 2019) ....................................40

85 Fed. Reg. 69778 (Nov. 3, 2020)...................................................*passim*

89 Fed. Reg. 8391 (Feb. 7, 2024) ...........................................................46

**Other Authorities**

Gray Wolf Species Assessment (Jan. 4, 2024),
　　https://www.regulations.gov/document/FWS-HQ-ES-2021-0106-
　　55881 ......................................................................................................29

H.R. Rep. No. 95-1625 (1978)...............................................................24

S. Rep. No. 97-418 (1982) ........................................................................3

Wolf Packs in Washington, https://wdfw.wa.gov/species-habitats/at-
　　risk/species-recovery/gray-wolf/packs .............................................18

## GLOSSARY

| Short Form | Title or Phrase |
|---|---|
| APA | Administrative Procedure Act |
| DPS | Distinct Population Segment |
| ER | Excerpts of Record |
| ESA | Endangered Species Act |
| SER | Supplemental Excerpts of Record |
| SPR | Significant Portion of its Range |

| Short Form | Document |
|---|---|
| Delisting Rule | Final Rule: Removing the Gray Wolf (Canis lupus) From the List of Endangered and Threatened Wildlife, 85 Fed. Reg. 69778 (Nov. 3, 2020) |
| Proposed Rule | Proposed Rule: Removing the Gray Wolf (Canis lupus) From the List of Endangered and Threatened Wildlife, 84 Fed. Reg. 9648 (Mar. 15, 2019) |
| Scientific Peer Review | Summary Report of Independent Peer Reviews for the U.S. Fish and Wildlife Service Gray Wolf Delisting Review (May 2019) |

| Short Form | Parties |
|---|---|
| Appellees | Defenders of Wildlife, Center for Biological Diversity, Sierra Club, National Parks Conservation Association, Oregon Wild, and Humane Society of the United States (No. 21-344-JSW); WildEarth Guardians, Western Watersheds Project, Cascadia Wildlands, Environmental Protection Information Center, Kettle Range Conservation Group, Klamath Forest Alliance, Klamath-Sisikyou Wildlands Center, The Lands Council, and Wildlands Network (No. 21-349-JSW); Natural Resources Defense Council (No. 21-561-JSW) |

| | |
|---|---|
| Farm Bureau | American Farm Bureau Federation, National Cattlemen's Beef Association, Public Lands Council, American Sheep Industry Association |
| FWS | U.S. Fish & Wildlife Service |
| Safari Club/NRA | Safari Club International, National Rifle Association of America |
| Utah | State of Utah |

INTRODUCTION

Gray wolves have a chance to be an American success story. Wolves once roamed across the nation. Hunted, trapped, and poisoned with the approval of federal and state agencies, by 1967 there were fewer than 1,000 wolves left in the contiguous United States, almost all in one small part of northeastern Minnesota. In 1978, the U.S. Fish and Wildlife Service ("FWS") protected gray wolves under the fledgling Endangered Species Act ("ESA") as two groups: a threatened population in Minnesota and an endangered population in the rest of the lower 48 states.

Since the listing, federal, state, and private efforts to bring wolves back from the brink of extinction have gone forward. Wolf populations have grown in the Great Lakes states and Northern Rockies, even though state laws allow killing of wolves absent the protections of the ESA. Wolf packs have begun to reestablish themselves in the West Coast states but face higher threats of genetic isolation and human-caused mortality. And a small number of wolves have been reintroduced to their historic range in northwest Colorado.

Yet FWS has shown an unrelenting desire to abandon federal wolf protection before achieving a durable recovery, repeatedly trying to remove protections through increasingly strained rules. The federal courts have consistently rejected those attempts as unlawful. Undaunted, in 2020 FWS again

finalized a delisting rule, this time eliminating all federal protections from gray wolves in 44 states. *See* 3-ER-304-421, 85 Fed. Reg. 69778 (Nov. 3, 2020) ("Delisting Rule").[1]

Appellees Defenders of Wildlife *et al.* successfully challenged the Delisting Rule, with the district court finding multiple legal flaws in FWS's decision. At their core, Appellees' arguments faulted FWS's reliance on the recovering wolf population in the Great Lakes states that allowed the agency to write off nascent and fragile wolf populations elsewhere as outliers whose loss would not matter or as evidence of alleged nationwide recovery that rendered continued protections unnecessary. The district court agreed and vacated the Delisting Rule, reinstating nationwide wolf protections. These appeals followed.

FWS now turns Appellees' arguments and the district court's opinion into hyperbole, claiming that both require restoration of wolves across all historic habitat. Such exaggeration is unwarranted. Nor can FWS support an argument that it can now never delist wolves, failing to reconcile its simultaneous positions that wolf delisting is impeded by judicial overreach, but wolves merit a new nationwide recovery vision. Moreover, FWS has rejected biologically sound proposals to designate and manage smaller wolf populations—populations that would give the

---

[1] In this brief, documents are cited using the volume number and pagination of the Excerpts of Record ("ER") or Supplement ER ("SER").

agency greater flexibility to address regional differences. Instead, FWS sought to ram through a nationwide delisting that left smaller populations in great peril. Premature delisting is not recovery. "At times, a court must lean forward from the bench to let an agency know, in no uncertain terms, that enough is enough." *Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69, 75 (D.D.C. 2014) (invalidating FWS's prior wolf delisting attempt) (cleaned up). This, again, is such a case. Appellees respectfully ask the Court to affirm the district court decision that keeps ESA protections for gray wolves in place until wolves' recovery is realized.

## STATEMENT OF THE CASE

### I. LEGAL BACKGROUND

Congress enacted the ESA to "provide a program for the conservation of ... endangered species and threatened species" and "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). ESA section 4—the "cornerstone of effective implementation" of the Act, S. Rep. No. 97-418, at 10 (1982)—establishes the framework for listing or delisting a species. *See* 16 U.S.C. § 1533. It provides that, in making decisions to list or delist a species as "endangered" or "threatened," the Secretary must assess five factors:

- the present or threatened destruction, modification, or curtailment of its habitat or range;
- overutilization for commercial, recreational, scientific, or educational purposes;

3

- disease or predation;
- the inadequacy of existing regulatory mechanisms; or
- other natural or manmade factors affecting its continued existence.

*Id.* § 1533(a)(1).

FWS can list or delist a distinct population segment ("DPS") of a vertebrate species, even when the entire species would not warrant listing or delisting. *See* 16 U.S.C. § 1532(16) (definition of species). This reflects "Congress's intent to target the Act's provisions where needed, rather than to require the woodenly undifferentiated treatment of all members of a taxonomic species regardless of how their actual status and condition might change over time." *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 598 (D.C. Cir. 2017). The ESA also requires FWS to make listing determinations "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A).

Once a species is listed under the ESA, "all Federal departments and agencies shall seek to conserve" the species. *Id.* § 1531(c). And, with limited exceptions, no individual, business, or government entity can "take"—that is, "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect," *id.* § 1532(19)—an endangered species. *See id.* § 1538(a)(1)(B).

II.    GRAY WOLVES IN THE UNITED STATES



The gray wolf (*Canis lupus*) is the largest wild member of the dog family (*Canidae*). 2-SER-342. Despite its name, a gray wolf's fur can range from white to shades of gray to coal black. *Id.* at 343. Gray wolves are territorial, social animals that hunt in groups and normally live in packs of two to eight individuals. 1-SER-067. Wolves eat medium and large mammals. *Id.* Wolves' predations can significantly shape their ecosystems, promoting biodiversity and overall ecosystem health by, for example, altering the movement patterns of elk to allow for recovery of over-grazed vegetation. 2-SER-381.

Historically, wolves were the nation's most common large carnivore, with habitat across nearly all of North America. 3-ER-431-32 & fig. 1. Many Native American cultures revere wolves, considering them "to possess equal, or superior,

5

capacity to human beings with respect to intelligence and agility," as well as "parenting skills and ability to coordinate and communicate collective action." 1-SER-069. With European settlement, however, "superstitions and fears ... led to widespread persecution of wolves." 68 Fed. Reg. 15804, 15805 (Apr. 1, 2003). In the United States, wolves were routinely hunted and killed, and this hunting and trapping, together with an active eradication program sponsored and carried out by the federal government (including the agency that became FWS) in the early 20th century, caused the extirpation of wolves from more than 95 percent of their range in the lower 48 states. *See* 3-ER-432-33 & fig. 1.

As a result, two subspecies of gray wolves were granted protection under the statutory forerunner of the ESA, the Endangered Species Preservation Act of 1966. 32 Fed. Reg. 4001 (Mar. 11, 1967) (*C. l. lycaon*); 38 Fed. Reg. 14678 (June 4, 1973) (*C. l. irremotus*). In January 1974, FWS granted those wolves protection under the then-current version of the ESA. 39 Fed. Reg. 1171 (Jan. 4, 1974). FWS subsequently granted other subspecies of gray wolves protections under the ESA. 41 Fed. Reg. 17736 (Apr. 28, 1976) (*C. l. baileyi*); 41 Fed. Reg. 24064 (June 14, 1976) (*C. l. monstrabilis*).

In 1978, after recognizing the uncertain taxonomy of the subpopulations and "that the entire species *Canis lupus* is Endangered or Threatened to the south of Canada," FWS reclassified gray wolves as endangered at the species level

throughout the contiguous United States, except for a population in Minnesota, which was listed as threatened. 43 Fed. Reg. 9607 (Mar. 9, 1978). This is the listing at issue here.

III.   FWS'S PRIOR, UNLAWFUL DELISTING EFFORTS

Gray wolves still exist in only a fraction of their range and at population numbers well below historical levels. Although FWS has taken important steps to recover wolves, the agency has also consistently demonstrated a desire to prematurely declare victory. For close to twenty years, FWS has tried to strip away protections for wolves, often relying on the same, flawed legal theory: that limited recovery in discrete areas can justify nationwide delisting. Federal courts have consistently rejected this "wolves in some areas are enough for all areas" approach and vacated FWS's unlawful delisting efforts.

For instance, in 2003, FWS issued a rule that created three new wolf DPSs and downlisted two of them from endangered to threatened status. Two courts invalidated this rule because FWS assessed only the core populations in the new DPSs and did not apply the statutory listing factors outside of those areas. *See Defs. of Wildlife v. Norton*, 354 F. Supp. 2d 1156, 1170-72 (D. Or. 2005) ("*Oregon Wolves*"); *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 564-65 (D. Vt. 2005) ("*Vermont Wolves*").

FWS repeated variations on this approach—drawing a narrow DPS while ignoring the broader population and wider habitat availability—with almost clockwork regularity in 2007, 2008, 2009, and 2011. Wolf advocates—including Appellees here—challenged these efforts. Again, the courts rejected them. *See Humane Soc'y of the U.S. v. Kempthorne*, 579 F. Supp. 2d 7 (D.D.C. 2008) (vacating rule); *Defs. of Wildlife v. Hall*, 565 F. Supp. 2d 1160 (D. Mont. 2008) (enjoining rule); Stip. Settlement Agreement & Order, *Humane Soc'y of the U.S. v. Salazar*, No. 09-1092 (D.D.C. July 2, 2009) (vacating rule); *Defs. of Wildlife v. Salazar*, 729 F. Supp. 2d 1207 (D. Mont. 2010) (vacating rule); *Humane Soc'y of the U.S. v. Jewell,* 76 F. Supp. 3d 69 (vacating rule), *aff'd* 865 F.3d 585 (D.C. Cir. 2017).[2] The challenged Delisting Rule represents another attempt by FWS to implement this same flawed playbook.

