Nos. 22-15529, 22-15532, 22-15534, 22-15535, 22-15536,
22-15537, 22-15626, 22-15627, 22-15628

———————————————————————

**United States Court of Appeals for the Ninth Circuit**

———————————————————————

Defenders of Wildlife, et al.,
*Plaintiffs/Appellees*,

v.

United States Fish and Wildlife Service, et al.,
*Defendants/Appellants*,

and

State of Utah, et al.,
*Intervenor Defendants/Appellants.*

———————————————————————

Appeals from the U.S. District Court for the N. District of California
Nos. 4:21-cv-344, 4:21-cv-349, and 4:21-cv-561 (Hon. Jeffrey S. White)

———————————————————————

**Reply Brief of the State of Utah**

———————————————————————

Kathy A.F. Davis
Jason L. DeForest
*Assistant Attorneys General*
1594 W. North Temple, Ste 300
Salt Lake City, Utah 84114
(801) 537-9801
kathydavis@agutah.gov
jdeforest@agutah.gov

*Counsel for the State of Utah*

# Table of Contents

Table of Authorities ................................................................... ii

Glossary ............................................................................... iv

Introduction ........................................................................... 1

Pertinent Statutes and Regulations .......................................... 2

Argument ............................................................................... 2

    I.    The Service's analysis demonstrates it did not ignore
or discount the importance of wolves outside the
Great Lakes states and the Northern Rockies ........................... 2

    II.   The State preserved its argument regarding
existing state and federal regulatory mechanisms and,
when considered together, those mechanisms
are adequate to protect wolves post-delisting. ......................... 8

Conclusion .............................................................................. 12

Form 8. Certificate of Compliance for Briefs ......................... 13

Addenda

    Endangered Species Act,
        16 U.S.C. § 1535……………………………………………Add-1

    Revised Interagency Cooperative Policy,
        81 Fed. Reg. 8663 (Feb. 22, 2016)…………………..…..Add-2

# Table of Authorities

**Cases**

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
    462 U.S. 87 (1983) ..................................................................... 4

*Defs. of Wildlife v. Norton,*
    258 F.3d 1136 (9th Cir. 2001) ............................................... 3, 7

*Defs. of Wildlife v. Zinke,*
    849 F.3d 1077 (D.C. Cir. 2017) ............................................... 10

*Friends of Blackwater v. Salazar,*
    691 F.3d 428 (D.C. Cir. 2012) ......................................... 9, 11, 12

*Humane Soc'y of U.S. v. Zinke,*
    865 F.3d 585 (D.C. Cir. 2017) ..................................... 3, 5, 6, 11

*Nw. Ecosystem All. v. U.S. Fish and Wildlife Serv.,*
    475 F.3d 1136 (9th Cir. 2007) ................................................ 4, 5

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
    747 F.3d 581 (9th Cir. 2014) .................................................... 4

**Statutes**

16 U.S.C. § 1532(16) .................................................................... 3

16 U.S.C. § 1533(a)(1) ................................................................. 3

16 U.S.C. § 1533(a)(1)(D) ........................................................ 9, 10

16 U.S.C. § 1533(b) ..................................................................... 3

16 U.S.C. § 1535(a) ...................................................................... 9

**Rules**

Fed. R. App. P. 32(a)(5) ............................................................. 13

Fed. R. App. P. 32(f) .................................................................. 13

**Other Authorities**

81 Fed. Reg. 8663 (Feb. 22, 2016) ............................................................9

# Glossary

| | |
|---|---|
| APA | Administrative Procedures Act |
| DPS | Distinct Population Segment |
| ESA | Endangered Species Act |
| FED-ER | Federal Appellants' Excerpts of Record |
| SPR | Significant Portion of its Range |
| NRM DPS | Northern Rocky Mountains Distinct Population Segment |

## Introduction

State management of gray wolves is critically important for the State of Utah ("State" or "Utah"). Appellees erroneously argue that wolves within the State have been ignored by the U.S. Fish and Wildlife Service ("Service") or, worse yet, subjected to further risk of extinction. In reality, the State has expended, and continues to expend, significant resources preparing for the conservation of wolves dispersing and/or establishing within its borders. So have other states within the species' range that are fully prepared to manage wolves post-delisting. Indeed, the district court recognized those efforts and found the Service can reasonably rely on those mechanisms in a delisting decision. That should have been the end of the inquiry – gray wolves are adequately protected to ensure conservation post-delisting by the states that will then have jurisdiction over the species.

On appeal, Appellees likewise ignore these findings, and the ESA's mandates, to argue the Service's decision discounted small populations of gray wolves outside of the Great Lakes states and the Northern Rocky Mountains. But the Service did not ignore the status of wolves in states such as Utah. Plus, as it relates to delisting, the Service must evaluate

1

how *existing* regulatory mechanisms address threats to the species – the ESA does not require an evaluation of mechanisms that *could* be put in place or speculation as to whether existing mechanisms *could* provide more protection. The Service reviewed existing state mechanisms and, in combination with existing federal mechanisms, found that wolves would be adequately protected post-delisting. This readily satisfies ESA mandates. The district court's contrary decision should be overturned.

