Nos. 22-15529, 22-15532, 22-15534, 22-15535, 22-15536,
22-15537, 22-15626, 22-15627, 22-15628

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

DEFENDERS OF WILDLIFE, et al.,
*Plaintiffs/Appellees,*

v.

UNITED STATES FISH AND WILDLIFE SERVICE, et al.,
*Defendants/Appellants*

and

STATE OF UTAH, et al.,
*Intervenor Defendants/Appellants.*

---

Appeal from the United States District Court for the Northern District of California
Nos. 4:21-cv-344, 4:21-cv-349, and 4:21-cv-561 (Hon. Jeffrey S. White)

---

**FEDERAL APPELLANTS' REPLY BRIEF**

---

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*

JOAN M. PEPIN
MICHAEL R. EITEL
ASTRID CEVALLOS

Of Counsel:                      AMELIA G. YOWELL
                                 *Attorneys*
LINUS CHEN                       Environment and Natural Resources Division
*Attorney*                       U.S. Department of Justice
U.S. Department of the Interior  Post Office Box 7415
Office of the Solicitor          Washington, D.C. 20044
                                 (202) 514-5580
                                 amelia.yowell@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

GLOSSARY ................................................................................. vi

INTRODUCTION ......................................................................... 1

ARGUMENT ............................................................................... 3

I.  Plaintiffs amplify the district court's error by focusing on individual wolves rather than the species overall. .......................... 3

    A.  The Service reasonably focused on metapopulations and did not ignore other wolves. ................................................. 4

    B.  The Service appropriately considered lost historical range. ............................................................................. 11

II.  The Service rationally concluded that areas on the peripheries of the core metapopulations are not "significant" portions of the wolf's range. ........................................................................ 14

    A.  The Service adequately explained how it determined "significance" in the Rule. .............................................. 15

    B.  The Service reasonably determined that portions of the wolf's peripheral range were not significant. ...................... 19

III.  Plaintiffs may not substitute their understanding of the genetics of Western wolves for that of the Service. ............................... 24

IV.  The Service rationally concluded that existing regulatory mechanisms were not inadequate. ............................................ 26

CONCLUSION ........................................................................... 29

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Alaska Oil & Gas Ass'n v. Jewell*,
    815 F.3d 544 (9th Cir. 2016) ................................................................5

*Biodiversity Legal Found. v. Babbitt*,
    943 F. Supp. 23 (D.D.C. 1996) .........................................................29

*Crow Indian Tribe v. United States*,
    965 F.3d 662 (9th Cir. 2020) .............................................................8, 9

*Ctr. for Biological Diversity v. Haaland*,
    998 F.3d 1061 (9th Cir. 2021) ...........................................................25

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
    450 F.3d 930 (9th Cir. 2006) .............................................................20

*Ctr. for Biological Diversity v. Zinke*,
    900 F.3d 1053 (9th Cir. 2018) ...........................................................11

*Defs. of Wildlife v. Norton*,
    258 F.3d 1136 (9th Cir. 2001) ...........................................................11

*Defs. of Wildlife v. Salazar*,
    812 F. Supp. 2d 1205 (D. Mont. 2009) ...............................................6

*Defs. of Wildlife v. U.S. Dep't of the Interior*,
    354 F. Supp. 2d 1156 (D. Ore. 2005) ..................................................9

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ..........................................................................27

*Friends of Blackwater v. Salazar*,
    691 F.3d 428 (D.C. Cir. 2012) ..........................................................28

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
    378 F.3d 1059 (9th Cir. 2004) ...........................................................17

*Humane Soc'y of U.S. v. Zinke*,
　　865 F.3d 585 (D.C. Cir. 2017)................................................7, 8, 9

*In re Polar Bear Endangered Species Act Listing*,
　　709 F.3d 1 (D.C. Cir. 2013).......................................................17

*Kern Cnty. Farm Bureau v. Allen*,
　　450 F.3d 1072 (9th Cir. 2006) ..................................................26

*Loper Bright Enters. v. Raimondo*,
　　603 U.S. 369 (2024)..................................................................11

*Marsh v. Or. Nat. Res. Council*,
　　490 U.S. 360 (1989)............................................................16, 23

*Nat'l Wildlife Fed'n v. Norton*,
　　386 F. Supp. 2d 553 (D. Vt. 2005) ..............................................9

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
　　475 F.3d 1136 (9th Cir. 2007) ..................................................26

*PDK Lab'ys Inc. v. U.S. Drug Enf't Agency*,
　　438 F.3d 1184 (D.C. Cir. 2006)..................................................17

*Pearson v. Shalala*,
　　164 F.3d 650 (D.C. Cir. 1999)....................................................18

*Ranchers Cattlemen Action Legal Fund United
　　Stockgrowers of Am. v. U.S. Dep't of Agric.*,
　　415 F.3d 1078 (9th Cir. 2005) ..................................................17

*Trout Unlimited v. Lohn*,
　　559 F.3d 946 (9th Cir. 2009) ......................................................6

*WildEarth Guardians v. Jeffries*,
　　370 F. Supp. 3d 1208 (D. Ore. 2019) ........................................29

*Wyo. Farm Bureau Fed'n v. Babbitt*,
　　199 F.3d 1224 (10th Cir. 2000) ..............................................5, 7

