Nos. 22-15529, 22-15532, 22-15534, 22-15535, 22-15536,
22-15537, 22-15626, 22-15627, 22-15628

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

DEFENDERS OF WILDLIFE, *et al*.,
Plaintiffs-Appellees,

v.

UNITED STATES FISH AND WILDLIFE SERVICE, *et al*.,
Defendants-Appellants,

and

STATE OF UTAH, *et al.*,
Intervenors-Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
Nos. 4:21-cv-344, 4:21-cv-349, 4:21-cv-561
Honorable Jeffrey S. White

**REPLY BRIEF OF INTERVENORS-DEFENDANTS-APPELLANTS
SAFARI CLUB INTERNATIONAL AND
NATIONAL RIFLE ASSOCIATION OF AMERICA**

Jeremy E. Clare
Regina Lennox
Safari Club International
501 2nd Street NE
Washington, DC 20002
(202) 543-8733
jclare@safariclub.org
rlennox@safariclub.org

Erin M. Erhardt
National Rifle Association of America
11250 Waples Mill Road
Fairfax, Virginia 22030
(703) 267-1161
eerhardt@nrahq.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

GLOSSARY ...................................................................................................... vii

INTRODUCTION ............................................................................................... 1

ARGUMENT ....................................................................................................... 2

I.    This Court should uphold the Delisting Rule based on the Service's
determination that the gray wolf entities are not listable "species." ............ 2

    A.    Appellees' preliminary arguments are not supported by the record. .... 2

    B.    The Service did not determine that the wolf entities were unlistable
based only on Congress's 1978 amendment. ........................................ 5

    C.    The Service is required to ensure it only lists "species," and threats
assessments are not required for non-species. ....................................... 8

    D.    The Service did not evade its statutory obligations in the Delisting
Rule. ...................................................................................................... 12

II.    The Service fulfilled its ESA obligations in fully analyzing the status of
wolves across the lower 48 states. ............................................................... 12

    A.    The Service fully analyzed the status of wolves outside core
populations, and correctly found that the gray wolf's recovery does
not depend on those wolves. ................................................................. 12

    B.    The Service fully analyzed whether the loss of historical range
negatively affected gray wolves. .......................................................... 17

    C.    The Delisting Rule sufficiently considered the genetics of West
Coast wolves. ....................................................................................... 22

        i.    The Service correctly concluded that West Coast and Northern
Rocky Mountain wolves are not distinct. .................................... 22

        ii.    The Service correctly concluded that one wolf with admixed
genetic heritage did not support a finding of a threat to the
species. ........................................................................................ 24

    D.    The district court should be reversed because the Delisting Rule
sufficiently evaluated the adequacy of post-delisting federal
regulatory mechanisms. ....................................................................... 26

CONCLUSION ........................................................................28

FORM 8. CERTIFICATE OF COMPLIANCE .....................................30

CERTIFICATE OF SERVICE ............................................................31

# TABLE OF AUTHORITIES

**<u>Cases</u>**

Atchafalaya Basinkeeper v. Bernhardt,
  No. 20-CV-651, 2024 WL 331584 (M.D. La. Jan. 29, 2024) .............................15

Auer v. Robbins,
  519 U.S. 452 (1997)..........................................................................................10

Cal. by & through Becerra v. Azar,
  950 F.3d 1067 (9th Cir. 2020) .............................................................................23

Conservation Cong. v. Finley,
  774 F.3d 611 (9th Cir. 2014) ...............................................................................13

Crow Indian Tribe v. United States,
  965 F.3d 662 (9th Cir. 2020) ...............................................................................12

Ctr. for Biological Diversity v. Norton,
  411 F. Supp. 2d 1271 (D.N.M. 2005),..................................................................15

Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,
  402 F. Supp. 2d 1198 (D. Or. 2005) ....................................................................27

Ctr. for Food Safety v. Regan,
  56 F.4th 648 (9th Cir. 2022) ................................................................................11

Defs. of Wildlife v. Kempthorne,
  535 F. Supp. 2d 121 (D.D.C. 2008)......................................................................15

Dial v. O'Malley,
  No. 23-3423, 2024 WL 4471510 (9th Cir. Oct. 11, 2024) ...................................10

Friends of Alaska Nat'l Wildlife Refuges v. Haaland,
  29 F.4th 432 (9th Cir. 2022) ..................................................................................5

Friends of Santa Clara River v. U.S. Army Corps of Eng'rs,
  887 F.3d 906 (9th Cir. 2018) ...............................................................................21

Gonzalez & Gonzalez Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.,
  107 F.4th 1064 (9th Cir. 2000) ..............................................................................8

Humane Society of the U.S. v. Zinke,
  865 F.3d 585 (D.C. Cir. 2017)................................................................... passim

Kern Cnty. Farm Bureau v. Allen,
 450 F.3d 1072 (9th Cir. 2006) ..............................................7

Kleppe v. New Mexico,
 426 U.S. 529 (1976)............................................................27

Loper Bright Enterprises v. Raimondo,
 603 U.S. 369 (2024)............................................................10

Marsh v. Or. Natural Res. Council,
 490 U.S. 360 (1989)............................................................21

Nat'l Wildlife Fed'n v. Norton,
 386 F. Supp. 2d 553 (D. Vt. 2005) ....................................15

Rocky Mount. Wild v. Walsh,
 216 F. Supp. 3d 1234 (D. Colo. 2016)..............................27

S.M. v. J.K.,
 262 F.3d 914 (9th Cir. 2001) .............................................22

San Luis & Delta-Mendota Water Auth. v. Jewell,
 747 F.3d 581 (9th Cir. 2014) ...................................... 14, 23

Satey v. JPMorgan Chase & Co.,
 521 F.3d 1087 (9th Cir. 2008) ...........................................22

