Nos. 22-15529, 22-15532, 22-15534, 22-15535, 22-15536,
22-15537, 22-15626, 22-15627, 22-15628

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

DEFENDERS OF WILDLIFE, ET AL.,
*Plaintiffs-Appellees*,

vs.

UNITED STATES FISH & WILDLIFE SERVICE, ET AL.,
*Defendants-Appellants,*

STATE OF UTAH, ET AL.,
*Intervenor-Appellants.*

On Appeal from the United States District Court, Northern District of
California, Oakland Division, Nos. 4:21-cv-344, 4:21-cv-349, 4:21-cv-561
(Hon. Jeffrey S. White)

## REPLY BRIEF OF INTERVENOR-APPELLANTS
## AMERICAN FARM BUREAU FEDERATION, NATIONAL
## CATTLEMEN'S BEEF ASSOCIATION, PUBLIC LANDS COUNCIL,
## AND AMERICAN SHEEP INDUSTRY ASSOCIATION

Lawson E. Fite
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Avenue, Suite 1900
Portland, OR 97204
Telephone: 503-222-9981
Facsimile: 503-796-2900

*Attorneys for Intervenor-Appellants American Farm Bureau Federation,
National Cattlemen's Beef Association, Public Lands Council, and
American Sheep Industry Association*

# <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ............................. 1

II.  ARGUMENT ................................................................................. 1

    A.   The Service adequately evaluated the status of wolves outside core population areas. .................................................................................... 1

    B.   The Service appropriately dealt with effects of lost historic range. ..... 9

    C.   The SPR Analysis Was Sufficient. ...................................................... 11

    D.   The Service adequately considered the status of West Coast wolves. 15

    E.   The agency's evaluation of federal regulatory mechanisms was not arbitrary. ............................................................................................... 16

III. CONCLUSION ............................................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Center for Biological Diversity v. Norton*,
411 F. Supp. 2d 1271 (D.N.M. 2005) ........................................................ 4

*Center for Biological Diversity v. Zinke*,
900 F.3d 1053 (9th Cir. 2018) ............................................................ 9, 11

*Defenders of Wildlife v. U.S. Fish & Wildlife Serv.*,
584 F. Supp. 3d 812 (N.D. Cal. 2022) ............................................... 12, 16

*Defs. of Wildlife v. Jewell*,
176 F. Supp. 3d 975 (D. Mont. 2016) ...................................................... 2

*Humane Soc'y of U.S. v. Zinke*,
865 F.3d 585 (D.C. Cir. 2017) ............................................................ 2, 4

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........................................................................... 8, 13

*National Wildlife Fed'n v. Norton*,
386 F. Supp. 2d 553 (D. Vt. 2005) ........................................................... 4

*Salisbury v. City of Santa Monica*,
998 F.3d 852 (9th Cir. 2021) ................................................................ 13

*Sharp v. Weston*,
233 F.3d 1166 (9th Cir. 2000) .............................................................. 14

*Shinseki v. Sanders*,
556 U.S. 396 (2009) ............................................................................ 15

*The Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) (en banc) ................................................ 8, 9

*Trim v. Reward Zone USA LLC*,
76 F.4th 1157 (9th Cir. 2023) ............................................................... 13

*United States v. Guthrie*,
50 F.3d 936 (11th Cir. 1995) .................................................................. 2

*WildEarth Guardians v. WildEarth Guardians v. Salazar*,
No. 10-CV-0002-WPJ/SMV, 2014 WL 10209231 (D.N.M. July 30,
2014) .................................................................................................... 17

**Statutes**

Administrative Procedure Act.................................................................................... 1, 8

    5 U.S.C. § 706 ......................................................................................................... 15

Endangered Species Act................................................................................................. 1