IV.   2020 DELISTING RULE

In March 2019, FWS again proposed eliminating ESA protections for wolves throughout the contiguous United States. 3-ER-494, 84 Fed. Reg. 9648 (Mar. 15, 2019). In the proposed rule, FWS assessed the status of protected gray wolves in the two listed entities—the threatened population in Minnesota and the

---

[2] Although litigation invalidated FWS's 2009 delisting of the Northern Rockies population of wolves, *see Defs. of Wildlife*, 729 F. Supp. 2d at 1228, Congress reinstated the delisting of wolves in Idaho and Montana in 2011. 3-ER-306. The D.C. Circuit upheld FWS's delisting of wolves in Wyoming. *Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1093 (D.C. Cir. 2017).

endangered population in the remaining states (not including wolves within the Northern Rockies DPS)—in combination. *Id.*

A scientific peer review commissioned by FWS sharply criticized the proposal, with several of the scientists opposing the proposed rule for failing to use the best available science. 2-SER-117-329. One of the peer reviewers found that FWS failed to "provide coherent factual support or logical explanation for the agency's conclusions;" bemoaned the "lack of detail and rigor in the treatment of genetic issues;" and faulted the "extreme oversimplification" of wolf genetics. *Id.* at 208-10. Peer reviewers questioned whether the proposed rule was based on the best available science,[3] noting there were clear omissions of key scientific data[4] and that the publications and analysis relied upon appeared "haphazard," *id.* at 287, and "ad hoc," *id.* at 321. FWS also received a public comment from nearly 100 scientists corroborating these key flaws and concluding that, in "the most general

---

[3] *See e.g.*, 2-SER-208 ("the proposed rule did not build on the assembled scientific information to provide coherent factual support or logical information for the agency's conclusions"); *id.* at 263 ("I do not find the proposed rule and draft biological report present the best available science."); *id.* at 324 ("[T]here are demonstrable errors of fact, interpretation, and logic. Some interpretations of scientific information are not sound.").

[4] *See e.g.,* 2-SER-321 ("The review overlooked many rigorous, peer-reviewed studies that are directly relevant to understanding and predicting rates of human-caused mortality among wolves inhabiting the current range of the gray wolf entity."); *id.* at 205 (suggesting key publications wrongly omitted from the proposed rule's underlying biological report "that need to be addressed in order for the report to provide a comprehensive information base for the rule").

terms, the FWS proposal does not represent the best-available science pertaining to wolf conservation." 1-SER-099.

Despite these critiques, on November 3, 2020, FWS issued its final rule delisting gray wolves. 3-ER-304. The Delisting Rule considered wolves in three different "configurations" for the purposes of delisting, including one not found in the proposed rule that combined listed wolves with the already congressionally delisted Northern Rockies DPS. 3-ER-310-11. The Delisting Rule took effect on January 4, 2021, removing federal protections from wolves across the nation.

## V.    DELISTING RESPONSE

FWS's nationwide wolf delisting caused immediate reactions. The state wolf management plans in each of the Great Lakes states called for wolf hunting and trapping seasons once federal protections were removed, and each state had held wolf hunts during previous periods of federal delisting. The Delisting Rule abruptly triggered a February wolf hunting season in Wisconsin.

A blood bath ensued. The Wisconsin law authorized hunting using dogs, an extremely efficient method of tracking down wolves. Wisc. Stat. § 29.185(6)(a)(2); 1-SER-021-22. It also required state regulators to keep hunting zones open at least 24 hours after the state provided public notice that a zone had met or would soon meet its kill quota. *Id.* at 024. Wisconsin's post-hunt report found 218 wolves were killed, almost 100 wolves above the state-licensed quota, in only two days. 1-SER-

045. A study by one of the peer review scientists for the Delisting Rule estimated that up to one-third of all wolves in Wisconsin were killed in the few months between delisting and April 2021. *Id.* at 050.

## VI.    DISTRICT COURT DECISION

Meanwhile, three separate groups of conservation organizations filed legal challenges to FWS's Delisting Rule. Several hunting, pro-gun, and agriculture groups, plus the State of Utah, intervened as defendants, and the cases were jointly briefed. After argument, the district court found the Delisting Rule invalid for multiple, independent reasons.

The court first held that FWS could not rely on a change in the statutory definition of "species" in the late 1970s to now bar the protection of wolves under the ESA. 1-ER-4, 10-13. FWS has not appealed this part of the district court's decision (although two Intervenors have).

The district court next found that FWS violated the ESA when it failed to assess the status of wolves across the entire listing, instead basing its decision on purported recovery of wolves in the Great Lakes states and in the delisted Northern Rockies population. *Id.* at 13-14. The court relatedly found that FWS failed to consider the distinct status of wolves in West Coast states. *Id.* at 15-17.

The district court also found that FWS's interpretation of the statutory phrase "significant portion of its range" ("SPR"), 16 U.S.C. § 1532(6), (20), was

11

unlawful, even under the since-overturned *Chevron* deference standard. *Id.* at 17-21. The court held that FWS's "interpretation is not a reasonable construction of the phrase 'significant portion of its range.'" *Id.* at 21.

The court addressed FWS's threats assessment, *id.* at 21-26, finding that FWS's failure "to analyze wolves outside of the two core metapopulations means that it failed to adequately conduct a threats assessment for these wolves." *Id.* at 21. The district court concluded that FWS failed to evaluate the impact of lost historical range on the status of gray wolves, *id.* at 21-22, finding that the Delisting Rule "fail[ed] to adequately address the possible enduring consequences of significant loss of historical range." *Id.* at 22. The court finally addressed the inadequacy of existing regulatory mechanisms, *id.* at 22-26, refusing to consider the Wisconsin wolf hunt that followed delisting, *id.* at 24 n.12, but finding that FWS had not adequately reviewed federal land management plans to ensure sustainable wolf populations post-delisting. *Id.* at 26.[5]

Based on these legal violations, the district court vacated and remanded the Delisting Rule, a ruling that returned ESA protections to wolves in 44 states. *Id.* at 28 ("Here, the Service's analysis relied on two core wolf populations to delist wolves nationally and failed to provide a reasonable interpretation of the

---

[5] The district court also rejected a challenge to FWS's denial of a 2018 Petition to designate different wolf DPSs. 1-ER-26-28. Appellees did not appeal this ruling.

'significant portion of its range' standard. These deficiencies in the Final Rule are serious and weigh in favor of vacatur.").

## SUMMARY OF ARGUMENT

FWS's Delisting Rule violated the ESA in at least four ways. First, FWS's threats assessment for gray wolves failed to review nationwide wolf impacts and failed to consider the effects of lost historical range on current wolf status and recovery. Second, FWS used a free-standing, anything-goes definition for analyzing whether wolves were recovered throughout a "significant portion of [their] range" and then arbitrarily applied that infinitely malleable standard. Third, FWS ignored the unique conservation status of wolves in West Coast states. And fourth, FWS failed to ensure adequate regulatory protections on federal lands. Separately, the statutory definition of "species" under the ESA did not and does not create an independent ground for delisting, contrary to Intervenors' argument. The Court should affirm the well-reasoned decision of the district court.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *Friends of Animals v. Haaland*, 997 F.3d 1010, 1015 (9th Cir. 2021). Review of FWS's compliance with the ESA is governed by the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"). *Id.* The APA, in turn, requires courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law." 5 U.S.C. § 706(2); *see Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").

The Court reviews questions of statutory interpretation de novo. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) (overruling *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837 (1984), and holding that the APA "prescribes no deferential standard" for answering legal questions.).

ARGUMENT

I. FWS'S THREATS' ASSESSMENT VIOLATED THE ESA.

FWS incorrectly asserts that the district court "presumed" that FWS could not delist gray wolves "until it could prove that wolves outside the core populations and current range were not at risk." FWS Br. at 27. This is not what the district court held. Instead, the district court properly reviewed FWS's Delisting Decision based on the best available science applied to the five statutory threat factors. And it held, based on that review, that FWS erred in two independent ways. First, although on the surface appearing to evaluate the nationwide wolf population, FWS improperly discounted the importance of wolves outside the Great Lakes and Northern Rockies as it analyzed threats. Second, FWS failed to account for the threat of lost historical habitat on the current wolf population. Either failure renders the Delisting Rule invalid.

A.    FWS Failed To Look at Nationwide Wolf Impacts.

The ESA requires FWS to "determine whether any species is an endangered species or a threatened species." 16 U.S.C. § 1533(a)(1). The ESA's focus on "species" applies equally to delisting decisions. Indeed, in making a delisting decision, FWS must conduct a "full, five-factor threats analysis" of the listed entity under 16 U.S.C. § 1533(a). *Crow Indian Tribe v. United States*, 965 F.3d 662, 678 (9th Cir. 2020). The requirement to analyze extinction risks at the protected-species level prevents FWS from making premature delistings that focus only on limited places where the species is making recovery progress.

Yet at every step in the Delisting Rule analysis, FWS avoided evaluating the entirety of the gray wolf population. FWS purported to evaluate wolves as four different "entities" in three different "configurations." 3-ER-310-11. These three configurations, at first blush, would appear to cover the full scope of the listed wolf species: (1) the threatened Minnesota entity and the endangered "44-State entity," separately; (2) a "combined listed entity" that joins the threatened and endangered areas together; and (3) a "lower 48 United States entity" that merges the "combined listed entity" with the congressionally delisted Northern Rockies population. *Id.*

But in application, no matter the "configuration," FWS's analysis focused *only* on one or both so-called "metapopulations" of wolves in the Great Lakes

states or the Northern Rockies. *E.g.*, 3-ER-406, 412-13, 416-17; FWS Br. at 29.

For instance, FWS acknowledged that wolf populations "peripheral to the Great

Lakes metapopulation within the lower 48 United States ... may be at greater risk

from human-caused mortality or from factors related to small numbers of

individuals," but dismissed these threats because these wolves were "not

meaningful." 3-ER-418; *see also* FWS Br. at 38. At no point did FWS go beyond

the largest "metapopulations" to evaluate the entire listed species.

This approach mirrored FWS's past, unlawful attempts to delist gray wolves

and violated the ESA's requirement that FWS must analyze the conservation status

of the full listed species. When FWS drew an arbitrary line around a purportedly

recovered subpopulation in the Great Lakes (and, for one configuration, the

Northern Rockies as well), and decided that all wolves outside that area were

unnecessary, it violated the ESA. *See Crow Indian Tribe*, 965 F.3d at 678.