To avoid duplicating arguments, the State will limit this Reply to the issue of state regulatory mechanisms and the Service's efforts to consider the same. The State nevertheless joins and incorporates by reference the Federal Defendants' and Intervenors' arguments.

## Pertinent Statutes and Regulations

All pertinent statutes and regulations referenced herein that were not previously included in the Addendum to Federal Appellants' opening brief are in the Addendum attached hereto.

## Argument

## I. The Service's analysis demonstrates it did not ignore or discount the importance of wolves outside the Great Lakes states and the Northern Rockies.

Appellees' argument underscores the district court's errors suggesting wolves outside of the Northern Rockies and/or the Great Lake

2

states were ignored or improperly discounted. This is inconsistent with the ESA, the Service's determination in the Final Rule, and the case law relied upon by the district court.

First, the ESA requires the Service to evaluate the status of an entire "species" – not whether lone, dispersing wolves, or peripheral populations could reach higher levels with additional protection. 16 U.S.C. § 1532(16); *see also Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 612 (D.C. Cir. 2017) (limiting a species review to "whether the species is endangered or threatened, *not whether the species could reach still higher population levels if given more protection*" (emphasis added)); *Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1143 (9th Cir. 2001) (finding that "[a] species with an exceptionally large historical range may continue to enjoy healthy population levels despite the loss of a substantial amount of suitable habitat").

In this instance, the Service evaluated the status of the species in several configurations and found the individual dispersing wolves, while valuable, are not necessary for the recovery of the species. 3-ER-409; 3-ER-412; 3-ER-417. These are matters within the Service's mandate and special expertise. *See* 16 U.S.C. § 1533(a)(1); 16 U.S.C. § 1533(b). The

district court's review must therefore be at its most deferential. *See, e.g.,* *San Luis & Delta-Mendota Water Auth. v. Jewell,* 747 F.3d 581, 592-93 (9th Cir. 2014) (quoting *Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 103 (1983) and finding a "reviewing court must generally be at its most deferential" when examining scientific matters within the Service's expertise); *Nw. Ecosystem All. v. U.S. Fish and Wildlife Serv.,* 475 F.3d 1136, 1140 (9th Cir. 2007) (finding an agency need only provide a "reasonable basis . . . for its decision"). Considering the strength of the two metapopulations, the Service had a reasonable basis for determining peripheral populations were not necessary for recovery. The district court overstepped its bounds by requiring more.

Second, Appellees' assertion that the Service failed to assess threats to wolves outside of the Great Lakes states and the Northern Rockies is inaccurate. The Service analyzed each identified threat to wolves in Utah, Colorado, Washington, Oregon, and California and found that, in each instance, those threats were ameliorated by existing regulatory mechanisms within those states. *See* 3-ER-322-47. Indeed, before opining on the adequacy of federal regulatory mechanisms,

4

discussed in greater detail below, the district court approved of the Service's reliance on those state-specific mechanisms. 1-ER-25.

With respect to the Central Rocky Mountain states, for instance, the district court found that the Service assessed the adequacy of regulatory mechanisms in both Colorado and Utah and "the Service's determination that the existing regulatory mechanisms in Colorado and Utah provide adequate protection for the gray wolf was not arbitrary and capricious." 1-ER-25. The district court made nearly identical findings about wolf management plans in Washington, Oregon, and California, finding the Service "articulated a reasonable basis for the conclusion that sufficient protections existed to guide management of wolves in these states following delisting." *Id.* It cannot simultaneously be true that the Service evaluated existing regulatory mechanisms in these states, through the lens of identified threats to wolves post-delisting, but somehow also ignored how delisting would affect the status of those wolves.

Third, and finally, Appellees' argument is inconsistent with the caselaw the district court relied upon. There are critical distinctions between the Service's erroneous evaluation in *Humane Society* and the

Service's proper evaluation here. Utah's opening brief dealt directly with those distinctions. Utah Br. At 9-13. But given Appellees' continued reliance on the case it bears repeating that the Final Rule does not suffer from the same "fundamental error" identified in *Humane Society*. 865 F.3d at 600. The rule at issue in *Humane Society* failed to "address the impact that extraction of [the Western Great Lakes DPS] would have on the legal status of the remaining wolves in the already-listed species." *Id.* In other words, *Humane Society* requires a review of the "whole picture of the listed species, not just a segment of it." *Id.* at 601. That is precisely what the Service did here.