# Statutes

Endangered Species Act

16 U.S.C. § 1531(a)(1) ..................................................................6

16 U.S.C. § 1531(a)(2) ..................................................................6

16 U.S.C. § 1531(b) ...................................................................5, 6

16 U.S.C. § 1532(3) ......................................................................5

16 U.S.C. § 1532(6) ..................................................................3, 11

16 U.S.C. § 1532(16) ..................................................................3, 5

16 U.S.C. § 1532(19) .....................................................................5

16 U.S.C. § 1532(20) .................................................................3, 11

16 U.S.C. § 1533(a)(1) ................................................................3, 5

16 U.S.C. § 1533(a)(1)(D) ..............................................................29

16 U.S.C. § 1533(b)(1)(A) ..............................................................16

16 U.S.C. § 1533(c) ..................................................................3, 5

16 U.S.C. § 1533(c)(1) ...................................................................3

16 U.S.C. § 1536(a)(2) ..................................................................6

16 U.S.C. § 1536(b)(4). ..................................................................6

16 U.S.C. § 1538(a)(1)(B) ................................................................6

16 U.S.C. § 1539(a) ......................................................................6

16 U.S.C. § 1539(d) ......................................................................6

## Regulations

50 C.F.R. § 424.11(e)(2) (2019) ...................................................................3

61 Fed. Reg. 4722 (Feb. 7, 1996) .............................................................10

79 Fed. Reg. 37578 (July 1, 2014)......................................................11, 15

82 Fed. Reg. 30502 (June 30, 2017) .........................................................22

84 Fed. Reg. 52598 (Oct. 2, 2019).....................................................22, 23

# GLOSSARY

APA                Administrative Procedure Act

DPS              Distinct Population Segment

ESA              Endangered Species Act

FDA              Food and Drug Administration

SPR              Significant Portion of its Range

**INTRODUCTION**

As explained in the Fish and Wildlife Service's Opening Brief, the recovery of the gray wolf is one of the Endangered Species Act's (ESA) greatest success stories. Nearly wiped out from the lower United States five decades ago, gray wolves now exist in two thriving metapopulations in the Western United States and the Great Lakes regions. Both metapopulations are also connected to large networks of wolves in Canada. Given this, the Service has long recognized the biological recovery of the gray wolf and has worked to fulfill its responsibility under the ESA to delist it.

Despite this impressive comeback, some environmental groups are hesitant to recognize that the species is no longer in danger of extinction because wolves are not everywhere they once were. But the ESA does not allow the Service to keep a recovered species on the list just so it can become more widespread or abundant. If the species no longer meets the Act's definition of "endangered or threatened," the Service must delist it.

Plaintiffs agree with these principles in theory, and they deny that the district court's order requires gray wolves to remain listed until they have been restored to their historical numbers and range. But Plaintiffs' Answering Brief nevertheless makes clear that Plaintiffs want the Service to keep gray wolves listed as long as

lone or dispersing groups of wolves are vulnerable anywhere in the United States and as long as wolves might theoretically return to areas where they used to live.

Plaintiffs cannot justify these goals. The Service's Rule delisting the gray wolf in the states where it had remained listed conforms to the ESA and the best available science. The Service carefully evaluated the entities as listed (Minnesota and, separately, the lower-44 states) and in other configurations. The Service then concluded that no configuration was endangered or threatened in all or a significant portion of its range. Plaintiffs oppose that holistic analysis by arguing that the Service should have looked at lone or smaller groups of wolves at the expanding edges of the metapopulations in isolation, without considering the larger populations those wolves are connected to. But the ESA does not require this type of analysis, either through its threats assessment or "significant portion of its range" (SPR) analysis. Nor does the scientific data support Plaintiffs' approach.

In the end, Plaintiffs suggest that the Service's attempts to address the gray wolf over the years were duplicitous and that the Court should view this Rule with skepticism. That accusation is unwarranted. If anything, the complicated history reveals that the Service has followed the best available scientific information and has done its best to navigate a complex litigation background. This Court should reverse the district court and uphold the Service's Rule.

**ARGUMENT**

## I. Plaintiffs amplify the district court's error by focusing on individual wolves rather than the species overall.

As the Service's Opening Brief explains (pp. 25–28), the ESA does not require the restoration of a species throughout its historical range before that species is delisted. Instead, Congress directed the Service to list a species only when the *species* is threatened or endangered. 16 U.S.C. § 1533(a)(1), (c)(1). By statute, this inquiry happens at the species level, which the ESA defines as taxonomic species, subspecies, or "any distinct population segment" (DPS). *Id.* § 1532(16). The Service thus may not keep a species listed unless it remains "in danger of extinction throughout all or a significant portion of its range" or is likely to become so "within the foreseeable future." *Id.* § 1532(6), (20); *see also id.* § 1533(c); 50 C.F.R. § 424.11(e)(2).

This is true even if the species has room to expand its range and even if individual members or populations of that species are still at risk. After all, every species is affected to some degree by threats like disease, predation, and human-caused mortality. And threats are frequently more acute at the edges of any species' range. But not all species are endangered or threatened under the ESA. 16 U.S.C. § 1533(a)(1). Plaintiffs' arguments in defense of the district court's decision conflict with these statutory directives.

### A. The Service reasonably focused on metapopulations and did not ignore other wolves.

Contrary to Plaintiffs' narrative, the Service thoroughly analyzed all gray wolves in the lower 48 states. Opening Br. 28–32. It specifically addressed wolves in Colorado (3-ER-343–44; 3-ER-363; 3-ER-411) and in the West Coast states (3-ER-342–46; 3-ER-361–63; 3-ER-411), including lone and dispersing wolves on the peripheries (3-ER-320; 3-ER-347). And the Service acknowledged that these wolves may be vulnerable to a variety of threats. 3-ER-320; 3-ER-47. But the agency ultimately concluded that any increased risks to these particular wolves would not threaten the species *overall* given the stable metapopulations. 3-ER-411; 3-ER-414–15; 3-ER-418–19.