Skidmore v. Swift & Co.,
 323 U.S. 134 (1944)............................................................10

Trout Unlimited v. Lohn,
 559 F.3d 946 (9th Cir. 2009) ........................................ 8, 11

## Statutes

16 U.S.C. § 1531(b) .................................................................15
16 U.S.C. § 1532(3) .................................................................15
16 U.S.C. § 1532(16) ...................................................... 7, 8, 25
16 U.S.C. § 1533(a)(1).................................................... 8, 17, 25
16 U.S.C. § 1533(a)(1)(D).......................................................26

## Rules

61 Fed. Reg. 4722 (Feb. 7, 1996) ...........................................24
78 Fed. Reg. 35664 (June 13, 2013) ........................................23

79 Fed. Reg. 37575, 37584 (July 1, 2014)................................................................18

84 Fed. Reg. 45020 (Aug. 27, 2019) ............................................................9

85 Fed. Reg. 69778 (Nov. 3, 2020) ("Delisting Rule") ................................... passim

**Regulations**

50 C.F.R. § 424.11 ............................................................................9

50 C.F.R. § 424.11(e)(3) ................................................................9

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Delisting Rule | Endangered and Threatened Wildlife and Plants; Removing the Gray Wolf (Canis lupus) from the List of Endangered and Threatened Wildlife, 85 Fed. Reg. 69778 (Nov. 3, 2020) |
| DPS | Distinct Population Segment |
| DPS Policy | Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 Fed. Reg. 4722 (Feb. 7, 1996) |
| ER | Federal Appellants' Excerpts of Record |
| ESA | Endangered Species Act |
| Int.ER | Intervenors-Defendants-Appellants' Excerpts of Record |
| NRA | National Rifle Association of America |
| SCI | Safari Club International |
| SPR Policy | Final Policy on Interpretation of the Phrase "Significant Portion of its Range" in the Endangered Species Act's Definitions of "Endangered Species" and "Threatened Species," 79 Fed. Reg. 37575 (July 1, 2014) |
| Service | U.S. Fish and Wildlife Service |
| SER | Appellees' Supplemental Excerpts of Record |
| 1978 Listing Rule | Reclassification of the Gray Wolf in the United States and Mexico, 43 Fed. Reg. 9607 (Mar. 9, 1978) |

# INTRODUCTION

Since the development of recovery plans in the late 1970s, the U.S. Fish and Wildlife Service ("Service") sought to recover gray wolves in the Great Lakes and Northern Rocky Mountains states and separately, the Mexican wolf in Arizona and New Mexico. The Service focused on these areas for good reason. First, wolves actually lived in the Great Lakes area, in Minnesota, in 1978. Second, the Northern Rocky Mountains provide sufficient habitat for wolf reintroductions. Importantly, the 1978 Listing Rule[1] did not promise to recover wolves in every state. Gray wolves outside the two core populations were not—and are not—part of the recovery criteria.

The Service and its state and private conservation partners faithfully executed those plans. By the early 2000s, the Service concluded that recovery criteria had been met and exceeded. Yet, for decades, plaintiffs and courts have quibbled with the Service's determinations that wolves are recovered. For some, there may never be enough wolves. Appellees' arguments are based on their belief that core, secure populations are not enough and wolves should be forced back into potential habitat across the country. The district court erroneously accepted these arguments. It is up to this Court to correct that error.

---

[1] Terms not otherwise defined have the meaning given in SCI and NRA's opening brief and the "Glossary" on the prior page.

The ESA does not require the Service to recover wolves everywhere. In fact, it does not require the Service to recover gray wolves at all given the entities listed under the ESA do not qualify as "species." The Court can reverse the district court and uphold the Delisting Rule on that issue alone. But focusing on Appellees' fact-based claims, the ESA does not require the Service to recover wolves everywhere, prioritize wolves outside core recovery zones, prioritize the genetics of literally one wolf, or consider lost historical range as a "threat." Appellees' arguments are not persuasive.

This Court should buck the trend of reading the ESA in a strained manner, like the district court. This Court should instead fulfill Congress's intent in moving recovered species *off* the ESA lists. Congress intended that the Service focus on at-risk species truly deserving of its resources. Gray wolves are not that species. This Court should put an end to unnecessary and unproductive wolf litigation and reverse the district court's erroneous rulings.

## ARGUMENT

I.  **This Court should uphold the Delisting Rule based on the Service's determination that the gray wolf entities are not listable "species."**

   A.  **Appellees' preliminary arguments are not supported by the record.**

This Court should affirm that the Service has the authority to delist an ESA-listed entity based on a determination that the entity does not meet the definition of

"species" under the ESA and uphold the Delisting Rule on that basis. The Court should also reject Appellees' arguments, which do not fairly represent SCI and NRA's opening brief. As an initial matter, SCI and NRA never contended that Appellees failed to challenge the ***legal outcome*** of the Service's determination that the listed entities are not species, i.e., delisting the entities. Appellees Br. at 60. Rather, SCI and NRA correctly assert that neither Appellees nor the district court disputed the factual substance of the Service's determination, i.e., that listed entities are not species as defined in the ESA. SCI/NRA Br. at 18–19. Thus, the Court need only settle the legal question of whether the Service can rely on that determination as an independent basis for removing the entities from the ESA.

Appellees erroneously argue that SCI and NRA employ a "post-hoc argument by counsel" in asserting the Court should uphold the Delisting Rule on this basis. Appellees Br. at 59. In the Delisting Rule and the proposed delisting rule, the Service determined that the listed wolf entities do not meet the ESA's definition of a species, which is an "independent basis for delisting," and thus the wolves "should be removed from the [ESA] List." 3-ER-309–10; *see also* 3-ER-370. Regardless of the subsequent threats assessments for the different configurations of wolves, the Service explicitly recognized that the wolves could and should be delisted based on the determination that the entities are not "species."