    16 U.S.C. § 1531(b).................................................................................................. 2

    16 U.S.C. § 1532(16)........................................................................................... 2, 14

    16 U.S.C. § 1533(a)(1).............................................................................................. 2

    16 U.S.C. § 1533(a)(3).............................................................................................. 3

    16 U.S.C. § 1533(b)(1)(A)....................................................................................... 3

    16 U.S.C. § 1533(b)(3)(A)..................................................................................... 16

    16 U.S.C. § 1533(b)(3)(C)(ii)................................................................................ 16

    16 U.S.C. § 1533(b)(6)(A)..................................................................................... 16

    16 U.S.C. § 1533(c)(2)............................................................................................. 3

    16 U.S.C. § 1533(f).................................................................................................. 3

    16 U.S.C. § 1533(g)(1)............................................................................................. 3

    16 U.S.C. § 1539(a)(2)(A)....................................................................................... 3

    87 Stat. 885, 886 (1973) ........................................................................................ 13

16 U.S.C. § 1604(g)(3)(B) .......................................................................................... 17

28 U.S.C. § 2111 .......................................................................................................... 15

**Other Authorities**

82 Fed. Reg. 30,502 (June 30, 2017) .......................................................................... 14

84 Fed. Reg. 52,598 (Oct. 2, 2019)............................................................................. 14

85 Fed. Reg. 69,778 (Nov. 3, 2020)................................. 1, 5, 6, 7, 9, 10, 11, 12, 16, 17

Black's Law Dictionary, *Significant* (12th ed. 2024) ................................................ 12

Black's Law Dictionary, *Species* (12th ed. 2024)........................................................ 2

# GLOSSARY

**APA**     Administrative Procedure Act

**DPS**     Distinct Population Segment

**ESA**     Endangered Species Act

**FWS**     United States Fish & Wildlife Service

**SPR**     Significant Portion of the Range

# I.    INTRODUCTION AND SUMMARY OF ARGUMENT

The gravamen of this appeal is the meaning of "recovery" under the Endangered Species Act. The Fish & Wildlife Service ("FWS" or "Service") found that gray wolves in the lower 48 states exist in two robust populations which have exceeded recovery goals. The species continues to exceed planning expectations and to expand its range. These developments should be cause for celebration.

For the district court and the Plaintiff-Appellees Defenders of Wildlife et al. ("Defenders"), however, the return of robust wolf populations is not enough. The Answering Brief disclaims the idea that wolves must be found to return to their entire historic range, but wants an unspecified "more than" real recovery. Neither the ESA nor the Administrative Procedure Act require such steps. This Court should reverse the district court and reinstate the 2020 De-Listing Rule.

# II.    ARGUMENT

## A.    The Service adequately evaluated the status of wolves outside core population areas.

Defenders first claim that the Service improperly discounted the importance of wolves outside the Great Lakes and Northern Rockies. Answering Br. 14. They claim that the Service improperly "focused" only on these populations. Answering Br. 15. Thus, Defenders argue that the Service has improperly attempted to "leverage wolf population growth in limited regions to delist vast areas…." Answering Br. 20. They further claim that the Service employed a "wolves in some

areas are enough for all areas" approach that courts have rejected. Answering Br. 19.

But the ESA does not permit listing of areas or ecosystems. It directs the Service to "determine whether any species is an endangered species or a threatened species…." 16 U.S.C. § 1533(a)(1). A species "includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). Although this definition uses the word "includes," it is not so expansive as to turn areas into species. The plain meaning of "species" is "a taxonomic class of organisms uniquely distinguished from other classes by shared characteristics and usu[ally] by an inability to interbreed with members of other classes." Black's Law Dictionary, *Species* (12th ed. 2024). It is no surprise that courts treat "species" as an issue of "taxonomic status," *United States v. Guthrie*, 50 F.3d 936, 945 (11th Cir. 1995), or of "organismal classifications," *Defs. of Wildlife v. Jewell*, 176 F. Supp. 3d 975, 1011 (D. Mont. 2016); *cf. Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 598 (D.C. Cir. 2017) (referring to "taxonomic species," quoted by Answering Brief 4).