FWS's unlawful focus on the purported recovery of wolves in "core" areas

of the Great Lakes and Northern Rockies was not new. The Delisting Rule's

approach followed the worn path of FWS's earlier attempt (struck down in the

D.C. Circuit) to delist gray wolves. In 2011, FWS first designated and delisted a

Western Great Lakes DPS of gray wolves, *see* 76 Fed. Reg. 81666 (Dec. 28, 2011),

and then separately proposed to delist all other gray wolves in the lower 48 United

States, *see* 78 Fed. Reg. 35664 (June 13, 2013). FWS reasoned that wolves outside

the core Great Lakes and the Northern Rockies areas were no longer protectable under the ESA. *See id*. at 35717-18. But the D.C. Circuit rejected FWS's approach as "a backdoor route to the *de facto* delisting of already-listed species," *Humane Soc'y*, 865 F.3d at 602, and explained that the agency could not "delist an already-protected species by balkanization," *id.* at 603; *see also id.* at 601 ("[W]hen a species is already listed, the Service cannot review a single segment with blinders on, ignoring the continuing status of the species' remnant.").

FWS has tried the same strategy again. FWS asserts that this time is different from *Humane Society* because the agency "did not leave a listed remnant here." FWS Br. at 33. This is a distinction without a difference given that FWS's delisting analysis still reached the same result—that wolves outside of purportedly recovered subpopulations in the Great Lakes or Northern Rockies were "not necessary" for the species and not worthy of further analysis. 3-ER-409, 412. FWS cannot now do in one step what the D.C. Circuit held it could not do in two. The delisting vacated in *Humane Society* unlawfully *created* a backdoor route to delisting the remnant; here, the Delisting Rule *took* the backdoor route to delisting the remnant. While FWS attempted to obscure its unlawfully narrow analysis by referring to seemingly all-encompassing "configurations," the result was the same: an unlawful "backdoor route" to nationwide delisting based solely on the asserted recovery of wolves in only two "core" geographic areas.

FWS does not argue otherwise. While asserting that it "acknowledged lone and dispersing wolves in its threats analysis," FWS Br. at 30, it ultimately discarded all effects that would not be likely to "impact the larger population." *Id.* Nor are wolves in the West Coast states of Washington, Oregon, and California simply lone, dispersing wolves; for example, as of December 31, 2023, state agencies and partnering tribes counted 260 wolves in 42 packs in Washington, approximately a quarter of which would be affected by the Delisting Rule. *See* Wolf Packs in Washington, https://wdfw.wa.gov/species-habitats/at-risk/species-recovery/gray-wolf/packs. The focus on core populations prevented FWS from validly assessing threats to the species as listed, which included the West Coast wolves.

FWS's failure to consider the entire species also echoed the errors of another earlier, unsuccessful attempt by the agency to downlist wolves. In that failed effort—as here—the agency "did not consider the threats to the wolf outside of the core areas" of the Great Lakes and the Northern Rockies. *Oregon Wolves*, 354 F. Supp. 2d at 1173 (evaluating and vacating 2003 downlisting rule). Specifically, when FWS focused only on the "core areas" of the Great Lakes and Northern Rockies to downlist wolves through newly created DPSs in 2003, it unlawfully ignored that "the conservation status of [wolf] populations ... varies dramatically, ranging from recovered populations in parts of Montana, to precarious populations

in Washington, to extirpated populations in Nevada, for example." *Id.* at 1171.

Two courts rejected this "wolves in some areas are enough for all areas" approach

to delisting. As one court held, "FWS simply cannot downlist or delist an area that

it previously determined warrants an endangered listing because it 'lumps together'

a core population with a low to non-existent population outside of the core area,"

thereby "bypassing the application of the ESA in the non-core population areas."

*Vermont Wolves*, 386 F. Supp. 2d at 565.

FWS's analysis in the Delisting Rule repeated these flaws. The Delisting

Rule analyzed the core populations of Great Lakes and Northern Rockies wolves

while failing to adequately evaluate wolves in low-population areas, such as the

West Coast, the Central Rockies, and the Northeast. 3-ER-419. But each of these

different populations of wolves, whether in established packs, precariously

established packs, or as lone dispersers within vast areas of suitable but largely

unoccupied habitat, were protected as members of the entire listed species. And

each population across the entire listed geography merited analysis—not just the

one or two "core" areas. *See Oregon Wolves*, 354 F. Supp. 2d at 1171; *Vermont

Wolves*, 386 F. Supp. 2d at 565. As with the 2003 rule, FWS's attempt to delist

smaller, more precarious populations of wolves based only on the status of distant,

larger populations without a reasoned and scientific foundation rendered the

Delisting Rule unlawful.

Whatever its legal theory, FWS remains intent on relying on one or two "core" populations to delist gray wolves nationally. *See* FWS Br. at 29 (discussing two populations of wolves). FWS's discussion of broad "entities" and "configurations" merely papered over the ways the agency unlawfully narrowed its analysis to find a "backdoor route" to delisting, despite the absence of recovered wolf populations in areas like the West Coast and Central Rockies. FWS "cannot take a full-speed ahead, damn-the-torpedoes approach to delisting." *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1030 (9th Cir. 2011). But it did just that in the Delisting Rule.

FWS is wrong to suggest that the district court's interpretation of the *Humane Society* decision makes it impossible to ever delist gray wolves. FWS Br. at 32-34. FWS has created this dilemma for itself by repeatedly attempting to leverage wolf population growth in limited regions to delist vast areas without legitimately considering the imperilment of smaller populations across the species' affected range. FWS can escape this self-generated quandary by conducting an analysis that rationally assesses the status and conservation importance of *all* wolf populations affected by a proposed delisting and determining—if such can be justified by the best available science—that the ESA listing factors support removal of their federal protections.

Alternatively, FWS can consider utilizing the flexibility afforded by the ESA—by, for example, designating and managing more regionally focused wolf DPSs with different levels of statutory protection reflecting their varying conservation statuses. FWS has been presented with several petitions for doing just this, including one it considered during this delisting process. 3-ER-405. It has rejected each one, instead opting to keep its focus on removing protections from wolves across the entire country.

Finally, although FWS's brief suggests that the agency has exhausted its wolf delisting options, *see* FWS Br. at 34, its actual conduct indicates otherwise. Since the Delisting Rule was vacated, FWS has begun a multi-year stakeholder process to find social agreement about the status of wolves, reiterating its commitment to releasing a new draft nationwide recovery plan for listed wolves by late 2025. If allowed to proceed, the process promises to yield defensible recovery criteria that in turn could lead to a valid delisting. Reinstating the Delisting Rule would cut that process off at the knees. And it is hard to square FWS's ongoing process with the agency's position, before this Court, that the decision below leaves it with no choice but to throw up its hands.

B.     FWS Failed To Consider the Effects of Lost Historical Range.

FWS equally erred in its treatment of the threat of lost historical range. The range of wolves before European settlement covered most of North America. 3-

21

ER-431-32. Today, wolves occupy only a small fraction of that range. *See id.* The "loss of historical range can lead to reduced abundance, inhibited gene flow, and increased susceptibility to extinction." *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018). Yet despite estimates that "95% of the gray wolf's historical range has disappeared," *Humane Soc'y*, 865 F.3d at 606, the Delisting Rule did not evaluate if the loss of that historical range was so substantial that it undermined the viability of gray wolves today.

The Delisting Rule's fleeting references to historical range do not constitute actual analysis. FWS claimed it "t[ook] into account the effect [of] lost historical range … through analysis of the five [listing] factors." 3-ER-319. But FWS's record citations fail to prove its point. FWS cites its statement in the Rule that "[a]n active eradication program is the sole reason that wolves were extirpated from much of their historical range in the United States." *Id.* at 320; FWS Br. at 38. As one scientific peer reviewer pointed out, though, this claim relied on an "outdated" source and failed to define the "eradication program" or determine if there were similar current threats to wolves. *See* 2-SER-271-72.

Other record citations also fail to live up to their billing. While the Delisting Rule contained a section entitled "Historical Context of Our Analysis," 3-ER-318, that section only explained why historical context matters in general. And after concluding that "alterations to gray wolf historical range … increased the

22

vulnerability of gray wolves … to a wide variety of threats that would not be at issue without such range reduction," the section ended with a promise the Delisting Rule did not keep: that FWS analyzed "these potential threats to gray wolves" later in the Rule. *Id.*

None of the pages cited by FWS contained an analysis of the effect of lost historical habitat on the present status of wolves. *See* FWS Br. at 38-39. The scientific peer reviewers noted this absence of analysis: they either answered "No" to the question of whether FWS had adequately considered the impacts of lost historical range, 2-SER-323; responded that FWS's analysis was so jumbled as to make answering the question impossible, *see id.* at 198-99; or provided a detailed description of the "omissions and misinterpretations" in FWS's range analysis, *id.* at 211-24.

FWS failed to meaningfully respond to these critiques in the Delisting Rule from its own peer reviewers. Instead, it repeated, without support, its justifications from the proposed rule, *see* 3-ER-379, and claimed increases in wolves' range since the lowest point in 1978 made the impacts of lost range no longer relevant, *see id.* at 415, 419. However, simply describing an increase of range from the species' nadir reveals little about the persisting impacts of lost historical range. For example, isolation caused by lack of recovery in now unoccupied areas (lost historical range) could risk the genetic health of the population or the loss of

unique ecological areas that were necessary for important evolutionary adaptations. 3-ER-534 ("future conservation efforts should provide full protection for distinct ecotypes"). FWS also confused the two issues surrounding consideration of "range," relying on court decisions that upheld FWS's definition of "range" to mean "current range," *see id.* at 379, and ignoring the impact of lost historical range in its threats analysis.[6]

FWS laments the district court's decision to put teeth into the consideration of the effects of lost historical habitat. FWS Br. at 39. Yet according to FWS, it was impossible to assess threats to wolves in areas where there were no wolves, even though the agency considered the absence of wolves in the same areas as a

---

[6] This Court upheld FWS's interpretation of "range" to mean "current" range in *Center for Biological Diversity v. Zinke* by relying on the *Chevron* standard of judicial deference. 900 F.3d at 1066-67 (explaining that the ESA "may not compel [FWS's] interpretation"). As FWS admits (at 35-36), *Loper Bright* overruled the *Chevron* standard. 144 S. Ct. at 2272-73. Indeed, the relevant legislative history indicates that "Congress used the term 'range'" elsewhere in the ESA "to refer to the historical range of the species." *Id.* (cleaned up) (quoting H.R. Rep. No. 95-1625, at 18 (1978)). This Court's precedent prior to FWS's interpretation held that FWS needed to consider whether "there are major geographical areas in which [the species] is no longer viable but once was." *Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001). However, this Court need not address the validity of FWS's interpretation of "range" here because under any interpretation, FWS's failure to consider threats to wolves due to lost historic range was unlawful.

reason not to consider the effects of habitat loss. *Id.* Moreover, none of this "reasoning" was in the Delisting Rule.[7]

FWS had an "obligation" when analyzing gray wolves "to contend with the implications of massive range loss for the species' endangered or threatened status within its current environment." *Humane Soc'y*, 865 F.3d at 606; *see also Ctr. for Biological Diversity v. Zinke*, 900 F.3d at 1067. And indeed FWS agreed that it must consider the effects of lost historical range. FWS Br. at 36. It failed to do so in the Delisting Rule. "Stating that a factor was considered … is not a substitute for considering it." *Getty v. Federal Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). As with FWS's last attempt to delist wolves in 2011 and 2013, the "wholesale failure to address that factor renders the Service's decision unreasoned, arbitrary, and capricious." *Humane Soc'y*, 865 F.3d at 607.