To begin, in contrast to the rule in *Humane Society*, the Service here did not "extract[]" a segment of the population to the detriment of a listed "remnant." *Id.* at 600-01. The configurations analyzed in the Final Rule were crafted to consider the status of wolves *throughout* the contiguous United States. 3-ER-310; 3-ER-412-15; 3-ER-415-19 (outlining the Service's conservative approach to the configurations of wolf entities to be considered, which included a full review of the status of *all* gray wolves throughout the lower 48 states). Appellees nevertheless argue this is a "distinction without a difference" because the Service based its delisting

6

decision on the recovery of two geographic areas and failed to assess threats to the species as listed. Appellees' Joint Answering Brief at 17. The Service did, in fact, recognize the importance of the two metapopulations to the status of the species and determined that wolves outside those populations were not "necessary" for recovered status in the three analyzed configurations. 3-ER-409; 3-ER-412-13; 3-ER-417. This is within the Service's discretion and satisfies the requirements of the ESA. *See, e.g.*, *Norton*, 258 F.3d at 1143 (finding that "[a] species with an exceptionally large historical range may continue to enjoy healthy population levels despite the loss of a substantial amount of suitable habitat").

However, Appellees' suggestion that the Service failed to assess threats to the species as listed is simply inaccurate. Unlike *Humane Society*, the Service did not ignore the effect that delisting of a population would have on a so-called "remnant." As discussed above and throughout Utah's opening brief, the Service fully analyzed threats to wolves outside of the two metapopulations and the regulatory mechanisms designed to address those threats. 3-ER-322-47. So, this was not a "wolves in some areas are enough for all areas" analysis, as Appellees suggest. Appellees'

Joint Answering Brief at 19. The Service did exactly what the ESA requires – a comprehensive analysis of threats to wolves outside of the metapopulations. 3-ER-322-47. The ESA demands nothing more, particularly considering the health of the metapopulations. The district court's decision should be overturned.

## II. The State preserved its argument regarding existing state and federal regulatory mechanisms and, when considered together, those mechanisms are adequate to protect wolves post-delisting.

First, Utah's argument about the adequacy of federal regulatory mechanisms is timely. The district court's decision delineated between state and federal management, rather than deferring to the Service's expertise regarding the effect of *all* existing regulatory mechanisms. 1-ER-26. Utah's opening brief responded to that delineation, demonstrating its jurisdiction over the species post-delisting and arguing that the "summation of state-specific plans," along with the resiliency of wolves in the Northern Rocky Mountains and the associated federal mechanisms, are more than adequate to support a delisting decision. Utah Br. at 19-20. This is consistent with Utah's position throughout this litigation, and it is not a novel argument. The Service is obligated to evaluate the effect of *all* existing post-delisting mechanisms in the

context of identified threats, which is precisely what it did here. *See* 16 U.S.C. § 1533(a)(1)(D); *Friends of Blackwater v. Salazar*, 691 F.3d 428, 436 (D.C. Cir. 2012) (finding the adequacy of regulatory mechanisms must be evaluated in the light of identified threats to the species). Utah made that argument below and argued the same in its opening brief, while also addressing the district court's decision to separate federal mechanisms from the analysis. Utah Br. at 17-20.

The ESA is expressly designed to use the collaborative efforts of state, tribal, and federal partners to recover endangered or threatened species and return them to state management. *See* 16 U.S.C. § 1535(a); 81 Fed. Reg. 8663 (Feb. 22, 2016) (policy (B) regarding listing activities). Utah demonstrated its commitment to this cooperative model by developing its Wolf Management Plan, and the Service reasonably determined those efforts were adequate to protect wolves post-delisting *throughout* the State. *See, e.g.*, 3-ER-364 (discussing post-delisting management in Utah). It is illogical to suggest that federal regulatory mechanisms should be considered in a vacuum or as the determining factor in overturning a delisting decision.

Second, and perhaps more importantly, the Service is afforded discretion to determine the "adequacy" of the existing regulatory mechanisms. It is well settled that the evaluation of state-specific management plans and regulations is "a quintessential judgment call that Congress left to the Secretary, and by delegation to the Service, which has years of experience in evaluating what is reasonably likely to be implemented and effective." *Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1083 (D.C. Cir. 2017). Moreover, the Service's "decision to delist in the absence of legal certainty is compatible with the ESA's requirement for monitoring of the species after delisting for at least five years and its emergency provisions authorizing the Secretary to take immediate action to ensure the delisted species does not become threatened or endangered again." *Id.* at 1084 (internal quotation marks omitted). The district court's decision effectively removed the Service's discretion to make these evaluations.