Plaintiffs do not engage with this analysis. They do not explain why two large metapopulations connected to thousands of wolves in Canada are "in danger of extinction" now or in the foreseeable future.[1] Instead, they assert that the Service failed to analyze lone and small groups of wolves on the edges of these metapopulations. Answering Br. 14–21. But what they really mean is that the Service did not analyze those wolves in the way Plaintiffs would have preferred—

---

[1] Plaintiffs also sidestep the question of what wolf "species" they believe is threatened or endangered, as that term is defined under the ESA. Although they argue that the Minnesota and lower-44 entities are listable entities, they never explain how those entities are overall threatened or endangered to warrant listing under the ESA.

as discrete, independent entities that must each be recovered before the Service can delist the species. That disagreement is not enough to overturn the Rule.

1. Plaintiffs argue that the Service should look at peripheral wolves in isolation and ignore how they contribute to the listed entities overall. Answering Br. 19–20. That argument finds no support in the ESA's text and structure.

As discussed, the ESA is a *species* recovery statute. Opening Br. 24–32; *see Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 550–51 (9th Cir. 2016) ("The purpose of the ESA is to ensure the recovery of endangered and threatened species, not merely the survival of their existing numbers."); *Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1235 (10th Cir. 2000) ("[T]he paramount objective of the [ESA is] to conserve and recover species, not just individual animals"). Congress deliberately defined "species" to include only taxonomic species, subspecies, and DPSs. 16 U.S.C. § 1532(16). And Congress instructed the Service to make listing decisions based on whether those species—not individual members of the species—are threatened or endangered. *Id.* § 1533(a)(1), (c).

To be sure, the ESA protects individual members of a listed species, but only as a means to recover the species overall. *Id.* §§ 1531(b), 1532(3). For example, the ESA generally prohibits the take[2] of individual members of an endangered species,

---

[2] Take "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

*id.* § 1538(a)(1)(B), but it allows certain exceptions if the take "will not operate to the disadvantage of such endangered species" as a whole. *Id.* § 1539(a), (d). Likewise, when a federal action will not jeopardize "the *continued existence*" of the entire species, the Act permits incidental take of members of the species. *Id.* § 1536(a)(2), (b)(4).

Congress thus distinguished between individual members of a protected species and the viability of the species overall. And Congress established that the loss of individual members is acceptable so long as that loss does not harm the species overall. That distinction is significant, and consistent with the ESA's intent to prevent extinction. *Id.* § 1531(a)(1)–(2), (b); *see generally Defs. of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1210 (D. Mont. 2009) (rejecting argument that 330 wolf deaths would cause irreparable harm because "the purpose of the ESA is to prevent species 'endangerment and extinction'" and therefore "the measure of irreparable harm is taken in relation to the health of the overall species rather than individual members" (quoting *Trout Unlimited v. Lohn*, 559 F.3d 946, 949 (9th Cir. 2009))). It is also consistent with basic principles of biology—for example, a species like the American black bear can flourish even when some individual bears are in peril or are no longer present in some states. Opening Br. 26, 31–32.

Plaintiffs' focus on individual and small groups of wolves conflicts with this plain reading of the ESA. Plaintiffs accuse the Service of assuming that "wolves in

some areas are enough for all areas." Answering Br. 19. And they bemoan the fact that the Rule removes protections from vulnerable individual wolves. *Id.* But these complaints do not reveal any flaws with the Service's analysis; they simply reflect the way that the ESA works. Congress never intended for a species that has recovered overall to remain listed until every member is safe from threats. Indeed, it is a "well-established fact" that "individual animals can and do lose protection simply by moving about the landscape," like when a wolf wanders from a protected state to a delisted one. *Wyo. Farm*, 199 F.3d at 1235 & n.4.

2. Without support in the ESA's text, Plaintiffs retreat to case law. Answering Br. 17–19. But the cases Plaintiffs cite do not support the district court's decision either. Opening Br. 32–34. The D.C. Circuit in *Humane Society* and this Court in *Crow Indian Tribe* took issue with carving DPSs out of larger listed entities without addressing whether the remnant would remain listable. For instance, the rulemaking in *Humane Society* reconfigured the listed wolf entities into a delisted DPS and a "remnant" that remained listed. *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 602 (D.C. Cir. 2017). The court was worried that the Service could later delist the remnant because it did not meet the definition of "species." *Id.* If that happened, those remnant wolves might ultimately lose their protections not due to recovery but because they no longer qualified as a listable species. *Id.* at 603. The court thus held that the Service could not carve up listed entities into a delisted DPS and a listed

remnant without first considering whether the remnant remained listable under the ESA. *Id.*

This Court expressed a similar concern and clarified that when designating and delisting a DPS that leaves another portion of the species listed, the agency must determine "whether there is a sufficiently distinct and protectable remnant population, so that the delisting of the DPS will not further threaten the existence of the [remaining listed] remnant." *Crow Indian Tribe v. United States*, 965 F.3d 662, 678 (9th Cir. 2020).

This Rule does not involve those circumstances. Rather than considering only part of a listed entity and disregarding the rest, the Service carefully considered the entire listed entities, without alteration. 3-ER-310–11; 3-ER-406–12. It then examined gray wolves in different configurations. 3-ER-310; 3-ER-412–15; 3-ER-415–19. After applying the ESA's listing analysis to each of these configurations, the Service concluded that none were endangered or threatened in all or a significant portion of their range. 3-ER-406–19.

That is the opposite of "backdoor delisting." Answering Br. 17. In *Humane Society*, the court used the term "backdoor delisting" because the Service left behind a remnant that was an "unlistable non-species" and thus set in motion its delisting without acknowledging it. 865 F.3d at 602. Here, the Service did not do anything

through the backdoor or in silence. It was upfront that it was delisting wolves *everywhere* because the species overall was recovered.