The Service further explained that "before proceeding with delisting"—because the Service knew it could have simply proceeded with delisting—it "***may* consider**" conducting an analysis of whether "any populations of gray wolves covered by the listed entities" are threatened or endangered, "to eliminate the possibility of removing protections" for potentially at-risk wolves. 3-ER-310 (emphasis added). The Service chose to take a "conservative approach," undoubtedly because it knew it would be sued, and conducted threats assessments for three different configurations of wolves. 3-ER-370 (noting that the Service "***elected*** not to act solely on that basis [of not being a species]") (emphasis added). In other words, after finding that the listed entities do not meet the definition of "species," the Service conducted a discretionary analysis of the conservation status of listed and non-listed wolves. The Service was not under the impression that it was legally required to conduct the analysis to delist the wolves.

Moreover, the fact that the Service chose to conduct threats assessments of three configurations of both listed ***and non-listed*** wolves highlights that the Service chose to go above and beyond any alleged statutory obligation to evaluate the conservation status of the listed wolf entities prior to delisting. Indeed, in the proposed delisting rule, the Service did not conduct a threats assessment of the listed entities separately, presumably because it did not think it was legally obligated to conduct such assessments after finding that the entities are not

"species." *See* 3-ER-499 (the Service only "consider[ed] the conservation status of the two listed wolf entities as one combined entity in this proposed rule," which it referred to as "the gray wolf entity"). However, in response to public comments, the Service expanded its analysis in the Delisting Rule to the two listed entities separately and an entity of all gray wolves in the lower 48, including non-listed wolves. 3-ER-310.

This is not a post-hoc argument; the Service did not disclaim its ability to delist the wolves pursuant to its finding that the entities are not "species." This Court can and should uphold the Delisting Rule on this basis alone, for the substantive reasons discussed below and in SCI and NRA's brief. "[A]n agency may offer alternative rationales for its decision, and if the agency makes clear that one would have been independently sufficient to justify its action, then a court need not consider the others if it finds the first to be valid." *Friends of Alaska Nat'l Wildlife Refuges v. Haaland*, 29 F.4th 432, 442 (9th Cir. 2022) (citations omitted).

### B. The Service did not determine that the wolf entities were unlistable based only on Congress's 1978 amendment.

Contrary to Appellees' repeated mischaracterization, SCI and NRA do not "insist that Congress, in 1978, meant to automatically delist" gray wolves, the 1978 amendment to the definition of species rendered the wolves "suddenly unlistable," or the listings have "been invalid for decades." Appellees Br. at 60, 61, 66.

Rather, SCI and NRA disputed the district court's suggestion that the 1978 definition does not apply to the wolves.[2]  SCI/NRA Br. at 19–25.  The argument Appellees make—that Congress did not intend to render the wolves unlistable in 1978—is irrelevant, as neither the Delisting Rule nor any of the parties have asserted that the wolves were automatically unlistable by Congress's action in 1978.  By focusing on this erroneous argument, Appellees brush aside many changes to the wolf entities that occurred between 1978 and 2020.[3]

This Court should reverse the district court's rejection of the ESA's plain language.  1-ER-11.  In the Delisting Rule, the Service explained that wolves in the listed entities are clearly not entire species or subspecies, nor are they "distinct" from other listed and non-listed wolves.  3-ER-309 (citing multiple studies from 2009 and 2010 with respect to connectivity of wolves in the Great Lakes area); 3-ER-310 (citing studies from 2016, 2017, 2018 and 2020 with respect to connectivity of West Coast and Northern Rocky Mountains wolves); *see also*

---

[2] While Appellees concede that the 1978 definition applies to wolves, Appellees Br. at 63 n.15, it is not clear that the district court held this.  1-ER-11.  But the parties apparently agree, and this Court should also conclude that the 1978 definition applies to gray wolves that were listed before it was adopted.

[3] SCI and NRA also did not contend that Congress intended to delist the two wolf entities when it delisted the Northern Rocky Mountains wolves.  *See* Appellees Br. at 64–65.  This Congressional delisting applies the 1978 definition of "species" to the Rocky Mountains wolves and thus reinforces Congress's recognition that the 1978 definition of "species" applies to gray wolves more broadly.  SCI/NRA Br. at 22–23.

SCI/NRA Br. at 17–19. Thus, under the ESA's plain language, the entities are not listable. 16 U.S.C. § 1532(16).[4]

Appellees seek to create a smokescreen over this simple determination by asserting that "this supposedly unlistable status must arise from Congress's amendment of the 'species' definition in 1978." Appellees Br. at 63. They ignore the expansion of the wolf populations noted in the Delisting Rule and the administrative and legislative changes that have altered the listed entities since 1978. But the Service correctly based its conclusion on recent data and the status of the listed entities *in 2020*. This Court's focus must be, as the Service's was, on whether the gray wolf entities were listable entities in 2020. The ESA requires the Service to "base its determination on the best scientific and commercial data available. . . . Essentially, [the Service] cannot ignore available biological information." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080–81 (9th Cir. 2006) (citations omitted). The Court should reject any efforts to cloud the issue and uphold as reasonable the Service's consideration of contemporaneous facts when it determined whether the listed entities are "species" under the ESA.

---

[4] All pertinent statutes and regulations are contained in the addendum of SCI and NRA's opening brief.