True, one of the of the purposes of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved…." 16 U.S.C. § 1531(b). Here, the means at issue is the section 4

listing and de-listing process. Other means throughout the statute include designation of critical habitat, 16 U.S.C. § 1533(a)(3), recovery planning, 16 U.S.C. § 1533(f), and habitat conservation plans, 16 U.S.C. § 1539(a)(2)(A). Congress started with a purpose and enacted specific means for the Service to administer. For a listing determination, that means a determination whether a species is an endangered or threatened species is limited to the five listing factors and to be based "solely on the basis of the best scientific and commercial data available…." 16 U.S.C. § 1533(b)(1)(A). The statute directs that de-listings be conducted under the same procedures as listings. 16 U.S.C. § 1533(c)(2). The only additional procedure for de-listing is to monitor the status of de-listed species for five years after de-listing. 16 U.S.C. § 1533(g)(1).

The ESA lists species—not areas, and not individuals. Therefore, the Service's task here was to evaluate the collective status of extant gray wolves in the lower 48 states and reach a conclusion about that entity's danger of extinction. The Service conducted this task faithfully and well. In practice, this meant evaluating the robustness of core populations or meta-populations of wolves and giving due account to individuals outside those populations. It does not mean, as Defenders claim, that the Service "left smaller populations in great peril." Answering Br. 3. Those smaller populations, in areas such as western Oregon, Nevada, and California, are the result of wolves colonizing or re-colonizing new

territory. They are clear and convincing evidence of recovery as the species expands its range. Defenders' argument inverts the policies of the ESA; it uses recovery as a cudgel to maintain regulation over areas being repopulated by wolves. The Court should focus on the species or other listable entities, just as the Service appropriately did.

Relying on the *Vermont Wolves* decision in *National Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005), Defenders argue that the Service "bypassed" application of the ESA to "non-core population areas." Answering Br. 19 (quoting *Norton*, 386 F. Supp. 2d at 565). As discussed below and in the Agricultural Groups' Opening Brief, this misreads the record. It also misreads the requirements of the ESA. *Vermont Wolves*, which is of course not binding here, has been criticized forcing the Service protect "areas of land where the gray wolf once roamed and, in effect, … restore the wolf to all of its historical range…." *Center for Biological Diversity v. Norton*, 411 F. Supp. 2d 1271, 1282 (D.N.M. 2005), *vacated pursuant to settlement*, 2007 WL 6477262 (D.N.M. July 2, 2007).

*Vermont Wolves* and *Humane Society* are further inapposite because they deal with de-listings of portions of species, rather than the full-species evaluation the Service conducted here. It serves Defenders' purposes to attempt to contort this case to fit those precedents, but there is no fit. Rather, there is the argument that de-listing can only be achieved if the species is recovering everywhere it may have

existed at some point in time. *See* Answering Br. 15 (criticizing a "focus" on "limited places where the species is making recovery process"). The record shows that the species is recovering and expanding everywhere it exists and that it has reached carrying capacity in some places. That is recovery by any definition.

The Service expressly reviewed the status of all wolves in the lower 48 states. *See* 85 Fed. Reg. 69,778, 69,893 (Nov. 3, 2020) [3-ER-419]. The Service extensively evaluated the status of wolves outside core populations, including detailed examination of human-caused wolf mortality in Oregon, 85 Fed. Reg. at 69,807 [3-ER-333], and Washington, *id.* at 69,808 [3-ER-334], and the ultimate conclusion that "[w]e also do not expect to see significant increases in human-caused mortality in the West Coast States primarily because those States have regulatory mechanisms in place that balance wolf management and wolf conservation." *Id.* at 69,812 [3-ER-338]. The Service reached the same conclusion regarding the southern Rocky Mountains. *Id.*

Defenders take issue with the Service's alleged "dismissal" of wolves outside the Northern Rocky Mountains and Great Lakes regions, claiming the Service found threats to those wolves "not meaningful." Answering Br. 16 (quoting 3-ER-418). Defenders conflate two separate analyses. In analyzing wolves across the lower 48, for example, the Service noted that "State wolf-management plans for Washington, Oregon, and California do not yet include

population management goals" but "these plans include recovery objectives intended to ensure the reestablishment of self-sustaining populations in these States." 85 Fed. Reg. at 69,891 [3-ER-417]. The Service therefore "expect[ed] Washington, Oregon, and California will manage wolves through appropriate laws and regulations to ensure that the recovery objectives outlined in their respective wolf management plans are achieved." *Id.* This is not dismissing or failing to evaluate West Coast wolves.