## II. FWS'S "SIGNIFICANT PORTION OF ITS RANGE" ANALYSIS WAS ARBITRARY.

FWS also erred in determining that wolves are not endangered or threatened through a "significant portion" of their range. FWS acknowledges, as it must, that to comply with the ESA, the agency must analyze whether gray wolves are

---

[7] FWS incorrectly claims that the district court's decision means wolves can never be delisted until they are restored to *all* of their historic range. FWS Br. at 3, 39-40. To the contrary, the decision simply requires FWS to analyze (as requested by its scientific peer reviewers) how the loss of 95% of wolves' historic range bears on the viability of the species—the very analysis FWS described but did not undertake in the Delisting Rule. 3-ER-318.

endangered or threatened throughout "all" of their range or a "significant portion" of their range. In that two-pronged review, what counts as a "significant portion" is vital. FWS Br. at 40. FWS has never articulated a legally defensible definition of "significant portion of its range." The Delisting Rule rested its "significant portion" findings on the unilluminating—and unexplained—term "meaningful," while at the same time perplexingly claiming not to interpret the key statutory language and that a "significant portion" was therefore any portion that "could be significant under any reasonable definition of significant." *Id.* at 40-41. In the end, the Court is left with two black holes: (1) there is nothing to adequately ground "meaningful" in any way to gauge FWS's conclusions; and (2) a definition that explicitly states that any reasonable definition will do is no definition at all. As the district court concluded, FWS's application of its purported standard lacks both objective "guideposts or factors" as well as a "sufficient explanation" for assessing its reasonableness, allowing for manipulations and evasions that consistently operated to the disadvantage of the wolves. 1-ER-20-21. These fundamental failings are fatal to FWS's decision to delist.

A.    Courts Have Repeatedly Rejected FWS's Attempts To Read the ESA's "Significant Portion" Language Out of the Statute.

A species must be listed under the ESA if it is threatened or endangered throughout "all or a significant portion of its range." 16 U.S.C. § 1532(6), (20). The disjunctive phrasing of this statutory language is key: listing is required for a

species that is imperiled in "all" of its range *or* "a significant portion" of its range. Yet for more than two decades, FWS has repeatedly collapsed the key distinctions between the "all" and "significant portion" standards, rendering the "significant portion" language meaningless. In response, courts—including this Court—have struck down these efforts.

In 2001, FWS argued that a species was eligible for listing based on the "significant portion" language only if it faced threats "in enough key portions of its range that the *entire species* is in danger of extinction, or will be in the foreseeable future." *Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1141 (9th Cir. 2001) (emphasis in original. This Court rejected this "redundant reading" because it rendered such a "significant statutory phrase" "superfluous." *Id.* at 1141-42. The Court remanded the challenged listing decision to FWS, with directions that the agency reconsider its position on the "significant portion" language using the legal standards in the Court's opinion. *Id.* at 1146.

Despite this Court's direction, thirteen years later FWS again promulgated a substitute policy that rendered the ESA's "significant portion" standard redundant. This time the policy asserted that a "significant portion" means any portion of a species' range for which the "contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its

27

range." 79 Fed. Reg. 37578, 37609 (July 1, 2014). More words, same result: while

FWS insisted that the 2014 policy represented a break from its previous

interpretation, two district courts found that any claimed difference was "illusory"

and held the policy unlawful. *Desert Survivors v. U.S. Dep't of the Interior*, 321 F.

Supp. 3d 1011, 1072-73 (N.D. Cal. 2018); *Ctr. for Biological Diversity v. Jewell*,

248 F. Supp. 3d 946, 956 (D. Ariz. 2017). The Arizona court concluded that "it

appears that the Service's goal in creating the Final SPR Policy was to give as little

substantive effect as possible to the SPR language of the ESA." *Ctr. for Biological*

*Diversity v. Jewell*, 248 F. Supp. 3d at 958.

> **B.** <u>FWS's Standardless "Significant Portion" Analysis in the Delisting
> Rule Was Arbitrary and Capricious.</u>

Having failed to convince any court to accept its prior interpretations of the

ESA's "significant portion" language, FWS refused to offer any fixed

interpretation of the "significant portion" standard in the Delisting Rule—even

while repeatedly concluding that various permutations of the lower 44 wolf

population did not constitute "significant portions" of the species' range. FWS

admitted in the proposed rule that it had "not yet determined the best way to

interpret 'significant' in light of the decision in *Desert Survivors*," one of the

rulings rejecting FWS's 2014 "significant portion" policy. 3-ER-530. And FWS

insisted that its approach was a one-off. *Id.* ("Our use of this standard for

'significant' is limited to this analysis and is not precedent for any future determinations.").[8]

In attempting to explain this single-use approach, FWS claimed to have assessed significance based on "whether portions of the range contribute meaningfully to the resiliency, redundancy, or representation of the gray wolf entity[.]" 3-ER-380; *see also id.* at 404 (asking whether portions "may be biologically meaningful"); FWS Br. at 41 (same). However, FWS did not explain how it measured whether any population's contribution would be biologically "meaningful." Instead, the agency repeatedly stated in the Delisting Rule that it "evaluated whether any portions could be significant under any reasonable definition of 'significant.'" 3-ER-404; *see also id.* at 411 (West Coast states and Northern Rockies); FWS Br. at 22-23 (noting that FWS "carefully explained that it evaluated significance based on 'any reasonable definition' of the term"). And, just as with "meaningful," FWS offered no explanation of what it deemed "reasonable." Instead of offering an interpretation of "significant" that could guide its "significant portion" analysis, FWS applied a formless approach that enabled it

---

[8] True to its word, in the recent Northern Rockies wolves assessment, FWS reversed itself and found that the West Coast wolves' portion of range may be significant due to their "unique ecoregional provinces," using a definition of significance that included "high quality or unique-value habitat relative to the rest of the habitat in the range." Gray Wolf Species Assessment (Jan. 4, 2024) at 70, https://www.regulations.gov/document/FWS-HQ-ES-2021-0106-55881.

to repeatedly dismiss wolf populations as unimportant without ever disclosing what level of importance could possibly suffice.

To survive judicial review, an agency must have engaged in "reasoned decisionmaking" that articulates a "satisfactory explanation" for its action. *State Farm*, 463 U.S. at 43. As such, an agency cannot, for example, "refuse to define the criteria" that it applies in a particular decision. *Pearson v. Shalala*, 164 F.3d 650, 660 (D.C. Cir. 1999). FWS's refusal to provide a satisfactory explanation with clearly articulated criteria plagues the Delisting Rule's "significant portion" determination.

As the district court correctly recognized, FWS's approach offers no guideposts for a reviewing court to ensure that the agency engaged in reasoned decisionmaking. 1-ER-20. And—even worse in light of FWS's history of unlawful "significant portion" interpretations—FWS's approach prevents a court from "assess[ing] whether the Service's interpretation gives independent meaning to the phrase ["significant portion"] or has again implemented an interpretation that renders it redundant or superfluous." 1-ER-21. A reviewing court requires "*some* metric" as a touchstone for its review. *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 81 (D.C. Cir. 2006) (emphasis in original). For instance, in *Pearson v. Shalala*, the D.C. Circuit faulted the agency for its failure to provide "definitional content" for the phrase

"'significant scientific agreement'" that would justify the agency's decision. 164 F.3d at 660-61; *see id*. at 653-54 (noting that the agency "never explained just how it measured 'significant' or otherwise defined the phrase"). The court in *Tripoli Rocketry* similarly expressed concern as to the "unbounded relational definition" associated with the standard "'much faster than'" because "it says nothing about what kind of differential makes one burn velocity 'much faster' than another." 437 F.3d at 81; *see also id*. at 82 (the "vague description 'much faster' conveys no information at all"). That same absence is fatal to FWS's standardless approach here. *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 101 (D.D.C. 2006) (remanding a decision where the agency's definitions, while providing some bounds, left "identifying the intensity of the impact—small, substantial, or somewhere in between—entirely up to the agency").

In its brief, FWS claims "wide discretion" to interpret the key statutory language. FWS Br. at 43. This remarkable demand for deference is inapt. Three years ago, the district court applied the deferential *Chevron* standard to "significant portion of [the] range," and still found that FWS's approach lacked "objective guideposts or factors against which the Court can judge the exercise of discretion." *Id*. at 20. The Supreme Court has since overturned *Chevron* in *Loper Bright*, 144 S. Ct. at 2272-73. Having lost below under the more deferential standard, FWS's current bluster about the discretion owed in a post-*Chevron* world is a distraction.

In any event, the central question here is not one of statutory interpretation; rather the question is whether FWS rationally applied the statutory standard to gray wolves.[9]

In this respect, FWS's reliance on this Court's decision in *Humane Soc'y of the U.S. v. Pritzker*, is misplaced. FWS Br. at 48 (*citing* 548 Fed. Appx. 355 (9th Cir. 2013)). There, the Court deferred to the agency's interpretation of "significant negative impact" as "permissible" under *Chevron*. *Id*. at 359. But, more relevant for this case, the Court expressed concern that broad language in the factors considered by the agency in applying its interpretation, such as "*measurable*" and "*contributing*," could "eviscerate ... the statutory standard," confer "virtually limitless discretion," and "preclude effective judicial review." *Id*. at 359-60 (emphasis in original). It is precisely those concerns that demand additional explanation around FWS's SPR determination.

Contrary to FWS's argument, *see* FWS Br. 47-49, a clearly reasoned approach does not require quantitative thresholds. Appellees in no sense seek a

---

[9] FWS's claim to "wide discretion" is drawn from a passing reference in this Court's decision in *Defs. of Wildlife v. Norton*, 258 F.3d at 1144. This Court's reference to "wide" discretion rested upon the fact that "the term is not defined in the statute." 258 F.3d at 1145. That leap from ambiguity to deference is at odds with *Loper Bright*, 144 S. Ct. at 2273 (courts "need not and under the APA may not defer to an agency interpretation of law simply because a statute is ambiguous").

ruling from this Court that would establish "quantifiable, bright-line standards." FWS Br. at 48. Rather, what Appellees—and the law—demand is a faithful application of the statutory text that will permit meaningful judicial review. *See, e.g.*, *Secs. and Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."). The lack of any true standard—quantitative or qualitative—is the central flaw.

Nor does FWS provide support for its claim that "other courts" have endorsed its use of "meaningfully contribute" for an SPR determination. FWS Br. at 49. FWS's invocation of *Defenders of Wildlife v. Zinke* underscores the problem. There, FWS assessed significance through the since-invalidated lens of the entire species' survival. 849 F.3d at 1092. The fact that, in the wolf listing at issue in *Zinke,* the FWS couched its "significant portion" finding in terms of whether the area would "meaningfully contribute" to wolf recovery, *id.* at 1093, only further demonstrates that phrase's hollowness and potential for resurrecting the agency's discredited approach here.