Stated simply, the ESA requires a determination as to the "inadequacy of existing regulatory mechanisms" after delisting. 16 U.S.C. § 1533(a)(1)(D). It does not require a determination of whether additional regulatory measures could provide for still higher populations. *See, e.g.*,

*Humane Society*, 865 F.3d at 601. By suggesting that additional federal regulatory mechanisms must be in place to support a delisting decision, the district court wrongfully imposes standards not contemplated by the ESA. Appellees nevertheless point to several threats that may occur on federal land and speculate as to mechanisms the federal government could use to address those threats. Appellees' Joint Answering Brief, at 55-57. This speculative effort is not what the ESA requires or even allows. *See, e.g.*, *Friends of Blackwater*, 691 F.3d at 436 (finding an evaluation of regulatory mechanisms must be tied to specifically identified threats). The state mechanisms outlined and discussed throughout the delisting rule have been deemed adequate to protect wolves post-delisting. 1-ER-23-25. That must be the end of the inquiry. Otherwise, evaluating the adequacy of regulatory mechanisms will forever be subject to an expansive, and legally untenable standard of "what more could be done to protect individual wolves."

As it relates to gray wolves, the State has been working for decades to prepare for the conservation of wolves within its borders and ensure management remains with the State. 3-ER-363-364 (outlining Utah's efforts to prepare for wolves and its plan for post-delisting management).

11

The State's management plan includes mechanisms to support that effort and ensure wolves dispersing and/or establishing within the State are protected, no matter where they may roam. *Id.* The Service found those mechanisms, in combination with the existing federal mechanisms, adequate to protect wolves post-delisting throughout the State. 1-ER-22-25. That finding is consistent with the purpose of the ESA and is exactly what the ESA requires in a delisting decision. The district court's decision regarding the adequacy of federal regulatory mechanisms must be overturned.

## Conclusion

For the foregoing reasons, this Court should reverse the district court's judgment, and the Final Rule delisting gray wolves throughout the lower 48 states should be reinstated.

Respectfully submitted,

/s/ Jason DeForest
Kathy A.F. Davis
Jason L. DeForest
*Attorneys for the State of Utah*

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):** Nos. 22-15529, 22-15532, 22-15534, 22-15535, 22-15536, 22-15537, 22-15626, 22-15627, 22-15628.

I am the attorney or self-represented party.

**This brief contains __2262__ words,** including __0__ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of , Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [ ] it is a joint brief submitted by separately represented parties.
   [ ] a party or parties are filing a single brief in response to multiple briefs.
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

13

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  _/s/ Jason DeForest_       **Date** April 11, 2025
(*use "*s/[typed name]*" to sign electronically-filed documents*)

# ADDENDUM

Endangered Species Act

16 U.S.C. § 1535……………………………….........……………Add-1

Revised Interagency Cooperative Policy

81 Fed. Reg. 8663 (Feb. 22, 2016)……………………….........…..Add-2

**ADDENDUM 1**

Endangered Species Act

16 U.S.C. § 1535

United States Code Annotated
  Title 16. Conservation
    Chapter 35. Endangered Species (Refs & Annos)

16 U.S.C.A. § 1535

§ 1535. Cooperation with States

Currentness

**(a) Generally**

In carrying out the program authorized by this chapter, the Secretary shall cooperate to the maximum extent practicable with the States. Such cooperation shall include consultation with the States concerned before acquiring any land or water, or interest therein, for the purpose of conserving any endangered species or threatened species.

**(b) Management agreements**

The Secretary may enter into agreements with any State for the administration and management of any area established for the conservation of endangered species or threatened species. Any revenues derived from the administration of such areas under these agreements shall be subject to the provisions of section 715s of this title.

**(c) Cooperative agreements**

**(1)** In furtherance of the purposes of this chapter, the Secretary is authorized to enter into a cooperative agreement in accordance with this section with any State which establishes and maintains an adequate and active program for the conservation of endangered species and threatened species. Within one hundred and twenty days after the Secretary receives a certified copy of such a proposed State program, he shall make a determination whether such program is in accordance with this chapter. Unless he determines, pursuant to this paragraph, that the State program is not in accordance with this chapter, he shall enter into a cooperative agreement with the State for the purpose of assisting in implementation of the State program. In order for a State program to be deemed an adequate and active program for the conservation of endangered species and threatened species, the Secretary must find, and annually thereafter reconfirm such finding, that under the State program--

**(A)** authority resides in the State agency to conserve resident species of fish or wildlife determined by the State agency or the Secretary to be endangered or threatened;

**(B)** the State agency has established acceptable conservation programs, consistent with the purposes and policies of this chapter, for all resident species of fish or wildlife in the State which are deemed by the Secretary to be endangered or threatened, and has furnished a copy of such plan and program together with all pertinent details, information, and data requested to the Secretary;

**(C)** the State agency is authorized to conduct investigations to determine the status and requirements for survival of resident species of fish and wildlife;

**(D)** the State agency is authorized to establish programs, including the acquisition of land or aquatic habitat or interests therein, for the conservation of resident endangered or threatened species of fish or wildlife; and

**(E)** provision is made for public participation in designating resident species of fish or wildlife as endangered or threatened; or

that under the State program--

**(i)** the requirements set forth in subparagraphs (C), (D), and (E) of this paragraph are complied with, and

**(ii)** plans are included under which immediate attention will be given to those resident species of fish and wildlife which are determined by the Secretary or the State agency to be endangered or threatened and which the Secretary and the State agency agree are most urgently in need of conservation programs; except that a cooperative agreement entered into with a State whose program is deemed adequate and active pursuant to clause (i) and this clause shall not affect the applicability of prohibitions set forth in or authorized pursuant to section 1533(d) of this title or section 1538(a)(1) of this title with respect to the taking of any resident endangered or threatened species.