Nor did the Service leave any wolves "orphan[ed] to the law." *Id.* at 603. The Service straightforwardly acknowledged that some lone and dispersing wolves were not as secure as wolves in the core metapopulations, but it determined that those peripheral portions of the species' range were not significant. 3-ER-411; 3-ER-414–15; 3-ER-418–19. Neither *Humane Society* nor *Crow Indian Tribe* foreclose this analysis. Indeed, in neither of those cases did the Service make this type of determination. Plaintiffs ignore these distinctions because they think that the Service "reached the same result." Answering Br. 17. But the Rule is not unlawful simply because of its ultimate outcome—the delisting of gray wolves.

3. The district court cases cited by Plaintiffs are also distinguishable. Answering Br. 19 (citing *Defs. of Wildlife v. U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156 (D. Ore. 2005); *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005)). Both cases overturned a past rulemaking splitting the wolf listings into multiple DPSs. The courts concluded, among other things, that the Service erred by drawing the DPS boundaries too broadly.[3] *Defs.*, 354 F. Supp. 2d at 1172; *Nat'l Wildlife*, 386 F. Supp. 2d at 564–65.

---

[3] The Vermont and Oregon decisions are non-precedential and, as explained, distinguishable. To the extent that the decisions can be read to support Plaintiffs'

Those cases addressed questions regarding the identification of a "species" under the ESA—whether the DPSs were valid. Environmental organizations argued that the DPSs were not valid and insisted that the Service needed to look at the entire species. Now, Plaintiffs say that the Service should have used DPSs. Answering Br. 2–3, 21. But DPSs are not just any group of a larger species. They are the smallest division of a taxonomic species that can be listed as a "species" under the ESA. And they are subject to strict requirements in line with Congress's guidance that the Service should designate DPSs "sparingly." 61 Fed. Reg. 4722, 4722 (Feb. 7, 1996) ("DPS Policy"). To qualify as a DPS, a population must be discrete—here, "markedly separated from other populations of the same taxon"—and significant to the larger taxonomic species. *Id.* at 4725. If those criteria are met, the Service must then determine whether the population is endangered or threatened under the ESA's five factors. *Id.*

Nowhere in their brief do Plaintiffs address this analytical framework or argue that any of the lone or dispersing groups of wolves qualify for listing as a DPS in their own right. Unlike prior rulemakings, the Service did not designate any DPSs in this Rule; it instead considered the entire listed entities. 3-ER-405–19. The Court should evaluate that analysis on its merits and ignore Plaintiffs' vague suggestion that the Service could have addressed these entities as DPSs. Answering Br. 2–3.

overarching argument that wolves cannot be delisted until they are recovered "in all areas," the decisions are not persuasive.

**B.    The Service appropriately considered lost historical range.**

As part of a listing decision, the ESA requires the Service to determine whether a species "is in danger of extinction" or likely to become so in the future "throughout all or a significant portion of its range."  16 U.S.C. § 1532(6), (20). When following that direction, the Service focuses on the species' status in its current range.  3-ER-312; 79 Fed. Reg. 37578, 37583–85 (July 1, 2014) ("SPR Policy").  As explained in the Opening Brief (pp. 35–36), this is the most natural reading of the text, and this Court has upheld it.  *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1063–67 (9th Cir. 2018).  Plaintiffs dislike that interpretation, but they agree that the Court need not address it here.[4]  Answering Br. 24.  The question instead is a factual one: did the Service appropriately consider the gray wolf's lost historical range?

The answer is yes.  Lost historical range is generally relevant for two reasons: it may exacerbate some threats and it may reveal others.  Opening Br. 36–37.  The

---

[4] Plaintiffs briefly argue that this Court should abandon its clear holding in *Center for Biological Diversity* and instead rely on older dicta from *Defenders of Wildlife v. Norton*, 258 F.3d 1136 (9th Cir. 2001).  Answering Br. 24 n.6.  But that is not how stare decisis works, even after *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).  *See Lopez v. Garland*, 116 F.4th 1032, 1045 (9th Cir. 2024) (applying decision under *Chevron* as statutory stare decisis even though that decision "was somewhat in tension with prior Ninth Circuit authority").  In any event, *Defenders of Wildlife* did not hold, as Plaintiffs suggest, that "'range' unambiguously means 'historical range.'"  *Ctr. for Biological Diversity*, 900 F.3d at 1063.

Service acknowledged this in the Rule, stating that lost historical range could affect "the current and future viability of the species" by making it harder for the species to survive a wide variety of threats and, separately, that lost historical range could be "evidence of the effects of an ongoing threat." 3-ER-318.

The Service then rationally concluded that neither situation was present, even though in 2020, gray wolves occupied only a fraction of their historical range. 3-ER-318. As the Service explained, the primary cause of the range contraction (unregulated hunting and other human-caused mortality) is no longer a serious threat endangering the species. 3-ER-320–39; 3-ER-347–69. And although the loss of that historical range makes some individual dispersing wolves more vulnerable to threats, 3-ER-320, the Service reasonably determined that any increased vulnerability is not so substantial that the species is at risk of extinction. 3-ER-411; 3-ER-414–15; 3-ER-418–19.

Plaintiffs complain that the Service's historical range analysis depended on, and appeared throughout, the entire Rule and not in one distinct section. Answering Br. 23. Even if true, the Service's formatting choices do not violate the ESA or APA. As for Plaintiffs' other criticisms, none are supported by the record.

First, Plaintiffs suggest that the Service overlooked whether the gray wolf's lost historical range risked the genetic health of the species. Answering Br. 23. But the Service thoroughly evaluated genetic diversity, including the effects of range

contraction on that diversity. It explicitly found that the "range reduction and subsequent [post-listing] expansion" of range in the Great Lakes area did not lead to an "isolated [genetic] bottleneck." 3-ER-346. The Service further explained that although "a significant amount [of historical genetic diversity] has likely been lost, current populations have high levels of genetic diversity in the Great Lakes area," in part because they are connected to Canadian wolves. 3-ER-346.