**C.    The Service is required to ensure it only lists "species," and threats assessments are not required for non-species.**

Appellees point to the text of the ESA to dispute that the Service can delist an entity based on a finding that the entity is not a species.  Appellees Br. at 65–66 (asserting 16 U.S.C. § 1533(c)(2) precludes delisting based on a finding that the entity is not a "species").  Although the Service makes listing decisions and revisions based on the ESA's five listing criteria, 16 U.S.C. § 1533(a)(1), the ESA *only* permits the Service to list "species." 16 U.S.C. § 1532(16).  Through the statutory definition of "species," Congress expressly limited what the Service can or cannot list under the ESA, and the Service cannot ignore or exceed that limitation.  *Gonzalez & Gonzalez Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064, 1074 (9th Cir. 2024) ("When a statute includes an explicit definition, we must follow that definition.") (internal quotation and citation omitted).  As this Court has held, the definitional determination is an "analytically distinct phase[ ]" under the ESA from the listing status determination.  *Trout Unlimited v. Lohn*, 559 F.3d 946, 955 (9th Cir. 2009).

Appellees suggest that once an entity is listed under the ESA—including because the Service determines it is a species—the Service must continue to analyze "the entity that was originally listed" and can only revise the listing based on a threats assessment evaluating the five listing factors.  Appellees Br. at 65–66.  Under this theory, once an entity is determined to be a "species," the Service is not

permitted to make subsequent definitional determinations as part of status reviews. However, the statutory text does not limit status reviews in this manner. And such a limitation is contrary to the Service's implementing regulation and the D.C. Circuit's holding in *Humane Society of the United States v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017).

In 2019, the Service revised portions of the regulations that implement Section 4 of the ESA, including 50 C.F.R. § 424.11 titled "Factors for listing, delisting, or reclassifying species." 84 Fed. Reg. 45020 (Aug. 27, 2019). When the Service adopted the Delisting Rule in 2020, the regulation provided, "[t]he Secretary shall delist a species if the Secretary finds that, after conducting a status review based on the best scientific and commercial data available[,] the listed entity does not meet the statutory definition of a species." 50 C.F.R. § 424.11(e)(3). Related to that provision, the Service explained:

> When we use the term "status review" in the context of evaluating extinction or not meeting the definition of a "species," this review may not necessarily involve an evaluation of the species' status relative to the five listing factors in section 4(a)(1) of the [ESA]. As is our common practice, if the Services determine the entity does not meet the statutory definition of a "species," the status review would conclude at that point.

84 Fed. Reg. at 45021. According to the Service's own interpretation, it is required to determine if the entity is a "species" under a Section 4 status review. And if it determines that the entity is not a species, the review concludes without a

threats assessment.  This Court should agree with the Service's interpretation of its statutory obligations.  *Loper-Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("courts may … seek aid from the interpretations of those responsible for implementing particular statutes.  Such interpretations 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance' consistent with the APA.") (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  And the Service's interpretation of its regulation is controlling because the interpretation is not "plainly erroneous."  *Dial v. O'Malley*, No. 23-3423, 2024 WL 4471510, *1 (9th Cir. Oct. 11, 2024) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

*Humane Society* rejected an argument similar to Appellees' asserted limitation.  In that litigation, the D.C. district court held that the Service cannot designate a DPS for purposes of delisting it, and designation of a DPS is a "one-way ratchet that only allows the Service to extend the [ESA's] protections to newly recognized groupings."  865 F.3d at 595–96.  The D.C. Circuit disagreed.  The Court reasoned that the Service's obligations are the same when reviewing a listed species as they are when initially listing a species: "the statute requires the Service to attend to both parts of the listing process—the initial listing, and the revision or delisting—with equal care."  *Id.* at 597.  Thus, because the Service is required to make the definitional determination when listing a species, it likewise must

conduct the same definitional analysis when reviewing the status of listed entities. *Trout Unlimited*, 559 F.3d at 949. The definitional determination is not a "one way ratchet"—or in this case, a "one time only" determination.

As Appellees note, the D.C. Circuit also held that "each decision made under [16 U.S.C. § 1533(c)(2)] must rely upon the five statutorily designated criteria for listing." Appellees Br. at 65 (citing *Humane Soc'y*, 865 F.3d at 596). The D.C. Circuit's holding makes sense in that case because the Service delisted a ***species***, which requires a threats assessment and determination of recovery. Here, the Service did not delist a species; it removed from the ESA two entities that it rightly concluded were ***not*** species. Forcing the Service to continue to regulate a non-species under the ESA—with or without a demonstration of recovery—would squarely contradict the Service's Congressional grant of authority. "When an agency deliberately ignores Congress's legislative command, it undermines the will of the people and ultimately our constitutional structure of government. Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 659 (9th Cir. 2022) (internal quotations omitted). Under the ESA, Congress only permits the Service to regulate species.

**D.** **The Service did not evade its statutory obligations in the Delisting Rule.**

As a final matter, this Court should reject any argument that the Service's action constitutes an impermissible "backdoor route" to delisting. Appellees Br. at 63 (citing *Humane Soc'y*, 865 F.3d at 602; *Crow Indian Tribe v. United States*, 965 F.3d 662, 667–78 (9th Cir. 2020)). For the reasons explained in SCI and NRA's opening brief, the Delisting Rule is not a "statutory dodge" like the rule at issue in *Humane Society*. SCI/NRA Br. at 25–26. In the Delisting Rule, the Service conducted a straightforward analysis, applying the required statutory definition to all listed gray wolves. This Court should reject Appellees' arguments, reverse the district court, and uphold the Delisting Rule.

**II.** **The Service fulfilled its ESA obligations in fully analyzing the status of wolves across the lower 48 states.**

**A.** **The Service fully analyzed the status of wolves outside core populations, and correctly found that the gray wolf's recovery does not depend on those wolves.**

The Service properly applied the ESA's five factors to gray wolves across the lower 48 states. Contrary to the district court's ruling and Appellees' arguments, the Service fully considered threats to wolves in the Great Lakes and Northern Rocky Mountains states, as well as wolves outside these "core metapopulations." SCI/NRA Br. at 30–36 (citing, *e.g.*, 3-ER-310–11; 3-ER-320–22; 3-ER-343–45; 3-ER-363–74; 3-ER-387; 3-ER-405–19). The district court and

Appellees erroneously try to conflate their ***disagreement*** with the Service's

conclusions with something the Service did ***not*** do: ignore the wolves'

conservation status. *See* Appellees Br. at 15–16.