The language Defenders quotes about "not meaningful" wolves is not in the Service's analysis of lower 48 wolves as a whole, particularly where the Service considered whether those wolves are endangered or threatened in a significant portion of their range ("SPR"). 85 Fed. Reg. at 69,892 [3-ER-418.] There, the Service evaluated whether threats to areas containing lone dispersing wolves or relatively few wolves would constitute threats to a significant portion of the range. The Service concluded no because these populations contain few wolves or few or no breeding pairs. It needed to determine whether these wolves were significant for purposes of the SPR analysis, and nothing more. This is far from the blinkered approach that Defenders allege occurred.

Notably, Defenders misstate the geographic scope of peripheral areas; the Service was clear that these areas are limited to portions of states and regions. *Id.* (citing central Rocky Mountains, western Washington, western Oregon, northern

California); compare Answering Br. 18, referring to entirety of Washington, Oregon, and California. The Service recognized the positive trend of expansion of the NRM population "into unoccupied suitable habitat in the Western United States is on going and *is likely to continue post-delisting*, which will increase wolf abundance and distribution in the United States." 85 Fed. Reg. at 69,891 [3-ER-417.] The Service found that this expansion will "further increasing the resiliency and redundancy of the lower 48 United States entity in the future." *Id.* at 69,890 [3-ER-416.] The statements are supported by the Service's analysis of threats in those unoccupied areas as well as its conclusions that maintenance of the recovered NRM population is likely to continue, providing ample opportunities for wolves to continue to expand their range. *Id.*

Defenders do not appear to dispute the fact that expansion will continue, but urge this Court to conclude that is a net negative, rather than the Service's logical conclusion that expansion will further increase resiliency and redundancy. Substantial scientific evidence shows that "[t]he ability to disperse long distances allows wolf populations to quickly expand and recolonize vacant habitats as long as rates of human-caused mortality are sustainable." [3-ER-429, Gray Wolf Biological Report.] The ongoing and future expansion of the range of the gray wolf is a strong indicator that rates of human-caused mortality are sustainable and that the population of wolves are robust. In sum, the Service fully considered

dispersing wolves, but Defenders simply dispute their conclusions. This type of biological analysis is at the core of deference to agency expertise under the Administrative Procedure Act. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) (recognizing that the APA "*does* mandate that judicial review of agency policymaking and factfinding be deferential").

Defenders also fault the Service for failing to recognize that every different population of wolves "were protected as members of the entire listed species." Answering Br. 19. This puts the cart before the horse. No one disagrees that these wolves were listed and subject to the legal protections of the ESA. The question the Service was required to answer is an objective inquiry into whether wolves are in fact an endangered or threatened species. A Section 4 listing determination is different in kind from a Section 7 jeopardy analysis; there is no obligation to analyze the *effect* of de-listing in the same way as analyzing, for example, construction of a dam.

Defenders assert that there are other options for the Service to deal with wolf recovery besides a de-listing rule. Answering Br. 21. Perhaps such options are available, but Defenders' argument relies on material that is not properly in the record before this Court. Nor does Defenders' policy preference carry the day. That the Service could have made a different choice does not make its action arbitrary and capricious. *The Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir.

2008) (en banc).

**B.     The Service appropriately dealt with effects of lost historic range.**

The current range of the gray wolf is smaller than it was before European settlement of North America. [3-ER-432.] Defenders assert that the Service did not evaluate if the loss of historic range was "so substantial that it undermined the viability of gray wolves today." Answering Br. 22. The Service conducted just that analysis. "Changes resulting from range contraction for the lower 48 United States," the Service found, "have increased the vulnerability of the lower 48 United States entity to threats such as reduced genetic diversity and restricted gene flow (reduced representation), catastrophic events (reduced redundancy), or stochastic disturbances (reduced resiliency), such as annual environmental fluctuations (prey availability, pockets of disease outbreaks) and anthropogenic stressors." 85 Fed. Reg. at 69,890 [3-ER-416.] The Service went on to explain how each of those threats, despite increased vulnerability, were not significant enough to find the lower 48 states' wolves warranted listing. *Id.* That is all that was required both by the ESA and this Court's precedent. *Center for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018).