In sum, FWS cannot justify its undefined, one-off, and ultimately cryptic approach to the critical significant portion determination. Courts are left without "guideposts or factors" against which to "judge the exercise of discretion." 1-ER-20. FWS's Delisting Rule instead illustrates that the agency has once again offered

no assurance that it recognizes the importance of wolves in a "significant portion," rather than "all," of their range. *Pearson*, 164 F.3d at 660 (noting that "appellants' suspicions as to the agency's real reason for its volte-face ... highlight the importance of providing a governing rationale" for the agency's decision). That alone is enough to doom the Delisting Rule.

C.   FWS Irrationally Applied Its Arbitrary "Significant Portion" Approach.

Even beyond FWS's overarching failure to provide an adequate explanation for what constituted a "significant portion" of range for gray wolves, FWS's application of its vague and malleable "significant portion" approach to wolves was arbitrary in multiple ways. FWS's "significant portion of its range" determination considered whether there are areas where wolves both (1) "may be" in danger of extinction or likely to become so in the foreseeable future, and (2) "may be significant." 3-ER-410. But without a coherent standard against which to measure "significance," FWS repeatedly arrived at inconsistent and irrational determinations and overlooked important factors. FWS's arguments, which rely heavily on a myopic approach to genetics and discount the significance of wolves in the areas examined because of their perilous status, ignore FWS's own contradictory findings, and ultimately fail to rehabilitate these arbitrary determinations.

1.  *FWS's approach to wolf abundance and genetic contributions was inconsistent.*

First, FWS's treatment of wolf abundance placed the wolves in a no-win situation, conflating the two prongs of its "significant portion" inquiry—significance of the range and the extinction risk there — and in doing so virtually ensuring that edge populations of gray wolves most at risk of extinction could never satisfy FWS's standards. As a result, FWS "failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, namely, the implication of writing off wolf populations precisely because their lower numbers indicate that they may be under increased threat of extinction.

FWS found that West Coast and Central Rockies wolves are "at greater risk from human-caused mortality or from factors related to small numbers." *See, e.g.*, 3-ER-411 (44-state entity). But FWS then discounted that risk because these populations of wolves purportedly were not biologically "significant," in part because of the very reason they were at risk: wolves in those areas "occur in small numbers and include relatively few breeding pairs." *Id.* FWS's analysis virtually ensured that still-recovering populations such as West Coast and Central Rockies wolves cannot satisfy both prongs of the SPR inquiry, given that, under FWS's approach, any imperiled population outside of a species' core habitat will be considered too small to be significant. FWS repeats the error before this Court,

35

referring to the issue of what it asserts to be "few wolves" along the West Coast.
FWS Br. at 52.

Dismissing these areas based on the relatively smaller numbers of wolves found there is in tension with FWS's finding as to the contribution that wolves in the West Coast and Central Rockies make to the species' overall health. FWS found that West Coast wolves could "fill social openings" and "recolonize vacant suitable habitat," which not only "supports the continued viability" of the wolves inside and outside West Coast states but also "enhances the resiliency, redundancy, and representation of wolves in the gray wolf entities evaluated in this rule." 3-ER-373; *see also id.* at 409 ("[T]he viability of the [44-State entity] is further enhanced by wolves that occur outside of Wisconsin and Michigan."). FWS also observed that more wolves in the West Coast states and Central Rockies "would add to resiliency, redundancy, and representation." *Id.*; *see also* 3-ER-392 ("[a]dditional populations of wolves in Colorado would add to the resiliency and redundancy of gray wolves in the lower 48 United States"). Without directly confronting these findings, FWS concluded that the wolves were nevertheless not "significant." 3-ER-411, 415; *see Pearson*, 164 F.3d at 660 (noting the shortcomings of a "I know it when I see it" approach).[10]

---

[10] Tellingly, in this appeal, FWS draws from the Delisting Rule's status determination for the combined listed entity to explain the approach to

Second, the limited analysis FWS conducted of the genetic contributions of peripheral populations once again put wolves in another bind: they were insignificant if too connected and similar to the core population in Wisconsin and Michigan but equally insignificant if too disconnected and different. In the SPR analysis for the 44-state entity, for example, FWS determined that wolves found in areas of Michigan and North and South Dakota are not a "significant portion" of the range because they are dispersers from the core populations, "do not contribute to the overall demographic or genetic diversity of the Wisconsin-Michigan population," and further lack "genetic or ecological uniqueness relative to other wolves in the States." 3-ER-410-11.

Yet while FWS dismissed the peripheral Wisconsin-Michigan populations as insignificant because they *were not* genetically distinct from other populations in those states, it equally dismissed the West Coast and Central Rockies wolves as "not necessary" because they *were* genetically distinct. *Id.* at 412, 417. According to FWS, these wolves were unimportant because they "are not connected biologically to the core populations in the 44-State entity, and are not biologically 'significant' to this entity" because they originated from the Northern Rockies. *Id.*

---

"representation," noting that the wolves' life-history characteristics assure the entity's "long-term survival." FWS Br. at 51. But, as applied to an SPR assessment, this is precisely the standard that courts have rejected. Whether a portion of the range is "significant" cannot be subsumed within the larger question of whether the entire species is threatened or endangered over the long-term.

at 411. This type of inconsistent reasoning is a hallmark of arbitrary and capricious decision making. *See Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (2015). As described by FWS, the Northern Rockies will simply continue to provide dispersing wolves to the West Coast and Central Rockies into the future. FWS Br. at 52. Similar to FWS's approach to the wolf numbers, this justification sidesteps the recognized contribution that wolves in, *e.g.*, the West Coast can play in stabilizing populations, expanding habitat, and contributing to genetic diversity. *See, e.g.* 1-SER-083 ("Range expansion [into West Coast states] is the only feasible way of achieving a long-term viable metapopulation … necessary to preserve genetic diversity and avoid long-term population decline."). Furthermore, it ignores that West Coast wolves display indications of mixed ancestry and distinct genetic traits "that could distinguish them" from Northern Rockies wolves, as found by the district court. 1-ER-17.

2.    *FWS failed to adequately consider important factors*

FWS's "significant portion" determinations for wolves in the West Coast states and a region of the Central Rockies on the Colorado-Utah border also overlooked factors that FWS itself has often deemed important. FWS recognized that these populations face a "greater risk from human-caused mortality" and other threats but dismissed the significance of these populations without considering

38

basic facts concerning both the wolves' habitat itself as well as the areas'
importance to the larger U.S. wolf population. 3-ER-411, 414-15.

First, FWS failed to adequately consider the potential significance of the
actual range at issue, in particular what it would mean to potentially lose a
considerable portion of existing gray wolf habitat. In the Delisting Rule, FWS
concluded that "significant portion of [its] range" refers to "members of the species
that occur in a particular geographic area" and "not the habitat in which these
members occur[.]" 85 Fed. Reg. at 69880 n.6. But while the phrase "significant
portion of [its] range" may permit FWS to consider significance through the lens of
biology, the agency must confront the size and characteristics of the area as part of
that inquiry. Indeed, avoiding consideration of the actual "range" at issue is
inconsistent with FWS's general approach. *See, e.g.*, 76 Fed. Reg. 23650, 23676
(Apr. 27, 2011) (FWS SPR analysis noting that "a portion of a range of a species
may make a meaningful contribution to the resiliency of the species if the area is
relatively large and contains particularly high-quality habitat"); 75 Fed. Reg.
60516, 60560 (Sept. 30, 2010) (FWS SPR analysis considering whether areas
"occupy relatively large or particularly high quality, unique habitat that could be
affected").

Here, the loss of range at issue is substantial. Deeming West Coast and
Central Rockies wolves "insignificant" and therefore expendable lopped off

several degrees of longitude and latitude from the farthest extensions of current gray wolf range westward and southward in the contiguous states. *See* 3-ER-432. FWS has frequently seized upon comparable potentials for range contraction to deem peripheral populations of a species significant in similar contexts. *See* 84 Fed. Reg. 52598, 52604 (Oct. 2, 2019) (FWS determination that loss of woodland caribou population in United States would be significant because it "would result in the loss of the southern-most extent of the range of woodland caribou by about 2.5 degrees of latitude," impacting representation and resilience of the species); 82 Fed. Reg. 30502, 30519 (June 30, 2017) (FWS determination that loss of Yellowstone-area grizzly bear population "would significantly impact representation of the species because it would substantially curtail the range of the grizzly bear in North America by moving the range approximately 3 degrees of latitude or 200 mi (350 km) to the north"). Yet FWS in the Delisting Rule disregarded comparable range contractions.

Second, FWS overlooked the importance that loss of such edge populations may have for the vitality of the larger U.S. wolf population. As FWS has observed in a similar context, such "peripheral populations can possess slight genetic or phenotypic divergences from core populations" that "may be central to the species' survival in the face of environmental change." 84 Fed. Reg. at 52632 (Woodland caribou listing determination). Yet here, despite FWS's own recognition that the

coastal wolf "ecotype" was "genetically and morphologically distinct, and display[ed] distinct habitat and prey preferences" from inland cousins, 3-ER-426, and despite acknowledging that some West Coast wolves show evidence of "an admixture of inland and coastal ecotypes," *id.* at 427, FWS ignored the potential importance of West Coast populations in its "significant portion" analysis. Indeed, FWS dismissed any potential that the West Coast wolves might represent a population with "markedly different genotypic or phenotypic traits that is evolving separate from other wolf populations." *Id.* at 411; *see also* 1-ER-16-17 (finding fault with the FWS's failure to adequately address the science indicating distinct genetic traits).

Again, this approach represented a sharp departure from FWS's own treatment of the significance determination in conducting similar analyses, where the agency deemed populations significant if they persisted "in an ecological setting unusual or unique for the taxon" or "differ[] markedly from other populations of the species in [their] genetic characteristics." 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996). It is also contrary to the best available science that demonstrates the importance of ecological diversity and spatial distribution to species viability. *See, e.g.,* 2-SER-319 (noting that adverse population effects can be countered by occasional influxes of individuals and their genetic diversity).

Third, FWS failed to consider all areas where wolves have been found throughout the United States. In the Delisting Rule, FWS stated that "[u]nder our SPR Policy, the Northeastern United States does not merit evaluation as a significant portion of the species' range because the best available science indicates that this area is *unoccupied*." 3-ER-379 (emphasis added). FWS's conclusion misapplies its own definition of "range": "the general geographical area within which the species is currently found, including those areas used throughout all or part of the species' life cycle, *even if not used on a regular basis*." 79 Fed. Reg. at 37583 (emphasis added); *see Ctr. for Biological Diversity v. Zinke*, 900 F.3d at 1067 (affirming definition). It also flatly contradicts the record. FWS has acknowledged documented wolves in the New England states of Vermont and Massachusetts, as well as other states. 3-ER-315. These areas are used as "part of the species' life cycle," 79 Fed. Reg. at 37609, through dispersal, which is a behavior that involves wolves leaving "their natal pack to locate social openings in existing packs or find a mate and form a new pack." 3-ER-429.[11]

---

[11] In the Delisting Rule, FWS asserted that for an area to be considered "occupied" wolves must "substantively contribute to the wolf's viability (*i.e.*, the ability of a species to sustain populations in the wild over time)." 3-ER-312. FWS cannot read the phrase "not used on a regular basis" out of existence by adding a requirement that wolves found in an area must "substantively contribute" to the entire species' viability. Courts "need not accept an agency's interpretation of its own regulations if that interpretation is inconsistent with the wording of the regulation." *Vermont Wolves*, 386 F. Supp. 2d at 563 (citation omitted).