**(2)** In furtherance of the purposes of this chapter, the Secretary is authorized to enter into a cooperative agreement in accordance with this section with any State which establishes and maintains an adequate and active program for the conservation of endangered species and threatened species of plants. Within one hundred and twenty days after the Secretary receives a certified copy of such a proposed State program, he shall make a determination whether such program is in accordance with this chapter. Unless he determines, pursuant to this paragraph, that the State program is not in accordance with this chapter, he shall enter into a cooperative agreement with the State for the purpose of assisting in implementation of the State program. In order for a State program to be deemed an adequate and active program for the conservation of endangered species of plants and threatened species of plants, the Secretary must find, and annually thereafter reconfirm such finding, that under the State program--

**(A)** authority resides in the State agency to conserve resident species of plants determined by the State agency or the Secretary to be endangered or threatened;

**(B)** the State agency has established acceptable conservation programs, consistent with the purposes and policies of this chapter, for all resident species of plants in the State which are deemed by the Secretary to be endangered or threatened, and has furnished a copy of such plan and program together with all pertinent details, information, and data requested to the Secretary;

**(C)** the State agency is authorized to conduct investigations to determine the status and requirements for survival of resident species of plants; and

**(D)** provision is made for public participation in designating resident species of plants as endangered or threatened; or

that under the State program--

**(i)** the requirements set forth in subparagraphs (C) and (D) of this paragraph are complied with, and

**(ii)** plans are included under which immediate attention will be given to those resident species of plants which are determined by the Secretary or the State agency to be endangered or threatened and which the Secretary and the State agency agree are most urgently in need of conservation programs; except that a cooperative agreement entered into with a State whose program is deemed adequate and active pursuant to clause (i) and this clause shall not affect the applicability of prohibitions set forth in or authorized pursuant to section 1533(d) or section 1538(a)(1) of this title with respect to the taking of any resident endangered or threatened species.

**(d) Allocation of funds**

**(1)** The Secretary is authorized to provide financial assistance to any State, through its respective State agency, which has entered into a cooperative agreement pursuant to subsection (c) of this section to assist in development of programs for the conservation of endangered and threatened species or to assist in monitoring the status of candidate species pursuant to subparagraph (C) of section 1533(b)(3) of this title and recovered species pursuant to section 1533(g) of this title. The Secretary shall allocate each annual appropriation made in accordance with the provisions of subsection (i) of this section to such States based on consideration of--

**(A)** the international commitments of the United States to protect endangered species or threatened species;

**(B)** the readiness of a State to proceed with a conservation program consistent with the objectives and purposes of this chapter;

**(C)** the number of endangered species and threatened species within a State;

**(D)** the potential for restoring endangered species and threatened species within a State;

**(E)** the relative urgency to initiate a program to restore and protect an endangered species or threatened species in terms of survival of the species;

**(F)** the importance of monitoring the status of candidate species within a State to prevent a significant risk to the well being of any such species; and

**(G)** the importance of monitoring the status of recovered species within a State to assure that such species do not return to the point at which the measures provided pursuant to this chapter are again necessary.

So much of the annual appropriation made in accordance with provisions of subsection (i) of this section allocated for obligation to any State for any fiscal year as remains unobligated at the close thereof is authorized to be made available to that State until the close of the succeeding fiscal year. Any amount allocated to any State which is unobligated at the end of the period during which it is available for expenditure is authorized to be made available for expenditure by the Secretary in conducting programs under this section.

**(2)** Such cooperative agreements shall provide for (A) the actions to be taken by the Secretary and the States; (B) the benefits that are expected to be derived in connection with the conservation of endangered or threatened species; (C) the estimated cost of these actions; and (D) the share of such costs to be borne by the Federal Government and by the States; except that--

**(i)** the Federal share of such program costs shall not exceed 75 percent of the estimated program cost stated in the agreement; and

**(ii)** the Federal share may be increased to 90 percent whenever two or more States having a common interest in one or more endangered or threatened species, the conservation of which may be enhanced by cooperation of such States, enter jointly into an agreement with the Secretary.

The Secretary may, in his discretion, and under such rules and regulations as he may prescribe, advance funds to the State for financing the United States pro rata share agreed upon in the cooperative agreement. For the purposes of this section, the non-Federal share may, in the discretion of the Secretary, be in the form of money or real property, the value of which will be determined by the Secretary, whose decision shall be final.

**(e) Review of State programs**

Any action taken by the Secretary under this section shall be subject to his periodic review at no greater than annual intervals.