Likewise, the Service explained that wolves in Washington, Oregon, and California are connected to the Western metapopulation, including Northern Rocky Mountain wolves, which "have been shown to have high genetic diversity, low levels of inbreeding, and connectivity with the large Canadian wolf population to the north." 3-ER-346. The Service recognized that dispersing wolves may be more vulnerable to isolation because they do not appear in robust numbers throughout their historical range, and that this could result in decreased genetic diversity and increased inbreeding. 3-ER-347. But the Service concluded that this risk was low, given the wolves' known avoidance of inbreeding and the fact that even low numbers of dispersing wolves contribute to genetic diversity. 3-ER-347. Thus, the Service determined that genetic risks "are not likely to be of such a magnitude that they pose a significant threat to the species." 3-ER-347.

Second, Plaintiffs speculate that lost historical range may lead to the loss of unique ecological areas, reduced abundance, or increased susceptibility to

extinction. Answering Br. 22–23. That speculation is not enough. Plaintiffs point to nothing in the record showing that these facts are true for gray wolves or relevant to the Service's analysis. Nor do any of the peer review comments on the proposed rule cast doubt on the final Rule's conclusions. The Service received these comments, considered them, and explained how they factored into its decision. *See, e.g.*, 2-SER-199–200 (describing confusion over DPS structures, but the Service did not designate any DPSs); 2-SER-213–24 (proposing a different understanding of range, which the Service specifically responded to at 3-ER-379).

\* \* \*

At bottom, Plaintiffs do not challenge the Service's scientific conclusion that the two gray wolf metapopulations are large and healthy. Plaintiffs instead argue that the Service discounted the importance of dispersing wolves and possible habitat on the peripheries, but Plaintiffs fail to show that threats to those wolves imperil the overall species. Although Plaintiffs may wish that gray wolves existed in "all areas," the ESA does not require it.

## II. The Service rationally concluded that areas on the peripheries of the core metapopulations are not "significant" portions of the wolf's range.

Plaintiffs next argue that the sparsely populated peripheral areas of the wolf's range are a "significant" portion in which the species is not secure, Answering Br. 35–43, but the Service reasonably concluded otherwise. Opening Br. 45–52. If the

Service determines that a portion of a species' range is "significant" and the species within that portion of the range is in danger of extinction under the five factors, then the *entire* species must be listed. *SPR Policy*, 79 Fed. Reg. at 37609. Here, the Service concluded that no portions of the range containing lone or small groups of wolves were significant to any broader entities—regardless of whether they qualified as species capable of being listed—and thus that those portions did not justify leaving gray wolves listed everywhere in Minnesota and the 44-state entity. 3-ER-405–19. Plaintiffs have not shown that this conclusion was legally or factually incorrect.

A. **The Service adequately explained how it determined "significance" in the Rule.**

Plaintiffs agree that this case does not require the Court to definitively resolve the statutory meaning of "significant." Answering Br. 32; Opening Br. 41–45. Indeed, Plaintiffs do not even offer their own definition of "significant." Rather, the parties agree that the question here is governed by the familiar arbitrary-and-capricious standard of review. Opening Br. 45: Answering Br. 28. The Service's SPR determination satisfies that deferential standard because it was reasonable and reasonably explained. Opening Br. 45–52.

To start, the Service provided a thorough and reasoned explanation of its decision-making. The Service explained that it applied the term "significant" to the gray wolf "in a way that is consistent" with recent "relevant case law," including a

district court decision vacating the Service's prior definition. 3-ER-530; 3-ER-379. The Service thus evaluated whether there were any portions that "could be considered significant under any reasonable definition of 'significant.'" 3-ER-404. The Service applied that broad definition by considering "any portions of the range that may be biologically meaningful in terms of the resiliency, redundancy, or representation of the entity being evaluated." 3-ER-404.

Plaintiffs argue that this approach is arbitrary and capricious because the Service did not explain how it measured "biologically meaningful." Answering Br. 29. Not so. The Service explained the concept of "resiliency, redundancy, or representation," which also appears in peer-reviewed scientific literature. 3-ER-568–70. And the Service provided further definitional content to these principles in the context of gray wolf biology. Opening Br. 50–51; 3-ER-317; 3-ER-380; 3-ER-411–12. It then applied those principles when making specific scientific determinations based on the best scientific and commercial data available. *See* 16 U.S.C. § 1533(b)(1)(A); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376 (1989) (agency determination involved "primarily issues of fact" that "require[d] a high level of technical expertise" (citation omitted)).

Plaintiffs concede that the district court was wrong to require objective or quantitative thresholds. Answering Br. 32–33. Yet they continue to fault the Service for not providing "clearly articulated criteria." Answering Br. 30. To the extent

Plaintiffs suggest that the Service must adopt general rules to implement the ESA's mandate, they are mistaken. *See Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1066–67 (9th Cir. 2004) (deferring to agency's methodological choices when determining how to apply a statutory mandate in a specific case), *superseded by regulation on other grounds*, 81 Fed. Reg. 7214 (Feb. 11, 2016).

And to the extent Plaintiffs assert that the Service failed to adequately explain its methodology, that argument is not supported by the record. The Service first made clear that it looked at a portion's biological significance to the overall entity. It then described how it used the "the Three Rs"—representation, resiliency, or representation—to make that determination. 3-ER-380; 3-ER-411–12. That methodology is clearly articulated and scientifically valid. Opening Br. 50–51. "Agencies routinely employ multi-factor standards when discharging their statutory duties," and courts have "never hesitated to uphold [those] decisions when adequately explained." *PDK Lab'ys Inc. v. U.S. Drug Enf't Agency*, 438 F.3d 1184, 1194 (D.C. Cir. 2006). What matters is that the agency provides enough explanation for courts to understand its decision and the evidence supporting it. *See Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1091, 1097 (9th Cir. 2005) (agency did not need to further explain its analysis including terms like "low" or "very low"); *In re Polar Bear Endangered Species Act Listing*, 709 F.3d 1, 15 (D.C. Cir. 2013) (Service's decision not to

expressly define "likely" did not "impede[] [the court's] ability to review the agency's decisionmaking process").