The district court and Appellees object because the Delisting Rule found that

wolves beyond the core metapopulations are "not meaningful to resiliency or

redundancy because they contain few wolves, or few or no breeding pairs," and are

"not contributing to representation because they dispersed or descend from the core

wolf populations…" *E.g.*, 3-ER-418. In other words, because these "peripheral"

wolves originated from core populations, they can be replaced from core

populations. *E.g.*, 3-ER-408 (recognizing "a small number of colonizing wolves in

the West Coast States and central Rocky Mountains that represent the expanding

edge of a larger population outside the 44-State entity"). It may sound harsh, but

this determination is biologically and legally supported. *E.g.*, 3-ER-487 (research

paper showing West Coast wolves descended from Northern Rocky Mountains

wolves); *accord Humane Soc'y*, 865 F.3d at 612 (finding, for states with no

resident wolves, "the Service reasonably concluded that the deaths of any wolves

that might enter those States would be so minimal as to pose no threat to the

segment's survival"). This Court should reverse the district court's attempt to

substitute its judgment for the biological science on which the Service relied. *E.g.*,

*Conservation Cong. v. Finley*, 774 F.3d 611, 620 (9th Cir. 2014).

Appellees also argue that the Service "improperly discounted the importance of wolves outside the Great Lakes and Northern Rockies as it analyzed threats." Appellees Br. at 14. But their critique reinforces that the Service *did* analyze threats to these peripheral wolves.[5] *E.g.*, 3-ER-408–10; 3-ER-412–14. And as set forth in SCI and NRA's opening brief, that is a scientific conclusion, within the Service's authority, and is owed deference. *E.g.*, *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 592–93 (9th Cir. 2014); SCI/NRA Br. at 38–39.

Appellees misconstrue the ESA in asserting that "[t]he requirement to analyze extinction risks at the protected-species level prevents [the Service] from making premature delistings that focus only on *limited places* where the species is making recovery progress." Appellees Br. at 15 (emphasis added). Appellees cite nothing for this position—probably because it is not true. "[T]he [ESA] tasks the Service with determining whether the species is endangered or threatened, not whether the species could reach still higher population levels if given more protection. Challenges to expanding a species' territory do not by themselves undermine survival in existing territory." *Humane Soc'y*, 865 F.3d at 612. Notably, other courts have upheld delisting where peripheral populations may face

---

[5] SCI and NRA respectfully request that this Court disregard data from 2023 cited in Appellees' answering brief (at 18), which show a higher number of wolves in Washington. While these data demonstrate how wolf populations are thriving, they were not before the Service in the 2020 Delisting Rule analysis.

greater threats than core populations, as long as the core populations are viable and do not meet the ESA's definitions of a threatened or endangered species. *E.g.*, *Basinkeeper v. Bernhardt*, No. 20-CV-651, 2024 WL 331584, *4, *13 (M.D. La. Jan. 29, 2024); *Defs. of Wildlife v. Kempthorne*, 535 F. Supp. 2d 121, 129–30 (D.D.C. 2008) (upholding the Service's determination that core populations of black bears on public conservation lands were secure, and the Service was not obligated to ascertain habitat loss on private lands because these lands "are not necessary to the survival of black bears").[6]

It is not "hyperbole" to object to the premise of Appellees' argument and the district court's ruling: the gray wolf's success in moving beyond its core populations dooms wolves to stay on the ESA lists until they are recovered in every single place where they have set foot. If wolves were ***less*** successful in expanding their habitat, Appellees would not be able to object to the Service's focus on core populations. That is not and cannot be what Congress created in the ESA—a law specifically intended to recover and remove populations from its own lists. 16 U.S.C. § 1531(b) (ESA's purpose is to conserve species); § 1532(3) (defining "conserve" as "the use of all methods and procedures which are

---

[6] *See also Ctr. for Biological Diversity v. Norton*, 411 F. Supp. 2d 1271, 1282 (D.N.M. 2005), *vacated pursuant to settlement sub nom. Ctr. for Biological Diversity v. Kempthorne*, No. 03-CV-252, 2007 WL 6477262 (D.N.M. July 2, 2007) (distinguishing *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005) and upholding the Service's focus on core populations of trout).

necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this [Act] are no longer necessary").

*Humane Society*, holding that the Service cannot delist a DPS without considering the impact of that delisting on the "remnant" listed population, does not apply here. SCI/NRA Br. at 34–36. That ruling was about an error in the process of applying the ESA. The Court upheld almost all the Service's science-based, factual findings, including findings that regulatory mechanisms were not inadequate. 865 F.3d at 607–14. Appellees tacitly admit "the D.C. Circuit rejected [the Service's] *approach*." Appellees Br. at 17 (emphasis added). Here, the Service took a different approach. It analyzed the status of, and then delisted, all gray wolves in the lower 48 states.[7] For these reasons, this Court should reject Appellees' arguments and reverse the district court.