Defenders criticize the record citations presented by the Service, starting with recapitulation of one of the peer reviews of the draft de-listing rule. Answering Br. 22. The Service responded in detail to peer review comments on

human-caused mortality. 85 Fed. Reg. at 69,846–50 [3-ER-372–76.] It also considered additional context in the record on the historic decline of wolves. "As a result of poisoning unregulated trapping and shooting, and the public funding of wolf extermination efforts, gray wolf populations were essentially eliminated from the western United States by the 1930s." [3-ER-432–33; *see also* 85 Fed. Reg. at 69,788, 3-ER-314.] Nothing the Service has stated is inconsistent with the historical record.

Defenders claim that the Service failed to respond to peer review comments on historic range, but again their arguments are belied by the record. The Service responded to these peer review comments. It clarified that "we assess threats to the species in its current range, including the effects of lost historical range on the species…. We also consider whether the threats that caused the loss of historical range are still affecting the species within its current range." 85 Fed. Reg. at 69,853 [3-ER-379.] And while Defenders claim that the Service confused two issues around range, any confusion was shared by the peer review on which Defenders rely. One reviewer pressed the Service to "substantively consider significance and effects of historic range loss in a manner which is not duplicative to assessing whether a species is at risk throughout its range." [2-SER-211.] As the Service explained in the Final Rule, such an analysis may be inconsistent with the mandates of section 4, particularly now that it is established that "range" means the

current range of the species. Defenders fail to show that the Service's consideration of past range was insufficient.

Indeed, it makes little sense to require analysis of historic range except as it relates to the current and future status of the species. Defenders characterize the Service's approach as refusing to assess threats in areas where there are no wolves. Answering Br. 24. This is wrong. The Service examined unoccupied potential habitat and weighed whether it would continue to be suitable for wolves. Requiring any more than that would substitute range and area for the actual status of the species. What matters under the ESA is where a species is and how it can be recovered. The Court should clarify its *Zinke* decision to emphasize that historic factors and historic range should be considered to the extent that they *presently* affect species.

## C. The SPR Analysis Was Sufficient.

The Service defined "significant" for purposes of the Rule to be "whether any portions of the range may be biologically meaningful in terms of the resiliency, redundancy, or representation of the entity being evaluated." *Id.* at 69,878 [3-ER-404.] Defenders claim this definition was inadequate because there is "nothing to adequately ground 'meaningful'" and because using any definition of significant "is no definition at all." Answering Br. 26. Both these contentions fail scrutiny.

The Service did not just ask whether an area is meaningful—it asked whether the area is biologically meaningful to specific factors. This is explained further in application. Isolated or peripheral wolves, the Service concluded, "do not contribute to the overall demographic or genetic diversity of the lower 48 United States entity, and they lack genetic uniqueness relative to other wolves in the entity." 85 Fed. Reg. at 69,892 [3-ER-418.] The Service further explained how lone dispersing wolves are not contributing to resiliency, redundancy, or representation of gray wolf populations. *Id.* Since these wolves did not contribute (at all) to the factors, they could not be biologically meaningful.

Defenders claim this approach was a cop-out, because the Service needed to provide a "metric" for measuring significance. Answering Br. 30. But what the Service essentially did was to apply the plain meaning of significant—which is "[o]f special importance." Black's Law Dictionary, *Significant* (12th ed. 2024). As Defenders points out at length, the Service's attempts to fashion a workable SPR policy have largely failed. Answering Br. 26–28. That doesn't mean the Service failed to do an SPR analysis. It simply took the most conservative approach and found that under *any* reasonable definition there was no significance.