By dismissing the potential significance of dispersing wolves in the Northeast based on a cramped assessment of the gray wolf's current range, FWS acted arbitrarily and unlawfully in violation of the ESA.

In the end, it appears that once again FWS's goal "was to give as little substantive effect as possible to the SPR language of the ESA." *Ctr. for Biological Diversity v. Jewell*, 248 F. Supp. 3d at 958. Unable to adopt a lawful interpretation, the agency has employed a one-time approach that is both meaningless and infinitely malleable, consistently applied here to deny protections to gray wolves. As a consequence, FWS has failed in its statutory obligation to list a species if imperiled throughout "all or a significant portion of its range." 16 U.S.C. § 1532(6), (20).

## III. FWS UNLAWFULLY IGNORED THE CONSERVATION STATUS OF WEST COAST WOLVES.

FWS next challenges the district court's holding that it arbitrarily discounted evidence and studies showing that West Coast wolves are genetically and eco-regionally distinct from Northern Rockies wolves. FWS Br. at 53. The district court correctly found that FWS failed to analyze whether acknowledged threats to these West Coast wolves warranted their continued listing under the ESA. Instead, the agency lumped them together with the already-delisted Northern Rockies population and dismissed their importance. In doing so, the agency contradicted its earlier findings and ignored the best available science.

A.    FWS Changed Its Position without Explanation.

Until the Delisting Rule, wolves in western sections of Washington, western sections of Oregon, and California were protected as endangered. *See* 3-ER-308. At the end of 2019, there were 54 wolves in that area. *Id.* at 455. The best available science indicated that a few of those wolves represented an admixture of a "coastal ecotype" that is "genetically and morphologically distinct, and display[s] distinct habitat and prey preferences, despite relatively close proximity" to other wolves. *Id.* at 426. Some wolves in that area also occupied coastal rainforest ecosystems, a "unique ecological setting" for the species. 2-SER-221.

In the Delisting Rule, FWS recognized that West Coast wolves were subject to greater threats than other, more stable wolf populations. For instance, FWS explained that "[e]xpanding populations, including the wolves in California, may be exposed to different pressures than core populations, including the potential for reduced genetic diversity." 3-ER-384. And it "acknowledge[d] that [West Coast wolves] may be at greater risk from human-caused mortality or from factors related to small numbers of individuals." *Id.* at 411, 415. Yet instead of analyzing those greater threats to West Coast wolves, FWS ignored them by treating West Coast wolves as merely an expendable extension of the congressionally delisted Northern Rockies population. *See id.*

44

Yet in 2008, FWS determined that West Coast wolves were sufficiently separate from Northern Rockies wolves to justify creating—and then delisting—the Northern Rockies DPS. *See* 73 Fed. Reg. 10514, 10518-19 (Feb. 27, 2008); 74 Fed. Reg. 15123, 15128-29 (Apr. 2, 2009). The Delisting Rule changed that determination, concluding that West Coast wolves "are *not* discrete from wolves in the delisted [Northern Rockies] portion of the gray wolf taxon," 3-ER-309-10 (emphasis added), and therefore *cannot* constitute a DPS that would warrant protection.

FWS's reversal without further explanation was arbitrary and capricious. When changing a policy position, an agency must, among other things, acknowledge that it is changing position and provide "a reasoned explanation … for disregarding facts and circumstances that underlay ... the prior policy." *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (cleaned up). "This framework applies to a change in position on whether a species warrants protection under the ESA." *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir. 2021). FWS failed to satisfy that obligation.

In the Delisting Rule, FWS referenced a so-called "detailed analysis of the discreteness of 'Pacific Northwest' wolves" as part of a "2013 status review for gray wolves in the Pacific Northwest." 3-ER-403. But the referenced "status

review" was not a final analysis but rather part of a *proposed rule*—one that scientific experts strongly criticized, that was never finalized, and that the D.C. Circuit explained would have unlawfully delisted remnant populations of wolves without analyzing threats to them. *Humane Soc'y*, 865 F.3d at 602-03. Further, mere incorporation of a prior assessment was not sufficient to explain a change in position, particularly when the assessment did not "purport to be a decision document." *Ctr. for Biological Diversity v. Haaland*, 998 F.3d at 1068. The Delisting Rule's references to the "status review" otherwise offer little more than "a cursory explanation of why the findings underlying [FWS's 2008] Decision no longer apply," *id.*, and cannot satisfy the agency's obligation to acknowledge and explain its changed policy position as to the discreteness of West Coast wolves.[12]

B.    FWS's Reliance on Lack of Physical Separation Was Invalid.

In the Delisting Rule (but notably not in the agency's brief to this Court), FWS relied on the distance between the West Coast and Northern Rockies populations to determine that they were not separate populations. This too violated the agency's own policies and contradicted the best available science.

---

[12] The previously designated (and now delisted) Northern Rockies DPS may not be the only valid listing entity in the western part of the United States, and a biological review since the Delisting Rule has identified various population boundaries. 89 Fed. Reg. 8391, 8394 (Feb. 7, 2024). Here, however, FWS changed course from its 2008 rulemaking without any explanation in the record for this 2020 decision.

FWS concluded that West Coast wolves were not discrete from Northern Rockies wolves because "there is little separation between occupied wolf habitat in the" Northern Rockies "and suitable habitat in western Washington, western Oregon, and northern California." 3-ER-310. But under FWS's longstanding policy, physical separation is not dispositive; a population segment may be considered "discrete" if it "is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors." 61 Fed. Reg. at 4725. The discreteness "standard ... does not require absolute separation of a DPS from other members of its species, because this can rarely be demonstrated in nature for any population of organisms." *Id.* at 4724; *see also Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 842 (9th Cir. 2003).

In an earlier application of that standard to the Northern Rockies wolves, FWS recognized that because the "policy does not require complete separation" between populations, even "if occasional individual wolves or packs disperse among populations ... [Northern Rockies] gray wolves are markedly separated from all other gray wolf populations in the U.S." 73 Fed. Reg. at 10519; *see also* 1-SER-080 (scientists explaining "barriers or discontinuities can be genetic, geographic or ecological and do not have to be 100% effective to meet the FWS's 1996 discreteness requirement under ESA"). In the Delisting Rule, FWS arbitrarily

47

departed, without explanation, from this prior finding and required something more—absolute separation—than its longstanding policy demands.

By considering only physical separation to determine discreteness, FWS's conclusion also ran counter to its own scientific findings and the other science before it. That science made clear that populations may be meaningfully discrete even if not geographically separated. In its underlying Biological Report, the agency recognized that "[f]actors such as habitat type and prey specialization have been shown to influence genetic structuring, leading to measurable differentiation *even between areas with no physical barriers to dispersal*." 3-ER-426 (emphasis added). FWS also acknowledged that genetic differences for wolves are "driven more strongly by climate and ecological factors" than by "isolation by distance." *Id.* And the record made clear that the West Coast has a distinct climate and ecology from interior areas of the West—like the Northern Rockies—and that habitat makes it more suitable for wolves with different genetic, morphological, and behavioral traits. *See* 3-ER-486 (analyzing habitat suitability for discrete genetic variations of wolves); 3-ER-381 (existence of at least one wolf with coastal genetic ancestry in area "highly suitable for coastal wolves"); *see also* 2-SER-210.

FWS's Biological Report further explained how "[h]aving robust populations of these different ecotypes improves the species' ability to adapt to changing environmental conditions over time and to recolonize a variety of

suitable habitats." 3-ER-451. But the agency in the Delisting Rule failed to
consider the scientific information in its Biological Report and raised by peer
reviewers demonstrating discreteness of West Coast wolves based on
"physiological, ecological, or behavioral factors," as required under its own
policies. 61 Fed. Reg. at 4725. Instead, FWS arbitrarily relied exclusively on
physical separation to evaluate discreteness.

    C.    <u>FWS Ignored Recent Genetic Science.</u>

In addition, the best available science showed that West Coast wolves may
have "markedly different genetic or phenotypic traits" than Northern Rockies
wolves. 2-SER-220. Recent genomic studies identified wolves in Washington with
"a dominant coastal ancestry," 3-ER-488, and found that Washington and Oregon
have distinct suitable habitats for coastal wolves and for inland wolves, *Id.* at 486.
The Delisting Rule acknowledged there are wolves in Washington "descended"
from "wolves in Canada," but then concluded that these wolves "are not
genetically distinct from" Northern Rockies wolves. 3-ER-310. This conclusion
"misinterprets the state of knowledge and/or does not address the implications of
these studies" before FWS. 2-SER-210; *see also* 1-SER-080 (scientist letter noting
"blanket delisting that is proposed would foreclose that important evolutionary
process, resulting in reduced genetic variability and evolutionary potential for the
species as a whole").

The cited studies found that where wolves had a mixed ancestry, these "individuals are likely ecological surrogates for the coastal wolves and provide similar community interactions and ecosystem functionality," and "healthy coastal habitats may enhance the proportion of alleles unique to coastal wolves and decrease the fraction of genomic contribution from the" Northern Rockies. 3-ER-560. Therefore, the authors concluded, "[g]iven their unique evolutionary heritage and adaptations, packs with a dominant coastal ancestry should be considered a priority for conservation." *Id.*

FWS disregarded this science and provided no support for its contrary claim that the West Coast wolves "are not an isolated population with unique or markedly different genotypic or phenotypic traits that is evolving separate from other wolf populations." 3-ER-411, 415. FWS "cannot ignore available biological information." *Ctr. for Biological Diversity v. Zinke*, 900 F.3d at 1060 (citations omitted).

Nor is FWS's current claim that it "considered and thoughtfully explained" its view persuasive. FWS Br. at 55. In the Delisting Rule, FWS simply noted the scientific findings that Washington "was an admixture zone for coastal and inland wolf ecotypes," 3-ER-381, and then summarily concluded to the contrary that Pacific Northwest wolves "originate[d] primarily from the interior forest ecotype." *Id.*; FWS Br. at 55. This leap showed neither consideration nor thoughtful

explanation. *See Ohio v. EPA*, 144 S. Ct. 2040, 2054 (2024) ("[A]wareness is not itself an explanation."). This is also not a situation with a "good faith disagreement" where FWS relied on other scientific information to support its conclusion. *See Trout Unlimited v. Lohn*, 559 F.3d 946, 956 (9th Cir. 2009).