**(f) Conflicts between Federal and State laws**

Any State law or regulation which applies with respect to the importation or exportation of, or interstate or foreign commerce in, endangered species or threatened species is void to the extent that it may effectively (1) permit what is prohibited by this chapter or by any regulation which implements this chapter, or (2) prohibit what is authorized pursuant to an exemption or permit provided for in this chapter or in any regulation which implements this chapter. This chapter shall not otherwise be construed to void any State law or regulation which is intended to conserve migratory, resident, or introduced fish or wildlife, or to permit or prohibit sale of such fish or wildlife. Any State law or regulation respecting the taking of an endangered species or threatened species may be more restrictive than the exemptions or permits provided for in this chapter or in any regulation which implements this chapter but not less restrictive than the prohibitions so defined.

**(g) Transition**

**(1)** For purposes of this subsection, the term "establishment period" means, with respect to any State, the period beginning on December 28, 1973, and ending on whichever of the following dates first occurs: (A) the date of the close of the 120-day period following the adjournment of the first regular session of the legislature of such State which commences after December 28, 1973, or (B) the date of the close of the 15-month period following December 28, 1973.

**(2)** The prohibitions set forth in or authorized pursuant to sections 1533(d) and 1538(a)(1)(B) of this title shall not apply with respect to the taking of any resident endangered species or threatened species (other than species listed in Appendix I to the Convention or otherwise specifically covered by any other treaty or Federal law) within any State--

**(A)** which is then a party to a cooperative agreement with the Secretary pursuant to subsection (c) of this section (except to the extent that the taking of any such species is contrary to the law of such State); or

**(B)** except for any time within the establishment period when--

**(i)** the Secretary applies such prohibition to such species at the request of the State, or

**(ii)** the Secretary applies such prohibition after he finds, and publishes his finding, that an emergency exists posing a significant risk to the well-being of such species and that the prohibition must be applied to protect such species. The Secretary's finding and publication may be made without regard to the public hearing or comment provisions of section 553 of Title 5 or any other provision of this chapter; but such prohibition shall expire 90 days after the date of its imposition unless the Secretary further extends such prohibition by publishing notice and a statement of justification of such extension.

**(h) Regulations**

The Secretary is authorized to promulgate such regulations as may be appropriate to carry out the provisions of this section relating to financial assistance to States.

**(i) Appropriations**

**(1)** To carry out the provisions of this section for fiscal years after September 30, 1988, there shall be deposited into a special fund known as the cooperative endangered species conservation fund, to be administered by the Secretary, an amount equal to 5 percent of the combined amounts covered each fiscal year into the Federal aid to wildlife restoration fund under section 669b of this title, and paid, transferred, or otherwise credited each fiscal year to the Sport Fishing Restoration Account established under 1016 of the Act of July 18, 1984.

**(2)** Amounts deposited into the special fund are authorized to be appropriated annually and allocated in accordance with subsection (d) of this section.

**CREDIT(S)**

(Pub.L. 93-205, § 6, Dec. 28, 1973, 87 Stat. 889; Pub.L. 95-212, Dec. 19, 1977, 91 Stat. 1493; Pub.L. 95-632, § 10, Nov. 10, 1978, 92 Stat. 3762; Pub.L. 96-246, May 23, 1980, 94 Stat. 348; Pub.L. 97-304, §§ 3, 8(b), Oct. 13, 1982, 96 Stat. 1416, 1426; Pub.L. 100-478, Title I, § 1005, Oct. 7, 1988, 102 Stat. 2307.)

16 U.S.C.A. § 1535, 16 USCA § 1535
Current through P.L. 119-4. Some statute sections may be more current, see credits for details.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**ADDENDUM 2**

Revised Interagency Cooperative Policy

81 Fed. Reg. 8663 (Feb. 22, 2016)

under FFDCA section 408(d), such as the tolerance in this final rule, do not require the issuance of a proposed rule, the requirements of the Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*), do not apply.

This action directly regulates growers, food processors, food handlers, and food retailers, not States or tribes, nor does this action alter the relationships or distribution of power and responsibilities established by Congress in the preemption provisions of FFDCA section 408(n)(4). As such, the Agency has determined that this action will not have a substantial direct effect on States or tribal governments, on the relationship between the national government and the States or tribal governments, or on the distribution of power and responsibilities among the various levels of government or between the Federal Government and Indian tribes. Thus, the Agency has determined that Executive Order 13132, entitled "Federalism" (64 FR 43255, August 10, 1999) and Executive Order 13175, entitled "Consultation and Coordination with Indian Tribal Governments" (65 FR 67249, November 9, 2000) do not apply to this action. In addition, this action does not impose any enforceable duty or contain any unfunded mandate as described under Title II of the Unfunded Mandates Reform Act (UMRA) (2 U.S.C. 1501 *et seq.*).