*Pearson v. Shalala*, 164 F.3d 650 (D.C. Cir. 1999), does not say otherwise. Answering Br. 30–31. There, the D.C. Circuit reviewed the Food and Drug Administration's (FDA) denial of four marketing claims companies sought to include on their dietary supplement labels. 164 F.3d at 652. The agency denied the companies' request because the claims "failed to give rise to 'significant scientific agreement'"—a requirement for marketing claims imposed by the FDA's regulations. *Id.* at 654. The FDA did not explain why it reached that conclusion. For example, in barring the use of a marketing claim that supplemental folic acid is more effective than folic acid in food, the FDA merely stated that "the scientific literature does not support the superiority of any one source over others." *Id.* Because the FDA did not explain "what it meant[] by significant scientific agreement or, at a minimum, what it does not mean," the D.C. Circuit concluded the FDA's denial was unreasonable. *Id.* at 661. In the court's words, "[t]o refuse to define the criteria [an agency] is applying is equivalent to simply saying no without explanation." *Id.* at 660. It thus remanded to the agency to provide more explanation. *Id.* at 661.

As discussed in the Opening Brief (pp. 45–52) and below (pp. 19–24), the Service's thorough analysis in the Rule is nothing like the agency action in *Pearson*.

Here, the Service explained how it determined "significant" (by evaluating whether a portion of the range contributed meaningfully to the resiliency, redundancy, or representation of the entity) and it described those methodological concepts as applied to gray wolves. But if the Court concludes that the Rule is unclear on this score, the correct course is to remand for the Service to provide more explanation. Opening Br. 44–45.

### B. The Service reasonably determined that portions of the wolf's peripheral range were not significant.

Although Plaintiffs challenge the methodology the Service used to determine "significant portion of its range," their brief reveals that they primarily disagree with the Service's application of that methodology. Plaintiffs assert that the Service made several inconsistent factual findings that show the Service's decision was arbitrary. Answering Br. 34–43. When viewed in context, however, none of the Service's factual findings were contradictory, much less arbitrary and capricious.

1. Like the district court, Plaintiffs misunderstand the Service's analysis of peripheral wolves in the central Rocky Mountains and West Coast states. Opening Br. 51–52. The Service reasonably recognized that wolves dispersing from the recovered and already delisted Northern Rocky Mountain region make the species stronger, while also recognizing that those peripheral areas do not qualify as "significant" for purposes of listing the 44-state entity under the ESA. Indeed, it

would have been arbitrary for the Service to ignore the obvious fact that more wolves in more places benefits the species.

At the same time, the Service determined that portions containing peripheral wolves were not "significant" portions of the 44-state entity's range precisely "[b]ecause these wolves represent the expanding edge of a recovered and stable source population." 3-ER-411. In 2020, these peripheral areas contained few wolves or few to no breeding pairs.[5] 3-ER-411. The Service also noted that these wolves are not "an independent population" or "an isolated population with unique or markedly different genotypic or phenotypic traits." 3-ER-411. The Service thus determined that these fringe areas do not significantly contribute to any configuration's ability to withstand random or catastrophic events (resiliency and redundancy) or its ability to adapt over time (representation). 3-ER-411; 3-ER-414–15; 3-ER-418–19.

Consistent with that conclusion, the Service determined that portions peripheral to the Great Lakes metapopulation were not significant because those portions contain lone dispersers or groups with few or no breeding pairs and thus do not contribute to the overall demographic or genetic diversity of the population. 3-ER-410; 3-ER-414; 3-ER-418.

_____

[5] Extra-record evidence from 2023 does not negate the Service's 2020 conclusions. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006); Answering Br. 18.

Despite this analysis, Plaintiffs argue that the Service arbitrarily wrote off these expanding edges. Answering Br. 35. Plaintiffs suggest that lone and peripheral wolves should be considered significant because they are fewer in number and thus more vulnerable to threats. Answering Br. 35. But "significant" refers to more than size: it means sufficiently great or important; noteworthy; or influential. Opening Br. 43. If the Service were required to look only at the size and vulnerability of a random subset of a species, that would result in the overlisting of species that are clearly robust. Plaintiffs' logic would also mean that every growing species would need to be listed, or remain listed, until it could expand no more. Opening Br. 52.

More granularly, the Service's analysis of West Coast wolves aligns with its analysis of the Great Lakes region—peripheral edges of both metapopulations are not significant portions of the gray wolf's range because the few wolves in those areas do not contribute meaningfully to the species' overall resiliency, representation, or redundancy. 3-ER-406–19. That conclusion is reasonable and well supported by the record. Opening Br. 45–46.

2.    Plaintiffs' alternative arguments fare no better. Answering Br. 38–43. For example, Plaintiffs argue that the Service should have considered West Coast wolves as "significant" because of their genetic traits. But, as explained below, the

Service thoroughly examined the genetic data and reasonably concluded that West Coast wolves descended from Northern Rocky Mountain wolves.

Plaintiffs also briefly question whether the Service erred by excluding the Northeastern United States as a "significant portion" of the wolf's range. Answering Br. 42. The record shows that the Service rationally concluded that states like Vermont and Massachusetts do not rise to the level of "significant" because only a few dispersing wolves have been spotted there, 3-ER-315, and those wolves "do not have a defined territory or consistently use any one area." 3-ER-372; 3-ER-379.