Last, this Court should disregard Appellees' focus on the Service's stakeholder engagement project and development of a nationwide recovery plan. Appellees Br. at 20. Ironically, both are driven by litigation brought by some Appellees. The stakeholder engagement intended to reduce future litigation over

---

[7] SCI and NRA object to Appellees' loss of accuracy at the expense of argument, in asserting that "established packs, precariously established packs, or … lone dispersers" are all "*populations* of wolves … across the entire listed geography." Appellees Br. at 19 (emphasis added). By definition, "lone dispersers" are not "populations." Moreover, the Service cannot fairly analyze the status of wolves where they are not resident. *See Humane Soc'y*, 865 F.3d at 612.

gray wolves. It was unsuccessful and has been terminated, per a February 7, 2025 communication. The nationwide recovery plan resulted from a settlement agreement in a case led by some Appellees. It (questionably) commits taxpayer dollars and Service resources into developing a recovery plan for a recovered species. Regardless, both items are outside the record and post-date the Delisting Rule.

### B. The Service fully analyzed whether the loss of historical range negatively affected gray wolves.

The district court's ruling, 1-ER-21–22, and Appellees' arguments that the Service failed to consider the effects of lost historical range, Appellees Br. at 21, run counter to the ESA and are undercut by the record. The district court's ruling should be reversed.

As explained in SCI and NRA's opening brief, the Service must determine a species' status based on the five factors in Section 4(a)(1) of the ESA. 16 U.S.C. § 1533(a)(1). The loss of "historical range" is not one of those factors, a fact the district court admitted. *See* 1-ER-21–22. Appellees, however, improperly try and create a new threat and a burden for delisting. They assert that the Service "failed to account for *the threat of* lost historical habitat on the current wolf population." Appellees Br. at 14 (emphasis added). The Service need not consider lost historical range as its own threat, but only to the extent it implicates the analysis of

the five factors.  3-ER-318; *see also* SPR Policy, 79 Fed. Reg. 37575, 37584 (July

1, 2014).

The Delisting Rule's consideration of lost historical range as part of the

analysis of the Section 4(a)(1) factors is more than sufficient.  The rule "[took] into

account the effect lost historical range may have on the current and future viability

of a species in the range it currently occupies and also evaluate[d] whether the

causes of that loss are evidence of ongoing or future threats to the species" through

this analysis.  3-ER-319.  The Service directly addressed the "causes and effects"

of historical range loss:

> [T]he impacts of lost historical range are no longer manifesting in a
> way that threatens the viability of the species.  The causes of the
> previous contraction (for example, targeted extermination efforts), and
> the effects of that contraction (for example, reduced numbers of
> individuals and populations, and restricted gene flow), in addition to
> the effects of all other threats, have been ameliorated or reduced such
> that the combined listed entity does not meet the [ESA's] definitions
> of "threatened species" or "endangered species."

3-ER-415.  *See also* 3-ER-314 (discussion of lost historical range and reduced

populations); 3-ER-504 (the Service did not address genetic diversity, gene flow,

or changes in population demographics because they are not a threat to wolves); 3-

ER-314 (discussion of lost historical range and distribution).

As another example, the Delisting Rule noted that "[a]n active eradication

program [was] the sole reason that wolves were extirpated from much of their

historical range in the United States," and "regulation of human-caused mortality

has long been recognized as the most significant factor affecting the long-term conservation of wolves." 3-ER-320; *see also* 3-ER-347. The Service analyzed this issue and concluded that those eradication programs have ended and human-caused mortality is highly regulated throughout most of the wolves' current range.[8] *E.g.*, 3-ER-320 ("After the gray wolf was listed under the [ESA], its protections, along with State endangered-species statutes, prohibited the intentional killing of wolves except under very limited circumstances … Aside from the reintroduction of wolves into portions of the northern Rocky Mountains, the regulation of human-caused wolf mortality is the primary reason wolf numbers have significantly increased and their range has expanded since the mid-to-late 1970s").

While Appellees criticize the Service's reference to an "eradication program" as lacking specificity, that statement is supported in the Delisting Rule with reference to "poisoning, unregulated trapping and shooting, and government-funded wolf-extermination efforts." *See* 3-ER-314; 3-ER-318 ("range of the gray

---

[8] The district court held that "state management plans in the Great Lakes States would adequately protect gray wolves after delisting." 1-ER-24. The district court further held that "the existing regulatory mechanisms in Colorado and Utah provide adequate protection for the gray wolf." 1-ER-25. No party challenges these decisions. Additionally, the regulatory framework for each of the Northern Rocky Mountains states ensures that wolf populations will be maintained "well above Federal recovery targets." 3-ER-323. Washington, Oregon, and California are "also committed to conserving wolves as demonstrated by the development of management plans and/or codification of laws and regulations that protect wolves." 3-ER-322.

wolf entity began receding after the arrival of Europeans as a result of deliberate killing of wolves by humans and government funded bounty programs aimed at eradication"); 3-ER-401 (same); 3-ER-320 (bounties became the norm across the wolves' range (citing various studies from 1997 to 2020)). These eradication programs had to be curtailed to support the increase in wolves in the United States. Int.ER-88 (finding that to increase wolf populations, a state must reduce illegal killing and conflicts with livestock); Int.ER-75 (finding wolves expand range and increase density when human-wolf conflict is limited); Int.ER-61. As a result, wolf populations increased rapidly when the source of mortality was reduced. 3-ER-429.