The district court faulted the Service for failing to establish an "objective" or quantitative threshold for significant. *Defenders of Wildlife v. U.S. Fish & Wildlife Serv.*, 584 F. Supp. 3d 812, 828 (N.D. Cal. 2022) [1-ER-20.] Notably, Defenders

do not defend the district court's holding, conceding that a quantitative approach is not required. Answering Br. 32. As they should. It is easy to imagine situations where a "significant" portion of a range either falls well above or below a certain quantitative threshold. A part of a range could be significant if it represents the majority of a species in a particular area, or 75% of the geographic range could be insignificant if it is used only for dispersal rather than essential life functions. Thus, any reading of significant should permit flexibility to evaluate each species on the available data—as the ESA requires.

After *Loper Bright*, it is clear that this Court has the opportunity to reach the "best" reading of "significant portion of the range" if it so desires. *Loper Bright*, 603 U.S. at 400. Doing so would use the traditional tools of statutory construction, starting with the text. *Salisbury v. City of Santa Monica*, 998 F.3d 852, 858 (9th Cir. 2021). This Court interprets statutes consistent with their ordinary meaning at the time of enactment. *Trim v. Reward Zone USA LLC*, 76 F.4th 1157, 1161 (9th Cir. 2023). The relevant language dates to the initial enactment of the ESA. 87 Stat. 885, 886 (1973). There is little difference in meaning between then and now.

The structure of the definition of threatened and endangered species may shed light as well; both refer to species in "all or a significant portion" of the range. In ordinary usage, that treats "significant portion" as a near-synonym or functional equivalent of "all." Thus a significant portion should be closer to all than none,

particularly given the later inclusion of "distinct population segments" as part of the definition of species in section 1532(16). This is consistent with how courts interpret a "significant change in facts or law" that justifies dissolving a consent decree. *See*, *e.g.*, *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000). Applying this to the ESA, a significant portion of the range is a portion where the same conservation benefit could be established without finding endangerment throughout the range.

Defenders attempt to flyspeck the Service's application of significance here. Answering Br. 34–43. These arguments fail. Where Defenders argue that removal of certain areas would decrease the physical range of the species, they return to the idea that areas rather than species are listed. Defenders attempt to show the Service's analysis was inconsistent with prior practice, but in doing so cite to the *DPS Policy*. Answering Br. 41. They also cite to determinations for a *DPS* of woodland caribou and grizzly bear, which use the DPS Policy's wildly different and unique definition of "significant." *See* 84 Fed. Reg. 52,598, 52,603 (Oct. 2, 2019) (explaining significance in DPS context); 82 Fed. Reg. 30,502, 30,517 (June 30, 2017) (same). No one contends that the definition of "significance" in the DPS Policy controls whether an area is a significant portion of the range.

Conflating SPR and DPS may make for easier rulemakings, but it was unlikely the goal of Congress in enacting the latter provision. Harmonizing the two

is difficult but the plain language shows that the DPS provision adds more flexibility by allowing the Service to list just the smaller population. The SPR language requires listing of the *entire* species. Defenders' argument comes down to the contention that threats to small groups of dispersing wolves require continued listing and regulation of core populations. That is not consistent with the ESA's text or structure.

**D.    The Service adequately considered the status of West Coast wolves.**

Defenders allege that the Service improperly ignored distinctions between West Coast and NRM wolves. Answering Br. 43. For reasons discussed in the Agricultural Groups' opening brief, the Service's conclusion was reasonable and entitled to deference. Additionally, the issue whether these wolves are discrete from Northern Rockies wolves is not properly before the Court.

The discreteness of West Coast wolves is not relevant to the question of whether the larger entities (particularly the lower 48 wolves) are threatened or endangered. West Coast wolves are subsumed into that analysis. Rather, discreteness is only relevant to whether West Coast wolves are a distinct population segment. Thus, with regard to the de-listing of wolves, any error on discreteness is harmless and should be disregarded. *See* 5 U.S.C. § 706; 28 U.S.C. § 2111; *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009) (error is harmless if it does not affect a party's substantial rights).