In sum, by grafting the West Coast wolves onto the purportedly recovered Northern Rockies population, FWS dodged the statutorily required delisting analysis for West Coast wolves and avoided evaluating "as important any threats to the gray wolf ecotype inhabiting Pacific coastal rainforest ecosystems ... that has colonized the U.S. Pacific Northwest." 2-SER-209; *see also Crow Indian Tribe*, 965 F.3d at 678 (delisting determination requires "full, five-factor threats analysis" of listed entity). Instead of protecting West Coast wolves, FWS made these genetically and eco-regionally important wolves invisible for the purposes of its ESA nationwide delisting analysis and unlawfully failed to consider threats to them.

## IV. FWS FAILED TO ENSURE THE ADEQUACY OF REGULATORY PROTECTIONS ON FEDERAL LANDS.

### A. The District Court Correctly Held No Federal Regulatory Mechanisms Exist.

The district court correctly held that the lack of *any* existing regulatory mechanisms on federal public lands for wolves also rendered the Delisting Rule deficient. 1-ER-26. Because there are no existing federal regulatory mechanisms

that address well-known threats to wolves, such as livestock grazing, logging, and motorized access, FWS's "decision that post-delisting federal public land management regimes provide adequate regulatory mechanisms was arbitrary and capricious." *Id.*

FWS must consider whether a species would be threatened by "the inadequacy of *existing* regulatory mechanisms" post-delisting. 16 U.S.C. § 1533(a)(1)(D) (emphasis added). Potential or future planned actions are not "existing" regulatory mechanisms as they have not yet been adopted. *Desert Survivors*, 321 F. Supp. 3d at 1051.[13] The possibility of future actions suggested in the Delisting Rule are not "regulatory mechanisms." *Id.* While adequate regulatory mechanisms may offer "something less than the stalwart protections of the ESA," something "more than no special protection at all" is required. *Greater Yellowstone Coal.,* 665 F.3d at 1032.

The district court correctly concluded that no regulatory mechanisms specifically addressing the threats wolves face exist in any federal land

---

[13] *See also Or. Nat. Res. Council v. Daley,* 6 F. Supp. 2d 1139, 1153 (D. Or. 1998). In reviewing FWS's listing and delisting decisions, courts have consistently held that federal regulatory mechanisms must be both *in effect* and effective. *Biodiversity Legal Found. v. Babbitt*, 943 F. Supp. 23, 26 (D.D.C. 1996) ( "if the Forest Service had an *existing* plan … then FWS would not have to enact its own plan"); *Sw. Ctr. for Biological Diversity v. Babbitt*, 939 F. Supp. 49 (D.D.C. 1996) (promises of future proposed actions were not existing regulatory mechanisms supporting delisting).

management regimes. 1-ER-26 (referencing 3-ER-368). Federal lands in the West "contain relatively expansive blocks of potentially suitable habitat for wolves," "are largely unavailable and/or unsuitable for intensive development," and "contain abundant ungulate populations" for wolves. 3-ER-368. But there are no standards, no guidelines, and no components in applicable federal land management plans to ensure wolves will continue to survive and recover in the West absent the ESA's protections. *Id.*

Forest Service land management plans regularly include habitat protections for big game animals (i.e., elk, deer, and other ungulate species), even when states generally regulate these species' population numbers and hunting on federal lands. *See e.g., Helena Hunters and Anglers Ass'n v. Moore*, 2023 WL 6626158 at *2-*3 (D. Mont. Oct. 11, 2023) (describing habitat cover and access regulations for elk in 1986 land management plan on the Helena National Forest in Montana). Additionally, federal land management agencies regularly account for other ESA species' protections post-delisting. For example, Forest Service and National Park Service regulations provide binding regulatory protections for grizzly bears in the Greater Yellowstone Ecosystem. *See Greater Yellowstone Coal.*, 665 F. 3d at 1032; *see also Swan View Coalition v. Barbouletos*, 2008 WL 5682092, at *2 (D. Mont. Mar. 31, 2008) (describing road density and secure core habitat protections afforded to grizzly bears on the Flathead National Forest by Amendment 19). And

Canada lynx are protected by the Northern Rockies Lynx Amendment, which ensures the species' habitat needs are met on Forest Service lands throughout their recovery area. *See Salix v. U.S. Forest Serv.*, 944 F. Supp. 2d 984, 986 (D. Mont. 2013) (describing programmatic plan amendment to forest plans of 18 National Forests to provide management direction for Canada lynx).

The district court correctly held that with no such federal regulatory mechanisms in place to protect wolves or their habitat, the Delisting Rule was arbitrary. 1-ER-26; *see Greater Yellowstone Coal,* 665 F. 3d at 1032.

B.   <u>FWS's New Theory that State Mechanisms Can Replace Federal Mechanisms Is Incorrect and Cannot Save the Flawed Rule.</u>

On appeal, FWS and Intervenors argue for the first time that since hunting is generally regulated by the states or tribes on federal lands and the district court found that state and tribal management plans were adequate to protect wolves in the context of hunting, there is no need for additional federal regulatory mechanisms. FWS Br. at 59; Utah Br. at 17-20; Safari Club/NRA Br. at 49-52; Farm Bureau Br. at 28-30. The Court should reject this new theory for several reasons.

First, the theory is untimely. "Absent exceptional circumstances, [this Court] generally will not consider arguments raised for the first time on appeal." *Japanese Village, LLC v. Fed. Transit Admin.*, 843 F. 3d 445, 454-55 (9th Cir. 2016) (cleaned up). The exceptions to this rule do not apply here: the new argument does

not raise a "purely" legal question, nor is it necessary to prevent a miscarriage of justice or to account for "a change in law" on appeal. *Id*. The Court should decline to consider this new argument.

However, even if this argument had been timely raised, it fails. FWS's focus on hunting ignores numerous other human-caused threats wolves face on federal public lands, such as impacts associated with increased human access and potential for conflict pursuant to livestock grazing, logging, and motorized access. Although the district court found that state management of wolf *hunting* is generally sufficient, FWS did not consider whether federal regulatory mechanisms were in place to protect against other threats on federal lands.

Here, FWS acknowledges that human-caused mortality is a threat on federal public lands for reasons other than state-regulated hunting. For example, livestock grazing on public lands can result in management removals and mortality of wolves when conflicts arise. 3-ER-368. Additionally, logging projects and motorized trail systems can increase the potential for human-caused mortality of wolves. *See Biodiversity Legal Found. v. Babbitt*, 943 F. Supp. 23, 26 (D.D.C. 1996) (increase in old-growth logging could negatively impact wolves by harming their primary prey and increasing hunter access); *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1231 (D. Or. 2019) (motorized trail system could negatively impact wolves). These additional threats to wolves—in addition to state-regulated

55

hunting—are present on federal public lands, and the district court was correct in faulting FWS for failing to ensure they would be adequately regulated post-delisting.

FWS and Intervenors rely on *Friends of the Blackwater v. Salazar,* but that case is inapposite. There, the court held there were no threats to the Virginia flying squirrel against which regulations would protect. 691 F.3d 428, 436 (D.C. Cir. 2012).[14] Here, federal land management agencies could protect wolves from identified threats on federal lands through regulatory mechanisms. Examples include land use plans to address the threat to wolves from livestock grazing—such as conditioning grazing permits on the use of coexistence measures, like fladry or range riders, or prohibiting livestock in wolf denning areas. Regulations limiting road densities in key wolf habitat can also alleviate the risk of vehicle strikes, as well as disturbance from logging activities or motorized trail systems.

Third, the mere fact that states generally have jurisdiction over wildlife within their borders does not prohibit federal agencies from protecting wildlife on federal lands they manage. As noted above, species-specific regulations, standards, guidelines, and land management plan components exist for many species on

---

[14] Safari Club/NRA's reliance on *Rocky Mountain Wild v. Walsh*, 216 F. Supp. 3d 1234, 1247 (D. Colo. 2016), is also without merit. There, like here, the district court found federal regulatory mechanisms were inadequate to uphold FWS's not-warranted finding on two species of plants. *Id.* at 1253.

federal public lands. Federal public lands in the West contain vast amounts of potentially suitable wolf habitat, 3-ER-368, but no protections for wolves. The district court was correct in faulting FWS for its arbitrary and capricious determination that adequate federal regulatory mechanisms exist. 1-ER-26.

C.     Potential "Sensitive Species" Status Designations Are Insufficient.

Contrary to FWS and Intervenor arguments, the potential future designation of wolves as a "sensitive species" in forthcoming Forest Service and Bureau of Land Management processes are not "existing" regulatory mechanisms. They are not even future planned actions. *Contra* FWS Br. at 60-61, Utah Br. at 17-20, Safari Club/NRA Br. at 49-52, Farm Bureau Br. at 28-30. The district court correctly rejected FWS's reliance on possible "sensitive species" listings because such designations did not exist nor was it clear how they might be adequate regulatory mechanisms, as the ESA requires. 1-ER-26; 16 U.S.C. § 1533(a)(1)(D).

First, "sensitive species" status for wolves post-delisting is wholly speculative. *Or. Nat. Res. Council,* 6 F. Supp. 2d at 1153. Wolves are not currently designated as a "sensitive species" even where they are already congressionally delisted. Nor is a "sensitive species" designation guaranteed for wolves in the future. 3-ER-368 (stating forests in Region 5 "may" designate wolves as "sensitive species" upon delisting). FWS "may not rely on plans for future actions to reduce threats and protect a species as a basis for deciding that listing is not currently

warranted." *Or. Nat. Res. Council,* 6 F. Supp. 2d at 1154. Second, assuming *arguendo* that "sensitive species" status is even likely (though still speculative) for wolves post-delisting, this status alone does not adequately address the specific threats facing the species on federal public lands.

FWS explains "sensitive species" status means only that federal agencies will "consider 'conservation objectives for the gray wolf and its habitat' during the planning and implementation" of projects on federal lands. FWS Br. at 60-61. With this explanation, the potential protections of sensitive species status are doubly speculative: wolves *might* be designated as sensitive species, and protections *may be considered*. In its decision, FWS said nothing about how "sensitive species" status might remedy any of the threats facing the species on federal public lands (i.e., livestock conflicts and associated removals, logging and motorized trails increasing hunter access). *Friends of Blackwater*, 691 F.3d at 436 (holding the agency must consider the adequacy or inadequacy of regulations in light of the threats to the species).

In sum, the absence of federal regulatory mechanisms to protect wolves post-delisting—even with the potential for possible future regulatory mechanisms—rendered FWS's delisting decision arbitrary and capricious. The Court should affirm.

V.    THE DISTRICT COURT CORRECTLY HELD THAT FWS DID NOT
      (AND COULD NOT) SOLELY RELY ON THE DEFINITION OF
      "SPECIES" TO JUSTIFY DELISTING.

    A.    <u>FWS Did Not Delist Wolves Solely on the Statutory Definition of
      Species.</u>

In the district court, FWS contended that because gray wolves allegedly did

not meet the current statutory definition of species, wolves could be delisted on

that basis alone. This was a post-hoc argument by counsel, for FWS explicitly

stated in the Delisting Rule that it was *not* delisting for that reason. 3-ER-310, 370

("[W]hile the currently listed entities could be removed from the List on that basis

… we elected not to act solely on that basis in this final rule."). The district court

rejected the argument that FWS could rely solely on the definition of species as an

independent basis for delisting gray wolves, noting as it did that FWS had not

actually done this in the challenged rule. 1-ER-10-12. While FWS "does not

challenge this holding on appeal," FWS at 21, Intervenors try to take up the

mantle. Safari Club/NRA Br. at 16-28. The Court should affirm the district court's

rejection of this argument because FWS did not rely on the definition of species to

delist wolves. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,* 33 F.4th

1202, 1223 (9th Cir. 2022) ("a foundational principle of administrative law [is] that

a court may uphold agency action only on the grounds that the agency invoked

when it took the action").