This action does not involve any technical standards that would require Agency consideration of voluntary consensus standards pursuant to section 12(d) of the National Technology Transfer and Advancement Act (NTTAA) (15 U.S.C. 272 note).

## VII. Congressional Review Act

Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), EPA will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

## List of Subjects in 40 CFR Part 180

Environmental protection, Administrative practice and procedure, Agricultural commodities, Pesticides and pests, Reporting and recordkeeping requirements.

Dated: February 4, 2016.

**Susan Lewis,**

*Director, Registration Division, Office of Pesticide Programs.*

Therefore, 40 CFR chapter I is amended as follows:

## PART 180—[AMENDED]

■ 1. The authority citation for part 180 continues to read as follows:

**Authority:** 21 U.S.C. 321(q), 346a and 371.

■ 2. In § 180.510, revise the entry for tea in the table in paragraph (a)(1) to read as follows:

## § 180.510 Pyriproxyfen; tolerances for residues.

(a) * * *

(1) * * *

| Commodity | Parts per million |
|---|---|
| * * * * * | |
| Tea ......................................... | 15 |
| * * * * * | |

* * * * *

[FR Doc. 2016–03608 Filed 2–19–16; 8:45 am]

**BILLING CODE 6560–50–P**

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

### 50 CFR Chapter IV

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

### 50 CFR Chapter IV

**[FWS–HQ–ES–2016–N017; FF09E00000 167 FXES11130900000]**

## Revised Interagency Cooperative Policy Regarding the Role of State Agencies in Endangered Species Act Activities

**AGENCY:** Fish and Wildlife Service, Interior, and National Marine Fisheries Service, National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Notice of policy revision.

**SUMMARY:** The Fish and Wildlife Service and National Marine Fisheries Service announce an interagency policy to clarify the role of State agencies in activities undertaken by the Services under authority of the Endangered Species Act of 1973, as amended, and associated regulations. The policy, which is a revision of a policy issued in 1994, reflects a renewed commitment by the Services and State fish and wildlife agencies to work together in conserving America's imperiled wildlife.

**DATES:** February 22, 2016.

**FOR FURTHER INFORMATION CONTACT:** Gary Frazer, Assistant Director for Ecological Services, U.S. Fish and Wildlife Service, 18th and C Streets NW., Washington, DC 20240; telephone 202/208–4646; facsimile 703/358–5618, or Angela Somma, Chief, Endangered Species Division, National Marine Fisheries Service, 1355 East-West Highway, Silver Spring, Maryland 20910; telephone 301/427–8403; facsimile 301/713–0376. If you use a telecommunications device for the deaf (TDD), call the Federal Information Relay Service (FIRS) at 800–877–8339.

**SUPPLEMENTARY INFORMATION:**

### Background

Congress enacted the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*) (ESA or Act), to establish a program for the conservation of endangered and threatened species and the ecosystems on which they depend. The Secretaries of the Interior and Commerce (hereafter referred to as "the Secretaries") have the responsibility for administering the ESA. The Secretaries have delegated this responsibility to the U.S. Fish and Wildlife Service of the Department of the Interior and the National Marine Fisheries Service of the Department of Commerce (hereafter referred to as "the Services").

The Services recognize that, in the exercise of their general governmental powers, States possess broad trustee and police powers over fish, wildlife, and plants and their habitats within their borders. Unless preempted by Federal authority, States possess primary authority and responsibility for protection and management of fish, wildlife, and plants and their habitats.

State agencies often possess scientific data and valuable expertise on the status and distribution of endangered, threatened, and candidate species of wildlife and plants. State agencies, because of their authorities and their close working relationships with local governments and landowners, are in a unique position to assist the Services in implementing all aspects of the Act. In this regard, section 6 of the Act provides that the Services shall cooperate to the maximum extent practicable with the States in carrying out programs authorized by the Act. The term State agency means any State agency, department, board, commission, or other governmental entity that is responsible for the management and conservation of fish, plant, or wildlife resources within a State.

**State Involvement**

In 1994, the Services published a policy regarding the role of State fish and wildlife agencies in implementing the ESA (59 FR 34275; July 1, 1994). That policy has been available on the Services' Web sites. We are now updating and revising that policy. The updated policy, developed in coordination with the State fish and wildlife agencies, reaffirms the commitment for engagement and collaboration between the Services and State fish and wildlife agencies on many aspects of ESA implementation, with the understanding that this collaboration is undertaken in the context of the ESA's statutory timelines.

The revised policy reflects a renewed commitment by the Services and State fish and wildlife agencies to work together in conserving America's imperiled wildlife. The revised policy also references the suite of ESA conservation tools not available or in common use when the policy was originally developed in 1994. These tools include Habitat Conservation Plans, Candidate Conservation Agreements with Assurances, and Safe Harbor Agreements. All of these tools are set forth in regulations in title 50 of the Code of Federal Regulations in part 17.