Finally, Plaintiffs point to the Service's significance analysis in other rules. Answering Br. 40 (citing 84 Fed. Reg. 52598 (Oct. 2, 2019); 82 Fed. Reg. 30502 (June 30, 2017)). Those rulemakings are irrelevant because they involved different legal inquiries and different facts. To start, the rules address "significance" in the context of identifying a DPS, not in analyzing whether a portion of the species' range is "significant." These statutory inquiries are separate, as the Service explained in the Rule. 3-ER-380. In short, the DPS inquiry concerns whether a population segment is even listable as a species, while the SPR inquiry concerns whether a listable entity is endangered or threatened. 3-ER-380.

But even assuming DPS analyses of other species are relevant, as Plaintiffs suggest, those rules do not show that the Service's SPR analysis was arbitrary or capricious. Opening Br. 43–44. Determining which portions of a species' range are

significant requires the Service to exercise its scientific judgment based on the specific characteristics of that species and the nature of the threats. *See Marsh*, 490 U.S. at 376–77. Thus, the Service's factual conclusion that a peripheral population is in some way significant to another species does not mean that the same is true for lone or dispersing gray wolves on the edges of established metapopulations.

For example, in the caribou rule cited by Plaintiffs, the Service determined that the peripheral southern mountain caribou population was "significant" *under its DPS Policy* because, among other things, that population had "adapted to an environment unique to woodland caribou" and had "distinct feeding behavior." 84 Fed. Reg. at 52604–05. The population was also physically and behaviorally separate from other caribou populations (discrete). *Id.* at 52605. Plaintiffs contend that the Service should have found peripheral portions of the gray wolf's range significant under its SPR inquiry for the same reasons. Answering Br. 40. But even putting aside the legal differences, the facts are dissimilar. Peripheral gray wolves descended from the two core metapopulations, are genetically similar, and lack ecological uniqueness.[6] 3-ER-410–11. That conclusion is specific to the biology of gray wolves and well supported by the record.

---

[6] The Service's recent species assessment form is not inconsistent. Answering Br. 29 n.8. There, the Service noted that portions of the range in the West Coast *may potentially* be significant to a Western DPS of gray wolves (which is a different entity than the entities here). Species Assessment Form at 70, https://www. regulations.gov/document/FWS-HQ-ES-2021-0106-55881 (last accessed April 7,

**III.  Plaintiffs may not substitute their understanding of the genetics of Western wolves for that of the Service.**

In another attempt to force the Service to consider West Coast wolves as an isolated group separate from the Western metapopulation, Plaintiffs criticize the Service's genetic analysis.  Answering Br. 43–51.  But it is well-established that courts must defer to an agency's interpretation of complicated scientific data.  Opening Br. 52–54.  In response, Plaintiffs raise several arguments they lost in the district court, and they fail to persuasively defend the one they won below.

Plaintiffs first raise the Service's prefatory discussion explaining that West Coast wolves are not "discrete" from Northern Rocky Mountain wolves.  3-ER-309; Answering Br. 49 (citing 1-SER-81).  But discreteness is a DPS factor.  3-ER-309; 3-ER-380–81.  This Court need not, and should not, address whether the listed entities could be split into DPSs on this record.  *See supra* at 10, 22; Opening Br. 20–21.

At any rate, the Service reasonably explained how scientific information had evolved since the agency's 2008 consideration of the issue, with the best available data now showing that West Coast wolves are biologically descended from Northern Rocky Mountain wolves.  3-ER-403.  Plaintiffs suggest that the district court should

---

2025).  The Service ultimately did not address the question of whether those portions were significant because it determined that wolves in those portions were not threatened or endangered.  *Id.* at 71–72; *see also* Opening Br. 19 n.3 (discussing the Service's 2024 conclusion that listing a large Western DPS of gray wolves is not warranted because those wolves are not threatened or endangered).

have ignored those careful conclusions because the Service discussed the new genetic data in detail in a 2013 status review and did not fully flesh out its analysis in the Rule. Answering Br. 46. That formalistic argument overlooks the fact that the Service appropriately incorporated its detailed analysis into its final Rule. 3-ER-310; 3-ER-403; 1-ER-16 (citing *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1068 (9th Cir. 2021) ("[I]f a published decision incorporates by reference a separate, fully reasoned document explaining why the agency changed positions, that may suffice.")).

Next, Plaintiffs assert that the Service erred by relying on only geographic proximity between West Coast wolves and Northern Rocky Mountain wolves. Answering Br. 46–49. Plaintiffs again misunderstand the Service's finding because they cite to the DPS standards. *Id.* Besides, the Service's scientific conclusion that wolves in the West Coast states are not distinct from Northern Rocky Mountain wolves is well supported by many factors, including the physical closeness of the populations, their genetic relationship, and evolutionary non-uniqueness. 3-ER-411; 3-ER-381.

As to the genetic data, the Service has explained how the district court improperly relied on its own interpretation of that data. Opening Br. 52–57. Plaintiffs' Brief is more of the same. For example, Plaintiffs point to a peer review of the proposed rule generally disagreeing with the Service's conclusion that wolves

are genetically healthy. 2-SER-211–13. That review contends that the Service misinterpreted the available data. 2-SER-212. And it barely mentions the Service's genetic analysis of West Coast wolves. 2-SER-212. Although a peer reviewer may disagree with the Service's resolution of conflicting opinions, that does not prove that the Rule is unlawful. *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1081 (9th Cir. 2006).