Appellees disagree with the Delisting Rule and point to comments from one peer reviewer, Adrian Treves, in support of the otherwise unfounded allegation that the Service turned a blind eye to the best available science on human-caused mortality. Appellees Br. at 22 (citing 2-SER-273–74). However, the Service did not disregard these comments. It simply found they were not the best available science. As part of its review of the best available science, the Service noted that Professor Treves's work has been questioned in a number of studies. *See, e.g.*, 3-ER-320 (noting that the findings of a study on human-caused mortality co-authored by Treves "have been questioned (Olson et al. 2017, entire; Pepin et al. 2017, entire; Stein 2017, entire)"); *see also* 3-ER-374 (disagreeing with research on

human-caused mortality by Treves and citing four different papers in support of this conclusion).  To the extent Appellees' objections turn on their interpretation of what the Service should have relied upon as the best available science, this Court should credit the Service's reasoned analysis.  *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 921 (9th Cir. 2018).  "[A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

Most importantly, due to the regulation of human-caused mortality, wolf range is expanding.  *See, e.g.*, 3-ER-413 (finding "significant expansion of the occupied range of and number of wolves in the combined listed entity over the past decades"); 3-ER-416 ("with ongoing State management in the [Northern Rocky Mountains] States, expansion of the western U.S. metapopulation into unoccupied suitable habitat in the West is likely to continue"); 3-ER-418 (same).  The Service anticipates that the current habitat of gray wolves will continue to "grow and expand post-delisting." 3-ER-389.  The Delisting Rule summarizes these findings in Figure 2, which shows that following the federal listing of gray wolve and the regulation of human-caused mortality, wolves' current range has expanded significantly.  3-ER-315.  Neither the district court nor Appellees attempt to contradict this substantive conclusion.

The Service explained that "[i]f the causes of the loss are ongoing, then that loss is also relevant as evidence of the effects of an ongoing threat." 3-ER-318. Because wolves are not only no longer subject to an eradication program but are protected by state laws, the Service reasonably concluded that lost historical range, in the context of the Section 4(a)(1) factors, did not threaten the species with extinction, now or in the foreseeable future. In analyzing the ESA factors of habitat loss and human-caused mortality, the Service considered the gray wolf's historic range. The district court erred in determining otherwise and its ruling should be reversed.

### C. The Delisting Rule sufficiently considered the genetics of West Coast wolves.

#### i. The Service correctly concluded that West Coast and Northern Rocky Mountain wolves are not distinct.

The Service validly changed and explained its position that West Coast wolves are not distinct from Northern Rocky Mountains wolves, to constitute a DPS. Appellees rely on an 11-year-old rule to argue that the Service changed its position without explanation. Appellees Br. at 44–46. Unsurprisingly, the district court rejected this argument. 1-ER-16. Appellees did not appeal this ruling. They waived any challenge to this point. *Satey v. JPMorgan Chase & Co.*, 521 F.3d 1087, 1093 n.1 (9th Cir. 2008); *S.M. v. J.K.*, 262 F.3d 914, 923 (9th Cir. 2001).

In any event, the district court correctly (in this instance) found that the Service fully explained why West Coast wolves are not a separate DPS. As the district court found, and Appellees admit, the Service relied upon a 2013 status review of Pacific Northwest wolves. Appellees object that the review was part of a proposed rule. Appellees Br. at 45–46 (citing 3-ER-403); *see also* 1-ER-15–16. However, the "proposed rule" made clear it was a final action with respect to "the completion of a status review for gray wolves in the Pacific Northwest initiated on May 5, 2011," and it fully explained why the Service no longer believed West Coast wolves to be discrete. 78 Fed. Reg. 35664, 35664, 35711–13 (June 13, 2013). That satisfies the Service's APA obligations. *Cal. by & through Becerra v. Azar*, 950 F.3d 1067 (9th Cir. 2020) (holding that the court does not provide "heightened review" for changes in agency policy, and it is enough that any agency "display awareness" of a policy change and provide its "belie[f]" that there are "good reasons for the new policy").

Appellees next challenge the Service's factual determination that West Coast wolves are not distinct due to a lack of "physical separation" from Northern Rocky Mountains wolves. Appellees Br. at 46–47. That is a scientific conclusion, within the Service's authority, and is owed deference. *E.g.*, *San Luis & Delta-Mendota*, 747 F.3d at 592–93.

According to the Service's DPS Policy, a DPS must be "discrete," meaning it is "markedly separated from other populations of the same taxon" due to "physical, physiological, ecological, or behavioral factors." 61 Fed. Reg. 4722, 4275 (Feb. 7, 1996). Thus, physical separation, alone, is sufficient to define a DPS.[9] But the Service did not stop there. Its biological report in support of the Delisting Rule discussed both physical separation and genetics. Based on genetic research, it found that gray wolves in the West Coast states are not "genetically distinct" but are "dispersers from the northern Rocky Mountains or descendants of those dispersers." 3-ER-427. The Service's conclusion shows that the West Coast wolves and Northern Rocky Mountains wolves are not "meaningfully discrete even if not geographically separated," because there is no "measurable differentiation" in their genetics. *See* Appellees Br. at 48. Thus, the Service correctly concluded that the West Coast wolves are not a proper DPS.

ii.     **The Service correctly concluded that one wolf with admixed genetic heritage did not support a finding of a threat to the species.**

The Delisting Rule reasonably considered the genetics of West Coast wolves. Appellees argue that "the best available science showed that West Coast

---

[9] The Service found that wolves may have dispersal ranges of up to several hundred kilometers. 3-ER-429. An established pack may have a territory of "more than 2,600 square kilometers." 3-ER-429. Such large ranges easily overlap with the listed portions of West Coast states, meaning there is no physical separation between the Northern Rocky Mountains and listed boundaries. 3-ER-310.

wolves *may* have 'markedly different genetic or phenotypic traits' than Northern

Rockies wolves." Appellees Br. at 50 (emphasis added). The cited study and its

successor (3-ER-477–93) showed one wolf in Washington State whose genetics

contained a "haplotype" found only in Alaskan or British Columbian "coastal"

wolves, in addition to genetic lineage from Northern Rocky Mountains wolves. 3-

ER-487. The study was not clear on where the "admixture" occurred: whether it

occurred in Washington State, or whether founding Washington State wolves

"were individuals from previous admixture events of coastal [British Columbia]

and [Northern Rocky Mountains] wolves … that migrated into the state." 3-ER-

487.