In the same Federal Register Notice that included the Final De-Listing Rule, the Service made findings on petitions to list a West Coast DPS of wolves as threatened. 85 Fed. Reg. at 69,879 [3-ER-405.] The Service denied the petition, stating that it did not provide substantial scientific or commercial information indicating that West Coast Wolves may qualify as a DPS. *Id.* A petition finding is a separate action from a listing or de-listing rule, as it is provided for by 16 U.S.C. § 1533(b)(3)(A) while final listing determinations are provided for by 16 U.S.C. § 1533(b)(6)(A). Any negative petition finding is subject to judicial review. 16 U.S.C. § 1533(b)(3)(C)(ii).

Two of the plaintiffs below sought judicial review of the petition denial. The district court denied their motion for summary judgment. 584 F. Supp. 3d at 833 [1-ER-28.] No plaintiff below filed a cross-appeal in any of these consolidated cases. Accordingly, the issue of discreteness is not before the Court.

### E. The agency's evaluation of federal regulatory mechanisms was not arbitrary.

Defenders assert that the district court's invalidation of the Service's analysis of federal regulatory mechanisms was appropriate. Like the district court, Defenders contend that wolf-specific standards and guidelines in Forest Plans are necessary to ensure adequate management. Answering Br. 53–54. Defenders ignore the nub of the Service's finding, which is that federal landholdings by their existence "are largely unavailable and/or unsuitable for intensive development and

contain abundant ungulate populations." 85 Fed. Reg. at 69,842 [3-ER-368.] That these lands exist is sufficient given the resilience and easy dispersal of wolf populations. Since those lands are also managed under statutory frameworks, the Service explained that "conservation objectives for the gray wolf and its habitat would continue to be addressed during planning and implementation of projects." *Id.*

Defenders also discount the finding that Forest Service Region 6 and the BLM *will* both designate wolves as sensitive species and/or species of conservation concern. While the Service noted that Forest Service Region 5 may designate wolves as sensitive species, it is important to note that only two of the listed land management units are within Region 5: the Lassen and Plumas National Forests. *Id.* The vast majority of federal lands with wolves will have such a designation. In *WildEarth Guardians v. WildEarth Guardians v. Salazar*, No. 10-CV-0002-WPJ/SMV, 2014 WL 10209231, at *5 (D.N.M. July 30, 2014), the court upheld a decision not to list a species on the basis of a sensitive species designation. The court noted that the National Forest Management Act requires the agency to "provide for diversity of plant and animal communities" and that courts have found special obligations under the statute for sensitive species. *Id.* (citing 16 U.S.C. § 1604(g)(3)(B) and *Ecology Center v. U.S. Forest Serv.*, 451 F.3d 1183, 1186 (10th Cir. 2006)). Defenders did not meet their burden to show that the Service's

analysis was arbitrary and capricious.

## III. CONCLUSION

The judgment of the district court should be reversed.

DATED this 18th day of April, 2025.

Respectfully submitted,

SCHWABE, WILLIAMSON & WYATT, P.C.

By:    *s/ Lawson E. Fite*
       Lawson E. Fite
       Email: lfite@schwabe.com

       *Attorneys for Intervenor-Appellants*
       *American Farm Bureau Federation,*
       *National Cattlemen's Beef*
       *Association, Public Lands Council,*
       *and American Sheep Industry*
       *Association*

Of counsel:
 Ellen Steen
 Travis Cushman
 AMERICAN FARM BUREAU
 FEDERATION
 Ste. 1000W
 600 Maryland Ave. S.W.
 Washington, D.C. 20024

Mary-Thomas Hart
NATIONAL CATTLEMEN'S BEEF
ASSOCIATION
1275 Pennsylvania Ave. N.W.
Suite 801
Washington, D.C. 20004

# CERTIFICATE OF COMPLIANCE

Ninth Cir. Case Number(s):  Nos. 22-15529, 22-15532, 22-15534, 22-15535, 22-15536, 22-15537, 22-15626, 22-15627, 22-156289.

This brief contains **4,056** words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f).  The brief's type size and typeface comply with FRAP 32(a)(5) and (6). I certify that this brief complies with the word limit of Cir. R. 32-1.

DATED this 18th day of April, 2025.

*s/ Lawson E. Fite*
Lawson E. Fite