Intervenors are conspicuously silent on FWS's disavowal of the "statutory species definition only" argument in the Delisting Rule. The closest Intervenors come to acknowledging these facts is to assert, incorrectly, that FWS's argument about the statutory species definition was uncontested in the district court. Safari Club/NRA Br. at 18. This is false; Appellees specifically challenged FWS's litigation position that an amendment to the ESA 40 years ago rendered gray wolf listings invalid. Appellees also challenged FWS's position as being impermissible post-hoc argument. 1-SER-002-04. The Court need go no further to affirm the district court on the point that FWS did not, in fact, delist wolves based solely on the statutory definition of species. 1-ER-12.

B. <u>Congress Did Not Wipe Out Protections for Wolves When It Amended the ESA in 1978.</u>

Although FWS no longer presses the post-hoc argument, Intervenors do. They insist that Congress, in 1978, meant to automatically delist previously listed species when it amended the ESA's definitions. There is no support for such a sweeping conclusion, especially after four decades of wolf litigation where FWS has never relied on this reasoning. Indeed, Intervenors' reasoning would allow FWS to do the very thing the law prohibits: use a "backdoor route to the *de facto* delisting of already-listed species, in open defiance of the Endangered Species Act's specifically enumerated requirement for delisting." *Humane Soc'y*, 865 F.3d at 602.

To fully understand the reach of Intervenors' argument, it is worth looking at the timeline for federal wolf protection in detail. FWS listed two gray wolf populations in 1978, 43 Fed. Reg. at 9610, when the ESA defined species to include "any subspecies of fish or wildlife or plants and any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature." Pub. L. 93–205, § 3(11), 87 Stat. 884, 886 (1973). Eight months after gray wolves were protected, Congress amended the definition of species in the Act to its present form, dropping the "common spatial arrangement" language and substituting language that defined a "species" to include "any distinct population segment" of any species. 16 U.S.C. § 1532(16). As distinct population segment is not a defined biological term, FWS eventually interpreted it through its DPS Policy 18 years later, 61 Fed. Reg. 4722, setting out parameters for delineating these smaller segments of populations for ESA listing.

Intervenors contend that this 1978 statutory change rendered the previously listed gray wolf populations suddenly unlistable, making delisting mandatory. Safari Club/NRA Br. at 19-20. Yet if Congress had intended this definitional amendment to delist iconic species—including not only wolves but also grizzly bears, bald eagles, American crocodiles, and loggerhead sea turtles, all of which were listed as population segments prior to the 1978 amendment—one would expect to find some hint in the plain statutory language or the legislative history of

such a sweeping purpose. There is none. To the contrary, legislators rejected a more restrictive definition of "species" the very next year, making clear that Congress wanted the definition of "species" to give FWS greater flexibility to *protect* imperiled populations. *See Humane Soc'y*, 76 F. Supp. 3d at 79-80 (summarizing ESA legislative history). "The notion that the FWS would use the 1978 definitional change to delist and remove protections from a DPS-designated population of an already listed taxonomic species was not acknowledged as a potential problem, perhaps in light of the overall purpose of the ESA 'to protect, conserve, propagate, and restore endangered species.'" *Id.* at 80-81. The 1978 definition allowed the wildlife agencies to list populations that were not recognized in formal taxonomic terms. *See* 61 Fed. Reg. at 4722. And nothing in the DPS Policy required FWS to apply it retroactively to earlier listings. *See id.* at 4725 (allowing "case-by-case" reevaluations); *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,* 475 F.3d 1136, 1144-45 (9th Cir. 2007) (noting 1978 wolf listings preceded DPS policy). There is no support for Intervenors' argument that Congress intended to wipe away existing protections when passing the 1978 amendments.

Any claim that administrative and legislative changes to the 1978 gray wolf listing over the past forty years compels delisting is also a red herring. Safari Club/NRA Br. at 22-23. As in 1978, wolves in Minnesota remain protected as a threatened species. Accordingly, the supposedly unlistable status of the affected

wolf populations cannot arise from the administrative and legislative changes recounted by Intervenors, for those did not apply to the Minnesota listing. Instead, this supposedly unlistable status must arise from Congress's amendment of the "species" definition in 1978. Yet, as discussed, there is no indication that Congress intended such a backwards result.

FWS has never delisted a pre-1978 listed species due to application of the later, 1978 definition of species. Intervenors point to other species' rules and vaguely allege FWS "applied" the 1978 definition, Safari Club/NRA at 23 n.8, but these examples only show FWS addressing the required delisting and listing factors and reciting the statutory language. *See, e.g.,* 72 Fed. Reg. 37346, 37358 (July 9, 2007) (delisting pre-1978 listed bald eagles and also denying 2006 petition to list Sonoran Desert bald eagle DPS).[15]

Moreover, any argument by Intervenors that FWS had effectively nullified the validity of the 1978 wolf listing through subsequent listing and DPS changes would amount to an allegation that the agency had already exploited "a backdoor route to the *de facto* delisting of already-listed species," which both this Court and the D.C. Circuit have told FWS it cannot lawfully do. *Humane Soc'y,* 865 F.3d at

---

[15] Safari Club/NRA (at 23-28) rebut an argument no one has made about the applicability of the 1978 statutory definition of species. That definition is plainly valid, but it has never been a basis for automatically delisting a long-protected population without the full analysis that the ESA otherwise requires.

602; *accord Crow Indian Tribe,* 965 F.3d at 677-78. Intervenors claim that the rule at issue is different because it did not create a new unlistable entity, but merely delisted existing entities already rendered unlistable by prior regulatory changes. Safari Club/NRA Br. at 26. This distinction misses the point. The *Humane Society* court held unlawful FWS's attempt to carve a listed entity into a delisted DPS and an unlistable remnant precisely because it would lead to the impermissible "statutory dodge" that Intervenors urge here: delisting the remnant—*i.e.* the 44-state entity—based on the delisting of the Northern Rockies DPS. *Humane Soc'y,* 865 F.3d at 602-03.[16]

FWS has managed and protected gray wolves and other species for 42 years, with never a suggestion that the listings might be invalid. In fact, in 2009, after FWS's decision to delist the Northern Rocky Mountain DPS was challenged, FWS argued that wolves within the 1978 listing, but outside of the Northern Rocky Mountain DPS—the very wolves now at issue—would remain protected: "FWS did not revise the listing status of wolves outside of the NRM DPS, and those wolves are and will remain protected under the ESA." *Defs. of Wildlife v. Salazar,* No. 09-77, ECF 114, Fed. Defs' Cross-Mot. for S.J. at 14-15 (D. Mont. Nov. 23, 2009). Intervenors argue that Congress expressed a different intent when it

---

[16] "Worse still, FWS has announced that, with the Western Great Lakes segment carved out, the remnant is no longer a protectable 'species' and has proposed its delisting for that reason alone." *Id.* at 602.

subsequently delisted the NRM DPS wolves through an appropriations rider and said nothing about which species definition it was overruling. Safari Club/NRA Br. at 22-23. Yet when this Court later considered the congressional delisting of these wolves, it found that the "meaning and intended effect of [the rider] are perfectly clear"—the rider created a "partial delisting," leaving the remaining wolves (these wolves) fully protected. *All. for the Wild Rockies v. Salazar*, 672 F.3d 1170, 1175 (9th Cir. 2012). In short, Congress did not render already listed species nonlistable when it amended the ESA in 1978, and Congress did not intend to create unlistable lower 44 and Minnesota entities as a side-effect of delisting the Northern Rockies DPS.

The plain language of the ESA further supports rejection of Intervenors' proposed analytical short cut. The ESA requires FWS to regularly undertake status reviews of a listed species. 16 U.S.C. § 1533(c)(2)(A). After a status review, FWS must determine "whether any such species" (that is, the entity that was originally listed) "should—(i) be removed from such list; (ii) be changed in status from an endangered species to a threatened species; or (iii) be changed in status from a threatened species to an endangered species." *Id.* § 1533(c)(2)(B). "Each decision made under those two statutory provisions must rely upon the five statutorily designated criteria for listing and the best available scientific and commercial data." *Humane Soc'y,* 865 F.3d at 596. Put another way, every decision to delist a

species, downlist a species, or uplist a species—as it was originally defined and protected—must be made using the statute's criteria and the best science, without exception. *See Coos Cnty. Bd. of Comm'rs v. Kempthorne,* 531 F.3d 792, 806 (9th Cir. 2008) ("Indeed, if … review determinations were *not* made in accordance with those provisions, the ESA's purposes would be quite ill-served."). What Intervenors contend (at 21) FWS must do runs directly counter to the plain language of the statute.

Finally, this argument is new to the complex litigation history of wolf protection under the ESA. Since 2003, FWS has attempted to designate and delist gray wolf DPSs at least six times. Various courts have reversed those delisting decisions and restored the affected wolves' protected status under the 1978 listing. Yet now Intervenors believe that, unbeknownst to the courts and litigants in those cases, the controversies addressed were beside the point because the gray wolf listing had been invalid for decades and the ESA itself mandated a sweeping delisting of wolves. The revisionist nature of this contention offers still more reason for this Court to reject it.

## CONCLUSION

Appellees respectfully ask the Court to affirm the decision of the district court, leaving gray wolves in 44 states nationwide protected under the Endangered Species Act.

DATED this 19th day of December, 2024.

*s/ Kristen L. Boyles*
Kristen L. Boyles
Michael B. Mayer
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-7340
kboyles@earthjustice.org
mmayer@earthjutice.org

Timothy J. Preso
Earthjustice
1716 W. Babcock St.
P.O. Box 4743
Bozeman, MT 59772-4743
(406) 586-9699
tpreso@earthjustice.org

*Attorneys for Appellees Defenders of Wildlife, et al.*

Jared E. Knicley
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington, DC 20005
(202) 513-6242
jknicley@nrdc.org

*Attorney for Appellee Natural Resources Defense Council*

Sarah K. McMillan
Western Environmental Law Center
103 Reeder's Alley,
Helena, MT 59601
(406) 708-3062
mcmillan@westernlaw.org

Kelly E. Nokes
Western Environmental Law Center
P.O. Box 218
Buena Vista, CO 81211
(575) 613-8051
nokes@westernlaw.org

*Attorneys for Appellees WildEarth Guardians, et al.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 22-15529, 22-15532, 22-15534, 22-15535, 22-15536, 22-15537, 22-15626, 22-15627, 22-15628

I am the attorney or self-represented party.

**This brief contains 15,395 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ **X** ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ **X** ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Kristen L. Boyles* _____ **Date** December 19, 2024 _____

69