Changes to the policy include more proactive conservation of imperiled species before they require protections of the ESA, expanded opportunities for engagement on listing and recovery activities, and improved planning with State agencies across a species' range. The revised policy follows:

**Policy Regarding the Role of State Agencies in Endangered Species Act Activities**

Section 6 of the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*) (ESA), directs the Secretaries of the Interior and Commerce to cooperate to the maximum extent practicable with the States in carrying out ESA programs. In furtherance of this provision of the law, it is the policy of the U.S. Fish and Wildlife Service and the National Marine Fisheries Service to involve State agencies as described in the items listed below for the following ESA activities:

*A. Prelisting Conservation*

1. Use the expertise and solicit the information of State agencies in determining which species should be included on the list of candidate animal and plant species.

2. Use the expertise and solicit the information of State agencies in conducting population status inventories and geographical distribution surveys to determine which species warrant listing.

3. Use the expertise of State agencies in designing and implementing prelisting stabilization actions, consistent with their authorities, for species and habitat to remove or alleviate threats so that the listing priority is reduced or listing as endangered or threatened is not warranted. Encourage collaborative conservation planning with State agencies across the range of a species, including, as appropriate, through State Wildlife Action Plans, and work collaboratively with State agencies to facilitate voluntary conservation actions on behalf of species before they reach the point at which they need to be listed as threatened or endangered under the Act.

4. Work collaboratively with State agencies to design and encourage the use of Candidate Conservation Agreements with Assurances to provide non-Federal landowners with incentives for engaging in voluntary proactive conservation of species that are candidates for listing under the Act.

*B. Listing*

1. Use the expertise of, and coordinate and collaborate with, State agencies in developing the scientific foundation upon which the Services base their determinations for listing actions, including: 12-month petition findings; proposed and final listing rules; section 4(d) rules that specify the prohibitions necessary and advisable for the conservation of species listed as threatened; proposed and final critical habitat designations; and proposed and final rules to change the status of a species from endangered to threatened (or vice versa) or to remove a species from the list.

2. Provide notification to State agencies of any proposed regulation in accordance with provisions of the Act and coordinate with State agencies in developing any work plans for future listing activities.

*C. Consultation*

1. Inform State agencies of any Federal agency action that is likely to adversely affect listed species or designated critical habitat, or that is likely to adversely affect species proposed for listing or proposed critical habitat, and request relevant information from them, including the results of any related studies, in analyzing the effects of the action and cumulative effects on the species and habitat.

2. Request an information update from State agencies prior to preparing the final biological opinion to ensure that the findings and recommendations are based on the best scientific and commercial data available.

3. Recommend to Federal agencies that they provide State agencies with copies of the final biological opinion unless the information related to the consultation is protected by national security classification or is confidential business information. Decisions to release such classified or confidential business information shall follow the action agency's procedures. Biological opinions not containing such classified or confidential business information will be provided to the State agencies by the Services, if not provided by the action agency, after 10 working days. The exception to this waiting period allows simultaneous provision of copies when there is a joint Federal-State consultation action.

*D. Habitat Conservation Planning*

1. Use the expertise and solicit the information and participation of State agencies in all aspects of the habitat conservation planning process.

2. Work collaboratively with State agencies to the maximum extent practicable to advance efficiency and avoid duplication of effort when the Services and the States both have similar authority for permitting activities related to threatened and endangered species.

*E. Recovery*

1. Use the expertise and solicit the information and participation of State agencies in all aspects of the recovery planning process for all species under their jurisdiction.

2. Use the expertise and solicit the information and participation of State agencies in implementing recovery plans for listed species. State agencies have the capabilities to carry out many of the actions identified in recovery plans and are in an excellent position to do so because of their close working relationships with local governments and landowners.

3. Recognize and use the expertise and authority of State agencies in designing and implementing monitoring programs for species that have been removed from the Lists of Endangered and Threatened Wildlife and Plants. Unless preempted by Federal authority (*e.g.*, Marine Mammal Protection Act, Bald and Golden Eagle Protection Act), States possess primary authority and responsibility for protection and management of fish, wildlife, and plants and their habitats, and are in an

excellent position to provide for the conservation of these species following their removal from the lists.

4. Work collaboratively with State agencies to design and encourage the use of Safe Harbor Agreements to assist in recovery of listed species.

**Authors**

The primary authors of this draft policy are the staff members of the Ecological Services Program, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, Falls Church, VA 22041 and staff members of the Endangered Species Division, National Marine Fisheries Service, 1355 East-West Highway, Silver Spring, Maryland 20910.

**Authority**

The authority for this action is the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*).

Dated: February 5, 2016.

**Daniel M. Ashe,**
*Director, U.S. Fish and Wildlife Service.*
Dated: February 10, 2016.

**Eileen Sobeck,**
*Assistant Administrator for Fisheries, National Marine Fisheries Service.*
[FR Doc. 2016–03541 Filed 2–19–16; 8:45 am]

**BILLING CODE 4333–15–P**