Plaintiffs' reliance on the 2018 Hendricks study fails for the same reason. Plaintiffs cite that study to challenge the Service's conclusion that wolves in Washington originated from the Northern Rocky Mountains, not coastal British Columbia. Answering Br. 50. But the Service engaged with that study in detail and rationally explained why the data supported the agency's determination. Opening Br. 52–57; 3-ER-381. That is all that is required. *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1149–50 (9th Cir. 2007).

## IV. The Service rationally concluded that existing regulatory mechanisms were not inadequate.

"[T]he primary threat to [the gray wolf's] viability is unregulated human-caused mortality," 3-ER-347, and that is why the Service extensively evaluated state and tribal mechanisms designed to prevent excessive mortality. 3-ER-347–69. The Service concluded that state and tribal management will adequately ameliorate

threats to wolves after delisting, 3-ER-347–69, and Plaintiffs do not dispute that conclusion in this appeal.[7]  Answering Br. 54.

Plaintiffs instead challenge the Service's analysis of existing federal regulatory mechanisms.  Plaintiffs first assert that "no regulatory mechanisms specifically addressing the threats wolves face exist in any federal land management regimes."  Answering Br. 52–53.  But that misstates the record.  As the Service recognized, there are many existing federal protections for gray wolves, including protections directed at their dens, habitat, and prey.  3-ER-366–68.  For example, national forests in the Great Lakes region maintain "a relatively high prey base," and they limit "road densities" and protect den and rendezvous sites.  3-ER-367.  These forests also contain "relatively few livestock," which means that wolf depredation "is not likely to be a frequent occurrence."  3-ER-367.  Gray wolves also regularly use national parks, which "are often the most protective" because parks prohibit

---

[7] The Service considered federal regulatory mechanisms in tandem with existing state and tribal protections, and rationally determined that these mechanisms were adequate to maintain the gray wolf's recovered status.  Opening Br. 59. Plaintiffs incorrectly contend that the Service forfeited the opportunity to discuss state management regimes as they relate to existing federal regimes.  Answering Br. 54–55.  The Service has consistently recognized the interaction between state and federal regimes when regulating human-caused mortality. ECF 107, Fed. S.J. Mot. at 47–48 (Aug. 20, 2021); ECF 130, Fed. Reply at 19–23 (Oct. 8, 2021).  And the Rule itself explained that state laws apply to many federal lands.  3-ER-351; 3-ER-367; *see Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) ("[T]he focal point for judicial review should be the administrative record" that the agency presents to the reviewing court).

hunting and require other measures to reduce human disturbances (like temporary closures around wolf dens and rendezvous sites). 3-ER-367.

The Service considered regulatory mechanisms in West Coast states as well. The Service noted that, unlike in the East, many federal land management plans in the West Coast do not include specific guidelines and standards for gray wolves. 3-ER-368. This is because those plans were developed before "the reestablishment of wolf packs" in the area. 3-ER-368. But even without specific gray wolf guidelines and standards, the Service noted that wolves have been able to disperse and reside on these lands. 3-ER-368. The Service also discussed general protections for animals, including wolves, on those lands and concluded that "[t]he gray wolf and its habitat are expected to persist on these lands once federally delisted." 3-ER-368. Plaintiffs have not shown that this factual conclusion was arbitrary or capricious.

Plaintiffs also fail to consider the proper legal context. The adequacy of existing regulatory mechanisms must be considered against the threat that the regulation is designed to meet. Opening Br. 58 (citing *Friends of Blackwater v. Salazar*, 691 F.3d 428, 436 (D.C. Cir. 2012)). Put plainly, a regulation (or lack of regulation) is inadequate only if there is a harm that needs regulating. Yet Plaintiffs point to nothing in the record suggesting there are any threats to wolves on federal lands that are not sufficiently managed by the existing regulations.

For example, Plaintiffs say that the Service ignored the effect of livestock grazing, Answering Br. 55, but the Service specifically discussed grazing on federal Western lands and concluded that any increased risk of mortality from livestock conflict would not affect overall wolf distribution and abundance. 3-ER-368 (discussing livestock conflict for both West Coast and Central Rocky Mountain wolves). Plaintiffs then cite two district court cases discussing alleged threats to a subspecies of wolves in Alaska, *Biodiversity Legal Found. v. Babbitt*, 943 F. Supp. 23 (D.D.C. 1996), and potential but unexamined effects of roads and trails to wolves traveling through the Ochoco National Forest in central Oregon, *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1231 (D. Ore. 2019). Plaintiffs identify nothing in those cases or in this record suggesting that any of these alleged threats rise to a level that would *imperil* the species without regulation.

Finally, Plaintiffs point to other potential regulations that might provide added protections to wolves, their dens, and habitat. Answering Br. 56. Again, the ESA does not direct the Service to consider whether additional regulatory mechanisms would better protect a species; it directs the Service to consider inadequacies in the *existing* regimes. 16 U.S.C. § 1533(a)(1)(D); Opening Brief 57–60. The Service did just that.

## CONCLUSION

For these reasons, the district court's judgment should be reversed.

Respectfully submitted,

s/ *Amelia G. Yowell*
ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*

JOAN M. PEPIN
MICHAEL R. EITEL
Of Counsel:                          ASTRID CEVALLOS
                                     AMELIA G. YOWELL
LINUS CHEN                           *Attorneys*
*Attorney*                           Environment and Natural Resources Division
U.S. Department of the Interior      U.S. Department of Justice
Office of the Solicitor              Post Office Box 7415
                                     Washington, D.C. 20044
                                     (202) 514-5580
                                     amelia.yowell@usdoj.gov


April 11, 2025
90-8-6-08427

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**: 22-15529, 22-15532, 22-15534, 22-15535, 22-15536, 22-15537, 22-15626, 22-15627, 22-15628

I am the attorney or self-represented party.

**This brief contains 6,999 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   s/ *Amelia G. Yowell*

**Date**       APRIL 11, 2025