    As SCI and NRA previously argued, the Service cannot and should not make

delisting decisions based on the genetics of one wolf. SCI/NRA Br. at 37–42. The

ESA requires the Service to analyze threats at the species or DPS level. 16 U.S.C.

§ 1532(16). Appellees and the district court would have the Service shift focus to

one wolf over the rest of the species. However, the ESA does not require the

Service to keep a species listed to protect one animal's genetics; it only requires

the Service to consider if a species is not a threatened species or endangered

species. 16 U.S.C. § 1533(a)(1). The Delisting Rule and supporting biological

report fully analyzed potential threats to wolf populations due to genetic issues and

acknowledged the genetics of this one wolf (and a second admixed wolf in the

delisted Northern Rocky Mountains).  *E.g.*, 3-ER-310; 3-ER-381; 3-ER-403; 3-ER-427.  Based on this analysis, the Service reasonably concluded that, despite this one wolf, listed West Coast wolves are not genetically distinct from the non-listed Northern Rocky Mountains wolves and are not a threatened or endangered species due to genetics.  Thus, the Service fulfilled its obligations under the ESA.[10]  This Court should correct the district court's error and reject any effort to extend the ESA's requirements beyond those that Congress intended.

### D. The district court should be reversed because the Delisting Rule sufficiently evaluated the adequacy of post-delisting federal regulatory mechanisms.

This Court should reject Appellees' arguments and reverse the district court's holding, which would raise the bar for assessing if a species is threatened or endangered "because of … the inadequacy of existing regulatory mechanisms."  16 U.S.C. § 1533(a)(1)(D); *see* Appellees Br. at 51–54.  The district court held that the Delisting Rule failed to explain how land management plans on federal lands "will ***ensure*** a sustainable wolf population post-delisting."  1-ER-26 (quoting 3-ER-368).  But the ESA does not require post-delisting regulatory mechanisms to "ensure" anything.

Rather, the correct question for the Court is "whether the existing regulatory mechanisms are so inadequate that they represent a threat to the [species] and, …

---

[10] This analysis applies as well to Appellees' arguments on page 38 of their brief.

lead [the Service] to a conclusion that the species is threatened or endangered."
*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 402 F. Supp. 2d 1198,
1209 (D. Or. 2005), *aff'd in part, rev'd in part on other grounds*, 274 F. App'x 542
(9th Cir. 2008); *Rocky Mount. Wild v. Walsh*, 216 F. Supp. 3d 1234, 1247 (D.
Colo. 2016); *see also Humane Soc'y*, 865 F.3d at 610–11 (holding that "the
Service adequately explained why Minnesota's new depredation scheme was
unlikely to threaten the wolves' survival"). This Court should rein in this
attempted overreach and affirm the Delisting Rule's conclusion that regulatory
mechanisms on federal lands do not threaten gray wolves.

The district court also erred by demanding too much of federal land
management plans. SCI and NRA's discussion of regulatory mechanisms in the
district court repeatedly described state plans and laws as the baseline for wolf and
wildlife management. No. 21-CV-344, ECF 111, at 17–28 (N.D. Cal. Aug. 27,
2021). States are the primary managers of wildlife within their borders as a matter
of settled law, including on federal lands. *E.g.*, *Kleppe v. New Mexico*, 426 U.S.
529, 545 (1976).[11] The Delisting Rule acknowledged this legal reality and
deferred to it. *E.g.*, 3-ER-351. For example, the Delisting Rule acknowledged that
Oregon delisted the gray wolf from the state list of endangered species, but found

---

[11] Appellees object that the primacy of state wildlife management is a "new
theory." Appellees Br. at 54. This is untrue, as shown in SCI and NRA's prior
briefing. This is also a legal question, not a fact issue that might be foreclosed.

other regulatory protections, including the state wolf management plan, did not threaten wolves and would sufficiently guide their management across the state. *E.g.*, 3-ER-333; 3-ER-360; *see also* 3-ER-361–63 (discussing Washington and California laws, which the Service found did not threaten wolves); 3-ER-364 (discussing Utah law with same finding). For all these reasons, this Court should uphold the Delisting Rule's determination with respect to the adequacy of federal regulatory mechanisms.

## CONCLUSION

SCI and NRA request that the Court reverse the district court's ruling and remand with instructions to reinstate the Delisting Rule.

DATED this 11th day of April 2025.

Respectfully submitted,

/s/ Jeremy E. Clare
Jeremy E. Clare
Regina Lennox
Safari Club International
501 2nd Street N.E.
Washington, D.C. 20002
202-543-8733
jclare@safariclub.org
rlennox@safariclub.org
*Attorneys for Intervenor-Defendant-Appellant Safari Club International*

/s/ Erin M. Erhardt
Erin M. Erhardt

National Rifle Association of America
11250 Waples Mill Road
Fairfax, Virginia 22030
703-267-1161
eerhardt@nrahq.org
*Attorney for Intervenor-Defendant-Appellant the National Rifle Association of America*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):**  22-15529, 22-15532, 22-15534, 22-15535, 22-15536, 22-15537, 22-15626, 22-15627, 22-15628

I am the attorney or self-represented party.

**This brief contains** | 6,697 | **words,** including | 0 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   ☐ it is a joint brief submitted by separately represented parties.
   ☐ a party or parties are filing a single brief in response to multiple briefs.
   ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ *Jeremy Clare* | **Date** | April 11, 2025
*(use "*s/[typed name]*" to sign electronically-filed documents)*

---

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court

for the United States Court of Appeals for the Ninth Circuit by using the appellate

CM/ECF system on April 11, 2025.

Respectfully submitted,

/s/ Jeremy E. Clare
Jeremy E. Clare
*Attorney for Intervenor-Defendant-*
*Appellant Safari Club International*